# EXHIBIT "9"

# DEPOSITION OF THOMAS FOSTER LEONARD

## July 20, 2005

## Pages 1 through 115

## CONDENSED TRANSCRIPT AND CONCORDANCE
## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

**Page 1**

```
 1          IN THE CIRCUIT COURT FOR
 2          BARBOUR COUNTY, ALABAMA
 3             CLAYTON DIVISION
 4  JOE HUGHES and FAYE HUGHES,
 5       Plaintiffs,
 6    vs.              CIVIL ACTION NO.
                          CV-04-106
 7
    GLOBAL GROUP, INC. d/b/a
 8  GLOBAL DEVELOPMENT, et al.,
 9       Defendants.
10  * * * * * * * * * * * * * * * * * *
11      IN THE CIRCUIT COURT FOR
12       BARBOUR COUNTY, ALABAMA
13          CLAYTON DIVISION
14  TOM GASSETT and PHYLLIS GASSETT,
15       Plaintiffs,
16    vs.              CIVIL ACTION NO.
                          CV-04-107
17
    GLOBAL GROUP, INC. d/b/a
18  GLOBAL DEVELOPMENT, et al.,
19       Defendants.
20  * * * * * * * * * * * * * * * * * *
21     DEPOSITION OF THOMAS FOSTER LEONARD
22  * * * * * * * * * * * * * * * * * *
23
```

**Page 2**

```
 1        DEPOSITION OF THOMAS FOSTER LEONARD, taken
 2  pursuant to stipulation and agreement before Lyn
 3  Daugherty, Certified Shorthand Reporter and
 4  Commissioner for the State of Alabama at Large, in
 5  the Law Offices of Cobb, Shealy, Crum & Derrick,
 6  206 North Lena Street, Dothan, Alabama, on
 7  Wednesday, July 20th, 2005, commencing at
 8  approximately 9:15 a.m.
 9
         * * * * * * * * * * * * * *
10
11          APPEARANCES
12  FOR THE PLAINTIFFS:
13  L. Shane Seaborn, Esquire
    PENN & SEABORN
14  Attorneys at Law
    5 Court Square
15  P.O. Box 688
    Clayton, Alabama 36016
16
    Lynn W. Jinks, III, Esquire
17  JINKS, DANIEL & CROW
    Attorneys at Law
18  219 North Prairie Street
    P.O. Box 350
19  Union Springs, Alabama 36089
20  FOR THE DEFENDANT LEONARD:
21  Leon A. Boyd, V, Esquire
    COBB, SHEALY, CRUM & DERRICK
22  Attorneys at Law
    P.O. Box 6346
23  Dothan, Alabama 36302
```

**Page 3**

```
 1  FOR THE DEFENDANT IP1 SKYSCRAPER:
 2  Russell L. Irby, Esquire
    P.O. Box 910
 3  Eufaula, Alabama 36072
 4
         * * * * * * * * * * * *
 5
          EXAMINATION INDEX
 6
 7  BY MR. SEABORN . . . . . . . . . .  6
 8  BY MR. IRBY . . . . . . . . . .  97
 9  BY MR. SEABORN . . . . . . . . . .  111
10          EXHIBIT INDEX
11  Plaintiff
12   1   Agreement dated May 18, 2004          13
13   2   Agreement dated May 18, 2004 with     18
         handwritten notes
14
     3   Contractor agreement dated March 19,  21
15       2004
16   4   Budget for Gassett home               22
17   5   List of activity by project           26
18   6   Option to purchase                    42
19   7   Option to purchase                    44
20   8   Fax transmittal from Ramsey, Baxley & 44
         McDougle
21
     9   E-mail from Charles H. McDougle to Mark  45
22       Dennis dated April 28, 2004
23       (Index continued on next page)
```

**Page 4**

```
 1  10  Chevy Chase Mortgage ECOA & Patriot Act  46
        Disclosure
 2
 3  11  Letter from Jeff Jernigan To Whom It May  47
        Concern
 4  12  Option to purchase                       52
 5  13  Letter dated October 5, 2004 to Tom      52
        Leonard from Nancy S. Pitman
 6
 7  14  Composite exhibit of statements and      56
        invoices
 8  15  Agreement dated June 8, 2004             62
 9  16  Agreement dated March 5, 2004            63
10  17  Budget for Hughes home                   65
11  18  Activity by project                      69
12  19  Composite exhibit                        74
13  20  Composite exhibit of work orders,        82
        receipts and invoices
14
15  21  Composite exhibit of statements from     84
        Builders Lighting & Appliance
16
17
18       * * * * * * * * * * * *
19
20
21
22
23
```

1 (Pages 1 to 4)

Page 5

STIPULATIONS

1　It is hereby stipulated and agreed by and
2　between counsel representing the parties that the
3　deposition of THOMAS FOSTER LEONARD is taken
4　pursuant to the Alabama Rules of Civil Procedure
5　and that said deposition may be taken before Lyn
6　Daugherty, Certified Shorthand Reporter, and
7　Commissioner for the State of Alabama at Large,
8　without the formality of a commission, that
9　objections to questions other than objections as to
10　the form of the question need not be made at this
11　time but may be reserved for a ruling at such time
12　as the said deposition may be offered in evidence
13　or used for any other purpose by either party
14　provided for by the Statute.
15　It is further stipulated and agreed by and
16　between counsel representing the parties in this
17　case that the filing of said deposition is hereby
18　waived and may be introduced at the trial of this
19　case or used in any other manner by either party
20　hereto provided for by the Statute regardless of
21　the waiving of the filing of the same.
22　It is further stipulated and agreed by and

(Numbering restarted)

1　STIPULATIONS
2　It is hereby stipulated and agreed by and
3　between counsel representing the parties that the
4　deposition of THOMAS FOSTER LEONARD is taken
5　pursuant to the Alabama Rules of Civil Procedure
6　and that said deposition may be taken before Lyn
7　Daugherty, Certified Shorthand Reporter, and
8　Commissioner for the State of Alabama at Large,
9　without the formality of a commission, that
10　objections to questions other than objections as to
11　the form of the question need not be made at this
12　time but may be reserved for a ruling at such time
13　as the said deposition may be offered in evidence
14　or used for any other purpose by either party
15　provided for by the Statute.
16　It is further stipulated and agreed by and
17　between counsel representing the parties in this
18　case that the filing of said deposition is hereby
19　waived and may be introduced at the trial of this
20　case or used in any other manner by either party
21　hereto provided for by the Statute regardless of
22　the waiving of the filing of the same.
23　It is further stipulated and agreed by and

Page 6

1　between the parties hereto and the witness that the
2　signature of the witness to this deposition is
3　hereby waived.
4　* * * * * * * * * *
5　THOMAS FOSTER LEONARD
6　The witness, after having first been duly sworn
7　to speak the truth, the whole truth and nothing but
8　the truth testified as follows:
9　EXAMINATION
10　BY MR. SEABORN:
11　Q.　State your full name for the record,
12　please, sir.
13　A.　Thomas Foster Leonard.
14　Q.　Mr. Leonard, my name is Shane Seaborn. We
15　met a few minutes ago. I, along with Lynn
16　Jinks, represent Tom and Phyllis Cassett
17　and Joe and Fay Hughes in a lawsuit that's
18　been brought in Barbour County involving
19　the construction of two homes down here in
20　Houston County. I'm going to ask you a
21　series of questions here today about your
22　involvement in the construction and
23　financing of those homes. And if at any

Page 7

1　time I ask you a question you don't
2　understand, if you'll just let me know,
3　I'll be glad to rephrase it. Is that okay?
4　A.　That's fine.
5　Q.　And if you'll just answer out loud so the
6　court reporter can take down your
7　responses. And if you need a break at any
8　time, if you'll just let me know.
9　A.　Okay.
10　Q.　What is your home address, Mr. Leonard?
11　A.　707 North Pontiac.
12　Q.　Now, in these two separate lawsuits you've
13　been sued individually and also Wiregrass
14　Properties, Incorporated is a named
15　defendant. Do you own Wiregrass
16　Properties, Incorporated?
17　A.　I do.
18　Q.　Are you the sole owner of that business?
19　A.　Yes, I am.
20　Q.　Is Wynell Leonard -- is that your wife?
21　A.　Yes.
22　Q.　Other than Wiregrass Properties, LLC, do
23　you also own Wiregrass Home Builders?

Page 8

1　A.　I do.
2　Q.　Are you the sole owner of Wiregrass Home
3　Builders?
4　A.　I am.
5　Q.　Wiregrass Construction, are you the owner
6　of Wiregrass Construction?
7　A.　I am not.
8　Q.　Okay. Other than Wiregrass Properties and
9　Wiregrass Home Builders --
10　A.　Yes.
11　Q.　-- do you own any other businesses,
12　Mr. Leonard?
13　A.　Yes, I do.
14　Q.　Tell me what those businesses are.
15　A.　Well, I own Core Construction & Development
16　Corporation.
17　Q.　Are you the sole owner of that business?
18　A.　Yes, I am.
19　Q.　Is that based out of Dothan?
20　A.　Based in St. Cloud, Florida.
21　Q.　Briefly, if you will, Mr. Leonard, tell me
22　what --
23　A.　That's not all now.

10-28-2005  15:31  From-                                           T-499  P.005  F-172
Deposition of Thomas Foster Leonard

Page 9

1  Q.  Okay.  I apologize for cutting you --
2  A.  If that's enough, that's fine.
3  Q.  No, it's not.  I just want to know
4      generally what Core Construction &
5      Development does down in St. Cloud.
6  A.  It develops land basically.  It buys and
7      sells parcels of land.
8  Q.  What other businesses, Mr. Leonard, do you
9      own solely or with someone else?
10 A.  I own Tork Home Corporation.
11 Q.  Where is that based out of?
12 A.  Well, it's based out of Dothan.
13 Q.  And what does Tork Home Corporation do?
14 A.  It -- It's a corporation that runs up and
15     down as -- we build on the Gulf Coast,
16     too.  And we buy land and develop it there
17     and just according to -- right now it's not
18     doing anything.  We sold out of land.  But
19     it's still an active corporation.
20 Q.  Are you the sole owner of Tork?
21 A.  No.  I'm 51 percent owner of Tork.
22 Q.  Who is the other business owner of Tork?
23 A.  Sandy Yates.

Page 10

1  Q.  Mr. Leonard, where is Sandy Yates from?
2  A.  Tallahassee.
3  Q.  Other than the businesses that you've named
4      thus far, do you own any other businesses
5      or have an ownership interest?
6  A.  I have T & R -- T & R Construction, LLC.
7  Q.  Okay.  Where is that business based out of?
8  A.  It's based out of Dothan.
9  Q.  Are you the sole owner of that business?
10 A.  I'm 51 percent on that.
11 Q.  Who is your other business partner?
12 A.  Richard Yates.
13 Q.  Is he related to Sandy Yates?
14 A.  He's -- Husband.
15 Q.  Okay.  What other businesses, Mr. Leonard?
16 A.  I think that's all.  We have maybe some
17     corporations that's inactive.  Really it --
18     We'll plug in every once in a while for an
19     LLC to buy land with or something of that
20     nature.
21 Q.  Primarily, Mr. Leonard, all of your
22     business interests in the corporations and
23     LLCs that you've named, do they involve

Page 11

1      land development and construction of --
2  A.  Yes, they do.
3  Q.  -- commercial and residential developments?
4  A.  Yes, they do.
5  Q.  And as I understand it, the only partners
6      that you have are Sandy Yates and Richard
7      Yates?
8  A.  Yes.
9  Q.  And I'm assuming -- and that's why I want
10     to ask.  Do these different corporations
11     have various employees?
12 A.  Yes.  But most of the employees -- I have a
13     kindly unique situation whereas I pay like
14     the bills on all the corporations.  I pay like
15     Core's overhead and -- all under one roof.
16     And that's in Dothan.  And, you know, we
17     ship checks to various offices.
18         Oh, I own Timber Win Corporation.
19 Q.  Timber Win?
20 A.  Yeah.  In De Funiak Springs.
21 Q.  What do they do?
22 A.  They build houses.
23 Q.  As far as -- As I understand correctly,

Page 12

1      all these corporations are housed -- or
2      LLCs -- in one office building in Dothan?
3  A.  Right.
4  Q.  Do you have some full-time employees that
5      work for you at the place of business here
6      in Dothan?
7  A.  Yes.
8  Q.  How many employees do you have that work
9      here in Dothan?
10 A.  Oh, one, two, four, five, six.
11 Q.  And primarily what do they do, Mr. Leonard?
12 A.  Primarily they process and -- bills,
13     invoices, keep up with subdivisions.
14 Q.  Are they -- And I apologize for cutting you
15     off, but are they more or less in the
16     administrative positions?
17 A.  Yes.
18 Q.  Any builders or general managers that you
19     have that work for you here in Dothan?
20 A.  I have one basically builder, but he's --
21     he's employed.  He's not -- He's not an
22     outside builder.  He works for the company.
23 Q.  What's his name?

3 (Pages 9 to 12)

Page 13

```
1   A.  Josh Parish -- Paris.  I'm sorry.
2   Q.  And what corporation or LLC does he work up
3        under?
4   A.  I think he's paid by Wiregrass Properties.
5   Q.  Are you in any business partnership with a
6        gentleman by the name of James Tyson?
7   A.  No.  Now, I have financed some for James
8        Tyson.
9   Q.  Okay.  We'll talk about him later on.
10           (Plaintiff's Exhibit 1 was marked
11            for identification.)
12  Q.  I'm going to go ahead and show you,
13       Mr. Leonard, what I'm going to mark as
14       Plaintiff's Exhibit Number 1 to your
15       deposition.  And I'll represent to you all
16       the documents that I'm going to show you
17       today and mark are documents that were
18       produced by you -- by your lawyer to me
19       with the exception of some bank documents
20       that we'll talk about later.
21  A.  Okay.
22  Q.  I'm going to show you this document that
23       appears to be an agreement between you and
```

Page 14

```
1        Global Group, Incorporated and Jarrett
2        Palmer and ask you is that your signature
3        on the bottom of that document?
4   A.  It is.
5   Q.  And, Mr. Leonard, just so I'm clear, what
6        was your agreement with Global Group,
7        Incorporated and Jarrett Palmer in regard
8        to this agreement dated May 18th, 2004?
9   A.  This basically is a form agreement that I
10       have where if I joint venture with
11       anybody.  And I say a joint venture.  It's
12       probably a mini-type joint.  I don't loan
13       them the construction money as such and
14       say -- and give them -- you've got the
15       house so far, you've got $5,000 coming and
16       depend on -- for them to pay the bills.  I
17       pay all the bills.  And when the house is
18       through with -- Now, we have a lot of stop
19       measures throughout this whole thing.
20       First of all, they come in and do a budget
21       and -- we do the budget and they get
22       everything -- actually, it's either a spec
23       house or a sold house.  And they give me
```

Page 15

```
1        all the information and we have kindly a
2        guideline of -- but then we can -- that's
3        what the people in Dothan do is keep those
4        bills straight, pay the bills.  And when
5        it's over with, when the house is sold, we
6        divide profits 50/50.
7   Q.  Just so I understand correctly, like on
8        Plaintiff's Exhibit Number 1, which is an
9        agreement between you and Jarrett Palmer
10       and Global Group to provide financing on
11       the house which I'm going to refer to as
12       the Gassetts' home in Dothan, is my
13       understanding correct, Mr. Leonard, that
14       you're going to provide the financing for
15       this project and in return Mr. Palmer and
16       Global Group is going to provide the
17       services and skill and then once the
18       project is complete y'all are going to
19       split the profits 50/50?
20  A.  That's exactly right.  I act as -- just as
21       a bank.  The same thing with the bank.
22       With one exception.  I'm not going to give
23       that builder money for him to pay the bills
```

Page 16

```
1        with because a lot of times the bills are
2        not paid.
3   Q.  So as part of that agreement you will pay
4        the vendors yourself directly rather than
5        to the builder or to the vendor; is that
6        correct?
7   A.  Exactly right.
8   Q.  Prior to the date on this agreement, May
9        18th, 2004, did you have any verbal
10       agreements prior to that date with
11       Mr. Palmer on the Gassetts' house?
12  A.  I can't answer that.  I don't -- I'm sure
13       he come in and we talked about it, you
14       know.  And you have to have some type of
15       agreement to even get -- you know, when he
16       come in the door, I didn't grab a piece of
17       paper and says, hey, this is what we're
18       going to do.  Sure, we had to talk about
19       it.  But we might have talked about it for
20       three weeks.  I don't know.  I don't
21       remember.
22  Q.  Prior to entering into this agreement or
23       simultaneously, what other information --
```

4 (Pages 13 to 16)

Deposition of Thomas Foster Leonard                                          July 26, 2005

Page 17

```
 1        and you talked about guideline and some
 2        stop measures -- would you have to have or
 3        did you have before entering into this
 4        agreement with Mr. Palmer?
 5   A.   Well, first of all, I had to have some type
 6        of appraisal or I had to have a basically
 7        firm commitment.  In this case I think we
 8        had firm commitments.
 9   Q.   Tell me what you mean by firm commitment.
10   A.   Okay.  They've gone to the mortgage company
11        and the mortgage company basically has
12        said, your loan is approved, build a house
13        and we'll finance this amount of money on
14        it.
15   Q.   So basically you make sure that the money
16        is going to come on the back end before you
17        get out on a limb; is that right?
18   A.   Not necessarily.  See, I would finance a --
19        you know, I would do this and I have done
20        it a number of times.  In fact, a large
21        chunk of my business through the years has
22        been exactly this.  I've built subdivisions
23        in Tallahassee.  One -- The first
```

Page 18

```
 1        subdivision I built was like a hundred
 2        lots -- over a hundred lots.  Built 184
 3        lots.  Built 145 lots.  And, you know, it
 4        didn't matter whether it was sold or not
 5        sold basically, see.  And here probably in
 6        the absence of appraisal I wanted a firm
 7        commitment.  But if he would have come with
 8        an appraisal, I probably would have done
 9        the same thing.
10   Q.   On the agreement it states that after
11        expense profit will be divided 50/50
12        between the parties and that the loan and
13        interest would be paid back.  What interest
14        rate did you charge on this particular
15        financing?
16   A.   I'm charged prime.  I have a little bit
17        better, but I pass on -- and I don't
18        understand the lowboy -- what is the
19        interest?  The low bar.
20   Q.   Lie bar?
21   A.   Something.  I have -- They will pass that
22        on to a certain amount of money for me.
23            (Plaintiff's Exhibit 2 was marked
```

Page 19

```
 1        for identification.)
 2   Q.   I'm going to show you, Mr. Leonard, what
 3        I'm going to mark as Plaintiff's Exhibit
 4        Number 2.  It appears to be the exact same
 5        document except some writing at the top.
 6        Would that number be your file number or
 7        some number that administrative would keep
 8        in regard to this particular house for the
 9        Gassetts?
10   A.   It would be our job number.
11   Q.   Does that number have any significance?
12   A.   Well, it does to us paying bills and
13        keeping -- keeping stuff straight as far as
14        where the Sheetrock went, where the cement
15        went.  It's a big job to build houses and
16        really keep all the vending -- vendors'
17        bills straight.  It's enormous job to do
18        the purchasing and really to keep -- well,
19        you know, just like pouring concrete.
20        You're pouring two houses a day, let's say,
21        and you -- you get out there and one of
22        them is 04 and one of them is 01.  And they
23        don't care where they charge it.  They
```

Page 20

```
 1        charge it to 04.  You look at 04 and it's
 2        got $4,000 on it and 01 don't have anything
 3        on it.  And it's a constant battle if you
 4        don't have a program, if you don't have
 5        systems.  And these systems that we have
 6        has been derived over 30 years -- or more
 7        than 30 years.  That doesn't mean anything,
 8        but that's -- when we look at 01, that's a
 9        number that we can relate to.
10   Q.   Okay.  I understand.
11            Does the agreement, Plaintiff's Exhibit
12        Number 1 -- 2 being the same thing with
13        this job number on it -- does it constitute
14        the total agreement that you had between
15        yourself and Global Group and Jarrett
16        Palmer as it relates to this job, the
17        Gassett house?
18   A.   I don't understand your question on that
19        now.
20   Q.   Does the agreement on Plaintiff's Exhibit
21        Number 1 between you and Jarrett Palmer and
22        Global Group constitute the entire
23        agreement as it relates to him building the
```

5 (Pages 17 to 20)

| Page 21 |
|---|
| 1   house on Westbrook for the Gassetts? |
| 2   A.  I still don't -- Are you saying would I -- |
| 3   is this agreement in effect or did I have a |
| 4   side agreement? |
| 5   Q.  Yes, sir.  Is that the total -- |
| 6   A.  No. |
| 7   Q.  That's the total -- |
| 8   A.  That's the total agreement. |
| 9        (Plaintiff's Exhibit 3 was marked |
| 10       for identification.) |
| 11  Q.  Okay.  I'm going to show you what I'm going |
| 12  to mark as Plaintiff's Exhibit Number 3. |
| 13  It's two pages, Mr. Leonard, and it's a |
| 14  contract agreement between the Gassetts and |
| 15  Global Development, which was produced by |
| 16  your lawyer.  I'm going to mark it as |
| 17  Plaintiff's Exhibit Number 3.  Is that |
| 18  something you would have seen or would have |
| 19  required prior to entering into the |
| 20  agreement with Mr. Palmer? |
| 21  A.  I'm not sure I'm familiar with this piece |
| 22  of paper.  Did it come from my -- |
| 23  Q.  Yes, sir. |

| Page 23 |
|---|
| 1   A.  He'd have to -- It is our form.  It's our |
| 2   form, but, yes, he would have had to |
| 3   produce it.  It's he or Warren's.  And I |
| 4   guess it's probably Jarrett's, because I |
| 5   don't think that Warren really had a lot to |
| 6   do with it.  Yes, but that would be -- and |
| 7   we would take -- we would really give him |
| 8   the form and he would go through it and he |
| 9   would fix these numbers.  We would go back |
| 10  and, you know, just say, wait a minute, I |
| 11  don't believe you can do it for that or |
| 12  this seems mighty high.  And just looking |
| 13  over this thing, I think plans and drafting |
| 14  was $1,000.  But that's all that is.  And |
| 15  my construction man or man in the office |
| 16  would have gone over this with him and seen |
| 17  that everything was in order. |
| 18  Q.  Is Josh Paris the person -- |
| 19  A.  No. |
| 20  Q.  Who would be the person in your office that |
| 21  would look at this paperwork? |
| 22  A.  Bill would -- would be the man.  He is -- |
| 23  Bill Mitchem. |

| Page 22 |
|---|
| 1   A.  -- producing? |
| 2   Q.  Yes, sir. |
| 3   A.  To tell you the truth, I think that's the |
| 4   first time I've ever seen it.  It could |
| 5   have been in the file now, but I haven't -- |
| 6   I did not ... |
| 7   Q.  When you agree to enter into these |
| 8   partnerships with Mr. Palmer in this |
| 9   particular case, do you -- is it part of |
| 10  your guidelines to know what the |
| 11  construction costs will be and an |
| 12  estimation on the profits? |
| 13  A.  Should have been estimated in there. |
| 14       (Plaintiff's Exhibit 4 was marked |
| 15       for identification.) |
| 16  Q.  I'm going to show you what's Plaintiff's |
| 17  Exhibit Number 4, which was produced by |
| 18  your lawyer, and ask you if that's |
| 19  something that you would require prior to |
| 20  the agreement with -- |
| 21  A.  Yes.  Yes.  This is mine. |
| 22  Q.  Is that something that Mr. Palmer would |
| 23  have produced? |

| Page 24 |
|---|
| 1   Q.  What's his position, Mr. Leonard? |
| 2   A.  He is -- I don't know what his position is |
| 3   because he does about everything.  He takes |
| 4   care of all the purchasing, keeps up with |
| 5   all the jobs and he's had -- got a lady |
| 6   that helps him.  But he is -- This man was |
| 7   my Sunday school teacher, oh, 25 years |
| 8   ago.  And he was with Masonite and he |
| 9   retired and he wanted to go to work for |
| 10  me.  And that's when there was nobody |
| 11  hardly but me and him and my wife.  And he |
| 12  went to work for me and he's been there |
| 13  ever since.  So he's in -- you know, he's |
| 14  in charge of -- and he would approve the |
| 15  bills like that come in.  Planning and |
| 16  drafting was $1,250.  Well, he's the one |
| 17  that would pull it in and say, you don't |
| 18  have but $1,000 in there, what's the |
| 19  problem, you didn't put enough in the -- |
| 20  the system fee is off.  And he keeps maybe |
| 21  a builder advised most of the time of how |
| 22  his budget is running. |
| 23  Q.  Do you, on this particular job -- what I'm |

6 (Pages 21 to 24)

**Page 25**

1    going to refer to as the Gassett job -- was
2    there a particular budget in place for
3    Mr. Palmer?
4  A.  Yes.
5  Q.  Would that document that you're looking at,
6    Plaintiff's Exhibit Number 4, reflect that
7    budget?
8  A.  Yes, it would.
9  Q.  As I understand it, Mr. Leonard, basically
10    you would be the person that would enter
11    into the agreement with the builder and in
12    turn Bill -- Mr. Mitchem would be the
13    person who would be responsible for
14    overseeing the project?
15  A.  Well, not the project. He would not be --
16    He would be in -- The project now would be
17    whoever the builder is. Bill would only
18    purchase items for him. Or the builder
19    would tell him he's getting concrete from
20    whoever. We don't hold the builder -- The
21    only thing we always have a builder to do
22    is try to stay within this budget. But if
23    he can buy from Lowe's and get it cheaper

**Page 26**

1    than he can from Evans Supply Company or
2    Home Depot, the builder is left up to do
3    that. He runs the job. He runs the
4    buying. We're there to try to give him
5    support as far as keeping his bills
6    straight.
7  Q.  Okay. Other than what I'll refer to as
8    financing and financial advice on the
9    budget, does Wiregrass Properties or any of
10    your companies provide any labor on the job
11    site?
12  A.  No.
13  Q.  Do they provide any tools?
14  A.  No.
15  Q.  Any work crew at all from Wiregrass
16    Properties would have gone on this job
17    site?
18  A.  No.
19  Q.  Does Wiregrass Properties have any occasion
20    to deal with the homeowner or purchaser
21    directly?
22  A.  No.
23        (Plaintiff's Exhibit 5 was marked

**Page 27**

1    for identification.)
2  Q.  I'm going to show you, Mr. Leonard, what
3    I'm going to mark as Plaintiff's Exhibit
4    Number 5, which has the project number,
5    which I understand is the Gassett home, and
6    ask you, is that something that's
7    maintained in your office as far as what
8    bills are paid on the job?
9  A.  Yes, it is.
10  Q.  And on the Gassett job, what does
11    Plaintiff's Exhibit Number 5 reflect that
12    Wiregrass Properties paid to different
13    vendors for this particular job?
14  A.  I'm sorry. I didn't understand that
15    question.
16  Q.  What's the total amount --
17  A.  That's been paid out?
18  Q.  Yes, sir.
19  A.  This is probably an old -- This is probably
20    one. But it shows $168,974.56.
21  Q.  And is that the amount of checks that have
22    been sent from Wiregrass Properties to
23    various --

**Page 28**

1  A.  No. There's been more sent than that.
2  Q.  And we'll get an updated invoice later on.
3  A.  This house has been closed. This house has
4    been closed. It is now in history. But we
5    can run you an up-to-date of what we paid
6    everybody on it. And I might as well go
7    ahead and tell you -- Well, I don't know
8    whether I ought to tell him or not. Maybe
9    let him -- You go ahead. I'll give you an
10    updated --
11  Q.  Mr. Leonard, what's the status of this
12    house now? Have you been paid your bills?
13  A.  Yes, I have.
14  Q.  Did the Palmers pay you?
15  A.  No, they did not.
16  Q.  Who paid your bills on the -- what I'm
17    referring to as the Gassett home on
18    Westbrook?
19  A.  Well, the finance company paid me.
20  Q.  Was it the finance company of the new
21    homeowners that are in there now?
22  A.  Yes.
23  Q.  Have your bills been paid in full?

7 (Pages 25 to 28)

Page 29

1  A.  Yes, they have.
2  Q.  Including the lot on this -- in this
3      subdivision?
4  A.  Yes, it has.
5  Q.  Did the Palmers ever pay you a penny from
6      this particular job?
7  A.  No, they did not.
8  Q.  Are there any liens, to your knowledge,
9      outstanding on this particular home right
10     now?
11 A.  There is no liens on it.
12 Q.  Do you know or are you aware that the
13     Gassetts paid over $100,000 of their money
14     for this particular house?
15 A.  I was told they did. And basically that's
16     when I quit on it. And he finished the
17     house.
18 Q.  When you say he, Jarrett Palmer?
19 A.  Jarrett finished the house. There was some
20     things that I had to pay that I would have
21     been in breach of contract with him. But
22     there's some things that he paid that I did
23     not -- just like labor.

Page 30

1  Q.  Now, you said that you would be in breach
2      of contract with him. Do you mean this
3      agreement that's in front of you --
4  A.  Yes.
5  Q.  -- at Plaintiff's Exhibit Number 1?
6  A.  Yes.
7  Q.  And today, Mr. Leonard, are you aware that
8      the Gassetts have paid in excess of
9      $100,000 for this particular house?
10 A.  I was told that, but I'm not -- it's not a
11     fact to me.
12 Q.  Have you asked Jarrett Palmer, since you
13     were in agreement with him, if these folks
14     paid any money out of their pocket to him?
15 A.  Sure I did.
16 Q.  What did he tell you?
17 A.  He said they paid Construction Services.
18 Q.  And I was going to get to that. But who is
19     Construction Services to your knowledge?
20 A.  You know, this morning I was sitting here
21     and I told Bo I did not -- he would not
22     · reveal -- he told me who Construction
23     Services was is the bank. See, when he

Page 31

1  come to me, he told me, he said, I've got
2. construction money set up on these and I've
3  got everything ready to go. But he said, I
4  can't get my money in fast enough. He
5  said, if I buy something and put it on the
6  job, then later -- it takes two weeks for
7  me to get an inspection and them to process
8  my loan -- I mean, to process that amount
9  of money. And so he said, you know, I'd
10 like to do it with you because I pay my
11 bills every week. If it hits the ground
12 before Friday, I pay it -- I mean, if it
13 hits the ground before Wednesday and I've
14 got a bill on it, I pay it and have for
15 many years. So he could not get his money
16 up and down the line, and that's why he
17 come to me and asked me to do the
18 construction loan on these.
19 Q.  Did you have an understanding at all per
20     that contract, Mr. Leonard, that's
21     Plaintiff's Exhibit Number 3 that the
22     Gassetts and Hughes -- and we'll get to
23     them -- were making payments to --

Page 32

1  A.  No, I did not.
2  Q.  -- Mr. Palmer?
3  A.  But getting back to -- He said they -- the
4      man -- that the bank furnished a man -- the
5      finance company furnished a man. And if
6      he -- this is after the fact now. And he
7      said, they told me if I got -- took in any
8      money to pay it to Construction Services,
9      and that's why I didn't tell you because I
10     was paying it -- I was paying it to
11     Construction Services. When the state man
12     come to see me, I told him, I said, who is
13     Construction Services? He will not reveal
14     to me who Construction Services is. Now, I
15     had an idea who Construction Services was.
16 Q.  Who did you think it was?
17 A.  I thought it was him. But, now, keep in
18     mind this is after the fact. You know,
19     this is after they come to my office and
20     told me that they had, in fact, paid them
21     some money.
22 Q.  And you're referring to the Hughes, I
23     think; is that correct?

8 (Pages 29 to 32)

**Page 33**

1  A.  Hughes and Gassett.
2  Q.  Once the house was sold on Westbrook, were
3     any attempts made by Wiregrass Properties
4     to reimburse them the money they had in
5     that property?
6  A.  Well, when the house was sold, I would --
7     he brought the -- he furnished the
8     customer.  Global Development furnished the
9     customer.  And they said, you sign a deed.
10    I said, I'm not giving you any money out of
11    this.  And I said, I am not -- you're going
12    to have to sue me for your half.  Out of
13    that it was $26,500.
14  Q.  The $26,500, was that the profit --
15  A.  Yes.
16  Q.  -- that was made on the house on Westbrook?
17  A.  Yes.
18  Q.  And that was after the construction loan
19    was paid off and plus interest; is that
20    correct?
21  A.  Exactly right.  And I paid that on Hughes's
22    lien.
23  Q.  So you -- Just so I'm clear, Mr. Leonard --

**Page 34**

1    and I apologize for being repetitive, but I
2    want to make sure I'm clear.  The profit
3    that was made on the Gassett home, the
4    $26,500 you did not split with Jarrett
5    Palmer?
6  A.  I did not.
7  Q.  You used that money to pay the liens on the
8    Hughes home; is that correct?
9  A.  Well, paid part of it.  Yes, I did.
10  Q.  Did it take the entire $26,500?
11  A.  Oh, I had a lien for $125,000.  That's
12    basically what I got in Hughes's house.
13  Q.  Well, when you say you paid the lien, you
14    paid Wiregrass Properties?
15  A.  No.  I paid the bank.  I don't fund this.
16    I go to the bank and borrow it.
17  Q.  Right.
18  A.  And that's another reason that we keep
19    numbers.  We -- I borrow money for sticks
20    and stones.  So basically when I get
21    through with a job, as a general rule, I'll
22    be -- maybe the last two weeks I'll carry
23    myself or something like that.  But when I

**Page 35**

1    look at a job and it's got $160,000 on it,
2    I can say basically it will coincide almost
3    with my cost.
4  Q.  But just so I'm clear, on the $26,500
5    profit, that lien went to Wiregrass
6    Properties' note at the bank?
7  A.  Yes.
8  Q.  I mean, it didn't go to Stokes Floor
9    Covering or some outstanding --
10  A.  No.
11  Q.  -- vendor?
12  A.  No.  See, it would have gone for -- it paid
13    on that lien, which on that he reduced the
14    amount that he owed.
15  Q.  Did he ever tell you in any conversation
16    even prior to or after the fact of this
17    lawsuit, Mr. Leonard, what he did with the
18    money that the Hughes or Gassetts paid him?
19  A.  No, he did not.  Well, yes, he did.  Let me
20    back up on that.  Yes, he did.  He told me
21    that Construction Services got it.  And I
22    told him, I said -- See, this is what's so
23    strange to me is basically even the state

**Page 36**

1    man didn't know who Construction Services
2    was when he -- when he come and interviewed
3    me, I asked him, I said, who is
4    Construction Services?  And he said, hmmm,
5    I don't know.  I said, that's who has got
6    the money.  I said, now, let me tell you --
7    and this is what I told Hughes and
8    Gassett.  I said, Jarrett is not smart
9    enough to come up with an elaborate scheme
10    like this.  I said if y'all work -- if
11    we'll all work together, we'll find out
12    where our money has gone.  But instead of
13    deposing him, you're deposing me.
14  Q.  We're going to get there.
15         MR. BOYD:  Just hold on and let
16       him ask the questions and you
17       respond to his questions;
18       okay?
19         THE WITNESS:  All right.
20  Q.  In addition to the Gassett home, the Hughes
21    home and I think the Etris home in Barbour
22    County, did you have a similar agreement
23    with Mr. Palmer and Global Group to finance

9 (Pages 33 to 36)

Deposition of Thomas Foster Leonard

July 20, 2005

Page 37

1    a home in Barbour County?
2    A.  Etris, yes.
3    Q.  Other than those three projects,
4         Mr. Leonard, did you have any other
5         agreements with Global Group or Jarrett
6         Palmer?
7    A.  I did have one.
8    Q.  Which one was it?
9    A.  It was a house out in Braxton Bend.
10   Q.  Were all these jobs done pretty close
11        together, or which one was done first?
12   A.  Well, these were started first.  The three
13        was started first.  And then we got to
14        Braxton Bend.  And Braxton Bend, he never
15        could produce to me a finance arrangement
16        that was satisfactory with me or he
17        couldn't -- appraisal.  So I had bought a
18        lot out there.  I had bought the lot that
19        he said was -- because he had to buy the
20        lot.  And I told him the house appraised at
21        $109,000.  In the beginning he could not
22        produce anything.  And I said, you've got
23        to have a firm commitment; you've got to

Page 38

1    have an appraisal or something.  And he
2    produced an appraisal that reflected
3    $190,000.  But he told me, he said -- and I
4    don't know if I ever seen a contract on it
5    or not.  He said, but I'm selling the house
6    for 160,000.  I said, you can't sell the
7    house for $160,000 if it appraised for
8    .190.  He said, yeah, I can make money on
9    it.  I said, I tell you what you do, you
10   buy me -- you just pay me for the lot and
11   you make the money and I'll skip over this
12   one.
13   Q.  Did he buy the lot from you?
14   A.  Yes, he did.
15   Q.  Did he pay you for the lot?
16   A.  The finance company.  Dothan Title got --
17        He got his bank -- I believe Skyscraper.
18        Now, I'm not sure about this because I
19        wasn't in on it.  But I know that the lady
20        at the -- down here -- he was supposed to
21        pay me one or two days and maybe a week
22        passed and she -- she was calling me for a
23        deed.  And she'd call me.  And, of course,

Page 39

1    I know her real good.  But she called me
2    and said, the money didn't come in.  And
3    then she called me and said, the money's
4    in.  I said, well, get him in there and
5    sign the deed and I'll come sign the deed.
6    Q.  So I understand it, you had the Etris
7         project in Barbour County?
8    A.  Yes, I did.
9    Q.  The Hughes and Gassett and then the Braxton
10        Bend property that you just sold the
11        property and that was it; is that correct?
12   A.  Yes.
13   Q.  Okay.  Did you finance the entire Etris
14        project?
15   A.  Yes.
16   Q.  Did you receive a profit?
17   A.  If I did, it was less than -- It was less
18        than $500 if I did.
19   Q.  Did you pay Mr. Palmer his 50 percent of
20        the interest as per the agreement?
21   A.  No, I did not.
22   Q.  And tell me why you didn't on that project.
23   A.  In fact -- Well, he had the Etris property

Page 40

1    sold for like 145, something like -- 140,
2    $45,000.  And he come up and settled with
3    them for $125,000.  And my bill was like
4    100 -- we had 124 or something and then I
5    had some additional things.  I'm not sure I
6    didn't run over on it because when we -- we
7    usually split out money to a builder as
8    quick as we get it.  But then there is some
9    things that you have to have holdouts for.
10   And the holdouts is electricity or anything
11   that's not paid, you know.  My people can
12   go through there and say, well, the brick
13   is not paid or anything.  So I do know that
14   we was counting down right at the last and
15   there might have been a profit there at
16   that time.  But the -- I didn't ever look
17   at the holdout sheets because I knew I
18   wasn't going to give him no money because
19   he had cut it like $20,000.
20   Q.  In addition to these -- the Etris, Hughes
21        and Gassett and the Braxton Bend we've
22        talked about, have you had any other
23        business relationship at all with Jarrett

10 (Pages 37 to 40)

Page 41

1    or Warren Palmer?
2    A.  No, I have not.
3    Q.  Any other --
4    A.  Now, wait a minute.  Hold on.  He built a
5        house at Midland City on my property under
6        the same -- but he did not sell it.  And I
7        had forgotten about that one.  But he built
8        a house out there before -- he had the
9        house built before we ever had any problem.
10   Q.  Was there a problem on that house in
11       Midland City as well?
12   A.  Yes.  He had a customer on it and that --
13       his customer -- he was supposed to close it
14       like next week and the customer went and
15       bought a new automobile to go with her new
16       house.  And, of course, when they run the
17       final, you know, the customer -- it threw
18       him over.  This is the story I got.
19   Q.  Was that prior -- How long ago was the
20       Midland City house?
21   A.  It was in before we ever knew that he took
22       the money.  Now, I can't give you the dates
23       on it.  I can't -- I don't remember exactly

Page 42

1        when.
2    Q.  I asked you about other business dealings
3        with Global Group.  Do you have any
4        developments or projects ongoing,
5        Mr. Leonard, that he's involved with
6        indirectly in Orlando, Destin --
7    A.  No.
8    Q.  -- that he is involved with in any form or
9        fashion?
10   A.  No.
11           (Plaintiff's Exhibit 6 was marked
12            for identification.)
13   Q.  I'm going to show you what I've marked as
14       Plaintiff's Exhibit Number 6 to your
15       deposition and ask you what that document
16       is.
17   A.  This is to purchase a lot on Westbrook.
18   Q.  Did you actually pay for the lot on
19       Westbrook?
20   A.  I did.  Didn't you see it on the cost
21       factor?
22   Q.  And you put it into your -- on Plaintiff's
23       Exhibit Number 5 where --

Page 43

1    A.  It's the first thing on there -- second
2        thing.  I'm sorry.  It had $42,436.99.  I
3        give them the check for $42,436.99 and that
4        was Jarrett's option on it.  And I just
5        simply sent a check to the closing attorney
6        to Ramsey, Baxley & McDougle.  And they
7        wouldn't sell the lot to me.  They had to
8        get back -- They had to have this option to
9        purchase made out to me instead of --
10   Q.  To Global Group?
11   A.  -- to Global, yeah.
12   Q.  And just so I'm clear, all this was done on
13       the lot prior to the agreement on the
14       Gassett house; is that correct?
15   A.  I don't know.  I'm not sure on that.
16   Q.  The date on the agreement is May 18th.
17       What's the date on that option?  Should be
18       in the last paragraph, Mr. Leonard.
19   A.  The 21st day.
20   Q.  Of May?
21   A.  Yeah.
22   Q.  So done pretty close?
23   A.  (Witness nods head).

Page 44

1            (Plaintiff's Exhibit 7 was marked
2             for identification.)
3    Q.  I'm going to show you what I'm going to
4        mark, then, as Plaintiff's Exhibit Number 7
5        and ask you, is this the option to purchase
6        you were talking about between Cara Dennis
7        and Global Development with a date of April
8        23rd on the bottom?
9    A.  I would assume it is.
10           (Plaintiff's Exhibit 8 was marked
11            for identification.)
12   Q.  And I'm going to show you -- We're going to
13       go through a lot of documents -- what I'm
14       going to mark as Plaintiff's Exhibit Number
15       8.  It's a fax transmittal from the
16       attorney's office that consists of four
17       pages.  Looks like the back two are the HUD
18       and the middle is a copy of the check.  And
19       this is just where -- as I understand it
20       where you paid for the lot for Global
21       Development; is that right?
22   A.  This is the first check I sent down there,
23       42.  We had to send another check.  It

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 45

1    included interest, I think. I'm not -- I'm
2    not real sure. One thing I do know we paid
3    $43,086.85 to them and this check don't
4    reflect. Now, I don't know whether we
5    issued another check or what we did on it
6    because this would have been our check.
7    That would have been our check.
8    Q.  Who is Mark Dennis, Mr. Leonard?
9    A.  Mark Dennis is with Century 21. I think he
10   is Tom West's son-in-law.
11          (Plaintiff's Exhibit 9 was marked
12          for identification.)
13   Q.  And I'm going to show you what I've marked
14   as Plaintiff's Exhibit Number 9, which I
15   assume was in your file. Is that something
16   that you had seen before, an e-mail?
17   A.  This would have been when he sent me this
18   new option. He -- I did not realize it at
19   the time, but he was very angry because
20   they were doing some kind of land swap.
21   Q.  Who was angry?
22   A.  Mark Dennis was. He was doing some kind of
23   swap. And I wasn't going to buy a lot and

Page 46

1    put it in Jarrett's name anyway. If I --
2    Always if I pay for the lot it goes in my
3    name. And Mark was -- they said was mad.
4    I never talked to him. It's a builder's
5    responsibility to get all this stuff and we
6    don't ever get into it. If he can't
7    produce it, we bypass it.
8          (Plaintiff's Exhibit 10 was marked
9          for identification.)
10   Q.  I'm going to show you, Mr. Leonard, what
11   I'm going to mark as Plaintiff's Exhibit
12   Number 10. It appears to be some documents
13   from Chevy Chase Mortgage and ask you, is
14   that a document or part of your guidelines
15   that you would require before financing a
16   job?
17   A.  This was something that he probably give me
18   to show that -- I don't remember this
19   first -- I don't remember this. This is
20   supposed to be basically what you would
21   call a firm commitment.
22   Q:  Is that part of your guidelines,
23   Mr. Leonard, to get a firm commitment

Page 47

1    before you --
2    A.  Firm commitment or appraisal one.
3          (Plaintiff's Exhibit 11 was marked
4          for identification.)
5    Q.  And I've already marked this as Plaintiff's
6    Exhibit Number 11. But it's from a
7    gentleman signed by Jeff Jernigan. Appears
8    to be the same document as complained in
9    Plaintiff's Exhibit Number 10. Is that
10   what you referred --
11   A.  Looks like a copy.
12   Q.  -- to as a firm commitment?
13          Do you know who Jeff Jernigan is?
14   A.  I do not.
15   Q.  In this particular situation with the
16   Gassett home, did you ever talk to anybody
17   with the finance company?
18   A.  No.
19   Q.  And I say finance company. What about IPI
20   Skyscraper?
21   A.  Well, I talked to Skyscraper and -- I
22   talked to Skyscraper because at the time he
23   was going to finance some stuff for me.

Page 48

1    You know, and we -- of course, he had a
2    pretty good -- he had a pretty good
3    finance. He had five-year interest only.
4    Had a five-year less than two percent.
5    Q.  Was that Adam Dispirto that you dealt with
6    with IPI Skyscraper?
7    A.  Yes.
8    Q.  Did you ever actually borrow any money from
9    them?
10   A.  I did not. I did not. I didn't -- Well, I
11   didn't want to borrow any money from them.
12   Basically what I was looking for -- I never
13   did ask them to borrow any money. What I
14   was looking for is permanent financing for
15   some people that was building houses that I
16   would be building a house for.
17   Q.  Do you know if they ever provide anybody --
18   or did you ever refer anybody to them that
19   they actually financed?
20   A.  I did not. But, now, this house -- this
21   Westbrook was financed by Skyscraper.
22   Q.  They're the ones that actually paid your
23   construction costs?

12 (Pages 45 to 48)

**Page 49**

1  A.  Well, Dothan Title give me the -- but
2      Janice told me that that was who was
3      financing it.
4  Q.  Have you ever met Adam Dispirto?
5  A.  No, I have not.
6  Q.  Did you ever discuss with Mr. Dispirto the
7      Hughes or Gassett home?
8  A.  I've discussed it many times with him.
9  Q.  What was his part in the Hughes or Gassett
10     home?
11 A.  Well, when this thing happened, I called
12     him and I couldn't get the Chevy Chase
13     and -- I couldn't get those separated.  And
14     I called him and I told him basically what
15     happened.  And he told me, he said, well --
16     this is what I remember.
17 Q.  I understand.
18 A.  I don't remember it word for word.  But
19     basically what he told me there was a
20     misunderstanding, that they would get me
21     out of it, that he had enough stuff to pay
22     and they would finance something for him
23     and get me out of it.

**Page 50**

1  Q.  Finance something for Jarrett Palmer?
2  A.  Somebody.  He told me, he said, when we
3      found this out, he said, I'll have you out
4      of it in three weeks.  I said, you know,
5      I've been around this game a long time.
6      And I said, you can't have me out of it in
7      three weeks.  I said, it's -- you're
8      blowing my horn.  He said, I can have you
9      out of it.  He said, when I get some
10     paperwork done, I can have you out of it.
11     And I told him -- Well, that's basically
12     what he told me.  Now, he couldn't tell me
13     how he was going to get me out of it.  I
14     would have liked to have known -- I'm still
15     looking for somebody who is carrying the
16     bag, though.  The monies that's supposed to
17     have been paid to him, somebody got that
18     money.
19 Q.  Did you ask Jarrett Palmer where the money
20     went that these folks --
21 A.  I asked him many times where it --
22 Q.  Did he ever give you an answer?
23 A.  He told me that -- All the time he said,

**Page 51**

1      well, when this thing is over, I'm going to
2      sue the bank and there's going to be a pot
3      of money.  I said, Jarrett, you've got to
4      reveal who that person is; they're going to
5      send you to the penitentiary.
6  Q.  How come, Mr. Leonard, you haven't sued
7      Jarrett Palmer or Global Development?
8  A.  Why would I sue them?  This is what I told
9      Gassett and Hughes.  I said, let me tell
10     you something; if we'll all work together,
11     somebody's got that money.  I said, I know
12     one thing, I didn't get it; you said you
13     paid it; but somebody somewhere has got
14     that money.  And I said, if we run at this
15     thing and sue him, I said, he is going to
16     run on us.  I said, he's, what, 30 years
17     old; he's going to take off; he's going to
18     leave these troubles behind.  I said, we've
19     got to work with him; and I'll work with
20     y'all; I'll keep you abreast all along the
21     way of what's going on and you keep me the
22     same.  Because they were calling
23     Skyscraper.  I talked to Tom several times

**Page 52**

1      and he'd say, well, Skyscraper told me this
2      and Skyscraper told me that.  And example
3      was that he did come back and work out -- I
4      say come back.  I don't know if he ever
5      left or not.  I don't think he did.  But
6      he's worked out two of them.
7  Q.  Which two?  Do you know?
8  A.  Well, he's worked out the one in Barbour
9      County and he worked out Westbrook.
10             (Plaintiff's Exhibit 12 was marked
11             for identification.)
12 Q.  Okay.  I'm going to show you what I've
13     marked as Plaintiff's Exhibit Number 12 and
14     just ask you what that is.
15 A.  It's the same thing that we were talking
16     about.  Here is -- This is the correct
17     option because it says $43,086.85.  That
18     is -- That is the one that we went with.
19     That's what our check was based on.
20             (Plaintiff's Exhibit 13 was marked
21             for identification.)
22 Q.  I'm going to show you, Mr. Leonard, what
23     I've marked as Plaintiff's Exhibit Number

13 (Pages 49 to 52)

10-28-2005  15:33  From-                                                    T-499  P.016/042  F-172
Deposition of Thomas Foster Leonard                                                  July 20, 2005

Page 53

```
 1        13. It appears -- It's a letter from Nancy
 2    Pitman, a lawyer here in Dothan, claiming a
 3    lien for Jordan Building Supply on the
 4    Westbrook home.  Is that something that's
 5    been satisfied?
 6    A.  Well, you can say that.  Ms. Nancy is bad
 7    about liening and then looking.  She -- She
 8    had a lien.  She wrote me -- This is not
 9    the first time that she has got mixed up on
10    Riverwalk out there.  She -- A lot that I
11    had sold James Tyson she called me -- or
12    she sent the lien out on my lot.  And I
13    called her and I told her, I said, this is
14    not the right lien.  I said, there's
15    nothing -- there's no money owed on this.
16    And she said, oh, yeah, there are.  Said,
17    Jordan Building Supply has got that lot
18    number.  I said, Nancy, this is not; you
19    don't owe anything on that.  I said, I
20    don't even do business with those people.
21    And she went ahead and put a lien on it
22    anyway.  And I just called the attorney and
23    let him -- No, I didn't.  I waited.  I
```

Page 54

```
 1    said, now, Nancy, James has got that house
 2    ready to close.  I said, he's going to
 3    close it pretty quick.  She said, my lien's
 4    where it's going to stay.  I said, okay.
 5    So I let him close the loan and then I
 6    called the attorney and said, here, I've
 7    tried to tell her.  So this time she called
 8    me and -- No, she didn't.  She sent the
 9    lien out on Westbrook and I called her and
10    I said, Nancy, you've still got a bad
11    deal.  She had a lien on Palmer and they
12    were just looking -- the house that he had
13    built so she told me was already closed and
14    she was just looking for something he was
15    building that didn't have a lien on it.
16    Well, we pay on lot numbers and job
17    numbers.  So I just sent her the
18    information on this and I said, Nancy, here
19    is your information on this we -- you
20    didn't even furnish.  I said, you don't --
21    foundation material.  I said, you don't --
22    here's where we bought the foundation
23    material from Couch and we've -- so she
```

Page 55

```
 1    took the lien off.
 2    Q.  So that lien from Jordan shouldn't even
 3    have been in place?
 4    A.  Exactly right.
 5    Q.  Do you know on the Gassett and Hughes
 6    home, Mr. Leonard, who actually got the
 7    license to build on those lots?
 8    A.  I do not.  I suppose Jarrett did.
 9    Q.  When you entered into this contract or
10    agreement with Jarrett on the Hughes and
11    Gassett home, do you even know if he was a
12    licensed contractor?
13    A.  Well, I never did see the license, but now
14    this is the way the thing started.  He come
15    to my office and said that he had passed
16    the test.  He got his building license, oh,
17    prior to me even talking to him.  And he
18    was telling me, he said, my daddy don't
19    even have his license.  He said, he's
20    failed the test a couple of times and I
21    passed it the first time.  I said, well,
22    that's real good, because I remember that.
23    Now, as far as him telling me to bring his
```

Page 56

```
 1    license in and let's put it here, no, I do
 2    not.
 3    Q.  You just relied on -- You remember him
 4    telling you he passed the test; is that
 5    right?
 6    A.  Yes.  Well, see, we made the check to the
 7    city.  The city wouldn't have took the
 8    check unless he did have a license --
 9    unless somebody had license.
10    Q.  Do you know who Doug Boatwright is?
11    A.  No, I do not.
12    Q.  Do you know in the Hughes or Gassett job,
13    is he the actual one that got a certificate
14    or the license to build on these lots?
15    A.  Who?
16    Q.  Doug Boatwright?
17    A.  I do not know.
18        (Plaintiff's Exhibit 14 was marked
19        for identification.)
20    Q.  I'm going to show you, Mr. Leonard, what
21    I've marked as a composite exhibit.  And I
22    tried my best to put these together per the
23    job.  And I marked it as Plaintiff's
```

14 (Pages 53 to 56)

| Page 57 | Page 59 |
|---|---|
| 1   Exhibit Number 14. Some of these<br>2   statements are to Global Development and<br>3   some of them are to Wiregrass Home<br>4   Builders. But are these documents that<br>5   you -- you don't have to look through all<br>6   of them. And I'll bring your attention to<br>7   a couple. But are these documents that you<br>8   would require from the vendor before you<br>9   would pay any of the bills?<br>10 A.  Yes.<br>11 Q.  And just so I'm clear, you'd keep up with<br>12   them by job number; is that right?<br>13 A.  Yes.<br>14 Q.  When you entered the agreement with<br>15   Mr. Palmer, were they to send all the bills<br>16   to Wiregrass?<br>17 A.  Yes. On these jobs now. They had other<br>18   jobs.<br>19 Q.  And you authorized -- Would you have to<br>20   authorize to the vendors that, yes, I'm<br>21   going to pay for these materials? How<br>22   would that work?<br>23 A.  Some I would. It always is that way when | 1   See, we're talking about builders. We're<br>2   not talking about people who says you go<br>3   and do it.<br>4 Q.  I understand that. But I thought your<br>5   agreement was to pay the bill, so to speak?<br>6 A.  It was.<br>7 Q.  Would you also pay Jarrett Palmer for his<br>8   labor?<br>9 A.  Sure. If he went out there and framed the<br>10   job or if he went out and done something,<br>11   yeah, we'd pay him.<br>12 Q.  Would you know -- for instance, that's got<br>13   the job number on it and obviously payable<br>14   to Global Development. Would he provide<br>15   you with some kind of invoice of what that<br>16   amount was to be paid for?<br>17 A.  Yes. He probably had some invoice along<br>18   with this. But the coding on it, 4050,<br>19   would reflect what it was for.<br>20 Q.  And, also, if he would have paid a vendor<br>21   directly, he may have said, I had to pay<br>22   for the cement, will you reimburse me?<br>23 A.  Right. |

| Page 58 | Page 60 |
|---|---|
| 1   you're dealing with a builder. Some would<br>2   require you to guarantee. Some they'll<br>3   charge the individual -- I mean, the<br>4   builder itself. And those bills -- if he<br>5   has got a supplier that's servicing him --<br>6   and it doesn't matter with us whether he<br>7   puts in Global or -- it wouldn't matter<br>8   what name he put it in as long as it was on<br>9   that particular job.<br>10 Q.  And I'll show you this. It's contained in<br>11   that composite exhibit, Mr. Leonard. But<br>12   it's a check request form to Global<br>13   Development. Is that something that would<br>14   be provided by Wiregrass Properties or<br>15   Wiregrass Home Builders?<br>16 A.  The check request?<br>17 Q.  Yes, sir.<br>18 A.  Yes, we would.<br>19 Q.  And tell me what would -- what kind of<br>20   situation would give rise to Wiregrass<br>21   Properties or Wiregrass Home Builders to<br>22   pay Global Development.<br>23 A.  Any of the work that they do on the job. | 1 Q.  Did you have an agreed-upon rate that he<br>2   would charge if he would say he wanted his<br>3   money back?<br>4 A.  Sure. What do you mean money back?<br>5 Q.  Well, if he actually --<br>6 A.  Yeah. That's what the budget sheet is<br>7   about. He -- You look at the budget sheet<br>8   and this is the boundaries of his cost. If<br>9   he runs over that, he puts a change order<br>10   in or he's supposed to put one in.<br>11 Q.  I understand. Can you look on the budget<br>12   sheet, Mr. Leonard, and tell -- or maybe<br>13   the Plaintiff's Exhibit Number 5. Can you<br>14   tell actually how much you paid Global<br>15   Development for this job?<br>16 A.  You could figure it up. It could be some<br>17   invoices in there. But you could figure<br>18   up. Just like here's for a building permit<br>19   that I reimbursed him for. But you go<br>20   through and figure it up. Each one of them<br>21   is coded and it's a certain segment of<br>22   building.<br>23 Q.  So just so I'm clear on that agreement you |

15 (Pages 57 to 60)

Page 61

1   entered into with Jarrett Palmer, Global
2   Development, in addition to paying the
3   actual construction costs for the sticks
4   and stones, you agreed to actually pay his
5   labor as well in addition to any other
6   subcontractors --
7   A.  No.  You're not understanding me.
8   Q.  Okay.
9   A.  Okay.  For instance, cleanup, cleanup
10  involves the yard.  It involves the inside,
11  the landscaping.  And just looking at that,
12  that's probably some landscaping.  We do
13  not, say, pay him on an hourly base.  We do
14  not guarantee him any amount of money.
15  We're saying this job -- let's say he's --
16  and I do have builders who is framing --
17  framers and finishers.  Okay.  This house
18  would cost $2,500 to frame, let's say.
19  Okay.  The $2,500, if he frames a house,
20  it's paid to him.  That's where he makes
21  his money.
22  Q.  Whatever the budget calls for is what you
23  review?

Page 62

1   A.  Exactly right.  Believe me, now, I don't
2   give away money.
3       MR. SEABORN:  Let's take a break
4       before I get to the Hughes.
5       (Brief recess was taken.)
6       (Plaintiff's Exhibit 15 was marked
7       for identification.)
8   Q.  Mr. Leonard, I'm going to show you what
9   I've marked as Plaintiff's Exhibit Number
10  15.  And I'll just try to go on through
11  some of these documents.  Is this another
12  joint venture agreement that you had with
13  Mr. Palmer on the Hughes' house?
14  A.  Yes.  It appears that.
15  Q.  And the date on that document is June the
16  8th, 2004?
17  A.  Yes.
18  Q.  And was it the same type of partnership
19  that y'all had before where you would
20  provide the financing and then he would pay
21  you back plus interest and then y'all would
22  split the profits?
23  A.  Yes, sir.

Page 63

1       (Plaintiff's Exhibit 16 was marked
2       for identification.)
3   Q.  I'm going to show you what I'm going to
4   mark as Plaintiff's Exhibit Number 16,
5   which is a contract between Global
6   Development and Joe Hughes dated March the
7   5th, 2004.  Had you seen that document
8   prior to entering into partnership with
9   Mr. Palmer?
10  A.  I'm not sure.  Did you get it from me?
11  Q.  Yes, sir.
12  A.  You didn't get anything from Jarrett?
13  Q.  No, sir.  I do have some stuff from the
14  Hughes and Gassetts obviously, but ...
15  A.  I guess it is.  You know, to tell you the
16  truth, I don't remember.
17      MR. BOYD:  Now, the question was,
18      did you get that before
19      entering into the agreement
20      with Global; right?
21      MR. SEABORN:  Right.
22  A.  Well, here is -- I can't answer that
23  truthfully.  He might have brought this in

Page 64

1   and give it to me and then this was worked
2   up.  We don't have -- You know, it's --
3   When you're dealing with a person, you
4   don't necessarily -- they don't know what
5   paperwork is.  And we might have had this
6   filled out before we ever seen this or he
7   might have brought this a week before.  And
8   I can't truthfully answer that.  But this
9   would be a part of it.
10  Q.  Sure.  And, also, on that contract, would
11  that be the job number for the Hughes'
12  house on Clardy, Mr. Leonard?
13  A.  I don't see a job number there.
14  Q.  Right there.
15  A.  Yes.
16  Q.  You talked about some guidelines earlier,
17  like a budget, that would be required
18  before you would agree to these
19  partnerships?
20  A.  Yes.
21  Q.  Do you have any written guidelines or
22  that's just something y'all -- that has
23  evolved over 30 years that you know you

16 (Pages 61 to 64)

Page 65

1    want before you —
2    A.   That's evolved over ...
3              (Plaintiff's Exhibit 17 was marked
4              for identification.)
5    Q.   Okay. I'm going to show you what's marked
6         as Plaintiff's Exhibit Number 17. Is that
7         the budget for the Hughes home?
8    A.   You're missing a page here somewhere, the
9         front page.
10   Q.   Is that marked -- That's marked Number 2.
11        I'm going to give you this and we'll put it
12        together somehow in the end and ask you
13        would that be the entire budget for the
14        Hughes home?
15   A.   No. This would not be the entire budget
16        for the Hughes home because we don't —
17        yeah, it could be. But usually we have --
18        well, he could put a job number here. We
19        constantly upgrade and this could be -- the
20        job number is the only thing that would
21        signify that it would be that.
22   Q.   And on this particular -- What would you
23        refer to this document as, Mr. Leonard?

Page 66

1    A.   Budget.
2    Q.   It states that the construction cost is
3         115,851 and the sales price is 145,851.
4         And the -- I'm assuming its projected
5         profit was $30,000?
6    A.   Yes.
7    Q.   Did you actually make a profit on the
8         Hughes home?
9    A.   No. I had not -- the Hughes home has not
10        been closed.
11   Q.   Tell me what do you mean as far as closed.
12        Between you and Jarrett Palmer?
13   A.   No. Everybody needs to get their money. A
14        closing is just simple documents that -- in
15        this particular case it was supposed to be
16        financed. And you go to the attorney --
17        and you know what I mean by a closed loan.
18        You close it and you cut everybody's check.
19   Q.   But you understand now that the Hughes have
20        paid over $140,000 to Global Development
21        for that house, don't you?
22   A.   No, I don't. That's not what he told me.
23   Q.   What did he tell you?

Page 67

1    A.   He told me 125,000.
2    Q.   I don't mean to be misrepresenting any
3         numbers, but you understand that he has
4         paid significant sums of money for that
5         house?
6    A.   I realize it now. I did not realize it
7         when I went into it.
8    Q.   Sitting here today, Mr. Leonard, do you
9         know who Construction Services is?
10   A.   Just like --
11             MR. BOYD:  Now, don't --
12   A.   No. I do now. I didn't know until this
13        morning. But -- No. I went through the
14        whole thing and I -- believe me, I pressed
15        him. But I didn't know who Construction
16        Services was. I had a suspicion who I
17        thought it was. But he come up with this
18        story like I was telling you that this --
19        and I said, well, you've got to name that
20        name. And he said, well, I can't think of
21        it and he's left the company. And he got
22        all the money and left the company. And I
23        said --

Page 68

1    Q.   Left Construction Services?
2    A.   Yeah.
3    Q.   Have you ever heard of a gentleman named
4         Robert Drale?
5    A.   Yes.
6    Q.   Who is that?
7    A.   I don't know. He's the one that bought the
8         house.
9    Q.   He ended up buying the house -- the Gassett
10        home?
11   A.   Yes.
12   Q.   And as I understand it, IPI Skyscraper
13        financed it?
14   A.   Yes, they did.
15   Q.   And do you know where Mr. Drale is from?
16   A.   I do not. He was supposed to close it two
17        weeks before and they told me he was coming
18        from Tampa and had a wreck. And I said,
19        does he live in Tampa? And they say, we
20        don't know where he lives. I said, well,
21        where did you meet him? They said, in New
22        York. So I ...
23   Q.   Other than knowing that he bought this

17 (Pages 65 to 68)

Page 69

1    house, had you heard his name before?
2    A.  I had heard that -- I heard his name that
3        Drale was going to help him. Now, I didn't
4        know to what extent. That's what he told
5        me at first, that there was a man was going
6        to help him and loan him some money. Now,
7        I don't know besides that.
8    Q.  Have you ever talked to Robert Drale?
9    A.  No, I have not.
10            (Plaintiff's Exhibit 18 was marked
11            for identification.)
12   Q.  I'm going to show you what I've marked as
13       Plaintiff's Exhibit Number 18, Mr. Leonard,
14       and ask you, is this the amount of money
15       that Wiregrass Home Builders has paid on
16       the Hughes home?
17   A.  No. It's more than that. There was
18       probably some late bills that come in.
19            MR. SEABORN: Bo, can -- and I'll
20            ask for it. But I want to
21            make sure we get an updated of
22            what Wiregrass has paid.
23            MR. BOYD: Okay.

Page 70

1    Q.  Mr. Leonard, how much -- I understand it's
2        more than $112,000. But has Wiregrass Home
3        Builders been paid any amount of money?
4    A.  No, they have not. You're talking about
5        from who? Qualify that. Becausewhile
6        ago --
7    Q.  From anybody.
8    A.  While ago-you considered me when I paid
9        that 25 -- $26,500 that I paid it on behalf
10       of myself, and. And I guess I did. But I also
11       paid it on behalf of Hughes too.
12   Q.  Have you been paid by anybody on the Hughes
13       house?
14   A.  No.
15   Q.  Has the note at SouthTrust or now Wachovia
16       been paid off?
17   A.  It has not.
18   Q.  And do you know -- and I don't mean to be
19       repetitive -- where the money went that the
20       Hughes paid to Global Development?
21   A.  I do not. I told you before he said it
22       went to Construction Services. I will add
23       this. And Bo's going to jump out of his

Page 71

1    skin. I didn't get it.
2    Q.  On 18 -- It's the same thing. I just was
3        looking. On 18, Mr. Leonard, the printout
4        for Wiregrass on the Hughes job, the first
5        payment from Wiregrass is to Jarrett Palmer
6        d/b/a Global Development, $12,000. Do you
7        know what that amount would be for?
8    A.  Yes, I do.
9    Q.  What would that be for?
10   A.  That was for a foundation. When we entered
11       into this, he had already started
12       foundation there. And he put the
13       foundation in and we was reimbursing him
14       for materials, labor, you know, just
15       exactly what he said that -- he probably
16       brought the bills in. But, anyway, that
17       was what he said he had spent on it.
18   Q.  Have you talked to him about paying your
19       money on the Hughes house?
20   A.  I sure have.
21   Q.  What's his response?
22   A.  Well, I told you in the beginning I told
23       them that this boy's going to run. And I

Page 72

1    knew he had some assets somewhere and I
2    knew that, like I said, somebody was in
3    this with him. And he has -- he has told
4    me that he was selling some properties on
5    the lake.
6    Q.  On Lake Eufaula or Compass Lake?
7    A.  Yes. Lake Eufaula. And that he would be
8        able to wipe out most of what Hughes owed.
9        And he said he was going to borrow the
10       money and talk to -- and pay Gassett back
11       his money. And I told him, I said, well, I
12       don't have any say-so in it. But if I sell
13       the house to somebody else -- and, of
14       course, you know, he told me all the time
15       that he was going to pay it back. I said,
16       how are you going to pay it back? He said,
17       well, these friends are going to help me.
18       And, you know, I might be extremely dumb,
19       but I still believe we could have worked
20       our money out.
21   Q.  You stated, Mr. Leonard, that you knew that
22       Jarrett Palmer had some assets. What are
23       you aware that he has?

18 (Pages 69 to 72)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 73

1    A.  Well, I don't know what he's got now, but I
2        think he had a couple of trucks.
3    Q.  What kind of trucks?
4    A.  Ford trucks.
5    Q.  Okay.  Just work trucks or something like
6        that?
7    A.  (Witness nods head).
8    Q.  And I say assets.  Do you know anything in
9        addition like beach property --
10   A.  No --
11   Q.  -- anything like that?
12   A.  -- I don't.
13   Q.  Are you aware of any projects that he has
14       ongoing in Orlando or Destin or Panama
15       City?
16   A.  He -- Let me tell you.  He told me that he
17       had a group that was going to back him in
18       Tampa.  This is the story he told me.  That
19       they had -- They wanted him to build 600
20       houses.  And he said, I don't know how to
21       go about it.  And I said, well, if you're
22       going to build 600 houses and they're going
23       to -- I said, you go down there and borrow

Page 74

1        the money to pay out.  I said, a good
2        construction money -- man in Florida who
3        knows what he can do and he's running that
4        kind of business, I said, he can borrow the
5        money for you to pay this deal out.  And he
6        said, will you help me?  I said, yeah, if
7        you'll pay it out.  Listen, I've nursed
8        this boy trying my best to get everybody
9        out of this.  And when they went and sued,
10       they just -- they shot down quite a bit of
11       work.  Of course, you never would have been
12       involved, so I guess there's some good come
13       out of it.  But that's all I know.
14   Q.  I understand.
15   A.  And last week -- a couple of weeks ago
16       somebody had occasion to say something
17       about him and they said, he's gone to
18       Tampa.
19           (Plaintiff's Exhibit 19 was marked
20            for identification.)
21   Q.  I'm going to show you, Mr. Leonard, what
22       I've marked as Plaintiff's Exhibit Number
23       19.  Again, it's a group of documents that

Page 75

1        were produced by your lawyer.  It's nine
2        total pages and just ask you if you will
3        tell me what those documents are.
4    A.  Well, I'd say that document was probably
5        picked up in the trash when it's talking
6        about preclosing four o'clock.  That
7        probably wasn't even talking about --
8        probably wasn't even talking about Hughes,
9        because there had been probably another
10       case that we was in preclosing.  It
11       wouldn't have had anything to do with
12       Hughes.
13   Q.  Are these notes that would be somebody with
14       your office or you or would they be
15       Palmer's notes?  Do you know?
16   A.  That's my note.  That's Bill's note
17       (indicating).
18   Q.  The second page?
19   A.  Yes.  And this probably refers to the
20       $12,000 that we paid him.  See, it says
21       assignment.  Whereas credit on back charge
22       to Chapman, vinyl, gables.  And he's just
23       making himself a note of things that he

Page 76

1        wanted to probably look at.  This is what I
2        was given by Emerald Coast Mortgage
3        Company.  And I tried to call Emerald Coast
4        Mortgage Company and I get no answer.
5    Q.  And basically, just so the record is clear,
6        this is a document that states that loans
7        have been approved by Chevy Chase on the
8        Etris house, which is in Barbour County?
9    A.  Yeah.
10   Q.  Joe Hughes and Skipper Woodham, which is
11       that the Braxton Bend house we've talked
12       about here?
13   A.  Yes.
14   Q.  My memory is bad, but did you get paid your
15       money back on the Braxton Bend house, or is
16       that one you skipped over?
17   A.  No.  That's the one he bought -- I bought
18       the lot on and this probably triggered it
19       because I saw $166,000 and the appraisal
20       was 190-something thousand.  And that's
21       probably when I told him, no, I -- you just
22       pay me back for my lot and you take it and
23       take your commitment.  Because I wasn't

19 (Pages 73 to 76)

Page 77

1    going to build it for 166,000.
2  Q.  And then the next document is just more
3    handwritten notes from you or Mr. Mitchem.
4  A.  Yes. It's still referring to the $12,000
5    that we was paying him.
6  Q.  I think that's just another copy of the
7    same thing.
8  A.  Yeah.
9  Q.  And the next document I probably should
10    have pulled out and marked separate. But
11    is that a copy of the lien that you filed
12    on the Hughes home?
13  A.  The -- They filed it. Dothan Title Company
14    filed it.
15  Q.  And that was the amount of money that you
16    had spent on their house; is that right?
17    At the time.
18  A.  Probably. Probably. I wouldn't be for
19    sure on that. It might have been that they
20    were looking -- we was looking to see what
21    would be paid or what the cost was on the
22    house.
23  Q.  Prior to filing that lien, Mr. Leonard, had

Page 78

1    you asked Jarrett Palmer had they paid any
2    money to him?
3  A.  No, I did not. I had no idea he was
4    paying. Because keep in mind, I had talked
5    to the mortgage company. What's the
6    mortgage company's name?
7  Q.  IPI.
8  A.  IPI. And I talked to the mortgage company
9    and that's what prompted this letter back
10    here. I talked to the mortgage company and
11    they said, well, Hughes was not cooperating
12    with him; he wouldn't send his stuff back.
13    But he said, you know, it would be no
14    problem to approve him. But he said he's
15    got some stuff out he's got to send him.
16  Q.  To your knowledge, Mr. Leonard, did IPI
17    ever tell you anything that wasn't true? I
18    mean, did they tell you they were going to
19    finance these houses?
20  A.  Sure, they did.
21  Q.  And they told you that Gassett and Hughes
22    had filled out the paperwork and they were
23    approved and it was just a matter of

Page 79

1    getting all the --
2  A.  I'm not sure that they --
3        MR. IRBY:  Object to the form on
4        that.
5  A.  -- told me they was approved.
6        THE WITNESS:  I'm sorry?
7        MR. IRBY:  I said I object to the
8        .form on that.
9  Q.  You can go ahead.
10  A.  I'm not sure that they told me it was
11    approved. They led me to believe that they
12    would be approved. And then he said --
13    I'll tell you what I did. About a week
14    later he come in and said I switched them
15    to Emerald; they're too slow up there.
16  Q.  Who said that?
17  A.  Jarrett.
18  Q.  Okay. He switched from IPI to Emerald
19    Coast?
20  A.  Yeah. And he explained to me some way that
21    it was a division of theirs or something
22    like that. And I didn't know that you
23    could get documents like that. That's what

Page 80

1    I say. This is an elaborate scheme and
2    there was more people involved than he.
3  Q.  Can you name anybody else that was involved
4    besides Jarrett Palmer?
5  A.  I cannot.
6  Q.  And the next document, Mr. Leonard, is a
7    fax from SouthTrust. Who is Franklin
8    Skinner?
9  A.  Franklin works -- he's our -- kindly like
10    our accountant and so-and-so and so-and-so.
11  Q.  And that's where y'all were just asking for
12    a payoff on the Hughes house on their line
13    of credit?
14  A.  Yeah.
15  Q.  Has that line of credit with SouthTrust
16    been satisfied?
17  A.  No, it has not.
18  Q.  And the next page is a document from Real
19    Estate Services. It says that the lender
20    is IPI Skyscraper. Is that where the
21    appraisal was paid for Joe and Fay Hughes'
22    home?
23  A.  Yes. We would have paid that.

20 (Pages 77 to 80)

Page 81

1   Q.  And then the next page, is that just a
2       building inspection?
3   A.  That's the permit or a copy of where he
4       paid it.
5   Q.  Should there be a copy of the permit on the
6       Gassett house as well that you would keep
7       in your file?
8   A.  There should have been.
9   Q.  I didn't see one, but --
10  A.  There should have been, but I don't know --
11      it could be misfiled or something like
12      that.
13  Q.  That's fine.
14  A.  I didn't take it out.  If I would have
15      been -- If I had went and took out some
16      stuff, I would have took out more stuff
17      than what I did.
18  Q.  I understand.  Well, I'm not accusing you
19      of that.  I just --
20  A.  I'm laying -- it's like a book here.
21  Q.  I don't know if the last page was included
22      in that exhibit that we didn't talk about.
23      It looks like just application for services

Page 82

1       for the city.
2   A.  Okay.  Here's the driving license --
3       somebody's driving license number on it.
4       And it said Jarrett Palmer.
5   Q.  What is that document, Mr. Leonard?
6   A.  That's for electricity.  Electricity and
7       water.
8           (Plaintiff's Exhibit 20 was marked
9            for identification.)
10  Q.  Same thing as before.  I'm going to mark --
11      I tried to pick all the work orders and
12      receipts or invoices from particular
13      vendors.  I'm going to mark that as
14      Plaintiff's Exhibit Number 20 and I'm going
15      to ask you about a few of those.  But just
16      generally does that look like documents
17      that you would have received from different
18      vendors to pay the bills?
19  A.  Yeah.  But -- Yeah, I guess it is.  I think
20      that Matthews Services is -- but it's got
21      the address on it there.  I'm pretty sure
22      it's all invoices that we got on bill
23      paying, whatever --

Page 83

1   Q.  I see a couple of them that -- I just want
2       to ask you about that.  It says ship to
3       Peter at Spann Farms.  Was there a job, to
4       your knowledge, that was going on at Spann
5       Farm at the time that Jarrett Palmer was
6       involved in?
7   A.  No.  He did a job out there.  If there's
8       one there, it's a mistake.
9   Q.  Like, for instance, I'll just show you
10      mine.  It's in that group of documents that
11      you have.  It says to Global Development,
12      ship to Peter at Spann Farms.
13  A.  Yeah.  I turned right to it.
14  Q.  Okay.  What would that be?
15  A.  That would be a misfile or a bill that
16      should not be in there.
17  Q.  Were you in partnership or joint venture
18      with Global Development or Jarrett on any
19      house in Spann Farm?
20  A.  I was not.
21  Q.  Whose house are you aware that he built out
22      there?
23  A.  Somebody -- I don't know whether his name

Page 84

1       was Peter or Peter something.  It was Peter
2       something.
3   Q.  And if there's a couple of invoices in here
4       to Spann Farms, that would just be
5       something that probably the -- a vendor
6       inadvertently sent you to pay or --
7   A.  Well, it shouldn't have been one in there,
8       because when it come in, it should have
9       been kicked out and given back to him.  He
10      might have sent it to us.  I hope we didn't
11      pay it.  Looks like there's a bunch of them
12      there at the same time.  But, no, that
13      would have been some type of mistake that
14      he come in and -- we did not have anything
15      to do with it.
16          (Plaintiff's Exhibit 21 was marked
17           for identification.)
18  Q.  And I've pulled some of these out that I
19      thought were for a different job number
20      that I'm going to ask you about.  I'll just
21      mark them as Plaintiff's Exhibit Number
22      21.  And some of them may go to the Hughes
23      or Gassett home.  But if you can look at

21 (Pages 81 to 84)

July 20, 2005

Page 85

1    them and tell me what they are,
2    Mr. Leonard.
3    A.  Builders Lighting would be for -- would be
4    for lights.
5    Q.  Can you tell, though, by this particular
6    invoice what job it would be applied to?
7    A.  No. It's not a job number on it.
8    Q.  I couldn't identify a particular job.
9    That's why I pulled them out.
10   A.  Did you get this from me?
11   Q.  Yes, sir.
12       I know some of them they shipped to
13   Main Street and I don't know what
14   significance that has.  One of them was
15   shipped to Live Oak Trail.  One shipped to
16   Chris Johnson, one to Spann Farm again, two
17   to Spann Farms.
18   A.  I don't know what these bills would be
19   doing in there.
20   Q.  Okay.  If Wiregrass Properties or Wiregrass
21   Home Builders paid these bills, it would be
22   reflected in the check numbers --
23   A.  It would be reflected down here.  Let's

Page 86

1    see.  Builders Lighting.  Even if they
2    didn't -- we didn't pay them, I don't know
3    what they'd be doing in my file.  I dare
4    say they're not paid.  They're not coded.
5    They're not coded at all.  On this we paid
6    for lighting materials from Lowe's.  Could
7    be some that he brought in for us to pay
8    and they kicked them out because they're
9    not on that -- these bills are not on
10   there.
11   Q.  Mr. Leonard, on the Hughes and Gassetts --
12   and I'll go ahead and ask you for the Erris
13   as well.  What was your understanding of
14   how they would pay Global Development?
15   A.  Who would pay?
16   Q.  The homeowner or the Hughes and the
17   Gassetts.
18   A.  Skyscraper would -- was financing it for
19   them.
20   Q.  And it was your understanding that it would
21   go to a closing and --
22   A:  Absolutely.
23   Q.  -- no installment payments were made at all

Page 87

1    or anything like that?
2    A.  Absolutely.  I've done -- In my career I've
3    probably done, oh, 1,200 and I've never
4    seen -- I've never seen this happen
5    before.  If you could have told me you
6    could beat me on a house building deal, I
7    would have said no.  Because all of it is
8    channeled through financing and I would --
9    I never seen anybody pay that was applied
10   for credit and the finance company say,
11   well, they was -- and I guess the finance
12   company was like me, they didn't know
13   anybody was getting it.  Now, I'm not
14   defending them, but they would have been
15   foolish to keep talking to me even up until
16   the time that he said we'll get you out.
17   Q.  Just some general background stuff,
18   Mr. Leonard.  I understand you've been a
19   defendant in other lawsuits; is that
20   correct?
21   A.  I sure have.
22   Q.  Has it been more than one?
23   A.  Oh, yeah.  I've been in business 40 years.

Page 88

1    Q.  Have you ever been a plaintiff in a
2    lawsuit?
3    A.  Tell me what a plaintiff is.
4    Q.  Where you're actually suing somebody else.
5    A.  No.
6    Q.  I know in Pike County you're actually suing
7    James Tyson; is that correct?  I'd consider
8    that a plaintiff, but --
9    A.  I don't think I'm suing James Tyson.  James
10   Tyson built some houses in Pike County and
11   James Tyson is being sued.
12   Q.  To your knowledge, Mr. Leonard, has Jarrett
13   Palmer been charged or convicted of a
14   crime?
15   A.  I can't answer that.  I don't know.  I've
16   heard -- since then I've heard he has been,
17   but I don't know that.
18   Q.  What is your relationship to the Palmers?
19   How do you know them?
20   A.  Okay.  I know Warren.  Warren had a -- he
21   was in the drafting business.  Of course, I
22   had Southern Home Builders and we used a
23   lot of -- he drafted most of the houses for

22 (Pages 85 to 88)



Page 89

1    us. I got to know him through that. And
2    me and him has hunt together, fished
3    together not -- you know, maybe one time a
4    year we'd hunt together. I knew Warren and
5    knew him real good, knew his family.
6    Q.  Do y'all go to church together?
7    A.  No, we do not. He worked for me at one
8    time.
9    Q.  Warren did?
10   A.  Yes.
11   Q.  As a draftsman?
12   A.  No. He was a salesman for me. He -- I
13   guess he quit about a year and a half ago
14   or in between times and he told me he was
15   going to retire.
16   Q.  Was he working for you at the time,
17   Mr. Leonard, when you went into this
18   partnership with Jarrett?
19   A.  No, he was not.
20   Q.  I understand that you knew Warren --
21   Mr. Palmer and he had worked for you
22   before. What situation arose where Jarrett
23   came to you and said, can you finance these

Page 90

1    jobs for me?
2    A.  Well, Warren -- We had a connection with
3    Jarrett on plans and Warren always --
4    Jarrett always drove our plans when Warren
5    worked for us.
6    Q.  Kind of as a courier?
7    A.  Yeah. And he would -- And Warren was a
8    good draftsman and he understood the layout
9    of a house, how to do this, how to do
10   that. And he did our -- you know, our
11   drafting. And I don't know that I ever saw
12   Jarrett. I mean, he would carry the plans
13   back and forth. And Warren and Mr. Mitchem
14   is really good friends and they go out and
15   eat every week. And from time to time,
16   well, Warren will come to the office and
17   pick him up and they'll go eat and he'll
18   say something to me if I'm passing by or
19   something. And he was telling me how good
20   Jarrett was doing in the building
21   business. And he said, the main thing that
22   he needs is somebody -- he said, he don't
23   know anything about systems or anything

Page 91

1    else. And some of the systems that he had.
2    in place how to do things Warren had
3    carried from our office to his office. And
4    he asked me, he said, could he come talk to
5    you about some of these things that he
6    don't understand? I said, sure. You know,
7    I'll be glad to help him. I've been
8    knowing him since he was -- I think I
9    remember the day he was born. I mean, I've
10   been knowing him that long. I said, sure,
11   I'll help him. And he got to coming and
12   asking me different things; how do you do
13   this, how do you do that, what kind of form
14   do you use. You know, I was just trying to
15   help him.
16   Q.  Yes, sir.
17   A.  That's the way it started.
18   Q.  As you look back on these agreements now,
19   Mr. Leonard, would you have done something
20   different as far as entering into these
21   partnerships with Jarrett?
22   A.  If I was looking back again, sure, I
23   wouldn't even have entered them.

Page 92

1    Q.  But, I mean, should you have done something
2    different or required anythingdifferent
3    than you did?
4    A.  I don't know what you mean, but I don't
5    know anything else I could have done. See,
6    you say -- if you're alluding to calling,
7    one thing you learn in the building
8    business that people deal with the people
9    that they know and trust. And for me to
10   call Joe Jones and say, I'm the president
11   of this corporation; if you have any
12   problems, call me. Well, guess what? He's
13   going to call me about every week. And he
14   said, well, I don't have a problem; I just
15   wanted to pass the time of day. And, you
16   know, really the system is supposed to take
17   care of itself. You don't want to talk to
18   Joe Smith. You don't -- You know, you'd
19   like to have Joe Smith as a friend and be
20   able to talk to him, but it's -- and I
21   guess it's in this way because the
22   construction business is the only thing I
23   know. But if he gets to talking to you

23 (Pages 89 to 92)

Page 93

1    instead of one of your partners and you're
2    the lead man, he's going to talk to you all
3    the time. He's never going to talk to the
4    partner again.
5  Q.  I understand. I've asked you about a
6    couple of these. And I just want to ask
7    you about some of these names. My
8    understanding you don't know Doug
9    Boatwright?
10  A.  No, I do not.
11  Q.  And you alluded to -- You know that Robert
12    Drale bought that house?
13  A.  Yes. He was on the closing statement.
14  Q.  Construction Services, you don't know who
15    that is I understand?
16  A.  (Witness shakes head).
17  Q.  Adam Dispirto is somebody that you've
18    talked to that you understood was with IPI
19    Skyscraper?
20  A.  Right. I talked to him on the phone.
21  Q.  What about Jeff Jernigan? His name has
22    been on some Chevy Chase --
23  A.  I don't know Jeff Jernigan.

Page 94

1  Q.  The Etrises in Barbour County, have you had
2    any direct dealing with them?
3  A.  No, I have not.
4  Q.  Who is Jim Corlee?
5  A.  Corey. Jim Corey is a man who has --
6    trying to help ...
7  Q.  Jarrett?
8  A.  Jarrett. I met him because, you know, I'd
9    call Jarrett and got to where Jarrett
10    wouldn't call me back. And they come by
11    the office one day and he introduced me to
12    Jim and he said he's going to be helping
13    me. And he did. He helped him quite a
14    bit. He -- to finish the Etris job up
15    there. And I think the way he got started,
16    he's the preacher up there somewhere. And
17    so that's my relationship with Jim.
18  Q.  As far as -- We talked about the contracts
19    with the Hughes and the Gassetts --
20  A.  Yes, sir.
21  Q.  -- that apparently were in your file and
22    · you said you couldn't recollect if you saw
23    them. You don't know, do you, Mr. Leonard,

Page 95

1    where the conversations between the Palmers
2    and the Hughes and Gassetts took place
3    about building this house and the contracts
4    being signed and stuff like that, do you?
5  A.  They give me an affidavit. Warren and
6    Jarrett give me an affidavit that the
7    contracts were signed in their office here.
8  Q.  But just so I'm clear, you never had any
9    direct dealing with the Hughes or Gassetts
10    other than after the fact they came in your
11    office about the lien?
12  A.  Absolutely right.
13        MR. SEABORN: I think that's about
14      it. Let me talk to him for a
15      few minutes.
16        (Brief recess was taken.)
17  Q.  Just a couple more, Mr. Leonard.
18  A.  Okay.
19  Q.  Do you have any relatives in Barbour
20    County?
21  A.  Not as I know of.
22  Q.  You talked about this scheme, that Jarrett
23    wasn't smart enough to come up with this

Page 96

1    elaborate scheme. To this day do you have
2    any idea what it was? Was it to get paid
3    twice on the same house, or do you have an
4    idea?
5  A.  I'm not sure. But if you knew where my
6    office was and knew how close these jobs
7    were to my office and he'd go and get money
8    from somebody and then bring me bills to
9    pay, you've got ice water running through
10    your veins. And I'm sure that they did
11    something with the money. He did not have
12    enough -- And he could have been paying for
13    other jobs as he was building them. I
14    don't know.
15  Q.  Did you ask his dad, Warren Palmer, about
16    the money?
17  A.  Warren says, I don't know nothing about
18    it. Yes, I did.
19  Q.  What did he say about Construction
20    Services?
21  A.  He said, I don't know who Construction
22    Services is. Now, believe me, I asked the
23    water boy over there who Construction

24 (Pages 93 to 96)

Page 97

```
 1    Services was. And I say the water boy. I
 2    asked everybody that I knew had anything to
 3    do with him what did they know and when did
 4    they know it and to give me anything that
 5    they had because this is a -- you know,
 6    this is a serious offense.
 7    Q.  What's your understanding of what he's been
 8        charged with? We talked about charged or
 9        convicted of a crime.
10    A.  I don't know. I just heard he was in jail
11        in Barbour County at one time. I don't
12        know.
13            MR. SEABORN: That's all. I
14        appreciate it, Mr. Leonard.
15            EXAMINATION
16    BY MR. IRBY:
17    Q.  I've got just a few questions, and I'll try
18        to make it brief because I know you've got
19        to go. Are you telling us you don't know
20        who is Construction Services?
21    A.  No, I do not.
22    Q.  Do you have any idea?
23    A.  Well, I had an idea it was Jarrett.
```

Page 98

```
 1    Q.  Do you know if it was a corporation or any
 2        kind of entity like that?
 3    A.  I'm pretty sure it was a corporation.
 4    Q.  And Jarrett told you that Construction
 5        Services got the money?
 6    A.  Yes, he did. He told me it was a man from
 7        the bank that -- and I said, that can't be,
 8        ·Jarrett. I said, that just can't be. He
 9        said, Tom, the bank pays somebody to go and
10        check these jobs when you're drawing
11        construction money and to fill out the
12        form. I said, you wasn't drawing
13        construction money. He said, it's the same
14        thing and if they pay anything at all. I
15        said, why didn't you tell me that they paid
16        anything? He said, well, I don't know.
17    Q.  What bank was it? What bank?
18    A.  What do you mean what bank?
19    Q.  You said it was a bank that -- Construction
20        Services was a bank like you act --
21    A.  Bank or finance company. I thought it was
22        ·Skyscraper. But, now, that -- I thought it
23        was Skyscraper who had the approval on the
```

Page 99

```
 1    mortgages.
 2    Q.  All right. For the people that are going
 3        to borrow the money --
 4    A.  Yes.
 5    Q.  -- like Etris and Gassett and Hughes?
 6    A.  Yes. He said that they checked the houses
 7        because these people -- they had to be
 8        approved. Each phase of the construction
 9        had to be approved by the bank.
10    Q.  You don't have any evidence that Skyscraper
11        was a part of Construction Services, do
12        you?
13    A.  No, I do not.
14    Q.  And you don't have any information that
15        Skyscraper got any of the money that
16        Mr. Palmer got, the $100,000 from Gassett
17        and the 125 or 140, whatever it was from
18        Hughes, do you?
19    A.  Ask me that question again.
20    Q.  I said, you don't have any information that
21        Skyscraper got any of that money, do you?
22    A.  No.
23    Q.  Do you know of anybody or any entity that
```

Page 100

```
 1    got any of that money other than Jarrett
 2    Palmer or Construction Services?
 3    A.  All I know is Construction Services is who
 4        Hughes and Gassett told me they made their
 5        checks out to.
 6    Q.  And they would have a canceled check for
 7        that somewhere, then?
 8    A.  Yes. That's what I told -- That's what I
 9        told the inspector from the Home Builders
10        Association. I said, well, turn those
11        checks over and let's see who it is. He
12        said, well, I can't let you see it.
13    Q.  Has anybody followed up on that to try to
14        bring any criminal conviction or anything?
15    A.  I don't know.
16    Q.  I mean, why was the state man down here in
17        the first place if he wasn't --
18    A.  I understand that y'all sent him.
19    Q.  I'm just trying to find out myself, because
20        I represent Skyscraper and I -- you know,
21        I'm in the dark about some of this, too,
22        and I'm trying to find out.
23    A.  Yeah.
```

25 (Pages 97 to 100)

Page 101

1   Q.  You said Palmer said he was going to sue
2       the bank.  Who was that?
3   A.  I guess he was talking about Skyscraper.
4   Q.  Sue them for what?
5   A.  Skyscraper the way I understood it -- and I
6       don't know how I told me this.  But I
7       understand that Skyscraper let a bank do
8       their financing, their construction loans.
9       See, like First Boston would do
10      construction loan for Skyscraper.  And the
11      rules and everything -- Skyscraper was not
12      the one --
13  Q.  Skyscraper is just a broker, isn't it?
14  A.  I don't know.
15  Q.  You don't know?
16  A.  No.
17  Q.  You don't know whether they were just
18      brokering loans for other banks or any
19      lenders?
20  A.  I guess all of them does that now.  I don't
21      know were they ever warehousing them or
22      what they're doing now.  I'm completely in
23      the dark.

Page 102

1   Q.  When did you first have any contact with
2       anyone at Skyscraper?
3   A.  I was in contact with Skyscraper right
4       after we started to do business.  And the
5       reason I was in Skyscraper, they wanted to
6       do some business in Florida with me.  They
7       wanted to do some business here.
8   Q.. How did you get in touch with Skyscraper to
9       begin with?
10  A.  Jarrett give me the card or give me the
11      number.
12  Q.  How did he get it?  Do you know?
13  A.  He had been doing business with them.
14  Q.  He had had other projects besides these
15      ones he had with you?
16  A.  That's what he said.
17  Q.  And do you know where any of these other
18      projects or houses were?
19  A.  No, sir, I don't.
20  Q.  But he is the one that put you onto
21      Skyscraper.  Is that what you're saying?
22  A.  That's right.
23  Q.  And he claims to have done business with

Page 103

1       them before --
2   A.  Yes.
3   Q.  -- you entered the picture; is that right?
4   A.  Yes.
5   Q.  Do you know of any other houses he had
6       built before he came to you or his daddy
7       came to you on his behalf and asked you to
8       help him?
9   A.  He had a house going out at -- close to
10      Midland City.  And he told me -- He took me
11      out there and showed me the house.  And at
12      the time he showed it to me they didn't
13      like a lot having it finished.  And then
14      later on he told me that he had closed it.
15      And I'm not sure he told me Skyscraper, but
16      I think Skyscraper financed that house.
17  Q.  Have you seen any mortgages, anything on
18      that?
19  A.  No, I have not.
20  Q.  Assuming that they did -- I don't know if
21      they did or not, but just for the sake of
22      argument, assuming they did finance that
23      house in Midland City for whoever ended up

Page 104

1       owning it, do you know of any other houses
2       that he built?
3   A.  The only ones that was indicated to -- and
4       he didn't indicate that.  The only houses I
5       knew he was building -- and I probably
6       learned this afterwards, of course -- was
7       in Braxton Bend.  And I understand he was
8       building it.  That -- Some mortgage company
9       or some bank shipped him that check to buy
10      that lot from me.
11  Q.  Was that Skyscraper or somebody else or do
12      you know?
13  A.  I don't know.
14  Q.  You don't know.  Okay.
15          Now, I believe you said you last heard
16      he was in Tampa; is that right?
17  A.  Somebody said he was in Tampa a couple of
18      weeks ago or -- was down there.  And I
19      don't even know who told me that.
20  Q.  Did I understand you earlier to say that
21      that's where Robert Drale was from or had
22      some connection with?
23  A.  I don't believe Robert Drale is from

26 (Pages 101 to 104)

**Page 105**

1  Tampa. He said that -- When he was
2  supposed to close that loan the first time,
3  they told me that -- Jim Corey told me that
4  he had a wreck coming from Tampa and he had
5  a wreck in Lake City. Now, I don't know
6  whether he -- seems like he said he was on
7  a rental car, so he might have flew into
8  Tampa. I don't know if that's where he
9  lived.
10  Q.  Do you know where Robert Drale is now?
11  A.  No, I do not.
12  Q.  Did you ever meet him?
13  A.  No, I did not.
14  Q.  I believe you said earlier that Jarrett
15  said that Skyscraper was too slow and he
16  was going to switch to Emerald Coast; is
17  that right?
18  A.  That's what he said.
19  Q.  Where is Emerald Coast located?
20  A.  That I don't know. It's got --
21      MR. SEABORN: Destin.
22  A.  Destin? That's where they're supposed to
23  be. But I notice that the phone number is

**Page 106**

1  exactly the same that Construction Services
2  was.
3  Q.  Was it a Dothan number or a Destin number?
4  A.  It was a Destin number.
5  Q.  Was Emerald Coast -- was that like a
6  developer or was that a finance company or
7  what?
8  A.  You got me.
9  Q.  You don't know?
10  A.  I don't know. I figure it was part of the
11  scheme.
12  Q.  Do you know who any of the principles of
13  Emerald Coast were?
14  A.  Do not.
15  Q.  You don't know if -- Well, you don't know
16  who they are, so I understand.
17  A.  All I'm receiving is something that's
18  supposed to be coming through the mail.
19  I'm not --
20  Q.  So this was on the Hughes and the Gassett
21  loans that Jarrett said he was going to
22  switch to Emerald Coast?
23  A.  And on the other one too.

**Page 107**

1  Q.  Etris?
2  A.  Etris.
3  Q.  Evidently they didn't switch to Emerald
4  Coast on Etris, did they, because it ended
5  up being financed by Skyscraper, didn't
6  they?
7  A.  I think it did, but they even -- they had
8  to approve it after all this come out.
9  Q.  Skyscraper had to approve it?
10  A.  Yes. So I don't know if they had -- I
11  don't even know if they had an application
12  before. I guess they did because I talked
13  to -- talked to Allen.
14  Q.  Adam, I think.
15  A.  I talked to him one time.
16  Q.  In any event, the Etrises got their loan
17  with Skyscraper --
18  A.  Yes.
19  Q.  -- in Barbour County?
20  A.  Yes. But they got it like $20,000 cheaper
21  than what it was supposed to have been.
22  Q.  But on the other two, Hughes and Gassett,
23  Jarrett Palmer made the decision to switch

**Page 108**

1  from Skyscraper to Emerald Coast?
2  A.  Yes.
3  Q.  Because he thought Skyscraper was too slow?
4  A.  That's the reason he give me. He said it's
5  a division of them; they don't really care
6  which one of them does it. I thought this
7  was real strange.
8  Q.  You don't know whether Emerald Coast is, in
9  fact, a division of Skyscraper or not, do
10  you?
11  A.  No, I do not.
12  Q.  You don't know who any of the principles
13  are as you told us a while ago?
14  A.  No.
15  Q.  Do you know if Robert Drale has any
16  connection with Emerald Coast --
17  A.  I do not.
18  Q.  -- or Construction Services?
19  A.  No, I do not.
20  Q.  How is this Jim Corey, I believe his name
21  is, how did he fit into the picture?
22  A.  All I know he just showed up one day and he
23  was trying to help Jarrett work out of

27 (Pages 105 to 108)

Page 109

1    this. And that's all I know. And I guess
2    he did.
3    Q.   Does he live in Barbour County, or does he
4         live in Houston County?
5    A.   I believe he lives in Houston County, but
6         he's got a church in Barbour County.
7    Q.   Were any of these people from -- that were
8         from Barbour County formerly or presently
9         like the Etrises there now, but Hughes and
10        Gassett, were they members of his church or
11        anything? Do you know?
12   A.   I don't know that.
13   Q.   When have you last talked to Jarrett
14        Palmer?
15   A.   He probably -- He and Jim probably come by
16        the office, I think, and told me that
17        Robert Drale had had a wreck. I believe
18        that's the last time. And that's been --
19   Q.   About how long ago was that?
20   A.   It was probably a month, five weeks ago.
21   Q.   Did Jarrett Palmer -- did he say anything
22        about his -- is he still going to try to
23        get this taken care of, then?

Page 110

1    A.   He was working on it. He was more assured
2         of it then -- now than he was then. He
3         said, I think I can -- basically he said, I
4         think that they'll loan me the money. I
5         told him, I said, if you were a
6         high-powered construction man, I said,
7         they're in demand. They're going to pay
8         him -- He told me that they were going to
9         pay him and go on and be commission and so
10        much for this and so much for that.
11   Q.   That's on the 600 houses he was building in
12        Tampa?
13   A.   Yeah. And I said, I tell you what, you can
14        find out if they're real. Say, listen,
15        it's going to take me $300,000 to move from
16        Dothan to Tampa. And I said, for a good
17        man that's going to build 600 houses and
18        they're going to pay you this kind of
19        money, if they're for real, they won't mind
20        putting it up.
21   Q.   Okay.
22   A.   But, now, he had some other way, too, he
23        said that he was -- anyway, him and Jim

Page 111

1    come by the office and talked to me and
2    said, I think this will work; we'll get the
3    rest of your money; we'll give Hughes the
4    lien; we'll pay off Gassett. I said, well,
5    that's what everybody wants.
6    Q.   And, again, you don't know what happened to
7         the money that Palmer got from Gassett and
8         Hughes?
9    A.   No, I do not.
10             MR. IRBY:  That's all the
11        questions I have.
12             MR. SEABORN:  Just one follow-up.
13             EXAMINATION
14   BY MR. SEABORN:
15   Q.   Both the loans or line of credit that you
16        had on the Hughes and Gassett house was
17        from SouthTrust?
18   A.   Yes.
19   Q.   Who do you deal with mainly at SouthTrust?
20   A.   Tom Scott.
21   Q.   Were you aware -- and I'll just show you --
22        that Jarrett Palmer or Global Group,
23        Incorporated had an account at SouthTrust,

Page 112

1    Global Group, Incorporated d/b/a
2    Construction Services?
3    A.   No, I did not. I did not know that.
4    Q.   Have you ever talked to Tom Scott at
5         SouthTrust about this particular situation?
6    A.   No.
7             MR. SEABORN:  That's all I have.
8    A.   Is this the money that he's got in there?
9         $140,000?
10   Q.   (Continuing by Mr. Seaborn:)  I think it's
11        long gone. I'm not sure the date on that.
12        That's the money -- just so you'll know.
13        You can see the deposits that he made from
14        the Hughes and Gassetts during this period
15        of time.
16   A.   He told me he was dealing with the bank in
17        Hartford.
18   Q.   Do you know what -- the Bank of Hartford,
19        would that --
20   A.   There's only one down there, I think.
21   Q.   Is that Harry Ann Smith's bank?
22   A.   No. I don't think Harry Ann Smith's got --
23        oh, she's connected to Slocomb National.

28 (Pages 109 to 112)

Page 113

1    MR. SEABORN: That's all. Thank
2        you, Mr. Leonard.
3    THE WITNESS: Okay.
4    (Deposition was concluded at
5        approximately 11:30 a.m.)
6
7    * * * * *-* * * * * * * * * *
8    FURTHER DEPONENT SAITH NOT
9    * * * * * * * * * * * * * *
10
11    REPORTER'S CERTIFICATE
12    STATE OF ALABAMA:
13    MONTGOMERY COUNTY:
14        I, Lyn Daugherty, Certified Shorthand
15    Reporter and Commissioner for the State of Alabama
16    at Large, do hereby certify that I reported the
17    deposition of:
18        THOMAS FOSTER LEONARD
19    who was duly sworn by me to speak the truth, the
20    whole truth and nothing but the truth, in the
21    matter of:
22        JOE HUGHES and FAYE HUGHES,
23        Plaintiffs,

Page 114

1    vs.
2    GLOBAL GROUP, INC. d/b/a GLOBAL
3    DEVELOPMENT, et al.,
4    Defendants.
5    IN THE CIRCUIT COURT FOR
6    BARBOUR COUNTY, ALABAMA
7    CLAYTON DIVISION
8    Civil Action No. CV-04-106
9    * * * * * * * * * * * * * *
10    TOM GASSETT and PHYLLIS GASSETT,
11    Plaintiffs,
12    vs.
13    GLOBAL GROUP, INC. d/b/a GLOBAL
14    DEVELOPMENT, et al.,
15    Defendants.
16    IN THE CIRCUIT COURT FOR
17    BARBOUR COUNTY, ALABAMA
18    CLAYTON DIVISION
19    Civil Action No. CV-04-107
20    on Wednesday, July 20th, 2005.
21        The foregoing 113 computer-printed pages
22    contain a true and correct transcript of the
23    examination of said witness by counsel for the

Page 115

1    parties set out herein. The reading and signing is
2    hereby waived.
3        I further certify that I am neither of kin
4    nor of counsel to the parties to said cause nor in
5    any manner interested in the results thereof.
6        This 3rd day of August 2005.
7
8
9
10        _____
         Lyn Daugherty,
         Certified Shorthand Reporter
         And Commissioner for the
11       State of Alabama at Large
12
13
14
15
16
17
18
19
20
21
22
23

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

**A**

able 72:8 92:20
about 6:21 13:9,20
  16:13,18,19 17:1
  24:3 38:18 40:22
  41:7 42:2 44:6 47:19
  52:16 53:7 59:1,2
  60:7 64:16 70:4
  71:18 73:21 74:17
  75:6,7,8 76:12 79:13
  81:22 82:15 83:2
  84:20 89:13 90:23
  91:5 92:13 93:5,7,21
  94:18 95:3,11,13,22
  96:15,17,19 97:8
  100:21 101:3 109:19
  109:22 112:5
abreast 51:20
absence 18:6
Absolutely 86:22 87:2
  95:12
according 9:17
account 111:23
accountant 80:10
accusing 81:18
act 4:1 15:20 98:20
Action 1:6,16 114:8,19
active 9:19
activity 3:17 4:11
actual 56:13 61:3
actually 14:22 42:18
  48:8,19,22 55:6 60:5
  60:14 61:4 66:7 88:4
  88:6
Adam 48:5 49:4 93:17
  107:14
add 70:22
addition 36:20 40:20
  61:2,5 73:9
additional 40:5
address 7:10 82:21
administrative 12:16
  19:7
advice 26:8
advised 24:21
affidavit 95:5,6
after 6:6 18:10 32:6,18
  32:19 33:18 35:16
  95:10 102:4 107:8
afterwards 104:6
again 74:23 85:16
  91:22 93:4 99:19
  111:6
ago 6:15 24:8 41:19
  70:6,8 74:15 89:13
  104:18 108:13
  109:19,20

agree 22:7 64:18
agreed 5:2,16,23 61:4
agreed-upon 60:1
agreement 2:2 3:12,13
  3:14 4:8,9 13:23 14:6
  14:8,9 15:9 16:3,8,15
  16:22 17:4 18:10
  20:11,14,20,23 21:3
  21:4,8,14,20 22:20
  25:11 30:3,13 36:22
  39:20 43:13,16 55:10
  57:14 59:5 60:23
  62:12 63:19
agreements 16:10 37:5
  91:18
ahead 13:12 28:7,9
  53:21 79:9 86:12
al 1:8,18 114:3,14
Alabama 1:2,12 2:4,6
  2:15,19,23 3:3 5:5,8
  113:12,15 114:6,17
  115:11
Allen 107:13
alluded 93:11
alluding 92:6
almost 35:2
along 6:15 51:20 59:17
already 47:5 54:13
  71:11
always 25:21 46:2
  57:23 90:3,4
amount 17:13 18:22
  27:16,21 31:8 35:14
  59:16 61:14 69:14
  70:3 71:7 77:15
angry 45:19,21
Ann 112:21,22
another 34:18 44:23
  45:5 62:11 75:9 77:6
answer 7:5 16:12 50:22
  63:22 64:8 76:4
  88:15
anybody 14:11 47:16
  48:17,18 70:7,12
  80:3 87:9,13 99:23
  100:13
anyone 102:2
anything 9:18 20:2,7
  37:22 40:10,13 53:19
  63:12 73:8,11 75:11
  78:17 84:14 87:1
  90:23,23 92:2,5 97:2
  97:4 98:14,16 100:14
  103:17 109:11,21
anyway 46:1 53:22
  71:16 110:23
apologize 9:1 12:14

34:1
apparently 94:21
APPEARANCES 2:11
appears 13:23 19:4
  46:12 47:7 53:1
  62:14
Appliance 4:15
application 81:23
  107:11
applied 85:6 87:9
appraisal 17:6 18:6,8
  37:17 38:1,2 47:2
  76:19 80:21
appraised 37:20 38:7
appreciate 97:14
approval 98:23
approve 24:14 78:14
  107:8,9
approved 17:12 76:7
  78:23 79:5,11,12
  99:8,9
approximately 2:8
  113:5
April 3:22 44:7
argument 103:22
arose 89:22
around 50:5
arrangement 37:15
asked 30:12 31:17 36:3
  42:2 50:21 78:1 91:4
  93:5 96:22 97:2
  103:7
asking 80:11 91:12
assets 72:1,22 73:8
assignment 75:21
Association 100:10
assume 44:9 45:15
assuming 11:9 66:4
  103:20,22
assured 110:1
attempts 33:3
attention 57:6
attorney 43:5 53:22
  54:6 66:16
Attorneys 2:14,17,22
attorney's 44:16
August 115:6
authorize 57:20
authorized 57:19
automobile 41:15
aware 29:12 30:7 72:23
  73:13 83:21 111:21
away 62:2
a.m 2:8 113:5

**B**

back 17:16 18:13 23:9

32:3 35:20 43:8
  44:17 52:3,4 60:3,4
  62:21 72:10,15,16
  73:17 75:21 76:15,22
  78:9,12 84:9 90:13
  91:18,22 94:10
background 87:17
bad 53:6 54:10 76:14
bag 50:16
bank 13:19 15:21,21
  30:23 32:4 34:15,16
  35:6 38:17 51:2 98:7
  98:9,17,17,18,19,20
  98:21 99:9 101:2,7
  104:9 112:16,18,21
banks 101:18 .
bar 18:19,20
Barbour 1:2,12 6:18
  36:21 37:1 39:7 52:8
  76:8 94:1 95:19
  97:11 107:19 109:3,6
  109:8 114:6,17
base 61:13
based 8:19,20 9:11,12
  10:7,8 52:19
basically 9:6 12:20
  14:9 17:6,11,15 18:5
  25:9 29:15 34:12,20
  35:2,23 46:20 48:12
  49:14,19 50:11 76:5
  110:3
battle 20:3
Baxley 3:20 43:6
beach 73:9
beat 87:6
before 2:2 5:6 17:3,16
  31:12,13 41:8,9,21
  45:16 46:15 47:1,
  57:8 62:4,19 63:18
  64:6,7,18 65:1 68:17
  69:1 70:21 82:10
  87:5 89:22 103:1,6
  107:12
begin 102:9
beginning 37:21 71:22
behalf 70:9,11 103:7
behind 51:18
being 20:12 34:1 88:11
  95:4 107:5
believe 23:11 38:17
  62:1 67:14 72:19
  79:11 96:22 104:15
  104:23 105:14
  108:20 109:5,17
Bend 37:9,14,14 39:10
  40:21 76:11,15 104:7
besides 69:7 80:4

102:14
best 56:22 74:8
better 18:17
between 5:3,17 6:1
  13:23 15:9 18:12
  20:14,21 21:14 44:6
  63:5 66:12 89:14
  95:1
big 19:15
bill 23:22,23 25:12,17
  31:14 40:3 59:5
  82:22 83:15
bills 11:14 12:12 14:16
  14:17 15:4,4,23 16:1
  19:12,17 24:15 26:5
  27:8 28:12,16,23
  31:11 57:9,15 58:4
  69:18 71:16 82:18
  85:18,21 86:9 96:8
Bill's 75:16
bit 18:16 74:10 94:14
blowing 50:8
Bo 30:21 69:19
Boatwright 56:10,16
  93:9
book 81:20
born 91:9
borrow 34:16,19 48:8
  48:11,13 72:9 73:23
  74:4 99:3
Boston 101:9
Both 111:15
bottom 14:3 44:8
bought 37:17,18 41:15
  54:22 68:7,23 76:17
  76:17 93:12
boundaries 60:8
Box 2:15,18,22 3:2
boy 74:8 96:23 97:1
Boyd 2:21 36:15 63:17
  67:11 69:23
boy's 71:23
Bo's 70:23
Braxton 37:9,14,14
  39:9 40:21 76:11,15
  104:7
breach 29:21 30:1
break 7:7 62:3
brick 40:12
brief 62:5 95:16 97:18
Briefly 8:21
bring 55:23 57:6 96:8
  100:14
broker 101:13
brokering 101:18
brought 6:18 33:7
  63:23 64:7 71:16

| | | | | |
|---|---|---|---|---|
| 86:7 | **Cara** 44:6 | clear 14:5 33:23 34:2 | **Concern** 4:3 | correctly 11:23 15:7 |
| **budget** 3:16 4:10 14:20 | **card** 102:10 | 35:4 43:12 57:11 | concluded 113:4 | cost 35:3 42:20 60:8 |
| 14:21 24:22 25:2,7 | **care** 19:23 24:4 92:17 | 60:23 76:5 95:8 | concrete 19:19 25:19 | 61:18 66:2 77:21 |
| 25:22 26:9 60:6,7,11 | 108:5 109:23 | close 37:10 41:13 43:22 | connected 112:23 | costs 22:11 48:23 61:3 |
| 61:22 64:17 65:7,13 | **career** 87:2 | 54:2,3,5 66:18 68:16 | connection 90:2 104:22 | **Couch** 54:23 |
| 65:15 66:1 | **carried** 91:3 | 96:6 103:9 105:2 | 108:16 | counsel 5:3,17 114:23 |
| **build** 9:15 11:22 17:12 | **carry** 34:22 90:12 | closed 28:3,4 54:13 | consider 88:7 | 115:4 |
| 19:15 55:7 56:14 | **carrying** 50:15 | 66:10,11,17 103:14 | considered 70:8 | counting 40:14 |
| 73:19,22 77:1 110:17 | **case** 5:18,20 17:7 22:9 | closing 43:5 66:14 | consists 44:16 | **County** 1:2,12 6:18,20 |
| **builder** 12:20,22 15:23 | 66:15 75:10 | 86:21 93:13 | constant 20:3 | 36:22 37:1 39:7 52:9 |
| 16:5 24:21 25:11,17 | **cause** 115:4 | **Cloud** 8:20 9:5 | constantly 65:19 | 76:8 88:6,10 94:1 |
| 25:18,20,21 26:2 | cement 19:14 59:22 | **Coast** 9:15 76:2,3 | constitute 20:13,22 | 95:20 97:11 107:19 |
| 40:7 58:1,4 | **Century** 45:9 | 79:19 105:16,19 | construction 6:19,22 | 109:3,4,5,6,8 113:13 |
| **builders** 4:15 7:23 8:3 | certain 18:22 60:21 | 106:5,13,22 107:4 | 8:5,6,15 9:4 10:6 | 114:6,17 |
| 8:9 12:18 57:4 58:15 | **certificate** 56:13 | 108:1,8,16 | 11:1 14:13 22:11 | **couple** 55:20 57:7 73:2 |
| 58:21 59:1 61:16 | 113:11 | **Cobb** 2:5,21 | 23:15 30:17,19,22 | 74:15 83:1 84:3 93:6 |
| 69:15 70:3 85:3,21 | **Certified** 2:3 5:7 | coded 60:21 86:4,5 | 31:2,18 32:8,11,13 | 95:17 104:17 |
| 86:1 88:22 100:9 | 113:14 115:10 | coding 59:18 | 32:14,15 33:18 35:21 | courier 90:6 |
| **builder's** 46:4 | **certify** 11:18 115:3 | coincide 35:2 | 36:1,4 48:23 61:3 | course 38:23 41:16 |
| **building** 12:2 20:23 | **change** 60:9 | come 14:20 16:13,16 | 66:2 67:9,15 68:1 | 48:1 72:14 74:11 |
| 48:15,16 53:3,17 | channeled 87:8 | 17:16 18:7 21:22 | 70:22 74:2 92:22 | 88:21 104:6 |
| 54:15 55:16 60:18,22 | **Chapman** 75:22 | 24:15 31:1,17 32:12 | 93:14 96:19,21,23 | **court** 1:1,11 2:14 7:6 |
| 81:2 87:6 90:20 92:7 | **charge** 18:14 19:23 | 32:19 36:2,9 39:2,5 | 97:20 98:4,11,13,19 | 114:5,16 |
| 95:3 96:13 104:5,8 | 20:1 24:14 58:3 60:2 | 40:2 51:6 52:3,4 | 99:8,11 100:2,3 | **Covering** 35:9 |
| 110:11 | 75:21 | 55:14 67:17 69:18 | 101:8,10 106:1 | credit 75:21 80:13,15 |
| **built** 17:22 18:1,2,3 | **charged** 18:16 88:13 | 74:12 79:14 84:8,14 | 108:18 110:6 112:2 | 87:10 111:15 |
| 41:4,7,9 54:13 83:21 | 97:8,8 | 90:16 91:4 94:10 | contact 102:1,3 | crew 26:15 |
| 88:10 103:6 104:2 | **Charles** 3:21 | 95:23 107:8 109:15 | contain 114:22 | crime 88:14 97:9 |
| bunch 84:11 | **Chase** 4:1 46:13 49:12 | 111:1 | contained 58:10 | criminal 100:14 |
| **business** 7:18 8:17 9:22 | 76:7 93:22 | coming 14:15 68:17 | continued 3:23 | **CROW** 2:17 |
| 10:7,9,11,22 12:5 | cheaper 25:23 107:20 | 91:11 105:4 106:18 | **Continuing** 112:10 | **Crum** 2:5,21 |
| 13:5 17:21 40:23 | **check** 43:3,5 44:18,22 | commencing 2:7 | contract 21:14 29:21 | customer 33:8,9 41:12 |
| 42:2 53:20 74:4 | 44:23 45:3,5,6,7 | commercial 11:3 | 30:2 31:20 38:4 55:9 | 41:13,14,17 |
| 87:23 88:21 90:21 | 52:19 56:6,8 58:12 | commission 5:9 110:9 | 63:5 64:10 | cut 40:19 66:18 |
| 92:8,22 102:4,6,7,13 | 58:16 66:18 85:22 | **Commissioner** 2:4 5:8 | contractor 3:14 55:12 | cutting 9:1 12:14 |
| 102:23 | 98:10 100:6 104:9 | 113:15 115:10 | contracts 94:18 95:3,7 | **CV-04-106** 1:6 114:8 |
| businesses 8:11,14 9:8 | checked 99:6 | commitment 17:7,9 | conversation 35:15 | **CV-04-107** 1:16 114:19 |
| 10:3,4,15 | checks 11:17 27:21 | 18:7 37:23 46:21,23 | conversations 95:1 | |
| **buy** 9:16 10:19 25:23 | 100:5,11 | 47:2,12 76:23 | convicted 88:13 97:9 | |
| 31:5 37:19 38:10,13 | **Chevy** 4:1 46:13 49:12 | commitments 17:8 | conviction 100:14 | |
| 45:23 104:9 | 76:7 93:22 | companies 26:10 | cooperating 78:11 | |
| buying 26:4 68:9 | **Chris** 85:16 | company 12:22 17:10 | copy 44:18 47:11 77:6 | |
| **buys** 9:6 | chunk 17:21 | 17:11 26:1 28:19,20 | 77:11 81:3,5 | |
| bypass 46:7 | church 89:6 109:6,10 | 32:5 38:16 47:17,19 | **Core** 8:15 9:4 | |
| | **CIRCUIT** 1:1,11 114:5 | 67:21,22 76:3,4 | **Corey** 94:5,5 105:3 | |
| **C** | 114:16 | 77:13 78:5,8,10 | 108:20 | |
| call 38:23 46:21 76:3 | city 41:5,11,20 56:7,7 | 87:10,12 98:21 104:8 | **Core's** 11:15 | |
| 92:10,12,13 94:9,10 | 73:15 82:1 103:10,23 | 106:6 | **Corlee** 94:4 | |
| called 39:1,3 49:11,14 | 105:5 | company's 78:6 | corporation 8:16 9:10 | |
| 53:11,13,22 54:6,7,9 | **Civil** 1:6,16 5:5 114:8 | **Compass** 72:6 | 9:13,14,19 11:18 | |
| calling 38:22 51:22 | 114:19 | complained 47:8 | 13:2 92:11 98:1,3 | |
| 92:6 | claiming 53:2 | complete 15:18 | corporations 10:17,22 | |
| calls 61:22 | claims 102:23 | completely 101:22 | 11:10,14 12:1 | |
| came 89:23 95:10 | **Clardy** 64:12 | composite 4:6,12,13,14 | correct 15:13 16:6 | |
| 103:6,7 | **Clayton** 1:3,13 2:15 | 56:21 58:11 | 32:23 33:20 34:8 | |
| canceled 100:6 | 114:7,18 | computer-printed | 39:11 43:14 52:16 | |
| car 105:7 | cleanup 61:9,9 | 114:21 | 87:20 88:7 114:22 | |
| | | | | |
| | | | | **D** |
| | | | | dad 96:15 |
| | | | | daddy 55:18 103:6 |
| | | | | **DANIEL** 2:17 |
| | | | | dare 86:3 |
| | | | | dark 100:21 101:23 |
| | | | | date 16:8,10 43:16,17 |
| | | | | 44:7 62:15 112:11 |
| | | | | dated 3:12,13,14,22 4:5 |
| | | | | 4:8,9 14:8 63:6 |
| | | | | dates 41:22 |
| | | | | **Daugherty** 2:3 5:7 |
| | | | | 113:14 115:9 |
| | | | | day 19:20 43:19 91:9 |
| | | | | 92:15 94:11 96:1 |
| | | | | 108:22 115:6 |
| | | | | days 38:21 |
| | | | | **De** 11:20 |
| | | | | deal 26:20 54:11 74:5 |

87:6 92:8 111:19
dealing 58:1 64:3 94:2
  95:9 112:16
dealings 42:2
dealt 48:5
decision 107:23
deed 33:9 38:23 39:5,5
defendant 2:20 3:1
  7:15 87:19
Defendants 1:9,19
  114:4,15
defending 87:14
demand 110:7
Dennis 3:22 44:6 45:8
  45:9,22
depend 14:16
DEPONENT 113:8
deposing 36:13,13
deposition 1:21 2:1 5:4
  5:6,13,18 6:2 13:15
  42:15 113:4,17
deposits 112:13
Depot 26:2
derived 20:6
Derrick 2:5,21
Destin 42:6 73:14
  105:21,22 106:3,4
develop 9:16
developer 106:6
development 1:8,18
  8:15 9:5 11:1 21:15
  33:8 44:7,21 51:7
  57:2 58:13,22 59:14
  60:15 61:2 63:6
  66:20 70:20 71:6
  83:11,18 86:14 114:3
  114:14
developments 11:3
  42:4
develops 9:6
different 11:10 27:12
  82:17 84:19 91:12,20
  92:2,2
direct 94:2 95:9
directly 16:4 26:21
  59:21
Disclosure 4:1
discuss 49:6
discussed 49:8
Dispirto 48:5 49:4,6
  93:17
divide 15:6
divided 18:11
division 1:3,13 79:21
  108:5,9 114:7,18
document 13:22 14:3
  19:5 25:5 42:15

46:14 47:8 62:15
63:7 65:23 75:4 76:6
77:2,9 80:6,18 82:5
documents 13:16,17,19
  44:13 46:12 57:4,7
  62:11 66:14 74:23
  75:3 79:23 82:16
  83:10
doing 9:18 45:20,22
  85:19 86:3 90:20
  101:22 102:13
done 17:19 18:8 37:10
  37:11 43:12,22 50:10
  59:10 87:2,3 91:19
  92:1,5 102:23
door 16:16
Dothan 2:6,23 8:19
  9:12 10:8 11:16 12:2
  12:6,9,19 15:3,12
  38:16 49:1 53:2
  77:13 106:3 110:16
Doug 56:10,16 93:8
down 6:19 7:6 9:5,15
  31:16 38:20 40:14
  44:22 73:23 74:10
  85:23 100:16 104:18
  112:20
drafted 88:23
drafting 23:13 24:16
  88:21 90:11
draftsman 39:11 90:8
Drale 68:4,15 69:3,8
  93:12 104:21,23
  105:10 108:15
  109:17
drawing 98:10,12
driving 82:2,3
drove 90:4
duly 6:6 113:19
dumb 72:18
during 112:14
d/b/a 1:7,17 71:6 112:1
  114:2,13

E

Each 60:20 99:8
earlier 64:16 104:20
  105:14
eat 90:15,17
ECOA 4:1
effect 21:3
either 5:14,20 14:22
elaborate 36:9 80:1
  96:1
electricity 40:10 82:6,6
Emerald 76:2,3 79:15
  79:18 105:16,19

106:5,13,22 107:3
  108:1,8,16
employed 12:21
employees 11:11,12
  12:4,8
end 17:16 65:12
ended 68:9 103:23
  107:4
enormous 19:17
enough 9:2 24:19 31:4
  36:9 49:21 95:23
  96:12
enter 22:7 25:10
entered 55:9 57:14
  61:1 71:10 91:23
  103:3
entering 16:22 17:3
  21:19 63:8,19 91:20
entire 20:22 34:10
  39:13 65:13,15
entity 98:2 99:23
Esquire 2:13,16,21 3:2
Estate 80:19
estimated 22:13
estimation 22:12
et 1:8,18 114:3,14
Etris 36:21 37:2 39:6
  39:13,23 40:20 76:8
  86:12 94:14 99:5
  107:1,2,4
Etrises 94:1 107:16
  109:9
Eufaula 3:3 72:6,7
Evans 26:1
even 16:15 35:16,23
  53:20 54:20 55:2,11
  55:17,19 75:7,8 86:1
  87:15 91:23 104:19
  107:7,11
event 107:16
ever 22:4 24:13 29:5
  35:15 38:4 40:16
  41:9,21 46:6 47:16
  48:8,17,18 49:4,6
  50:22 52:4 64:6 68:3
  69:8 78:17 88:1
  90:11 101:21 105:12
  112:4
every 10:18 31:11
  90:15 92:13
everybody 28:6 66:13
  74:8 97:2 111:5
everybody's 66:18
everything 14:22 23:17
  24:3 31:3 101:11
evidence 5:13 99:10
Evidently 107:3

evolved 64:23 65:2
exact 19:4
exactly 15:20 16:7
  17:22 33:21 41:23
  55:4 62:1 71:15
  106:1
examination 3:5 6:9
  97:15 111:13 114:23
example 52:2
except 19:5
exception 13:19 15:22
excess 30:8
exhibit 3:10 4:6,12,13
  4:14 13:10,14 15:8
  18:23 19:3 20:11,20
  21:9,12,17 22:14,17
  25:6 26:23 27:3,11
  30:5 31:21 42:11,14
  42:23 44:1,4,10,14
  45:11,14 46:8,11
  47:3,6,9 52:10,13,20
  52:23 56:18,21 57:1
  58:11 60:13 62:6,9
  63:1,4 65:3,6 69:10
  69:13 74:19,22 81:22
  82:8,14 84:16,21
expense 18:11
explained 79:20
extent 69:4
extremely 72:18
e-mail 3:21 45:16

F

fact 17:20 30:11 32:6
  32:18,20 35:16 39:23
  95:10 108:9
factor 42:21
failed 55:20
familiar 21:21
family 89:5
far 10:4 11:23 14:15
  19:13 26:5 27:7
  55:23 66:11 91:20
  94:18
Farm 83:5,19 85:16
Farms 83:3,12 84:4
  85:17
fashion 42:9
fast 31:4
fax 3:20 44:15 80:7
Fay 6:17 80:21
FAYE 1:4 113:22
fee 24:20
few 6:15 82:15 95:15
  97:17
figure 60:16,17,20
  106:10

file 19:6 22:5 45:15
  81:7 86:3 94:21
filed 77:11,13,14
filing 5:18,22 77:23
fill 98:11
filled 64:6 78:22
final 41:17
finance 17:13,18 28:19
  28:20 32:5 36:23
  37:15 38:16 39:13
  47:17,19,23 48:3
  49:22 50:1 78:19
  87:10,11 89:23 98:21
  103:22 106:6
financed 13:7 48:19,21
  66:16 68:13 103:16
  107:5
financial 26:8
financing 6:23 15:10
  15:14 18:15 26:8
  46:15 48:14 49:3
  62:20 86:18 87:8
  101:8
find 36:11 100:19,22
  110:14
fine 7:4 9:2 81:13
finish 94:14
finished 29:16,19
  103:13
finishers 61:17
firm 17:7,8,9 18:6
  37:23 46:21,23 47:2
  47:12
first 6:6 14:20 17:5,23
  22:4 37:11,12,13
  43:1 44:22 46:19
  53:9 55:21 69:5 71:4
  100:17 101:9 102:1,
  105:2
fished 89:2
fit 108:21
five 12:10 109:20
five-year 48:3,4
fix 23:9
flew 105:7
Floor 35:8
Florida 8:20 74:2
  102:6
folks 30:13 50:20
followed 100:13
follows 6:8
follow-up 111:12
foolish 87:15
Ford 73:4
foregoing 114:21
forgotten 41:7
form 5:11 14:9 23:1,2,8

10-28-2005   15:37   From-                                                                    July 20, 2005

Deposition of Thomas Foster Leonard

Page 4

| | | | |
|---|---|---|---|
| 42:8 58:12 79:3,8 | 107:22 109:10 111:4 | 63:3,3 65:5,11 69:3,5 | 53:13 54:7,9,17 | 28:3,12 29:14,17,19 |

42:8 58:12 79:3,8
91:13 98:12
**formality** 5:9
**formerly** 109:8
**forth** 90:13
**Foster** 1:21 2:1 5:4 6:5
6:13 113:18
**found** 50:3
**foundation** 54:21,22
71:10,12,13
**four** 12:10 44:16 75:6
**frame** 61:18
**framed** 59:9
**framers** 61:17
**frames** 61:19
**framing** 61:16
**Franklin** 80:7,9
**Friday** 31:12
**friend** 92:19
**friends** 72:17 90:14
**from** 3:20,21 4:2,5,14
10:1 21:22 25:19,23
26:1,15 27:22 29:5
38:13 44:15 46:13
47:6 48:8,11 53:1
54:23 55:2 57:8
63:10,12,13 68:15,18
70:5,7 71:5 77:3
79:18 80:7,18 82:12
82:17 85:10 86:6
90:15 91:3 96:8 98:6
99:16,17 100:9
104:10,21,23 105:4
108:1 109:7,8 110:15
111:7,17 112:13
**front** 30:3 65:9
**full** 6:11 28:23
**full-time** 12:4
**fund** 34:15
**Funiak** 11:20
**furnish** 54:20
**furnished** 32:4,5 33:7,8
**further** 5:16,23 113:8
115:3

___
**G**

**gables** 75:22
**game** 50:5
**Gassett** 1:14,14 3:16
6:16 20:17 25:1 27:5
27:10 28:17 33:11
34:3 36:8,20 39:9
40:21 43:14 47:16
49:7,9 51:9 55:5,11
56:12 68:9 72:10
78:21 81:6 84:23
99:5,16 100:4 106:20

107:22 109:10 111:4
111:7,16 114:10,10
**Gassetts** 15:12 16:11
19:9 21:1,14 29:13
30:8 31:22 35:18
63:14 86:11,17 94:19
95:2,9 112:14
**general** 12:18 34:21
87:17
**generally** 9:4 82:16
**gentleman** 13:6 47:7
68:3
**gets** 92:23
**getting** 25:19 32:3 79:1
87:13
**give** 14:14,23 15:22
23:7 26:4 28:9 40:18
41:22 43:3 46:17
49:1 50:22 58:20
62:2 64:1 65:11 95:5
95:6 97:4 102:10,10
108:4 111:3
**given** 76:2 84:9
**giving** 33:10
**glad** 7:3 91:7
**Global** 1:7,8,17,18 14:1
14:6 15:10,16 20:15
20:22 21:15 33:8
36:23 37:5 42:3
43:10,11 44:7,20
51:7 57:2 58:7,12,22
59:14 60:14 61:1
63:5,20 66:20 70:20
71:6 83:11,18 86:14
111:22 112:1 114:2,2
114:13,13
**go** 13:12 23:8,9 24:9
28:6,9 31:3 34:16
35:8 40:12 41:15
44:13 59:2 60:19
62:10 66:16 73:21,23
79:9 84:22 86:12,21
89:6 90:14,17 96:7
97:19 98:9 110:9
**goes** 46:2
**going** 6:20 13:12,13,16
13:22 15:11,14,16,18
15:22 16:18 17:16
19:2,3 21:11,11,16
22:16 25:1 27:2,3
30:18 33:11 36:14
40:18 42:13 44:3,3
44:12,12,14 45:13,23
46:10,11 47:23 50:13
51:1,2,4,15,17,17,21
52:1,22 54:2,4
56:20 57:21 62:8

63:3,3 65:5,11 69:3,5
69:12 70:23 71:23
72:9,15,16,17 73:17
73:22,22 74:21 77:1
78:18 82:10,13,14
83:4 84:20 89:15
92:13 93:2,3 94:12
99:2 101:1 103:9
105:16 106:21
109:22 110:7,8,15,17
110:18
**gone** 17:10 23:16 26:16
35:12 36:12 74:17
112:11
**good** 39:1 48:2,2 55:22
74:1,12 89:5 90:8,14
90:19 110:16
**grab** 16:16
**ground** 31:11,13
**group** 1:7,17 14:1,6
15:10,16 20:15,22
36:23 37:5 42:3
43:10 73:17 74:23
83:10 111:22 112:1
114:2,13
**guarantee** 58:2 61:14
**guess** 23:4 63:15 70:10
74:12 82:19 87:11
89:13 92:12,21 101:3
101:20 107:12 109:1
**guideline** 15:2 17:1
**guidelines** 22:10 46:14
46:22 64:16,21
**Gulf** 9:15

___
**H**

H 3:21
**half** 33:12 89:13
**handwritten** 3:13 77:3
**happen** 87:4
**happened** 49:11,15
111:6
**hardly** 24:11
**Harry** 112:21,22
**Hartford** 112:17,18
**having** 6:6 103:13
**head** 43:23 73:7 93:16
**heard** 68:3 69:1,2,2
88:16,16 97:10
104:15
**help** 69:3,6 72:17 74:6
91:7,11,15 94:6
103:8 108:23
**helped** 94:13
**helping** 94:12
**helps** 24:6
**her** 39:1 41:15 53:13

53:13 54:7,9,17
**hereto** 5:21 6:1
**hey** 16:17
**he'll** 90:17
**high** 23:12
**high-powered** 110:6
**him** 13:9 15:23 20:23
23:7,16 24:6,11
25:18,19 26:4 28:8,9
29:21 30:2,13,14
32:12,17 35:18,22
36:3,13,16 37:20
39:4 40:18 41:18
46:4 49:8,12,14,14
49:22 50:11,17,21
51:15,19 53:23 54:5
55:17,23 56:3 58:5
59:11 60:19 61:13,14
61:20 67:15 68:21
69:3,6,6,7 71:13,18
72:3,11 73:17,19
74:17 75:20 76:21
77:5 78:2,12,14,15
84:9 89:1,2,5 90:17
91:7,8,10,11,15
92:20 93:20 94:8,13
95:14 97:3 100:18
103:8 104:9 105:12
107:15 110:5,8,9,23
**himself** 75:23
**history** 28:4
**hits** 31:11,13
**hmmm** 36:4
**hold** 25:20 36:15 41:4
**holdout** 40:17
**holdouts** 40:9,10
**home** 3:16 4:10 7:10,23
8:2,9 9:10,13 15:12
26:2 27:5 28:17'29:9
34:3,8 36:20,21,21
37:1 47:16 49:7,10
53:4 55:6,11 57:3
58:15,21 65:7,14,16
66:8,9 68:10 69:15
69:16 70:2 77:12
80:22 84:23 85:21
88:22 100:9
**homeowner** 26:20
86:16
**homeowners** 28:21
**homes** 6:19,23
**hope** 84:10
**horn** 50:8
**hourly** 61:13
**house** 14:15,17,23,23
15:5,11 16:11 17:12
19:8 20:17 21:1 28:3

28:3,12 29:14,17,19
30:9 33:2,6,16 34:12
37:9,20 38:5,7 41:5,8
41:9,10,16,20 43:14
48:16,20 54:1,12
61:17,19 62:13 64:12
66:21 67:5 68:8,9
69:1 70:13 71:19
72:13 76:8,11,15
77:16,22 80:12 81:6
83:19,21 87:6 90:9
93:12 95:3 96:3
103:9,11,16,23
111:16
**housed** 12:1
**houses** 11:9 19:15,20
48:15 73:20,22 78:19
88:10,23 99:6 102:18
103:5 104:1,4 110:11'
110:17
**Houston** 6:20 109:4,5
**HUD** 44:17
**Hughes** 1:4,4 4:10 6:17
31:22 32:22 33:1
34:8 35:18 36:7,20
39:9 40:20 49:7,9
51:9 55:5,10 56:12
62:4,13 63:6,14
64:11 65:7,14,16
66:8,9,19 69:16
70:11,12,20 71:4,19
72:8 75:8,12 76:10
77:12 78:11,21 80:12
80:21 84:22 86:11,16
94:19 95:2,9 99:5,18
100:4 106:20 107:22
109:9 111:3,8,16
112:14 113:22,22
**Hughes's** 33:21 34:12
**hundred** 18:1,2
**hunt** 89:2,4
**Husband** 10:14

___
**I**

**ice** 96:9
**idea** 32:15 78:3 96:2,4
97:22,23
**identification** 13:11
19:1 21:10 22:15
27:1 42:12 44:2,11
45:12 46:9 47:4
52:11,21 56:19 62:7
63:2 65:4 69:11
74:20 82:9 84:17
**identify** 85:8
**III** 2:16
**inactive** 10:17

10-28-2005 15:38 From- Case 1:05-cv-01082-MHT-VPM Document 27-10 Filed 01/06/2006 Page 37 of 44 T-499 P.037/042 F-172
Deposition of Thomas Foster Leonard

Page 5

| | | | | |
|---|---|---|---|---|
| inadvertently 84:6 | 63:12 66:12 71:5 | 77:6 78:23 80:11 | 106:10,12,15,15 | 60:12 62:8 64:12 |
| INC 1:7,17 114:2,13 | 72:22 78:1 79:17 | 81:1,19,23 82:15 | 107:10,11 108:8,12 | 65:23 67:8 69:13 |
| included 45:1 81:21 | 80:4 82:4 83:5,18 | 83:1,9 84:4,20 87:17 | 108:15,22 109:1,11 | 70:1 71:3 72:21 |
| Including 29:2 | 88:12 89:18,22 90:3 | 91:14 92:14 93:6 | 109:12 111:6 112:3 | 74:21 77:23 78:16 |
| Incorporated 7:14,16 | 90:4,12,20 91:21 | 95:8,17 97:10,17 | 112:12,18 | 80:6 82:5 85:2 86:11 |
| 14:1,7 111:23 112:1 | 94:7,8,9,9 95:6,22 | 98:8 100:19 101:13 | knowing 68:23 91:8,10 | 87:18 88:12 89:17 |
| Index 3:5,10,23 | 97:23 98:4,8 100:1 | 101:17 103:21 | knowledge 29:8 30:19 | 91:19 94:23 95:17 |
| indicate 104:4 | 102:10 105:14 | 108:22 111:12,21 | 78:16 83:4 88:12 | 97:14 113:2,18 |
| indicated 104:3 | 106:21 107:23 | 112:12 | known 50:14 | less 12:15 39:17,17 |
| indicating 75:17 | 108:23 109:13,21 | | knows 74:3 | 48:4 |
| indirectly 42:6 | 111:22 | **K** | | let 7:2,8 28:9 35:19 |
| individual 58:3 | Jarrett's 23:4 43:4 | keep 12:13 15:3 19:7 | **L** | 36:6,15 51:9 53:23 |
| individually 7:13 | 46:1 | 19:16,18 32:17 34:18 | L 2:13 3:2 | 54:5 73:16 95:14 |
| information 15:1 16:23 | Jeff 4:2 47:7,13 93:21 | 51:20,21 57:11 78:4 | labor 26:10 29:23 59:8 | 100:12 101:7 |
| 54:18,19 99:14,20 | 93:23 | 81:6 87:15 | 61:5 71:14 | letter 4:2,5 53:1 78:9 |
| inside 61:10 | Jernigan 4:2 47:7,13 | keeping 19:13,13 26:5 | lady 24:5 38:19 | let's 19:20 56:1 61:15 |
| inspection 31:7 81:2 | 93:21,23 | keeps 24:4,20 | lake 72:5,6,6,7 105:5 | 61:18 62:3 85:23 |
| inspector 100:9 | Jim 94:4,5,12,17 105:3 | kicked 84:9 86:8 | land 9:6,7,16,18 10:19 | 100:11 |
| installment 86:23 | 108:20 109:15 | kin 115:3 | 11:1 45:20 | license 55:7,13,16,19 |
| instance 59:12 61:9 | 110:23 | kind 45:20,22 58:19 | landscaping 61:11,12 | 56:1,8,9,14 82:2,3 |
| 83:9 | Jinks 21:6,17 61:6 | 59:15 73:3 74:4 90:6 | large 2:4 5:8 17:20 | licensed 55:12 |
| instead 36:12 43:9 93:1 | job 19:10,15,17 20:13 | 91:13 98:2 110:18 | 113:16 115:11 | Lie 18:20 |
| interest 10:5 18:13,13 | 20:16 24:23 25:1 | kindly 11:13 15:1 80:9 | last 34:22 40:14 43:18 | lien 23:22 34:11,13 |
| 18:19 33:19 39:20 | 26:3,10,16 27:8,10 | knew 40:17 41:21 72:1 | 74:15 81:21 104:15 | 35:5,13 53:3,8,12,14 |
| 45:1 48:3 62:21 | 27:13 29:6 31:6 | 72:2,21 89:4,5,5,20 | 109:13,18 | 53:21 54:9,11,15 |
| interested 115:5 | 34:21 35:1 46:16 | 96:5,6 97:2 104:5 | late 69:18 | 55:1,2 77:11,23 |
| interests 10:22 | 54:16 56:12,23 57:12 | know 7:2,8 9:3 11:16 | later 13:9,20 28:2 31:6 | 95:11 111:4 |
| interviewed 36:2 | 58:9,23 59:10,13 | 16:14,15,20 17:19 | 79:14 103:14 | liening 53:7 |
| introduced 5:19 94:11 | 60:15 61:15 64:11,13 | 18:3 19:19 22:10 | Law 2:5,14,17,22 | liens 29:8,11 34:7 |
| invoice 28:2 59:15,17 | 65:18,20 71:4 83:3,7 | 23:10 24:2,13 28:7 | lawsuit 6:17 35:17 88:2 | lien's 54:3 |
| 85:6 | 84:19 85:6,7,8 94:14 | 29:12 30:20 31:9 | lawsuits 7:12 87:19 | lighting 4:15 85:3 86:1 |
| invoices 4:7,13 12:13 | jobs 24:5 37:10 57:17 | 32:18 36:1,5 38:4,19 | lawyer 13:18 21:16 | 86:6 |
| 60:17 82:12,22 84:3 | 57:18 90:1 96:6,13 | 39:1 40:11,13 41:17 | 22:18 53:2 75:1 | lights 85:4 |
| involve 10:23 | 98:10 | 43:15 45:2,4 47:13 | laying 81:20 | like 11:14 15:7 18:1 |
| involved 42:5,8 74:12 | Joe 1:4 6:17 63:6 76:10 | 48:1,17 50:4 51:11 | layout 90:8 | 19:19 24:15 29:23 |
| 80:2,3 83:6 | 80:21 92:10,18,19 | 52:4,7 55:5,11 56:10 | lead 93:2 | 31:10 34:23 36:10 |
| involvement 6:22 | 113:22 | 56:12,17 59:12 63:15 | learn 92:7 | 40:1,1,3,19 41:14 |
| involves 61:10,10 | Johnson 85:16 | 64:2,4,23 66:1 67:6,7 | learned 104:6 | 44:17 47:11 60:18 |
| involving 6:18 | joint 14:10,11,12 62:12 | 67:12,15 68:7,15,20 | leave 51:18 | 64:17 67:10,18 72:2 |
| IPI 3:1 47:19 48:6 | 83:17 | 69:4,7 70:18 71:7,14 | led 79:11 | 73:5,9,11 79:22,23 |
| 68:12 78:7,8,16 | Jones 92:10 | 72:14,18 73:1,8,20 | left 26:2 52:5 67:21,22 | 80:9 81:11,20,23 |
| 79:18 80:20 93:18 | Jordan 53:3,17 55:2 | 74:13 75:15 78:13 | 68:1 | 82:16 83:9 84:11 |
| Irby 3:2,8 79:3,7 97:16 | Josh 13:1 23:18 | 79:22 81:10,21 83:23 | Lena 2:6 | 87:1,12 92:19 95:4 |
| 111:10 | July 2:7 114:20 | 85:12,13,18 86:2 | lender 80:19 | 98:2,20 99:5 101:9 |
| issued 45:5 | jump 70:23 | 87:12 88:6,15,17,19 | lenders 101:19 | 103:13 105:6 106:5 |
| items 25:18 | June 4:8 62:15 | 88:20 89:1,3 90:10 | Leon 2:21 | 107:20 109:9 |
| | just 7:2,5,8 9:3,17 14:5 | 90:11,23 91:6,14 | Leonard 1:21 2:1,20 | liked 50:14 |
| **J** | 15:7,20 19:19 23:10 | 92:4,5,9,16,18,23 | 4:5 5:4 6:5,13,14 | limb 17:17 |
| jail 97:10 | 23:12 29:23 33:23 | 93:8,11,14,23 94:8 | 7:10,20 8:12,21 9:8 | line 31:16 80:12,15 |
| James 13:6,7 53:11 | 35:4 36:15 38:10 | 94:23 95:21 96:14,17 | 10:1,15,21 12:11 | 111:15 |
| 54:1 88:7,9,9,11 | 39:10 43:4,12 44:19 | 96:21 97:3,4,5,10,12 | 13:13 14:5 15:13 | List 3:17 |
| Janice 49:2 | 52:14 53:22 54:12,14 | 97:18,19 98:1,16 | 19:2 21:13 24:1 25:9 | listen 74:7 110:14 |
| Jarrett 14:1,7 15:9 | 54:17 56:3 57:11 | 99:23 100:3,15,20 | 27:2 28:11 30:7 | little 18:16 |
| 20:15,21 29:18,19 | 60:18,23 61:11 62:10 | 101:6,14,15,17,21 | 31:20 33:23 35:17 | live 68:19 85:15 109:3 |
| 30:12 34:4 36:8 37:5 | 64:22 66:14 67:10 | 102:12,17 103:5,20 | 37:4 42:5 43:18 45:8 | 109:4 |
| 40:23 50:1,19 51:3,7 | 71:2,14 73:5 74:10 | 104:1,12,13,14,19 | 46:10,23 51:6 52:22 | lived 105:9 |
| 55:8,10 59:7 61:1 | 75:2,22 76:5,21 77:2 | 105:5,8,10,20 106:9 | 55:6 56:20 58:11 | lives 68:20 109:5 |

Page 6

LLC 7:22 10:6,19 13:2
LLCs 10:23 12:2
loan 14:12 17:12 18:12
    31:8,18 33:18 54:5
    66:17 69:6 101:10
    105:2 107:16 110:4
loans 76:6 101:8,18
    106:21 111:15
located 105:19
long 41:19 50:5 58:8
    91:10 109:19 112:11
look 20:1,8 23:21 35:1
    40:16 57:5 60:7,11
    76:1 82:16 84:23
    91:18
looking 23:12 25:5
    48:12,14 50:15 53:7
    54:12,14 61:11 71:3
    77:20,20 91:22
looks 44:17 47:11
    81:23 84:11
lot 14:18 16:1 23:5
    29:2 37:18,18,20
    38:10,13,15 42:17,18
    43:7,13 44:13,20
    45:23 46:2 53:10,12
    53:17 54:16 76:18,22
    88:23 103:13 104:10
lots 18:2,2,3,3 55:7
    56:14
loud 7:5
low 18:19
lowboy 18:18
Lowe's 25:23 86:6
Lyn 2:2 5:6 113:14
    115:9
Lynn 2:16 6:15

_____

M

mad 46:3
made 5:11 33:3,16 34:3
    43:9 56:6 86:23
    100:4 107:23 112:13
mail 106:18
main 85:13 90:21
mainly 111:19
maintained 27:7
make 17:15 34:2 38:8
    38:11 66:7 69:21
    97:18
makes 61:20
making 31:23 75:23
man 23:15,16,22 34:6
    32:4,4,5,11 36:1 69:5
    74:2 93:2 94:5 98:6
    100:16 110:6,17
managers 12:18

manner 5:20 115:5
many 12:8 31:15 49:8
    50:21
March 3:14 4:9 63:6
mark 3:21 13:13,17
    19:3 21:12,16 27:3
    44:4,14 45:8,9,22
    46:3,11 63:4 82:10
    82:13 84:21
marked 13:10 18:23
    21:9 22:14 26:23
    42:11,13 44:1,10
    45:11,13 46:8 47:3,5
    52:10,13,20,23 56:18
    56:21,23 62:6,9 63:1
    65:3,5,10,10 69:10
    69:12 74:19,22 77:10
    82:8 84:16
Masonite 24:8
material 54:21,23
materials 57:21 71:14
    86:6
matter 18:4 58:6,7
    78:23 113:21
Matthews 82:20
may 3:12,13 4:2 5:6,12
    5:13,19 14:8 16:8
    43:16,20 59:21 84:22
maybe 10:16 24:20
    28:8 34:22 38:21
    60:12 89:3
McDougle 3:20,21 43:6
mean 17:9 20:7 30:2
    31:8,12 35:8 58:3
    60:4 66:11,17 67:2
    70:18 78:18 90:12
    91:9 92:1,4 98:18
    100:16
measures 14:19 17:2
meet 68:21 105:12
members 109:10
memory 76:14
met 6:15 49:4 94:8
middle 44:18
Midland 41:5,11,20
    103:10,23
might 16:19 28:6 40:15
    63:23 64:5,7 72:18
    77:19 84:10 105:7
mighty 23:12
mind 32:18 78:4
    110:19
mine 22:21 83:10
mini-type 14:12
minute 23:10 41:4
minutes 6:15 95:15
misfile 83:15

misfiled 81:11
misrepresenting 67:2
missing 65:8
mistake 83:8 84:13
misunderstanding
    49:20
Mitchem 23:23 25:12
    77:3 90:13
mixed 53:9
money 14:13 15:23
    17:13,15 18:22 29:13
    30:14 31:2,4,9,15
    32:8,21 33:4,10 34:7
    34:19 35:18 36:6,12
    38:8,11 39:2 40:7,18
    41:22 48:8,11,13
    50:18,19 51:3,11,14
    53:15 60:3,4 61:14
    61:21 62:2 66:13
    67:4,22 69:6,14 70:3
    70:19 71:19 72:10,11
    72:20 74:1,2,5 76:15
    77:15 78:2 96:7,11
    96:16 98:5,11,13
    99:3,15,21 100:1
    110:4,19 111:3,7
    112:8,12
money's 39:3
monies 50:16
MONTGOMERY
    113:13
month 109:20
more 12:15 20:6 28:1
    69:17 70:2 77:2 80:2
    81:16 87:22 95:17
    110:1
morning 30:20 67:13
mortgage 4:1 17:10,11
    46:13 76:2,4 78:5,6,8
    78:10 104:8
mortgages 99:1 103:17
most 11:12 24:21 72:8
    88:23
move 110:15
much 60:14 70:1
    110:10,10
myself 34:23 70:10
    100:19

_____

N

name 6:11,14 12:23
    13:6 46:1,3 58:8
    67:19,20 69:1,2 78:6
    80:3 83:23 93:21
    108:20
named 7:14 10:3,23
    68:3

names 93:7
Nancy 4:5 53:1,6,18
    54:1,10,18
National 112:23
nature 10:20
necessarily 17:18 64:4
need 5:11 7:7
needs 66:13 90:22
neither 115:3
never 37:14 46:4 48:12
    55:13 74:11 87:3,4,9
    93:3 95:8
new 28:20 41:15,15
    45:18 68:21
next 3:23 41:14 77:2,9
    80:6,18 81:1
nine 75:1
nobody 24:10
nods 43:23 73:7
North 2:6,18 7:11
note 35:6 70:15 75:16
    75:16,23
notes 3:13 75:13,15
    77:3
nothing 6:7 53:15
    96:17 113:20
notice 105:23
number 13:14 15:8
    17:20 19:4,6,6,7,10
    19:11 20:9,12,13,21
    21:12,17 22:17 25:6
    27:4,4,11 30:5 31:21
    42:14,23 44:4,14
    45:14 46:12 47:6,9
    52:13,23 53:18 57:1
    57:12 59:13 60:13
    62:9 63:4 64:11,13
    65:6,10,18,20 69:13
    74:22 82:3,14 84:19
    84:21 85:7 102:11
    105:23 106:3,3,4
numbers 23:9 34:19
    54:16,17 67:3 85:22
nursed 74:7

_____

O

Oak 85:15
object 79:3,7
objections 5:10,10
obviously 59:13 63:14
occasion 26:19 74:16
October 4:5
off 12:15 24:20 33:19
    51:17 55:1 70:16
    111:4
offense 97:6
offered 5:13

office 12:2 23:15,20
    27:7 32:19 44:16
    55:15 75:14 90:16
    91:3,3 94:11 95:7,11
    96:6,7 109:16 111:1
offices 2:5 11:17
oh 11:18 12:10 24:7
    34:11 53:16 55:16
    87:3,23 112:23
okay 7:3,9 8:8 9:1 10:7
    10:15 13:9,21 17:10
    20:10 21:11 26:7
    36:18 39:13 52:12
    54:4 61:8,9,17,19
    65:5 69:23 73:5
    79:18 82:2 83:14
    85:20 88:20 95:18
    104:14 110:21 113:3
old 27:19 51:17
once 10:18 15:17 33:2
one 11:15 12:2,10,20
    15:22 17:23 19:21,22
    24:16 27:20 37:7,8
    37:11 38:12,21 41:7
    45:2 47:2 51:12 52:8
    52:18 56:13 60:10,20
    68:7 76:16,17 81:9
    83:8 84:7 85:14,15
    85:16 87:22 89:3,7
    92:7 93:1 94:11
    97:11 101:12 102:20
    106:23 107:15 108:6
    108:22 111:12
    112:20
ones 48:22 102:15
    104:3
ongoing 42:4 73:14
only 11:5 25:17,21 48:3
    65:20 92:22 104:3,4
    112:20
onto 102:20
option 3:18,19 4:4 43:4
    43:8,17 44:5 45:18
    52:17
order 23:17 60:9
orders 4:13 82:11
Orlando 42:6 73:14
other 5:10,14,20 7:22
    8:8,11 9:8,22 10:3,4
    10:11,15 16:23 26:7
    37:3,4 40:22 41:3
    42:2 57:17 61:5
    68:23 87:19 95:10
    96:13 100:1 101:18
    102:14,17 103:5
    104:1 106:23 107:22
    110:22

10-28-2005  15:38  From-                                    T-499  P.037/042  F-172

Deposition of Thomas Harris -

ought 28:8
out 7:5 8:19 9:11,12,18
  10:7,8 17:17 19:21
  27:17 30:14 33:10,12
  36:11 37:9,18 40:7
  41:8 43:9 49:21,23
  50:3,3,6,9,10,13 52:3
  52:6,8,9 53:10,12
  54:9 59:9,10 64:6
  70:23 72:8,20 74:1,5
  74:7,9,13 77:10
  78:15,22 81:14,15,16
  83:7,21 84:9,18 85:9
  86:8 87:16 90:14
  98:11 100:5,19,22
  103:9,11 107:8
  108:23 110:14 115:1
outside 12:22
outstanding 29:9 35:9
over 15:5 18:2 20:6
  23:13,16 29:13 38:11
  40:6 41:18 51:1 60:9
  64:23 65:2 66:20
  76:16 96:23 100:11
overhead 11:15
overseeing 25:14
owe 53:19
owed 35:14 53:15 72:8
own 7:15,23 8:11,15
  9:9,10 10:4 11:18
owner 7:18 8:2,5,17
  9:20,21,22 10:9
ownership 10:5
owning 104:1
o'clock 75:6

**P**
page 3:23 65:8,9 75:18
  80:18 81:1,21
pages 21:13 44:17 75:2
  114:21
paid 13:4 16:2 18:13
  27:8,12,17 28:5,12
  28:16,19,23 29:13,22
  30:8,14,17 32:20
  33:19,21 34:9,13,14
  34:15 35:12,18 40:11
  40:13 44:20 45:2
  48:22 50:17 51:13
  59:16,20 60:14 61:20
  66:20 67:4 69:15,22
  70:3,8,9,11,12,16,20
  75:20 76:14 77:21
  78:1 80:21,23 81:4
  85:21 86:4,5 96:2
  98:15
Palmer 14:2,7 15:9,15

16:11 17:4 20:16,21
  21:20 22:8,22 25:3
  29:18 30:12 32:2
  34:5 36:23 37:6
  39:19 41:1 50:1,19
  51:7 54:11 57:15
  59:7 61:1 62:13 63:9
  66:12 71:5 72:22
  78:1 80:4 82:4 83:5
  88:13 89:21 96:15
  99:16 100:2 101:1
  107:23 109:14,21
  111:7,22
Palmers 28:14 29:5
  88:18 95:1
Palmer's 75:15
Panama 73:14
paper 16:17 21:12
paperwork 23:21
  50:10 64:5 78:22
paragraph 43:18
parcels 9:7
Paris 13:21 23:18
Parish 13:1
part 16:3 22:9 34:9
  46:14,22 49:9 64:9
  99:11 106:10
particular 18:14 19:8
  22:9 24:23 25:2
  27:13 29:6,9,14 30:9
  47:15 58:9 65:22
  66:15 82:12 85:5,8
  112:5
parties 5:3,17 6:1
  18:12 115:1,4
partner 10:11 93:4
partners 11:5 93:1
partnership 13:5 62:18
  63:8 83:17 89:18
partnerships 22:8
  64:19 91:21
party 5:14,20
pass 18:17,21 92:15
passed 38:22 55:15,21
  56:4
passing 90:18
Patriot 4:1
pay 11:13,14 14:16,17
  15:4,23 16:3 28:14
  29:5,20 31:10,12,14
  32:8 34:7 38:10,15
  38:21 39:19 42:18
  46:2 49:21 54:16
  57:9,21 58:22 59:5,7
  59:11,21 61:4,13
  62:20 72:10,15,16
  74:1,5,7 76:22 82:18

84:6,11 86:2,7,14,15
  87:9 96:9 98:14
  110:7,9,18 111:4
payable 59:13
paying 19:12 32:10,10
  61:2 71:18 77:5 78:4
  82:23 96:12
payment 71:5
payments 31:23 86:23
payoff 80:12
pays 98:9
penitentiary 51:5
PENN 2:13
penny 29:5
people 15:3 40:11
  48:15 53:20 59:2
  80:2 92:8,8 99:2,7
  109:7
per 31:19 39:20 56:22
percent 9:21 10:10
  39:19 48:4
period 112:14
permanent 48:14
permit 60:18 81:3,5
person 23:18,20 25:10
  25:13 51:4 64:3
Peter 83:3,12 84:1,1,1
phase 99:8
phone 93:20 105:23
Phyllis 1:14 6:16
  114:10
pick 82:11 90:17
picked 75:5
picture 103:3 108:21
piece 16:16 21:21
Pike 88:6,10
Pitman 4:5 53:2
place 12:5 25:2 55:3
  91:2 95:2 100:17
plaintiff 3:11 88:1,3,8
Plaintiffs 1:5,15 2:12
  113:23 114:11
Plaintiff's 13:10,14
  15:8 18:23 19:3
  20:11,20 21:9,12,17
  22:14,16 25:6 26:23
  27:3,11 30:5 31:21
  42:11,14,22 44:1,4
  44:10,14 45:11,14
  46:8,11 47:3,5,9
  52:10,13,20,23 56:18
  56:23 60:13 62:6,9
  63:1,4 65:3,6 69:10
  69:13 74:19,22 82:8
  82:14 84:16,21
Planning 24:15
plans 23:13 90:3,4,12

please 6:12
plug 10:18
plus 33:19 62:21
pocket 30:14
Pontiac 7:11
position 24:1,2
positions 12:16
pot 51:2
pouring 19:19,20
Prairie 2:18
preacher 94:16
preclosing 75:6,10
presently 109:8
president 92:10
pressed 67:14
pretty 37:10 43:22 48:2
  48:2 54:3 82:21 98:3
price 66:3
primarily 10:21 12:11
  12:12
prime 18:16
principles 106:12
  108:12
printout 71:3
prior 16:8,10,22 21:19
  22:19 35:16 41:19
  43:13 55:17 63:8
  77:23
probably 14:12 18:5,8
  23:4 27:19,19 46:17
  59:17 61:12 69:18
  71:15 75:4,7,8,9,19
  76:1,18,21 77:9,18
  77:18 84:5 87:3
  104:5 109:15,15,20
problem 24:19 41:9,10
  78:14 92:14
problems 92:12
Procedure 5:5
process 12:12 31:7,8
produce 23:3 37:15,22
  46:7
produced 13:18 21:15
  22:17,23 38:2 75:1
producing 22:1
profit 18:11 33:14 34:2
  35:5 39:16 40:15
  66:5,7
profits 15:6,19 22:12
  62:22
program 20:4
project 3:17 4:11 15:15
  15:18 25:14,15,16
  27:4 39:7,14,22
projected 66:4
projects 37:3 42:4
  73:13 102:14,18

prompted 78:9
properties 7:14,16,22
  8:8 13:4 26:9,16,19
  27:12,22 33:3 34:14
  35:6 58:14,21 72:4
  85:20
property 33:5 39:10,11
  39:23 41:5 73:9
provide 15:10,14,16
  26:10,13 48:17 59:14
  62:20
provided 5:15,21 58:14
pull 24:17
pulled 77:10 84:18
  85:9
purchase 3:18,19 4:4
  25:18 42:17 43:9
  44:5
purchaser 26:20
purchasing 19:18 24:4
purpose 5:14
pursuant 2:2 5:5
put 24:19 31:5 42:22
  46:1 53:21 56:1,22
  58:8 60:10 65:11,18
  71:12 102:20
puts 58:7 60:9
putting 110:20
P.O 2:15,18,22 3:2

**Q**
Qualify 70:5
question 5:11 7:1 20:18
  27:15 63:17 99:19
questions 5:10 6:21
  36:16,17 97:17
  111:11
quick 40:8 54:3
quit 29:16 89:13
quite 74:10 94:13

**R**
R 10:6,6
Ramsey 3:20 43:6
rate 18:14 60:1
rather 16:4
reading 115:1
ready 31:3 54:2
real 39:1 45:2 55:22
  80:18 89:5 108:7
  110:14,19
realize 45:18 67:6,6
really 10:17 19:16,18
  23:5,7 90:14 92:16
  108:5
reason 34:18 102:5
  108:4

receipts 4:13 82:12
receive 39:16
received 82:17
receiving 106:17
recess 62:5 95:16
recollect 94:22
record 6:11 76:5
reduced 35:13
refer 15:11 25:1 26:7
  48:18 65:23
referred 47:10
referring 28:17 32:22
  77:4
refers 75:19
reflect 25:6 27:11 45:4
  · 59:19
reflected 38:2 85:22,23
regard 14:7 19:8
regardless 5:21
reimburse 33:4 59:22
reimbursed 60:19
reimbursing 71:13
relate 20:9
related 10:13
relates 20:16,23
relationship 40:23
  88:18 94:17
relatives 95:19
relied 56:3
remember 16:21 41:23
  46:18,19 49:16,18
  55:22 56:3 63:16
  91:9
rental 105:7
repetitive 34:1 70:19
rephrase 7:3
reported 113:16
reporter 2:3 5:7 7:6
  113:15 115:10
REPORTER'S 113:11
represent 6:16 13:15
  100:20
representing 5:3,17
request 58:12,16
require 22:19 46:15
  57:8 58:2
required 21:19 64:17
  92:2
reserved 5:12
residential 11:3
respond 36:17
response 71:21
responses 7:7
responsibility 46:5
responsible 25:13
rest 111:3
results 115:5

retire 89:15
retired 24:9
return 15:15
reveal 30:22 32:13 51:4
review 61:23
Richard 10:12 11:6
right 9:17 12:3 15:20
  16:7 17:17 29:9
  33:21 34:17 36:19
  40:14 44:21 53:14
  55:4 56:5 57:12
  59:23 62:1 63:20,21
  64:14 77:16 83:13
  93:20 95:12 99:2
  102:3,22 103:3
  104:16 105:17
rise 58:20
Riverwalk 53:10
Robert 68:4 69:8 93:11
  104:21,23 105:10
  108:15 109:17
roof 11:15
rule 34:21
rules 5:5 101:11
ruling 5:12
run 28:5 40:6 41:16
  51:14,16 71:23
running 24:22 74:3
  96:9
runs 9:14 26:3,3 60:9
Russell 3:2

**S**

S 4:5
SAITH 113:8
sake 103:21
sales 66:3
salesman 89:12
same 5:22 15:21 18:9
  19:4 20:12 41:6 47:8
  51:22 52:15 62:18
  71:2 77:7 82:10
  84:12 96:3 98:13
  106:1
Sandy 9:23 10:1,13
  11:6
satisfactory 37:16
satisfied 53:5 80:16
saw 76:19 90:11 94:22
saying 21:2 61:15
  102:21
says 16:17 52:17 59:2
  75:20 80:19 83:2,11
  96:17
say-so 72:12
scheme 36:9 80:1 95:22
  96:1 106:11

school 24:7
Scott 111:20 112:4
Seaborn 2:13,13 3:7,9
  6:10,14 62:3 63:21
  69:19 95:13 97:13
  105:21 111:12,14
  112:7,10 113:1
second 43:1 75:18
see 17:18 18:5 30:23
  32:12 35:12,22 42:20
  55:13 56:6 59:1
  64:13 75:20 77:20
  81:9 83:1 86:1 92:5
  100:11,12 101:9
  112:13
seems 23:12 105:6
seen 21:18 22:4 23:16
  38:4 45:16 63:7 64:6
  87:4,4,9 103:17
segment 60:21
sell 38:6 41:6 43:7
  72:12
selling 38:5 72:4
sells 9:7
send 44:23 51:5 57:15
  78:12,15
sent 27:22 28:1 43:5
  44:22 45:17 53:12
  54:8,17 84:6,10
  100:18
separate 7:12 77:10
separated 49:13
series 6:21
serious 97:6
services 15:17 30:17,19
  30:23 32:8,11,13,14
  32:15 35:21 36:1,4
  67:9,16 68:1 70:22
  80:19 81:23 82:20
  93:14 96:20,22 97:1
  97:20 98:5,20 99:11
  100:2,3 106:1 108:18
  112:2
servicing 58:5
set 31:2 115:1
settled 40:2
several 51:23
shakes 93:16
Shane 2:13 6:14
Shealy 2:5,21
sheet 60:6,7,12
Sheetrock 19:14
sheets 40:17
she'd 38:23
ship 11:17 83:2,12
shipped 85:12,15,15
  104:9

Shorthand 2:3 5:7
  113:14 115:10
shot 74:10
show 13:12,16,22 19:2
  21:11 22:16 27:2
  42:13 44:3,12 45:13
  46:10,18 52:12,22
  56:20 58:10 62:8
  63:3 65:5 69:12
  74:21 83:9 111:21
showed 103:11,12
  108:22
shows 27:20
side 21:4
sign 33:9 39:5,5
signature 6:2 14:2
signed 47:7 95:4,7
significance 19:11
  85:14
significant 67:4
signify 65:21
signing 115:1
similar 36:22
simple 66:14
simply 43:5
simultaneously 16:23
since 24:13 30:12 88:16
  91:8
sir 6:12 21:5,23 22:2
  27:18 58:17 62:23
  63:11,13 85:11 91:16
  94:20 102:19
site 26:11,17
sitting 30:20 67:8
situation 11:13 47:15
  58:20 89:22 112:5
six 12:10
skill 15:17
skin 71:1
Skinner 80:8
skip 38:11
skipped 76:16
Skipper 76:10
Skyscraper 3:1 38:17
  47:20,21,22 48:6,21
  51:23 52:1,2 68:12
  80:20 86:18 93:19
  98:22,23 99:10,15,21
  100:20 101:3,5,7,10
  101:11,13 102:2,3,5
  102:8,21 103:15,16
  104:11 105:15 107:5
  107:9,17 108:1,3,9
Slocomb 112:23
slow 79:15 105:15
  108:3
smart 36:8 95:23

Smith 92:18,19
Smith's 112:21,22
sold 9:18 14:23 15:5
  18:4,5 33:2,6 39:10
  40:1 53:11
sole 7:18 8:2,17 9:20
  10:9
solely 9:9
some 10:16 12:4 13:7
  13:19 16:14 17:1,5
  19:5,7 29:19,22
  32:21 35:9 40:5,8
  45:20,22 46:12 47:23
  48:15 50:9 57:1,3,23
  58:1,2 59:15,17
  60:16 61:12 62:11
  63:13 64:16 69:6,18
  72:1,4,22 74:12
  78:15 79:20 81:15
  84:13,18,22 85:12
  86:7 87:17 88:10
  91:1,5 93:7,22
  100:21 102:6,7 104:8
  104:9,22 110:22
somebody 50:2,15,17
  51:13 56:9 72:2,13
  74:16 75:13 83:23
  88:4 90:22 93:17
  96:8 98:9 104:11,17
somebody's 51:11 82:3
somehow 65:12
someone 9:9
something 10:19 18:21
  21:18 22:19,22 27:6
  31:5 34:23 38:1 40:1
  40:4 45:15 46:17
  49:22 50:1 51:10
  53:4 54:14 58:13
  59:10 64:22 73:5
  74:16 79:21 81:11
  84:1,2,5 90:18,19
  91:19 92:1 96:11
  106:17
somewhere 51:13 65:8
  72:1 94:16 100:7
son-in-law 45:10
sorry 13:1 27:14 43:2
  79:6
Southern 88:22
SouthTrust 70:15 80:7
  80:15 111:17,19,23
  112:5
so-and-so 80:10,10
Spann 83:3,4,12,19
  84:4 85:16,17
speak 6:7 59:5 113:19
spec 14:22

spent 71:17 77:16
split 15:19 34:4 40:7
  62:22
Springs 2:19 11:20
Square 2:14
St 8:20 9:5
started 37:12,13 55:14
  71:11 91:17 94:15
  102:4
state 2:4 5:8 6:11 32:11
  35:23 100:16 113:12
  113:15 115:11
stated 72:21
statement 93:13
statements 4:6,14 57:2
states 18:10 66:2 76:6
status 28:11
Statute 5:15,21
stay 25:22 54:4
sticks 34:19 61:3
still 9:19 21:2 50:14
  54:12 72:19 77:4
  109:22
stipulated 5:2,16,23
stipulation 2:2
STIPULATIONS 5:1
Stokes 35:8
stones 34:20 61:4
stop 14:18 17:2
story 41:18 67:18
  73:18
straight 15:4 19:13,17
  26:6
strange 35:23 108:7
Street 2:6,18 85:13
stuff 19:13 46:5 47:23
  49:21 63:13 78:12,15
  81:16,16 87:17 95:9
subcontractors 61:6
subdivision 18:1 29:3
subdivisions 12:13
  17:22
sue 33:12 51:2,8,15
  101:1,4
sued 7:13 51:6 74:9
  88:11
suing 88:4,6,9
sums 67:4
Sunday 24:7
supplier 58:5
Supply 26:1 53:3,17
support 26:5
suppose 55:8
supposed 38:20 41:13
  46:20 50:16 60:10
  66:15 68:16 92:16
  105:2,22 106:18

107:21
sure 16:12,18 17:15
  21:21 30:15 34:2
  38:18 40:5 43:15
  45:2 59:9 60:4 63:10
  64:10 69:21 71:20
  77:19 78:20 79:2,10
  82:21 87:21 91:6,10
  91:22 96:5,10 98:3
  103:15 112:11
suspicion 67:16
swap 45:20,23
switch 105:16 106:22
  107:3,23
switched 79:14,18
sworn 6:6 113:19
system 24:20 92:16
systems 20:5,5 90:23
  91:1

───── T ─────

T 10:6,6
take 7:6 23:7 34:10
  51:17 62:3 76:22,23
  81:14 92:16 110:15
taken 2:1 5:4,6 62:5
  95:16 109:23
takes 24:3 31:6
talk 13:9,20 16:18
  47:16 72:10 81:22
  91:4 92:17,20 93:2,3
  95:14
talked 16:13,19 17:1
  40:22 46:4 47:21,22
  51:23 64:16 69:8
  71:18 76:11 78:4,8
  78:10 93:18,20 94:18
  95:22 97:8 107:12,13
  107:15 109:13 111:1
  112:4
talking 44:6 52:15
  55:17 59:1,2 70:4
  75:5,7,8 87:15 92:23
  101:3
Tallahassee 10:2 17:23
Tampa 68:18,19 73:18
  74:18 104:16,17
  105:1,4,8 110:12,16
teacher 24:7
tell 8:14,21 17:9 22:3
  25:19 28:7,8 30:16
  32:9 35:15 36:6 38:9
  39:22 50:12 51:9
  54:7 58:19 60:12,14
  63:15 66:11,23 73:16
  75:3 78:17,18 79:13
  85:1,5 88:3 98:15

110:13
telling 55:18,23 56:4
  67:18 90:19 97:19
test 55:16,20 56:4
testified 6:8
Thank 113:1
their 29:13 30:14 66:13
  77:16 80:12 95:17
  100:4 101:8,8 107:16
theirs 79:21
thereof 115:5
they'd 86:3
thing 14:19 15:21 18:9
  20:12 23:13 25:21
  43:1,2 45:2 49:11
  51:1,12,15 52:15
  55:14 65:20 67:14
  71:2 77:7 82:10
  90:21 92:7,22 98:14
things 29:20,22 40:5,9
  75:23 91:2,5,12
think 10:16 13:4 17:7
  22:3 23:5,13 32:16
  32:23 36:21 45:1,9
  52:5 67:20 73:2 77:6
  82:19 88:9 91:8
  94:15 95:13 103:16
  107:7,14 109:16
  110:3,4 111:2 112:10
  112:20,22
Thomas 1:21 2:1 5:4
  6:5,13 113:18
though 50:16 85:5
thought 32:17 59:4
  67:17 84:19 98:21,22
  108:3,6
thousand 76:20
three 16:20 37:3,12
  50:4,7
threw 41:17
through 14:18 17:21
  23:8 34:21 40:12
  44:13 57:5 60:20
  62:10 67:13 87:8
  89:1 96:9 106:18
throughout 14:19
Timber 11:18,19
time 5:12,12 7:1,8 22:4
  24:21 40:16 45:19
  47:22 50:5,23 53:9
  54:7 55:21 72:14
  77:17 83:5 84:12
  87:16 89:3,8,16
  90:15,15 92:15 93:3
  97:11 103:12 105:2
  107:15 109:18
  112:15

times 16:1 17:20 49:8
  50:21 51:23 55:20
  89:14
Title 38:16 49:1 77:13
today 6:21 13:17 30:7
  67:8
together 36:11 37:11
  51:10 56:22 65:12
  89:2,3,4,6
told 29:15 30:10,21,22
  31:1 32:7,12,20
  35:20,22 36:7 37:20
  38:3 49:2,14,15,19
  50:2,11,12,23 51:8
  52:1,2 53:13 54:13
  66:22 67:1 68:17
  69:4 70:21 71:22,22
  72:3,11,14 73:16,18
  76:21 78:21 79:5,10
  87:5 89:14 98:4,6
  100:4,8,9 101:6
  103:10,14,15 104:19
  105:3,3 108:13
  109:16 110:5,8
  112:16
Tom 1:14 4:5 6:16
  45:10 51:23 98:9
  111:20 112:4 114:10
tools 26:13
top 19:5
Tork 9:10,13,20,21,22
total 20:14 21:5,7,8
  27:16 75:2
touch 102:8
Trail 85:15
transcript 114:22
transmittal 3:20 44:15
trash 75:5
trial 5:19
tried 54:7 56:22 76:3
  82:11
triggered 76:18
troubles 51:18
trucks 73:2,3,4,5
true 78:17 114:22
trust 92:9
truth 6:7,7,8 22:3
  63:16 113:19,20,20
truthfully 63:23 64:8
try 25:22 26:4 62:10
  97:17 100:13 109:22
trying 74:8 91:14 94:6
  100:19,22 108:23
turn 25:12 100:10
turned 83:13
twice 96:3
two 6:19 7:12 12:10

19:20 21:13 31:6
  34:22 38:21 44:17
  48:4 52:6,7 68:16
  85:16 107:22
type 11:14 17:5 62:18
  84:13
Tyson 13:6,8 53:11
  88:7,9,10,11

───── U ─────

under 11:15 13:3 41:5
understand 7:2 11:5,23
  15:7 18:18 20:10,18
  25:9 27:5,14 39:6
  44:19 49:17 59:4
  60:11 66:19 67:3
  68:12 70:1 74:14
  81:18 87:18 89:20
  91:6 93:5,15 100:18
  101:7 104:7,20
  106:16
understanding 15:13
  31:19 61:7 86:13,20
  93:8 97:7
understood 90:8 93:18
  101:5
Union 2:19
unique 11:13
unless 56:8,9
until 67:12 87:15
updated 28:2,10 69:21
upgrade 65:19
up-to-date 28:5
use 91:14
used 5:14,20 34:7
  88:22
usually 40:7 65:17

───── V ─────

V 2:21
various 11:11,17 27:23
veins 96:10
vending 19:16
vendor 16:5 35:11 57:8
  59:20 84:5
vendors 16:4 19:16
  27:13 57:20 82:13,18
venture 14:10,11 62:12
  83:17
verbal 16:9
very 45:19
vinyl 75:22
vs 1:6,16 114:1,12

───── W ─────

W 2:16
Wachovia 70:15

Page 10

| | | | | |
|---|---|---|---|---|
| wait 23:10 41:4 | 33:2 37:10,12 44:6 | wrote 53:8 | 20:12,21 30:5 | 36072 3:3 |
| waited 53:23 | 45:20 51:22 52:15 | Wynell 7:20 | 1,200 87:3 | 36089 2:19 |
| waived 5:19 6:3 115:2 | 54:12 57:15 75:1 | | 10 4:1 46:8,12 47:9 | 36302 2:23 |
| waiving 5:22 | 77:20 78:18,22 80:11 | **Y** | 100 40:4 | |
| want 9:3 11:9 34:2 | 83:17 84:19 86:23 | yard 61:10 | 11 4:2 47:3,6 | **4** |
| 48:11 65:1 69:20 | 94:21 95:7 96:7 | Yates 9:23 10:1,12,13 | 11:30 113:5 | 4 3:16 22:14,17 25:6 |
| 83:1 92:17 93:6 | 101:17,21 102:18 | 11:6,7 | 111 3:9 | 40 87:23 |
| wanted 18:6 24:9 60:2 | 106:13 109:7,7,10 | yeah 11:20 38:8 43:11 | 113 114:21 | 4050 59:18 |
| 73:19 76:1 92:15 | 110:5,8 111:21 | 43:21 53:16 59:11 | 115,851 66:3 | 42 3:18 44:23 |
| 102:5,7 | Westbrook 21:1 28:18 | 60:6 65:17 68:2 74:6 | 12 4:4 52:10,13 | 44 3:19,20 |
| wants 111:5 | 33:2,16 42:17,19 | 76:9 77:8 79:20 | 124 40:4 | 45 3:21 |
| warehousing 101:21 | 48:21 52:9 53:4 54:9 | 80:14 82:19,19 83:13 | 125 99:17 | 46 4:1 |
| Warren 23:5 41:1 | West's 45:10 | 87:23 90:7 100:23 | 125,000 67:1 | 47 4:2 |
| 88:20,20 89:4,9,20 | we'll 10:18 13:9,20 | 110:13 | 13 3:12 4:5 52:20 53:1 | |
| 90:2,3,4,7,13,16 91:2 | 17:13 28:2 31:22 | year 89:4,13 | 14 4:6 56:18 57:1 | **5** |
| 95:5 96:15,17 | 36:11,11 51:10 65:11 | years 17:21 20:6,7 24:7 | 140 40:1 99:17 | 5 2:14 3:17 4:5,9 26:23 |
| Warren's 23:3 | 87:16 111:2,3,4 | 31:15 51:16 64:23 | 145 18:3 40:1 | 27:4,11 42:23 60:13 |
| wasn't 38:19 40:18 | we're 16:17 26:4 36:14 | 87:23 | 145,851 66:3 | 5th 63:7 |
| 45:23 75:7,8 76:23 | 44:12 59:1,1 61:15 | York 68:22 | 15 4:8 62:6,10 | 50 39:19 |
| 78:17 95:23 98:12 | we've 40:21 51:18 | y'all 15:18 36:10 51:20 | 16 4:9 63:1,4 | 50/50 15:6,19 18:11 |
| 100:17 | 54:23 76:11 | 62:19,21 64:22 80:11 | 160,000 38:6 | 51 9:21 10:10 |
| water 82:7 96:9,23 | while 10:18 70:5,8 | 89:6 100:18 | 166,000 77:1 | 52 4:4,5 |
| 97:1 | 108:13 | | 17 4:10 65:3,6 | 56 4:6 |
| way 51:21 55:14 57:23 | whole 6:7 14:19 67:14 | **$** | 18 3:12,13,13 4:11 | |
| 79:20 91:17 92:21 | 113:20 | $1,000 23:14 24:18 | 69:10,13 71:2,3 | **6** |
| 94:15 101:5 110:22 | wife 7:20 24:11 | $1,250 24:16 | 18th 14:8 16:9 43:16 | 6 3:7,18 42:11,14 |
| Wednesday 2:7 31:13 | Win 11:18,19 | $100,000 29:13 30:9 | 184 18:2 | 600 73:19,22 110:11,17 |
| 114:20 | wipe 72:8 | 99:16 | 19 3:14 4:12 74:19,23 | 62 4:8 |
| week 31:11 38:21 | Wiregrass 7:13,15,22 | $109,000 37:21 | 190 38:8 | 63 4:9 |
| 41:14 64:7 74:15 | 7:23 8:2,5,6,8,9 13:4 | $112,000 70:2 | 190-something 76:20 | 6346 2:22 |
| 79:13 90:15 92:13 | 26:9,15,19 27:12,22 | $12,000 71:6 75:20 | | 65 4:10 |
| weeks 16:20 31:6 34:22 | 33:3 34:14 35:5 57:3 | 77:4 | **2** | 688 2:15 |
| 50:4,7 68:17 74:15 | 57:16 58:14,15,20,21 | $125,000 34:11 40:3 | 2 3:13 18:23 19:4 20:12 | 69 4:11 |
| 104:18 109:20 | 69:15,22 70:2 71:4,5 | $140,000 66:20 112:9 | 65:10 | |
| well 8:15 9:12 17:5 | 85:20,20 | $160,000 35:1 38:7 | 20 4:13 82:8,14 | **7** |
| 19:12,18 24:16 25:15 | witness 6:1,2,6 36:19 | $166,000 76:19 | 20th 2:7 114:20 | 7 3:19 44:1,4 |
| 28:6,7,19 33:6 34:9 | 43:23 73:7 79:6 | $168,974.56 27:20 | 2004 3:12,13,15,22 4:5 | 707 7:11 |
| 34:13 35:19 37:12 | 93:16 113:3 114:23 | $190,000 38:3 | 4:8,9 14:8 16:9 62:16 | 74 4:12 |
| 39:4,23 40:12 41:11 | Woodham 76:10 | $2,500 61:18,19 | 63:7 | |
| 47:21 48:10 49:1,11 | word 49:18,18 | $20,000 40:19 107:20 | 2005 2:7 114:20 115:6 | **8** |
| 49:15 50:11 51:1 | work 4:13 12:5,8,19 | $26,500 33:13,14 34:4 | 206 2:6 | 8 3:20 4:8 44:10,15 |
| 52:1,8 53:6 54:16 | 13:2 24:9,12 26:15 | 34:10 35:4 70:9 | 21 3:14 4:14 45:9 84:16 | 8th 62:16 |
| 55:13,21 56:6 60:5 | 36:10,11 51:10,19,19 | $30,000 66:5 | 84:22 | 82 4:13 |
| 61:5 63:22 65:18 | 52:3 57:22 58:23 | $300,000 110:15 | 21st 43:19 | 84 4:14 |
| 67:19,20 68:20 71:22 | 73:5 74:11 82:11 | $4,000 20:2 | 219 2:18 | |
| 72:11,17 73:1,21 | 108:23 111:2 | $42,436.99 43:2,3 | 22 3:16 | **9** |
| 75:4 78:11 81:6,18 | worked 52:6,8,9 64:1 | $43,086.85 45:3 52:17 | 23rd 44:8 | 9 3:21 45:11,14 |
| 84:7 86:13 87:11 | 72:19 89:7,21 90:5 | $45,000 40:2 | 25 24:7 70:9 | 9:15 2:8 |
| 90:2,16 92:12,14 | working 89:16 110:1 | $5,000 14:15 | 26 3:17 | 910 3:2 |
| 97:23 98:16 100:10 | works 12:22 80:9 | $500 39:18 | 28 3:22 | 97 3:8 |
| 100:12 106:15 111:4 | wouldn't 43:7 56:7 | | | |
| went 19:14,15 24:12 | 58:7 75:11 77:18 | **0** | **3** | |
| 35:5 41:14 50:20 | 78:12 91:23 94:10 | 01 19:22 20:2,8 | 3 3:14 21:9,12,17 31:21 | |
| 52:18 53:21 59:9,10 | wreck 68:18 105:4,5 | 04 19:22 20:1,1 | 3rd 115:6 | |
| 67:7,13 70:19,22 | 109:17 | | 30 20:6,7 51:16 64:23 | |
| 74:9 81:15 89:17 | writing 19:5 | **1** | 350 2:18 | |
| were 13:17 30:13 31:23 | written 64:21 | 1 3:12 13:10,14 15:8 | 36016 2:15 | |

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

# AGREEMENT

This agreement made and entered into at Dothan, Alabama this <u>18 day of May, 2004</u>

And between <u>Jarrett Palmer</u> and <u>Thomas F. Leonard</u> for the purposes hereinafter

Set forth.

    Thomas F. Leonard will furnish construction loan on

<u>Global Group, Inc./Jarrett Palmer</u>

<u>106 Eastland Road</u>

<u>Dothan, AL 36303</u>

To build a house located <u>on 326 Kirkwood Drive, Lot 18, Block B, Westbrook</u>

<u>Subdivision, Dothan, AL 36303.</u>

    When the house is completed, check will be endorsed over to Thomas F. Leonard

To pay loan and interest on cost incurred on the house.

    After expense, profit will be divided fifty-fifty (50/50) between parties.

<u>Jarrett Palmer/Global Group, Inc.</u> is responsible for building said house.


_Thomas F. Leonard_
Thomas F. Leonard

_Jarrett Palmer_
Jarrett Palmer


This agreement signed on <u>18</u> day of <u>MAY</u>, 2004.

_Mona Lisa Well_
Notary Public

My Commission Expires December 8, 2004
Notary Public, Alabama, State at Large



PLAINTIFF'S
EXHIBIT

## AGREEMENT

This agreement made and entered into at Dothan, Alabama this __June 8, 2004__ .

And between __Thomas F. Leonard__ and __Jarrett Palmer__ for the purposes hereinafter

Set forth.

Thomas F. Leonard will furnish construction loan on

__Global Group, Inc./Jarrett Palmer__

__106 Eastland Road__

__Dothan, AL 36303__

To build a house located on: __3600 Clardy Road, Dothan, Al 36303__

When the house is completed, check will be endorsed over to Thomas F. Leonard

To pay loan and interest on cost incurred on the house.

After expense, profit will be divided fifty-fifty (50/50) between parties.

__Jarrett Palmer/Global Group, Inc.__ is responsible for building said house.

_Thomas F. Leonard_ (signature)

Thomas F. Leonard

_Jarrett Palmer_ (signature)

Jarrett Palmer

This agreement signed on __8th__ day of __June__, 2004.

_Mona Lisa Will_ (signature)

Notary Public


PLAINTIFF'S EXHIBIT