# EXHIBIT "12"

**American Court Reporting**
**toll-free (877) 320-1050**

1 (Pages 2 to 5)

---

**Page 2**

IN THE CIRCUIT COURT OF
BARBOUR COUNTY, ALABAMA
CLAYTON DIVISION

CIVIL ACTION NUMBER:  CV-04-106
JOE HUGHES and FAYE HUGHES,
    Plaintiff (s),
vs.
GLOBAL GROUP, INC., et al.,
    Defendant (s).
**********************************************
CIVIL ACTION NUMBER:  CV-04-107
TOM GASSETT and PHYLLIS GASSETT,
    Plaintiff (s),
vs
GLOBAL GROUP, INC., et al.,
    Defendant (s).

DEPOSITION TESTIMONY OF:
JOE HUGHES
OCTOBER 26, 2005
9:00 A.M.
REPORTED BY:  MELISSA S. LEE, CSR

---

**Page 3**

1         S T I P U L A T I O N S
2
3        IT IS STIPULATED AND AGREED,
4    by and between the parties through
5    their respective counsel, that the
6    deposition of JOE HUGHES may be taken
7    before Melissa S. Lee, CSR, Commissioner
8    and Notary Public for the State of Alabama
9    At Large, at the law offices of PENN &
10   SEABORN, 5 Court Square, Clayton, Alabama,
11   36106, on the 26th day of October,
12   2005, commencing at or about 9:00 a.m.
13       IT IS FURTHER STIPULATED AND
14   AGREED that the signature to and the
15   reading of the deposition by the
16   witness is waived, the deposition to
17   have the same force and effect as if
18   full compliance had been had with all
19   laws and rules of court relating to
20   the taking of depositions.
21       IT IS FURTHER STIPULATED AND
22   AGREED that it shall not be necessary
23   for any objections to be made by

---

**Page 4**

1    Counsel as to any questions except as
2    to form or leading questions, and that
3    counsel for the parties may make
4    objections and assign grounds at the
5    time of trial, or at the time said
6    deposition is offered in evidence, or
7    prior thereto.

---

**Page 5**

1        In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as
3    Amended, effective May 15, 1988, I,
4    MELISSA S. LEE, CSR, am hereby delivering
5    to RUSSELL L. IRBY, the original
6    transcript of the oral testimony taken on
7    the 26th day of October, 2005, along with
8    exhibits.
9        Please be advised that this is
10   the same and not retained by the Court
11   Reporter, nor filed with the Court.

---

**American Court Reporting**
**toll-free (877) 320-1050**

2 (Pages 6 to 9)

Page 6

1      I N D E X
2
3
4    EXAMINATION BY:              PAGE NO:
5    Mr. Irby            13-115; 163-166
6    Mr. Boyd            115-163; 166-167
7
8
9
10
11   EXHIBITS:
12   Defendant's 1 (New Purchase Ap.)            31
13   Defendant's 2 (Global Dev Contract)         66
14   Defendant's 3 (Description of Materials)    67
15   Defendant's 4 (Survivorship Warrant)        67
16   Defendant's 5 (RESPA Servicing)             69
17   Defendant's 6 (Chevy Chase Document)        71
18   Defendant's 7 (Loan Program Description)    74
19   Defendant's 8 (Mortgage Origination)        76
20   Defendant's 9 (Good Faith Estimate)         77
21   Defendant's 10 (Truth in Lending)           78
22   Defendant's 11 (Right to Appraisal)         80
23   Defendant's 12 (Appraisal)                  81

Page 7

1      I N D E X (Continued)
2
3    Defendant's 13 (Equal Credit Op. Act)       82
4    Defendant's 14 (Discrimination Act)         82
5    Defendant's 15 (Disclosure Notices)         83
6    Defendant's 16 (Pre-Ap Disclosure)          83
7    Defendant's 17 (Mortgage Origination)       84
8    Defendant's 18 (Borrower's Cert)            85
9    Defendant's 19 (Statement of Denial)        87
10   Defendant's 20 (Copy of Cancelled Checks)   88
11   Defendant's 21 (Lien)                       89
12   Defendant's 22 (Interrogatories)            91
13   Defendant's 23 (Complaint)                  92
14   Defendant's 24 (Summons)                    94
15   Defendant's 25 (Letter)                     96
16   Defendant's 26 (Application Form)           97
17   Defendant's 27 (IPI Web Page)               98
18
19
20
21
22
23

Page 8

1      A P P E A R A N C E S
2
3    FOR THE PLAINTIFF (S):
4
5      Ms. Christine Diane Crow
6      JINKS, DANIEL & CROW
7      P. O. Box 350
8      Union Springs, Alabama, 36089
9
10     Mr. L. Shane Seaborn
11     PENN & SEABORN
12     5 Court Square
13     Clayton, Alabama, 36106
14
15   FOR THE DEFENDANT (S), IPI SKYSCRAPER:
16
17     Mr. Russell Lee Irby
18     Mr. Albert H. Adams, Jr.
19     IRBY LAW FIRM
20     257 West Broad Street
21     Eufaula, Alabama, 36027
22
23

Page 9

1      A P P E A R A N C E S (Continued)
2
3    FOR THE DEFENDANT (S), TOM LEONARD and
4    WIREGRASS CONSTRUCTION:
5
6      Mr. Leon A. Boyd
7      COBB, SHEALY, CRUM & DERRICK
8      Post Office Box 6346
9      Dothan, Alabama, 36302
10
11   ALSO PRESENT:
12
13     Faye Hughes
14     Tom Gassett
15
16
17
18
19
20
21
22
23

**American Court Reporting**
**toll-free (877) 320-1050**

3 (Pages 10 to 13)

Page 10

1    I, MELISSA S. LEE, CSR,
2    Court Reporter and Notary Public for
3    the State of Alabama at Large, acting
4    as Commissioner, certify that on this
5    date as provided by Rule 30 of the
6    Alabama Rules of Civil Procedure, and
7    the foregoing stipulations of counsel,
8    there came before me at the law
9    offices of PENN & SEABORN, 5 Court Square,
10   Clayton, Alabama, 36106, on the 26th day
11   of October, 2005, JOE HUGHES, witness in
12   the above cause, for oral examination,
13   whereupon, the following proceedings
14   were had:
15
16       MR. IRBY:  Before we get started, I
17   want to ask for the Rule.  I realize these
18   cases are consolidated for discovery, but
19   they're going to be tried -- they obviously
20   will have to be severed.  And I also think
21   -- I've got to check on this somewhere, but
22   in the back of my mind there is some rule
23   about you can only try one case per term, per

Page 11

1    defendant because everybody would be struck
2    out of the same venire and would result in
3    prejudice, potentially, to the defendants if
4    they had multiple trials during the same
5    term.
6        So obviously these cases would be
7    severed, and we wouldn't want the witness in
8    one case to be sitting in on the testimony of
9    the plaintiff witness in the other.  So we
10   would like to ask for the rule.
11       MS. CROW:  First, Russell, I don't
12   think that there is any rule in depositions.
13   I think it's pretty clear that the rule is
14   only invoked -- can only be invoked for trial
15   purposes and not for depositions.
16       And also, I'm not aware of any rule
17   that says you can only try one case per
18   defendant in a criminal court.  I know Judge
19   Smithart generally does that out of an
20   abundance of fairness to a particular
21   defendant, but I -- there is no case law or
22   rule that provides for that.  And so --
23       MR. IRBY:  Well, I --

Page 12

1        MS. CROW:  I don't think that it
2    would prohibit -- anything would prohibit Mr.
3    Gassett from sitting in on his deposition.
4    And, of course, Ms. Hughes is allowed to sit
5    in on it.
6        MR. IRBY:  Of course we don't
7    object to her because she's a plaintiff in
8    the same case, but Mr. Gassett is a plaintiff
9    in another case, as I said, that would
10   obviously have to be severed for trial.
11       MS. CROW:  Right.  And there is no
12   question about that, but I don't think that
13   there is a rule for depositions.
14       MR. SEABORN:  In fact, I think some
15   case law came out that anybody can sit in on
16   a deposition, even a non-party, even a
17   witness at the deposition.  Now, I obviously
18   don't have the case pulled, but I don't think
19   the rule applies to depositions.
20       MR. IRBY:  Well, of course this is
21   just an extension of court.  And we disagree,
22   and we would still like to put on the record
23   that we asked to invoke the rule and the

Page 13

1    plaintiffs objected over our request to do
2    that.
3        MR. BOYD:  I want to go on the
4    record as making the same recommendation
5    or --
6        MR. IRBY:  Objection.
7        MR. BOYD:  The same objection to
8    Mr. Gassett sitting in on the Hugheses'
9    depositions.
10       MS. CROW:  It's noted.
11       MR. IRBY:  Has the witness been
12   sworn?
13       COURT REPORTER:  No.
14
15       JOE HUGHES
16   Having been duly sworn, was examined and
17   testified as follows:
18
19       COURT REPORTER:  Usual
20   stipulations?
21       MR. IRBY:  That's fine.
22       MS. CROW:  That's fine.
23

**American Court Reporting**
**toll-free (877) 320-1050**

Page 14

1
2   EXAMINATION BY MR. IRBY:
3       Q   Would you state your name, please.
4       A   Joe F. Hughes.
5       Q   And where do you live, Mr. Hughes?
6       A   I live at 3200 Clardy Road, Dothan,
7   Alabama.
8       Q   All right. How long have you lived
9   there?
10      A   Approximately one year.
11      Q   Okay. Where did you live before
12  that?
13      A   At Highway 130 -- that's 75 Highway
14  130, Louisville, Alabama.
15      Q   Okay. When did you move from there
16  to Dothan?
17      A   Approximately one year ago.
18      Q   Do you recall what month it was?
19      A   It was in October.
20      Q   October of '04?
21      A   That's correct.
22      Q   All right, sir. How much education
23  do you have, Mr. Hughes?

Page 15

1       A   High school and the equivalency of
2   two years of college.
3       Q   And where did you go to high
4   school?
5       A   Pike County High School, Brundidge,
6   Alabama.
7       Q   All right. And where did you go to
8   college?
9       A   I went to Faulkner University, and
10  it was at the Armories in Brundidge and in
11  Troy.
12      Q   When did you finish high school?
13      A   1964.
14      Q   Okay. And what did you do after
15  you got out of high school? Give me your
16  work history if you will.
17      A   Okay. I went to basic training for
18  six months after that. And then early in
19  '65 --
20      Q   In the Army or --
21      A   That's right.
22      Q   Okay.
23      A   National Guard.

Page 16

1       Q   All right.
2       A   I worked in Union Springs when I
3   came back from basic training, then I worked
4   for Gibson Propane Gas Company in Union
5   Springs and in Brundidge, then I went to
6   Price Brothers' Gas Company, and then from
7   there to International Paper Company, and
8   from International Paper Company to the
9   Alabama Army National Guard in January of
10  1980.
11      Q   You've been in the Guard since
12  1980 -- or before, but --
13      A   I've been in the Guard since 13
14  January of 1964.
15      Q   All right. Are you in the Guard
16  now?
17      A   I am.
18      Q   What's your rank?
19      A   I'm a first sergeant, pay grade
20  E-8.
21      Q   And out of what Guard unit are you?
22      A   Brundidge.
23      Q   Brundidge?

Page 17

1       A   The 900 Maintenance Company.
2       Q   Okay. Have you ever been in the
3   Guard operating out of Barbour County?
4       A   I have not.
5       Q   Okay. Have you ever -- other than
6   the home that's in dispute here, have you
7   ever owned a home before?
8       A   I have.
9       Q   And where was that?
10      A   75 Highway 130 in Louisville,
11  Alabama.
12      Q   And what happened to that house?
13      A   I sold it.
14      Q   And when was that?
15      A   In June of '04.
16      Q   Okay. Prior to your move to Dothan
17  in October of '04; is that correct?
18      A   That's correct.
19      Q   All right. And where did you live
20  from June to October of '04?
21      A   In January of '03 I was activated
22  and mobilized and deployed with the Alabama
23  Army National Guard -- my unit was. We were

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

1  deployed to the Air Force and Air Guard sites
2  around the state of Alabama, and I lived in
3  Montgomery in an apartment.
4      Q    Okay.  Did your wife live there
5  with you?
6      A    No.
7      Q    Where did she live?
8      A    She lived in Louisville until we
9  sold the house.  And then our house wasn't
10  finished at the appropriate time, and so she
11  was basically homeless.
12      Q    Well, who did she stay with during
13  this time?
14      A    She stayed with her sister
15  sometimes, with -- she would occasionally
16  come to Montgomery and stay overnight a
17  couple nights with me up there.
18      Q    Uh-huh (nodding head).  Who is her
19  sister?
20      A    Margaret Grubbs.
21      Q    And where does she live?
22      A    In Dothan.
23      Q    All right.  Did you have a mortgage

Page 19

1  on your home in Louisville?
2      A    Did not.
3      Q    Have you ever had a mortgage on a
4  home before this one that was involved --
5  supposed to be involved in this case?
6      A    I did not.  I had a personal loan
7  when I bought that house.
8      Q    Is that on the Louisville house, or
9  was it on some --
10      A    On the Louisville house.  Yes, sir.
11      Q    Did you put that house up as
12  collateral for that personal loan?
13      A    The -- yeah.  Yes, it was.
14      Q    All right.  So you had to sign a
15  mortgage then, didn't you?
16      A    No.  I've never had a mortgage.
17      Q    All right.  When did you decide
18  that you wanted a house in Dothan?
19      A    Probably 1989, 1990 -- I mean, say
20  about 2000, somewhere along there.
21      Q    All right.  And did you -- what did
22  you say the address of your home now is?
23      A    3200 Clardy, C-L-A-R-D-Y, Road in

Page 20

1  Dothan, Alabama.
2      Q    And how did you pick that spot?
3      A    We rode around and saw that vacant
4  lot, and it had a for sale sign on it.  And
5  we contacted Mr. Watford and -- that's who it
6  turned out to be the phone number from.  And
7  we purchased the lot from him.
8      Q    From a Mr. Watford?
9      A    Jimmy Watford.
10      Q    Was it deeded to you and your wife?
11      A    That's correct.
12      Q    And when was that?
13      A    2001.  April, I think.
14      Q    All right.  But you didn't make any
15  effort to build a house from 2001 until
16  sometime in '04; is that right?
17      A    That's right.
18      Q    All right.  Why did you have such a
19  time delay there?
20      A    I was looking at retiring from the
21  Guard as a full-time employee, also as a
22  drilling guardsman.  And I knew that was
23  coming in 2006.  And Dothan is where we chose

Page 21

1  to retire.
2      Q    Okay.  Now, had you ever built a
3  home before anywhere?
4      A    Have not.
5      Q    Never had a builder build a home
6  for you anywhere before?
7      A    No, sir.
8      Q    Okay.  Who was the builder for this
9  home?
10      A    Global Development.  Jarrett and
11  Warren Palmer.
12      Q    All right.  How did you come in
13  contact with them?
14      A    My wife called a telephone number
15  that was in the Thrifty Nickle.
16      Q    What's the Thrifty Nickle?
17      A    It's just a little for sale
18  newspaper with a lot of ads and then some
19  stuff for sale people -- individuals have.
20  It's a little free paper that's in the stands
21  in the convenient stores and grocery stores
22  and whatnot.
23      Q    Do you know where she got the

**American Court Reporting**
**toll-free (877) 320-1050**

Page 22

1   Thrifty Nickle from?
2       A   It had to be some place in Dothan.
3   I don't know specifically.  They even give
4   them away in Louisville -- at that time.
5       Q   But you think this particular one
6   you might have gotten in Dothan -- or she
7   might have gotten?
8       A   I think so.
9       Q   All right.  And what was in the
10  Thrifty Nickle?  You said a telephone number
11  or something.
12      A   There was two, approximately -- or
13  a whole row of one-inch ads down the side of
14  the page.  And she thought she was calling
15  Mikie Walding Construction.  And the ads were
16  so stacked that she called the number below
17  the ad rather than the one above the ad, and
18  she got Global Development.
19      Q   Okay.  Is that the first time y'all
20  ever heard of that company?
21      A   That's true.
22      Q   Okay.  And do you know who she
23  talked to?

Page 23

1       A   Warren Palmer.
2       Q   All right.  Is he an employee or
3   principal of that company to your knowledge?
4       A   To my knowledge he is.
5       Q   Okay.  And what happened after she
6   talked to Mr. Palmer about building a house?
7       A   He said, yes, we do build houses,
8   and we would love to talk with you.  And so a
9   meeting was set up.  We met briefly at
10  Hardee's on the north part of the Circle.
11      Q   That's in Dothan.
12      A   In Dothan.
13      Q   Let me ask you this before you go
14  any further.  The number that you called for
15  Global, was that a Dothan number?
16      A   It was.
17      Q   Okay.  And y'all met at Hardee's in
18  Dothan --
19      A   That's right.
20      Q   -- on the Circle?  All right.  What
21  happened there?
22      A   We told him basically what we was
23  looking for.  And he said we can do that, you

Page 24

1   know, we need to set up another meeting, and
2   we'll discuss it further.
3       Q   Okay.
4       A   And that was done.
5       Q   All right.  About how long after
6   that first meeting?
7       A   That was in -- I think that was in
8   early February of '04.
9       Q   '04?  Okay.
10      A   And then probably a week later --
11  remember, I was still activated and deployed.
12      Q   Yes, sir.  I understand.
13      A   I had limited time that I could
14  make these appointments and whatnot.  But,
15  anyway, we met a couple more times at their
16  place in Dothan.  And we decided on a plan,
17  and he drew that plan.
18      Q   Who is "he"?  Mr. --
19      A   Warren Palmer.
20      Q   Warren Palmer.  Okay.
21      A   We settled on the plan.  And this
22  was done with telephone calls and a couple
23  other meetings.  There was probably three or

Page 25

1   four meetings that took place during this
2   time.  Finally the --
3       Q   Were all those meetings in Dothan?
4       A   -- final draft was done.
5       Q   Excuse me, sir.  Were all those
6   meetings in Dothan, the three or four other
7   meetings you had?
8       A   They were.
9       Q   Okay.
10      A   But he delivered to us a draft plan
11  with specifications.  We picked that up, and
12  my wife brought it home.  We looked at it; we
13  talked about it; we discussed it.  And then
14  we called him back and said we'll do you --
15  we'll let you do the house.
16      Q   Okay.  And around about when was
17  this you reckon?
18      A   It was the week prior to 5 February
19  of '04 -- or 5 March of '04.
20      Q   Where was it y'all looked at the
21  plans at, you and your wife, when you decided
22  you were going to go with Palmer?
23      A   In detail we looked at them in

Page 26

1  Louisville, Alabama.
2      Q    The Palmers weren't there, were
3  they?
4      A    They were not.
5      Q    Okay.  Nobody from IPI Skyscraper
6  or anybody else were there when you looked at
7  the plans, were they?
8      A    They were not.
9      Q    All right.  After you told -- I
10  assume Mr. Warren Palmer?  Is that who you
11  were dealing with?
12      A    That's correct.
13      Q    That you were going to go with the
14  plans they put forth with you, did y'all
15  enter into any kind of contract --
16      A    We did.
17      Q    -- to build the house?
18      A    We did.
19      Q    All right.  And I'm going to get a
20  copy of it in a minute.  I've got to get all
21  these exhibits here in order, but let me ask
22  you a little bit about it first.  Where was
23  it that -- where were y'all when the contract

Page 27

1  was presented to you?
2      A    The paper contract was presented to
3  us in Dothan, Alabama.
4      Q    Okay.  There at the office of
5  Global Development?
6      A    It was.
7      Q    Given to you by Mr. Warren Palmer?
8      A    Jarrett Palmer.
9      Q    Jarrett Palmer.  Excuse me.  All
10  right.  Was this the first time you had seen
11  Jarrett?
12      A    Oh, no.
13      Q    Okay.  You had dealt with him some
14  during the course of all this?
15      A    We had talked to him.
16      Q    All right.  Did y'all sign the
17  contract then and there?
18      A    We did.
19      Q    There in Dothan?
20      A    We did.
21      Q    Okay.  And so after you signed the
22  contract, was it your expectation that Global
23  Development and the Palmers were going to

Page 28

1  build a house for you?
2      A    That's correct.
3      Q    All right.  Up to that point in
4  time had there been any mention of IPI
5  Skyscraper?
6      A    Yes, sir.
7      Q    When was that?
8      A    That was in February of '04.
9      Q    At the very beginning?
10      A    After the -- probably the second
11  meeting.
12      Q    Okay.  And what was presented to
13  you then about IPI Skyscraper?
14      A    They asked me how was I going to
15  finance the house, and I told them that I
16  planned to use my own money.  And they -- it
17  was presented that -- you know, why use my
18  own money when I could borrow money for 1.95
19  percent.
20      Q    And who told you 1.95 -- the
21  Palmers -- at that time?
22      A    The Palmers.
23      Q    Okay.  They said you could get a

Page 29

1  loan with a mortgage company for that rate?
2      A    Yeah.  IPI Skyscraper.
3      Q    All right.  Did you later talk to
4  IPI Skyscraper or any representative about
5  it?
6      A    I did not.
7      Q    Okay.
8      A    The Palmers had the applications,
9  and we agreed on what I was -- how much I was
10  going to borrow.
11      Q    Which was how much?
12      A    $75,000.
13      Q    All right.  And the applications
14  were presented to you by the Palmers?  Nobody
15  at that point in time from IPI Skyscraper had
16  any contact with you?
17      A    No, sir.
18      Q    All right.  And did you fill out
19  the application?
20      A    I did.
21      Q    And what did you do with it?
22      A    I gave it to the Palmers.
23      Q    Was that done in Houston County?

**American Court Reporting**
**toll-free (877) 320-1050**

8  (Pages 30 to 33)

Page 30

1    A    It was.
2    Q    All right.  And what happened after
3  you gave the application to the Palmers?
4    A    I'm assuming that they faxed it to
5  New York or whatever.  That's an assumption.
6  But, anyway, I got a telephone call back in
7  Louisville that said that, you know, I was
8  good to go for the 75,000 at --
9    Q    Who was the call from?
10    A    With my provisions.
11    Q    Which were what?
12    A    I wanted a five-year loan with
13  fifty-nine payments being less than a
14  thousand dollars, the sixtieth payment being
15  the rest of what was owed.
16    Q    And what would you do after the
17  five years on the rest that was owed?
18    A    I was going to pay it, the sixtieth
19  -- the sixtieth payment would be the rest of
20  what was owed.
21    Q    Okay.  So you were going to pay the
22  balance of the loan in full?  That was your
23  intentions; is that right?

Page 31

1    A    That's right.
2    Q    Okay.  Excuse me.  You said you got
3  a call.  Who was the call from?
4    A    From the Palmers.
5    Q    Okay.  Still hadn't had any contact
6  with IPI Skyscrapers directly at that time?
7    A    Had not.
8    Q    All right.  And so you filled out
9  the application and gave it to the Palmers,
10  and it went wherever it went from there; is
11  that right?
12    A    That's right.
13    Q    All right.
14    A    Now, I brought that application to
15  Louisville because it required some stuff
16  that I didn't have with me.
17    Q    Like financial information on --
18    A    That's right.
19    Q    -- you and your wife?
20    A    That's right.
21    Q    Okay.
22    A    And I filled it out.  And this is
23  what I -- you've got a copy of it, but that's

Page 32

1  what I filled out right there.
2    Q    Let's just go ahead --
3    MS. CROW:  I think we've given you
4  a copy of this.
5    MR. ADAMS:  This one?
6    MS. CROW:  Right.
7    Russell, let me keep --
8    MR. IRBY:  Oh, okay.  Yeah, yeah.
9    Give me that one.
10    MS. CROW:  I just don't want to
11  lose my copy.
12    MR. IRBY:  Yeah.  I don't blame
13  you.
14    Since you mentioned it, I'll just
15  go ahead and offer this one right here as
16  Defendant -- we are a defendant?
17    MR. ADAMS:  It's hard to think
18  about it in that perspective
19    MS. CROW:  Yeah.  I know.  I never
20  do that right.
21    MR. IRBY:  I'll mark this as
22  Defendant's Exhibit 1.
23    (WHEREUPON, Defendant's Exhibit 1

Page 33

1  was marked for identification.
2    A copy is attached.)
3    Q    (BY MR. IRBY)  Is that the copy of
4  the application you filled out and gave to
5  the Palmers?
6    A    It is.
7    Q    All right.  And it was filled out
8  partially in Barbour County, but it was
9  delivered to the Palmers in Houston County;
10  right?
11    A    I'm not sure whether I faxed it to
12  them.  There was some stuff there that had to
13  be -- I think some -- like some W-2s from a
14  couple years back that was required, so I
15  -- I think we delivered that.
16    Q    All right.  And after you delivered
17  that application, did you get any more forms
18  you had to fill out or anything?
19    A    I did.
20    Q    All right.  Can you tell us
21  basically what they were, what they consisted
22  of?
23    A    It was a mortgage, I guess,

Page 34

1   affidavit. It was no way near what was
2   discussed. I refused to sign it. I gave it
3   back to him. And where it went from there, I
4   do not know.
5       Q   You gave it back to who, Mr.
6   Palmer?
7       A   Mr. Palmer. Jarrett Palmer.
8       Q   What was different about it than
9   what you had discussed?
10      A   The interest rate. And then I had
11  basically told him that all of those add-on
12  things -- a big closing cost and this, that,
13  and the other -- I wasn't going to pay that.
14      Q   Okay.
15      A   They were on that application. I
16  don't know where it came from typed, but he
17  gave it to me. And after reading it -- we
18  brought it home and read it, and we met him
19  in Ozark the Sunday after the contract was
20  signed. We gave it back to him.
21      Q   Gave it back to Mr. Palmer?
22      A   That's right.
23      Q   Unsigned?

Page 35

1       A   Unsigned.
2       Q   Did you ever sign any more
3   documents besides that application?
4       A   I did not.
5       Q   Okay. And you say it wasn't the
6   1.95 percent interest rate you had thought
7   you were getting; is that right?
8       A   That's right.
9       Q   That was one of the reasons you
10  didn't sign any more documents?
11      A   Plus all the other add-ons there I
12  was talking about.
13      Q   All right. Was there any other
14  reason you didn't sign it?
15      A   No, sir. Not to my knowledge. Not
16  that I know.
17      Q   Up to this point in time when you
18  say you refused to sign these documents, had
19  you had any direct contact with anybody from
20  IPI Skyscraper?
21      A   I had not.
22      Q   Never talked to anybody on the
23  phone or anything from them?

Page 36

1       A   I had not.
2       Q   Had you ever gotten any mail from
3   them, thanking --
4       A   I had not.
5       Q   -- you for --
6       A   I got a letter at some point in
7   time. I forgot the date on the letter, but I
8   got a letter thanking me for, I guess,
9   filling this out.
10      Q   All right. So you didn't like the
11  way the documents read because it wasn't what
12  you thought you were getting, so did you
13  withdraw your application with Skyscraper --
14  IPI Skyscraper?
15      A   I did not. I continued saying that
16  I would take the loan if it was what was
17  quoted to me.
18      Q   Okay. Did they revise the
19  paperwork and get them like you were
20  expecting them?
21      A   I never saw any.
22      Q   You never saw any more papers?
23      A   I never saw any more papers

Page 37

1   until -- some paperwork came to us from Chase
2   Bank.
3       Q   Right.
4       A   And I don't know what day that was.
5   It wasn't right either.
6       Q   Okay. What was wrong?
7       A   Still -- the interest rate wasn't
8   what had been quoted to me, and I gave those
9   back to Mr. Palmer.
10      Q   Did you sign those from Chevy --
11      A   I did not.
12      Q   Are you sure about that?
13      A   I'm quite sure.
14      Q   All right. And, again, they didn't
15  have the terms you expected?
16      A   That's right.
17      Q   And would that be about the
18  interest rate and the --
19      A   Yes, sir.
20      Q   Who was Chevy Chase or Chase Bank,
21  whatever you call it?
22      A   I'm assuming that that was -- that
23  IPI is just a broker.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 38

1    Q   All right.
2    A   I found that out later on -- that
3  they're just a broker.  So they --
4    Q   Do you understand what a broker is
5  in loans?
6    A   I do.
7    Q   What's your understanding of it?
8    A   Well, okay.  I'm an originator.
9    Q   Right.
10    A   I contract with you to get you a
11  loan.
12    Q   Right.
13    A   And then I push it off to whoever
14  will take that loan.
15    Q   Okay.  And is that what was done in
16  your course -- it was pushed off to Chevy
17  Chase or wherever?
18    A   That's who I got the paperwork
19  from, sir.
20    Q   Okay.  And what was the interest
21  rate on the paperwork that you didn't like?
22    A   I don't remember.  It was -- it was
23  somewhere around 5 percent.

Page 39

1    Q   Uh-huh (nodding head).  Okay.  Was
2  there anything else on the paperwork that you
3  didn't like, like the add-on charges and
4  the --
5    A   Same thing.  Yes, sir.
6    Q   So you refused to sign those?
7    A   I refused to sign them.
8    Q   All right.  And what happened to
9  the paperwork?  You say you gave it back to
10  Palmer?
11    A   That's right.
12    Q   And up to this point in time you
13  had no direct contact with anybody from IPI
14  Skyscraper?
15    A   Had not.
16    Q   So when you gave the paperwork back
17  to the Palmers, you didn't expect to get a
18  loan from IPI Skyscraper or Chevy Chase then,
19  did you?
20    A   Chevy Chase was not my problem.
21  IPI was my problem.  They had committed to me
22  through their representative, which was the
23  Palmers, that they would give me 1.95 percent

Page 40

1  interest.
2    Q   All right.  Now, you say the
3  Palmers were their representatives.  What do
4  you base that on?
5    A   Well, they gave me all the
6  paperwork.  And the originator right there is
7  Global/Drell, the source.
8    Q   Well, do you know whether or not
9  IPI Skyscraper prepared this or --
10    A   I have -- I have no idea.
11    Q   All right.  Do you know the Drell
12  that is referred to on here?
13    A   I got some telephone calls from
14  Drell.
15    Q   All right.  Before we get to those,
16  you also see a guy named Adam DiSpirito's
17  name on there; is that right?
18    A   That's correct.
19    Q   All right.  And it just says --
20  under his name it says, source:
21  Global/Drell?
22    A   That's correct.
23    Q   All right.  Doesn't say anything

Page 41

1  about Global/Drell being tied in with IPI
2  Skyscraper or anything, does it?
3    MS. CROW:  Object to the form.
4    A   To me it does.  It says Adam J.
5  DiSpirito.
6    Q   Well, I'm talking about --
7    A   And that's source, Global/Drell.
8    Q   All right.  And that appears under
9  Adam's name, Adam DiSpirito?
10    A   It does.
11    Q   All right.  Up until -- had you had
12  any contact with Adam DiSpirito up to that
13  point in time?
14    A   Had not.  No, sir.  Had not.
15    Q   All right.  And you said your
16  problem was with IPI Skyscraper because you
17  claim that the Palmers and Global were
18  representatives of IPI Skyscraper?
19    A   They were.  Yes, sir.
20    Q   And you base that on this document?
21    A   In my mind, yes, sir.
22    Q   In your mind?
23    A   Uh-huh (nodding head).

**American Court Reporting**
**toll-free (877) 320-1050**

11 (Pages 42 to 45)

Page 42

1    Q    All right.  And you base that on
2  this document which has been marked as
3  Defendant's Exhibit 1.
4    A    I do.
5    Q    Is that a fair statement?
6    A    Yes, sir.
7    Q    All right.  But you had had -- you
8  had had no contact whatsoever at that point
9  in time with anybody over the phone or in
10  person that told you they were a
11  representative of IPI Skyscraper, had you?
12    A    No, sir.
13    Q    All right.  And you said you
14  understood what a mortgage broker was, and
15  you understood that IPI Skyscraper -- you
16  came to learn -- was a mortgage broker?
17    A    Yes, sir.  In the beginning I
18  thought it was a bank.
19    Q    All right.  And that Chevy Chase
20  was actually the mortgage company, was it
21  not?
22    A    That's correct.
23    Q    All right.  Now, I think I asked

Page 43

1  you, and I don't remember exactly --
2    A    That was one mortgage company that
3  I think they done business with.
4    Q    Yeah.  They could have done it with
5  a bunch of them, couldn't they?
6    A    Yes, sir.
7    Q    Okay.  Would it have made any
8  difference to you what mortgage company
9  handled the loan?
10    A    No, sir.
11    Q    Would it have made a difference to
12  you whether IPI took the mortgage or Chevy
13  Chase as long as it was what was presented to
14  you?
15    A    That's correct.
16    Q    Wouldn't make any difference, would
17  it?
18    A    Wouldn't make any difference.
19    Q    All right.  So I think I asked you
20  the question that after you refused to sign
21  those documents that had Chevy Chase's name
22  on it, you didn't have any outstanding loan
23  applications, did you?  You weren't expecting

Page 44

1  a loan from anyone, were you?
2    A    Jarrett Palmer told me that he
3  would continue to pursue a loan through IPI
4  if I wanted him to do so.  And I told him
5  yes, go ahead.
6    Q    Do you know what, if anything, he
7  did as far as pursuing it?
8    A    I don't know any -- I don't know
9  what he did.
10    Q    Did he ever tell you he was
11  pursuing it further?
12    A    He told me he would pursue it,
13  but --
14    Q    But did he --
15    A    -- then --
16    Q    Did he do any acts to do that?
17    A    Not that I saw.
18    Q    So there wasn't any more paperwork
19  that came down after the Chevy Chase
20  paperwork, was there?
21    A    No, sir.
22    Q    All right.  And you didn't
23  intend -- you didn't intend to do a loan on

Page 45

1  the terms that had been presented to you
2  either by IPI Skyscraper or Chevy Chase for
3  the nearly 5 percent interest because you
4  wanted 1.95?
5    A    That's correct, sir.
6    Q    All right.  And when, if ever, did
7  you first have any contact with anyone
8  claiming to be a representative of IPI
9  Skyscraper?
10    A    Drell called me.  In the process of
11  this, in March or April, Drell called me two
12  or three times.  First of all, he told me
13  that IPI wouldn't loan $75,000, that the
14  smallest thing they would do was a hundred
15  thousand.
16        And I said, you know, if I've got
17  to take a hundred, I'll take a hundred.  And
18  -- at the rate of interest and with the
19  provisions that I had set forth before.  And
20  he informed me that he had just been to some
21  kind of a school, and he had found out that
22  they might could do the 75,000.
23    Q    Did he say what kind of school he

**American Court Reporting**
**toll-free (877) 320-1050**

Page 46

1  had been to?
2      A   It was a mortgage brokers' school.
3      Q   All right.  Do you know if he was
4  employed by IPI Skyscraper?
5      A   I do not know, sir.
6      Q   Do you know if he was employed by
7  Global Development?
8      A   I do not know, sir.
9      Q   Have you come -- have you come to
10  learn that he was employed by Global
11  Development?
12      A   I don't know that for sure.
13      Q   Have you heard that?
14      A   But it's on the web page, now.
15      Q   That he is employed by Global?
16      A   That's right.  He's an owner.
17      Q   Of Global?
18      A   It says -- it says --
19      Q   Robert Drell?
20      A   That's right.
21      Q   All right.  I notice your lawyer
22  showed my some stuff a while ago where they
23  got on the web page and found out that

Page 47

1  Adam DiSpirito worked for IPI Skyscraper.
2  Have you seen that?
3          MS. CROW:  Object to the form.  I
4  don't think that that's into evidence, but --
5  a lawyer --
6      A   I don't know that to be true.  I
7  haven't -- I've seen the web page, but I
8  don't know if Adam DiSpirito is on there.
9      Q   All right.  You've seen IPI
10  Skyscraper's web page?
11      A   I have.  A long time ago.
12      Q   All right.  Did you see anything
13  about Robert Drell being employed there?
14      A   I did not.
15      Q   All right.  Do you remember if you
16  saw whether Adam DiSpirito was employed
17  there?
18      A   He was.
19      Q   All right.  Did you see anything
20  about Warren or Jarrett Palmer being employed
21  with IPI Skyscraper?
22      A   No, sir.
23      Q   Okay.  So from your investigation

Page 48

1  of checking, the only person that you
2  determined through these investigations was
3  an employee of IPI was Adam DiSpirito?
4      A   For sure, that's -- as sure as I
5  can be with a telephone call, yes, sir.
6      Q   All right.  Did any of these other
7  people ever represent themselves or present
8  themselves as being -- when I say "these
9  other people," I mean the Palmers or Drell.
10  Of being employees of IPI Skyscraper?
11      A   Yes, sir.  And -- and -- I mean,
12  not straight out, but we were talking about a
13  loan with IPI Skyscraper.
14      Q   Uh-huh (nodding head).
15      A   And they were talking like they
16  sure knew what they were doing:  We can do
17  this; we can't do that.
18      Q   Well, do you know how they acquired
19  that information?
20      A   No, sir.  I don't know.
21      Q   All right.  Well, when -- when, if
22  ever, did you ever have any conversations
23  with Adam DiSpirito?

Page 49

1      A   It was in late October, early
2  November of '04.
3      Q   All right.  Now, you had applied, I
4  believe, in March or April, thereabouts, of
5  '04 for these loans, hadn't you?
6      A   I had.
7      Q   All right.  And because it didn't
8  have the right terms, you didn't go forward
9  with those loans?
10      A   That's correct, sir.
11      Q   So is it fair to say that from that
12  time until October of '04, you didn't have
13  any contact with IPI Skyscraper directly?
14      A   Did not.
15      Q   All right.
16      A   That I remember.  No, sir.
17      Q   All right.  And you didn't -- you
18  didn't have an active application for a loan
19  pending with IPI Skyscraper?
20          MS. CROW:  Object to the form.
21      A   I thought I had.
22      Q   Well, you thought you had, but you
23  hadn't -- you said you wasn't going to accept

**American Court Reporting**
**toll-free (877) 320-1050**

13 (Pages 50 to 53)

Page 50

1  the -- you refused to sign the papers that
2  they had presented to you?
3      A   That's right.
4      Q   All right.  So --
5      A   It was not what was quoted to me.
6      Q   So how did you feel that you had a
7  pending application for a loan if you hadn't
8  even signed the paperwork that they submitted
9  to you to get the loan in the first place?
10      A   Based on who I thought was their
11  representative, Drell and Palmer.  I thought
12  they were still pursuing an application.
13      Q   You thought that based on what they
14  were telling you; right?
15      A   That's right.
16      Q   You never called up anybody at IPI
17  Skyscraper and said, "hey, do these guys work
18  for y'all" or anything like that, did you?
19      A   I didn't.
20      Q   Okay.  But you did look up on the
21  Internet to find out about them?
22      A   That was the initial -- when I made
23  the initial application, I looked up IPI

Page 51

1  Skyscraper.  And they had a great web page in
2  there, so --
3      Q   All right.  So when DiSpirito
4  called you in October -- this is from April
5  or so until October, nearly six months
6  later -- it's nearly a four-, five-,
7  six-month period.  Y'all didn't -- you didn't
8  have any dealings at all with IPI Skyscraper,
9  did you?
10      A   No, sir.
11      Q   And what was the purpose of
12  DiSpirito's call when he called you in
13  October of '04?
14      A   He talked to my wife first.  And it
15  was concerning this -- at that time we had
16  received the liens from Tom Leonard.
17      Q   Uh-huh (nodding head).
18      A   We had talked to Tom Leonard on, I
19  believe, November the 1st.  There -- the
20  following week my wife got a telephone call
21  from Adam DiSpirito, and he said that his job
22  was to straighten messes out like that; and that if
23  it was purely a misunderstanding; and that if

Page 52

1  we didn't get lawyers involved in it and give
2  him a couple weeks, he could get it all
3  straightened out.
4      Q   Well, did he say how he was going
5  to straighten it out?
6      A   He didn't say how he was going to
7  straighten it out.
8      Q   Did he tell you that Robert Drell
9  was trying to get a loan from Skyscraper to
10  get some of this resolved?
11      A   He didn't tell me that Robert Drell
12  was trying to do anything.
13      Q   He just said he would straighten it
14  out?
15      A   That's right.
16      Q   But didn't say how he would
17  straighten it out?
18      A   He said he got paid to do things
19  like that.
20      Q   All right.  But in your mind you
21  thought you had a pending application, but
22  you hadn't done anything in furtherance of it
23  in nearly six months?

Page 53

1      A   I hadn't.
2      Q   Didn't you find it sort of strange
3  that he would be calling you six months later
4  trying to clear this up when y'all hadn't had
5  any dealings from around April or May until
6  this time about a loan?
7      A   I did think it kind of strange.
8      Q   You did?
9      A   I did.
10      Q   How so?
11      A   Well, when the liens came about and
12  we became aware of the liens, when they were
13  filed with us, when we got a copy of them,
14  Tom Leonard -- we went over and talked to
15  him, and he said he had talked to DiSpirito
16  and that -- he also said that if I didn't get
17  lawyers involved --
18      Q   Tom Leonard did?
19      A   That's right.  That we would get
20  this straightened out.  And I told him that I
21  could wait a reasonable amount of time.
22      Q   What was the deal about the liens
23  that Tom Leonard filed on your house?  What

**American Court Reporting**
**toll-free (877) 320-1050**

Page 54

1   was the problem there?
2       A   I paid cash for my house in three
3   payments.
4       Q   Who did you pay the cash to?
5       A   I paid $75,000 to Construction
6   Services who was supposedly an escrow.
7       Q   Who at construction services?
8       A   Jarrett Palmer.
9       Q   So in essence you paid Jarrett
10  Palmer?
11      A   That's right.  I found that out
12  after the fact.  And then I gave $65,000 to
13  Global Development.
14      Q   And that's also Jarrett Palmer?
15      A   That's correct.
16      Q   Do you understand that he does
17  business like Global Development, Inc. doing
18  business as Construction Services?
19      A   I did not until after the fact.
20      Q   All right.  And you didn't pay any
21  money to IPI Skyscraper, did you?
22      A   I did not.
23      Q   Do you have any evidence whatsoever

Page 55

1   that IPI Skyscraper got a penny out of the
2   money that was paid to Jarrett Palmer or his
3   companies?
4       A   It was represented to me that the
5   initial fifty-five thousand dollars and
6   change -- and I don't remember exactly what
7   it was, but it was fifty five thousand
8   dollars plus.  But of that moneys, that
9   $5,000 and the change, was the interest and
10  the application fee and everything that went
11  along with this right here.
12      Q   Okay.  Who represented that to you?
13      A   The Palmers.
14      Q   All right.  Nobody from IPI
15  Skyscraper ever represented that to you, did
16  they?
17      A   They didn't.
18      Q   All right.  And you don't have any
19  -- let me ask you this:  You gave checks to
20  the Palmers?
21      A   I did.
22      Q   And have you looked on the back of
23  those checks to see who endorsed them, who

Page 56

1   cashed them?
2       A   Yes, sir.
3       Q   Who was that?
4       A   Steve and Jarrett Palmer.
5       Q   Nothing on there about IPI
6   Skyscraper getting any money out of it, is
7   there?
8       A   No, sir.
9       Q   And your understanding was based on
10  what Jarrett Palmer told you?
11      A   That's right.
12      Q   Nobody from IPI Skyscraper told you
13  that they were getting any money out of it?
14      A   That's correct.
15      Q   All right.  Do you know what
16  Jarrett Palmer did with the money?
17      A   I have no idea.  It sure wasn't
18  build my house, apparently.
19      Q   Okay.  I believe your lawyer has
20  subpoenaed his banking records.  Do you know
21  if any of those banking records reveal any
22  money paid to IPI Skyscraper?
23      A   I don't know.

Page 57

1       Q   You don't know?
2       A   No.
3           MR. SEABORN:  They do.
4           MR. IRBY:  They do?
5           MR. SEABORN:  A couple of them look
6   like application fees.
7           MR. IRBY:  Yeah.  They got two
8   hundred -- they got $365 application fee, I
9   think.
10      Q   Other than an application fee, do
11  you know of any money they got?
12      A   No, sir.
13      Q   And you understand mortgage
14  companies -- if you don't make -- mortgage
15  companies make money making mortgages, don't
16  they?
17      A   Sure.
18      Q   All right.  If they don't make a
19  mortgage, they don't make any money?
20      A   That's right.
21      Q   All right.  Now, you've alleged
22  that IPI Skyscraper set out to deprive you of
23  your money and your home.  What do you — how

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 58

1  did IPI Skyscraper do that?
2     A   By not granting me what was
3  promised or quoted to me by their
4  representative and not coming through with
5  the deal.
6     Q   Okay. Well, that's not making you
7  the loan?
8     A   That's right.
9     Q   Because of the different terms?
10    A   That's right.
11    Q   But you don't have any evidence
12  that they stole your money or anything of the
13  like, do you, or converted your money?
14    A   No, sir. I don't -- I don't have
15  any evidence of that.
16    Q   And you don't have any evidence
17  that they have -- that they have an interest
18  -- you own the home, as a matter of fact,
19  don't you? You're still in the home?
20    A   Yes, sir. But it's got a bunch of
21  liens on it.
22    Q   I know you said Tom Leonard. Who
23  else has a lien?

Page 59

1     A   Jordan's Building Supply, E. E.
2  Bentley Insulation Company, and that's it.
3     Q   Okay. How much are the liens?
4     A   Between 126- and $127,000.
5     Q   You're in the house; right?
6     A   I am.
7     Q   You're not making any payments
8  anywhere; right?
9     A   No, sir.
10    Q   Has anybody tried to evict you or
11  get you out of the house or anything like
12  that?
13    A   No, sir.
14    Q   What's wrong with the house? What
15  was it that you or your wife didn't like
16  about the workmanship?
17    A   It's very poor workmanship. The
18  -- the majority of the plumbing and the sewer
19  drain system don't meet code. The master
20  bath tub is propped up with brick with wooden
21  wedges drove in under there. The windows are
22  not sealed. The brick was very poorly laid.
23  The -- and just numerous things. You've got

Page 60

1  a copy there where I filed a complaint with
2  the building --
3     Q   Okay.
4     A   -- officer.
5     Q   All those problems are related to
6  the shotty workmanship on building your
7  house; right?
8     A   Yes, sir.
9     Q   And that was done by the Palmers
10  and Global Development?
11    A   It was.
12    Q   All right. IPI Skyscraper didn't
13  have anything to do with building your house,
14  did they?
15    A   Not to my knowledge.
16    Q   Okay. Did the Palmers ever promise
17  to get those things straightened out?
18    A   They did. The last day I saw
19  Jarrett Palmer.
20    Q   When was that?
21    A   That was somewheres around the 15th
22  of October of '04.
23    Q   Okay. Before or -- before this

Page 61

1  call from Adam DiSpirito?
2     A   Before the call from Adam
3  DiSpirito.
4     Q   Where were you and your wife when
5  you received the call from Adam DiSpirito?
6     A   In the house at 3200 Clardy Road.
7     Q   In Dothan?
8     A   That's right.
9     Q   And where was Adam DiSpirito?
10    A   I have no idea. I'm assuming he
11  was in New York.
12    Q   In New York? You understand that's
13  where he was based at the time?
14    A   That's right.
15    Q   All right. And you were in Houston
16  County when you got that call. And that --
17  this is in October of '04, after the shotty
18  workmanship had already come about?
19    A   Yes, sir.
20    Q   All the problems had manifested
21  themselves about the house by then?
22    A   That was the day I got the
23  certificate of occupancy. Jarrett Palmer

**American Court Reporting**
**toll-free (877) 320-1050**

Page 62

1  gave it to us.
2      Q   You did get a certificate of
3  occupancy?
4      A   We did.
5      Q   Okay.
6      A   And we went over what was wrong,
7  and he says I'll be back tomorrow to start to
8  work on fixing it.
9      Q   So in the fall, around October or
10  November or whenever it was, of '04 is the
11  first time you had any contact directly with
12  anybody from IPI Skyscraper that was an
13  employee -- that you knew was an employee,
14  and that was Adam DiSpirito?
15      A   Yes, sir.  That was the first time
16  I got a call from New York.  Yes, sir.
17      Q   All right.  And you were situated
18  in Houston County, and as far as you know he
19  was in New York when that call was made?
20      A   That's right.
21      Q   And he told you he was in business
22  to clear up messes like this, and he was
23  going to try to get it cleared up; is that

Page 63

1  right?
2      A   No, sir.  He said he was going to
3  clear it up.
4      Q   All right.  When did -- I believe
5  this lawsuit you filed was in December of
6  '04.  When did you first contact a lawyer
7  about it?
8      A   It was sometime in December of '04.
9      Q   Well, do you remember the first
10  part or middle part or latter part or what?
11      A   It might have been the latter part
12  of November or either the first part of
13  December.
14      Q   Okay.
15      A   I'm not real sure.
16      Q   And how long had you waited after
17  talking to Adam about getting it cleared up
18  before you consulted a lawyer about it?
19      A   I'm not sure.  I gave him --
20  Jarrett Palmer told me that he was turning it
21  over to DiSpirito to get it straightened out
22  and that he needed ten days.
23      Q   That's what Jarrett told you?

Page 64

1      A   That's right.  And I'll -- I gave
2  him ten days from November 1st of '04.
3      Q   Okay.  Did you ever -- did you ever
4  call Adam DiSpirito yourself and say, hey,
5  Adam, or something to the effect, like what
6  are you doing about trying to straighten this
7  out?
8      A   I did.
9      Q   When was that?
10      A   That was in -- probably around the
11  middle of November.
12      Q   All right.  And what was -- what
13  was his response or attitude about that?
14      A   I'm working on it, just give me a
15  little more time and don't get lawyers
16  involved in it.
17      Q   Okay.  And so you waited a little
18  longer, and you did get lawyers involved.
19  And that's what we're here about today; is
20  that right?
21      A   That's correct.
22      Q   When you had that telephone
23  conversation with Adam, did you place the

Page 65

1  call or did he place it?
2      A   There were several calls that went
3  back and forth.  And he left messages on my
4  answering machine to the effect that he was
5  working on it and that he was working on some
6  municipals and that he was going to have to
7  underwrite some of it himself.
8      Q   What does that mean, "working on
9  some municipals"?
10      A   I don't know.
11      Q   And when he said underwrite it
12  himself -- meaning Adam DiSpirito himself
13  would underwrite it or --
14      A   That's -- that's what I took him
15  at.
16      Q   How would he underwrite it?
17      A   I don't know.  By using his own
18  money, I guess.
19      Q   All right.  Why would he do such a
20  thing?
21      A   I don't know.
22      Q   You said y'all had a series of
23  telephone calls.  Each time were you in your

**American Court Reporting**
**toll-free (877) 320-1050**

Page 66

1  home in Dothan when those calls --
2      A   No, sir.  To the best of my
3  remembrance, I called him a couple times from
4  Maxwell Air Force Base.
5      Q   All right.  So the calls were
6  either made from Dothan or --
7      A   Montgomery.
8      Q   -- Montgomery?  None were made in
9  Barbour County, were they?
10     A   The -- no, sir.  We were in Dothan.
11     Q   All right.  And Adam DiSpirito was
12  in New York, wasn't he?
13     A   As far as I know.  Yes, sir.
14     Q   And you had moved from Barbour
15  County by then?
16     A   I had.
17         MR. IRBY:  Y'all mind if we take a
18  break?  I've got several documents, but I've
19  got to have about five minutes to get them --
20         MS. CROW:  That's fine.
21             (10:14 a.m.)
22         (WHEREUPON, a break was taken.)
23             (10:31 a.m.)

Page 67

1          (WHEREUPON, Defendant's Exhibit 2
2      was marked for identification.
3      A copy is attached.)
4          MR. IRBY:  All right.  Back on the
5  record now.
6      Q   I appreciate you giving me a chance
7  to go through some of these documents to try
8  to get them in some sort of order here.  And
9  you've told us about some of the stuff, so
10  I'll try to breeze through it as quick as I
11  can.
12         First of all, I've got Defendant's
13  Exhibit 2 which appears to be a contract
14  between you and Global Development -- is that
15  correct -- on building your home?
16     A   That is -- that's correct, sir.
17  That's my signature.
18     Q   All right.  Did you read and
19  understand that?
20     A   I did.  Uh-huh (nodding head).
21     Q   And you executed it in Houston
22  County you told us earlier?
23     A   I did.  I signed this in Houston

Page 68

1  County.
2          MR. IRBY:  All right.  We offer
3  that.
4      Q   I'm not sure -- I'm going to show
5  it to you anyway and see.
6          (WHEREUPON, Defendant's Exhibit 3
7      was marked for identification.
8      A copy is attached.)
9      Q   Is this a proposal that Jarrett
10  Palmer presented to you, or did you get that
11  about what all was going into your house?
12     A   Yes, sir.  I got something like
13  this -- very similar to it.
14     Q   All right.  And that told the
15  specifications of the -- what all he was
16  supposed to do; is that right?  That's
17  Plaintiff's Exhibit 3.
18         MR. SEABORN:  Defendant's.
19         MR. IRBY:  Excuse me.  I'm sorry.
20     A   That's correct, sir.
21         MR. IRBY:  All right.  We offer
22  that as Plaintiff's (sic) Exhibit 3.
23         (WHEREUPON, Defendant's Exhibit 4

Page 69

1      was marked for identification.
2      A copy is attached.)
3      Q   All right.  And you told us you got
4  this property from the Watfords; is that
5  correct?
6      A   Jimmy Watford.
7      Q   All right.  I'll show you what has
8  been marked as Plaintiff's -- hell.  There I
9  go again.  Defendant's Exhibit 4 and ask you
10  if that is a true and correct copy of the
11  deed there that you got from the Watfords?
12     A   It is.  Yes, sir.
13     Q   All right.  And that property is
14  the home that you and your wife presently
15  live in; is that correct?
16     A   That's correct, sir.
17     Q   And that is in Houston County?
18     A   That's correct, sir.
19     Q   Okay.  Now, you told us earlier
20  that you had not signed any documents with
21  IPI or Chevy Chase; is that right?
22     A   No, sir.  To the best of my
23  remembrance, I haven't.

**American Court Reporting**
**toll-free (877) 320-1050**

18 (Pages 70 to 73)

---

Page 70

1      Other than this right here.
2      Q    All right.  Other than -- you're
3  pointing to the application which is --
4      A    That's right.
5      Q    -- Defendant's Exhibit 1?
6      A    Yes, sir.
7      Q    To the best of your recollection;
8  is that right?
9      A    That's correct, sir.
10      Q    I'll show you what has been marked
11  four --
12      MS. CROW:  I think you have two 4s.
13      MR. IRBY:  That's right.  I never
14  could count.
15      MR. ADAMS:  Couldn't remember he
16  was a defendant either.
17      MS. CROW:  That's all right.  I
18  make that mistake all the time if I'm on the
19  wrong side.
20      (WHEREUPON, Defendant's Exhibit 5
21  was marked for identification.
22      A copy is attached.)
23      Q    It's called a RESPA servicing

---

Page 71

1  disclosure.  It appears to be your signature
2  dated May 7, '04.  Is that your signature on
3  there?
4      A    That don't look like my signature.
5      Q    Well, let's look at --
6      A    All right.  And I know the date's
7  not mine.
8      MS. CROW:  I think the only thing
9  that has your signature is this contract
10  right here.
11      A    I'll still have to say that don't
12  look like my signature.
13      MS. CROW:  That's fine.  You've
14  answered the question.
15      Q    All right.  It doesn't look like
16  your signature, but it's signed Joe F.
17  Hughes.  That's how you sign; is that
18  correct?
19      A    That's correct, sir.
20      Q    All right.  And it is your
21  signature -- you don't dispute that that's
22  your signature on the contract with --
23      A    I don't dispute that.  No, sir.

---

Page 72

1      Q    All right.
2      MR. IRBY:  We offer that as
3  Defendant's 5.
4      Q    Before I go there, look up at the
5  top and see who it says is the lender.
6      A    Chevy Chase Bank.
7      (WHEREUPON, Defendant's Exhibit 6
8  was marked for identification.
9      A copy is attached.)
10      Q    All right.  I'll show you -- could
11  it be you signed that and just don't
12  remember?  Because I'm no handwriting expert,
13  but it don't look that different to me.
14      A    It looks different to me in some
15  aspects.
16      Q    All right.  Do you know who would
17  have signed your name --
18      A    No, sir.
19      Q    -- if anyone?
20      A    No, sir.  I don't know for sure.
21      Q    All right.  I show you -- well, let
22  me ask you this:  Did documents come to you
23  from Palmer or in the mail?

---

Page 73

1      A    The documents came to me from Chevy
2  Chase.
3      Q    All right.  And what did you do
4  with them?
5      A    I gave them back to Jarrett Palmer.
6      Q    Okay.  You didn't give them back to
7  Chevy Chase?
8      A    I didn't.
9      Q    Okay.
10      A    Uh-uh (shaking head).  Not to my
11  knowledge.  Not that I remember.
12      Q    Okay.  Let me show you what's been
13  marked as Defendant's Exhibit 6.  And flip
14  over to the second page and tell me if that's
15  your signature on there.
16      A    No, sir.  That don't look like my
17  signature either.
18      Q    All right.  You don't recall
19  signing that?
20      A    I don't.
21      Q    Could you be mistaken in signing
22  and just don't recall?
23      A    I don't think so.

---

Page 74

1    Q   All right.
2    A   But now --
3    Q   All right. As long as you're
4  looking at it, read this paragraph right
5  here. Well, I guess the document -- I can't
6  see it upside down.
7        MR. ADAMS: Here you go. You want
8  to look at this one?
9    Q   Look on there and just tell me if
10  it says something about how your interest
11  rate is determined and how your payments are
12  determined. Do you see that?
13    A   I do.
14    Q   Do you see down below that it says
15  how your interest rate can change?
16    A   That's right. Yes, sir. I see
17  that.
18    Q   All right. If you signed it, did
19  you read it and understand it -- if you did
20  sign it --
21        MS. CROW: Object to the form.
22    Q   -- if you're just mistaken?
23    A   I would have read it. Yes, sir.

Page 75

1        (WHEREUPON, Defendant's Exhibit 7
2        was marked for identification.
3        A copy is attached.)
4    Q   All right. And what's that titled
5  up at the top, if you will, before I go on to
6  something else?
7    A   It's from the Chevy Chase Bank
8  wholesale lending division. It's
9  semi-adjustable rate, non-convertible
10  mortgage disclosure, page one of two.
11    Q   It says it's an adjustable rate?
12    A   That's right.
13    Q   All right. And appears to be your
14  signature?
15        MS. CROW: Object to the form.
16  He's already testified that that does not
17  appear to be his signature.
18        MR. IRBY: Well, he said he didn't
19  think he signed it, but it's got his name on
20  it.
21    Q   It's got your name on it, doesn't
22  it?
23    A   It does have my name on it. Yes,

Page 76

1  sir.
2    Q   All right. I'll show you what's
3  been marked Plaintiff's Exhibit 7 -- or
4  excuse me. Defendant's Exhibit 7. I ask you
5  to flip over -- well, first of all, tell us
6  what that is.
7    A   It says construction permanent loan
8  program description and conditions. How much
9  further do you want me to --
10    Q   That's far enough. Just flip over
11  and see if it appears to bear your signature.
12  Page five, I think it is.
13    A   It's got my name. I don't think
14  that's my signature.
15    Q   What's different about it from your
16  signature?
17    A   I don't make my Us like that.
18    Q   Well, do you know who would have
19  signed your name to it?
20    A   I do not know, sir.
21    Q   You're saying you gave those papers
22  to -- what's his name -- Warren Palmer?
23    A   Jarrett Palmer.

Page 77

1    Q   Jarrett Palmer. Excuse me. Let me
2  just see that a minute. If you did sign it
3  and just don't remember, would you have read
4  it and understood it?
5    A   Yes, sir. Pretty much so.
6    Q   Okay. And you can't point us to
7  any person who would have committed a forgery
8  of your name on this document, can you?
9        MS. CROW: Object to the form.
10  That calls for speculation.
11        You don't have to answer that.
12    Q   Well, you've told us you don't know
13  who signed it if you didn't sign it; is that
14  right?
15    A   I don't know.
16        MR. IRBY: What was that one, 7?
17        MR. ADAMS: Seven.
18        (WHEREUPON, Defendant's Exhibit 8
19        was marked for identification.
20        A copy is attached.)
21    Q   I'll show you what's been marked as
22  Defendant's Exhibit 8 and ask you if that
23  appears to be your signature on there.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 78

1    A   No, sir.  That doesn't look like my
2   signature and -- but it looks like the
3   previous four or five you showed me there
4   that I said don't look like my signature.
5    Q   All right.  If you did sign it and
6   you just don't recollect that you signed it,
7   did you read and understand that, when you
8   signed it, if you signed it?
9        MS. CROW:  Object to the form.
10   A   I would have.
11   Q   All right.  You admit you got a
12  package of papers from Chevy Chase, don't
13  you?
14   A   I do.  Yes, sir.
15   Q   Okay.  Do you remember getting what
16  they call a "good faith estimate"?
17   A   I think I do.  Yes, sir.
18       (WHEREUPON, Defendant's Exhibit 9
19       was marked for identification.
20       A copy is attached.)
21   Q   All right.  Let me show you
22  Defendant's Exhibit 9 which purports to be a
23  good faith estimate.  Did you sign that

Page 79

1   document?
2    A   Yes, sir.
3    Q   Okay.  How can you be so sure you
4   signed that one and not --
5    A   Well, looking at my signature.
6   That looks like mine, and that would be the
7   way I would date it.
8    Q   All right.  Let me see.
9        Okay.  Do you remember getting a
10  truth in lending disclosure statement in the
11  package of papers you got?
12   A   I don't remember it.  No, sir.  Not
13  specifically.
14       (WHEREUPON, Defendant's Exhibit 10
15       was marked for identification.
16       A copy is attached.)
17   Q   I'll show you what's been marked as
18  Defendant's Exhibit 10 which appears to be a
19  truth in lending statement.
20       Did you sign that?
21   A   That's not my signature.
22   Q   Okay.  Even if you claim you didn't
23  sign it, you got all these documents, didn't

Page 80

1   you?
2    A   I don't -- I don't remember
3   specifically getting this.  I got a package
4   of papers.  And when I found out it wasn't
5   what the -- what had been discussed earlier,
6   then I didn't want it.  I didn't want to
7   participate.
8    Q   So you withdrew your loan
9   application?
10   A   I didn't withdraw it.  No, sir.
11   Q   You just didn't intend to go
12  forward with it?
13   A   Under this deal.  No, sir.
14   Q   All right.  Well, before you got
15  involved in the financing aspect here, you
16  were going to pay cash for this house,
17  weren't you?
18   A   That's correct, sir.
19   Q   After this didn't go through for
20  whatever reason, this loan with IPI
21  Skyscraper or Chevy Chase, did you seek any
22  financing anywhere else?
23   A   No, sir.

Page 81

1    Q   You still intended to pay cash?
2    A   Yes, sir.
3    Q   So you didn't go get a loan
4   somewhere and pay a higher interest rate
5   anywhere, did you?
6    A   I did not.
7    Q   Look on there -- on this truth in
8   lending statement and look up here in this
9   corner.  What is the interest rate expressed
10  on there?
11   A   4.375.
12   Q   All right.  Now, I believe you told
13  us earlier you got upset when it went from
14  1.95 to nearly 5 percent?
15   A   That's right.  I did.
16       (WHEREUPON, Defendant's Exhibit 11
17       was marked for identification.
18       A copy is attached.)
19   Q   All right.  That was Number 10.
20  I'll show you what's marked as Plaintiff's
21  (sic) Exhibit 11.  What does that document
22  state it is?
23   A   Notice to applicant of right to

**American Court Reporting**
**toll-free (877) 320-1050**

Page 82

1  receive copy of appraisal report.
2      Q   Did you sign that document?
3      A   That does look like my signature.
4      Q   All right. And that's Number 11.
5  Did you, in fact, receive a copy of the
6  appraisal?
7      A   I don't remember, sir.
8          (WHEREUPON, Defendant's Exhibit 12
9          was marked for identification.
10         A copy is attached.)
11     Q   All right. Well, let me show you
12 what's marked as Defendant's Exhibit 12 and
13 ask you if you've seen a copy of that
14 appraisal.
15     A   No, sir. To the best of my
16 knowledge, I've never seen a copy of it.
17     Q   Okay. Today is the first time
18 you've ever seen the appraisal on it?
19     A   That's correct, sir. This is -- I
20 guess it is. No, sir. I have not seen a
21 copy of that appraisal.
22         MR. IRBY: That was?
23         COURT REPORTER: 12.

Page 83

1          (WHEREUPON, Defendant's Exhibit 13
2          was marked for identification.
3          A copy is attached.)
4      Q   I'll show you what's marked as
5  Defendant's Exhibit 13 and ask you if that's
6  your signature on that.
7      A   Yes, sir. I think it is.
8      Q   All right. What is that, by the
9  way?
10     A   This is an Equal Credit Opportunity
11 Act.
12         (WHEREUPON, Defendant's Exhibit 14
13         was marked for identification.
14         A copy is attached.)
15     Q   Okay. I'll show you Defendant's
16 Exhibit 14 and ask you if that's your
17 signature on that.
18     A   It does appear to be my signature.
19     Q   All right. And what is that, by
20 the way?
21     A   This is the Housing Financial
22 Discrimination Act of 1977, Fair Lending
23 Notice.

Page 84

1          (WHEREUPON, Defendant's Exhibit 15
2          was marked for identification.
3          A copy is attached.)
4      Q   Okay. I show you Defendant's
5  Exhibit 15 and ask you if that's your
6  signature on that.
7      A   It appears to be. Yes, sir.
8      Q   All right. What is that, by the
9  way?
10     A   It's disclosure notices affidavit
11 of occupancy anti-coercion statement, Fair
12 Credit Reporting Act, and FHA loans only.
13         I've got this way out of order.
14     Q   Sir?
15         MS. CROW: That's okay. She'll get
16 it back in order for you.
17     Q   Yeah. She'll -- that was 15.
18         (WHEREUPON, Defendant's Exhibit 16
19         was marked for identification.
20         A copy is attached.)
21     Q   I show you Defendant's Exhibit 16
22 and ask you to flip over to page -- well, you
23 can look over on page three, and see if

Page 85

1  that's your signature on there.
2      A   It appears to be.
3      Q   Okay. And look at pages one and
4  two. Does that appear to be your initials on
5  there?
6      A   It appears to be.
7      Q   And what is that document, sir?
8      A   Pre-application disclosure and fee
9  agreement.
10     Q   All right. Does that talk about
11 the processing fee and all you paid on your
12 loan?
13     A   It does. It talks about an
14 application fee, property appraisal fee, and
15 then credit report fee.
16     Q   Okay. Did you pay those, or did
17 anybody pay them for you?
18     A   I didn't pay them.
19     Q   Okay. Do you know if Global or
20 anybody paid them?
21     A   I don't know.
22     Q   All right. That was 16.
23         (WHEREUPON, Defendant's Exhibit 17

**American Court Reporting**
**toll-free (877) 320-1050**

22 (Pages 86 to 89)

Page 86

1    was marked for identification.
2        A copy is attached.)
3        Q    I show you Defendant's 17 and ask
4    you if you can identify that document.
5        A    Mortgage loan origination
6    agreement.  That appears to be my signature.
7        Q    All right.
8        MR. IRBY:  I would like to offer
9    that as 17.
10        (WHEREUPON, Defendant's Exhibit 18
11        was marked for identification.
12        A copy is attached.)
13        Q    Defendant's Exhibit 18, what is
14    that?
15        A    Borrowers certification and
16    authorization.
17        Q    Does that appear to be your
18    signature on that?
19        A    It does.
20        MR. IRBY:  Okay.  We offer that.
21        Q    I noticed, Mr. Hughes, that most of
22    those signatures that you say are yours are
23    in March of '04, but you dispute the ones in

Page 87

1    May of '04.  Is that a fair statement?
2        A    I don't know.  I didn't keep up
3    with the dates, but --
4        Q    All right.  But some of those you
5    admit are your signature, and some you say
6    aren't?
7        A    Some I say don't appear to be mine.
8    Yes, sir.
9        Q    Don't appear to be?
10        A    Yes, sir.
11        Q    All right.  Well, do you know why
12    you signed some and others you wouldn't have
13    signed?
14        A    No.
15        Q    Okay.
16        A    Unless it was the different dates.
17        Q    All right.  And you said something
18    earlier about dates.  Why, in your mind,
19    couldn't you have signed this in May?  What
20    would prohibit you from signing it then?  You
21    weren't out of the country on active duty or
22    anything, were you?
23        A    No, sir.  I just don't remember

Page 88

1    signing anything in May.
2        Q    You just don't remember?
3        A    Pertaining to a loan.  This was all
4    done initially, and, you know, I was waiting
5    on a loan to be granted.
6        Q    All right.  Well, did you receive
7    documents more than one time?
8        A    Not that I remember.
9        Q    All right.  Did you receive some
10    documents from IPI Skyscraper and some from
11    Chevy Chase?
12        A    I really don't remember.  No, sir.
13    There was a package of documents that came to
14    me that was from Chevy Chase.  And, again, I
15    didn't -- I didn't agree with what was on
16    them, and I gave them back to Jarrett Palmer.
17        (WHEREUPON, Defendant's Exhibit 19
18        was marked for identification.
19        A copy is attached.)
20        Q    Okay.  Do you remember getting this
21    document, Defendant's Exhibit 19, statement
22    of credit denial termination of change?  Were
23    you given a copy of that?

Page 89

1        A    No, sir.  I didn't get a copy of
2    it.
3        Q    Well, what was the date that was
4    mailed?  It says mailed down there.
5        A    On 8/9/2004.
6        Q    Right.  You deny you ever got a
7    copy of that?
8        A    I don't remember getting a copy of
9    it.
10        Q    You don't remember.  Okay.  All
11    right.
12        MR. IRBY:  We would like to offer
13    that.
14        (WHEREUPON, Defendant's Exhibit 20
15        was marked for identification.
16        A copy is attached.)
17        Q    Now, you talked about making some
18    payments earlier to Construction Services,
19    and I'm just going to introduce this as a
20    composite.  I think your lawyer or somebody
21    gave me a copy.  I don't know where I got
22    this from.  And I don't have all the payments
23    you made.  But look.  There are two checks

Page 90

1   there.  What are those?
2       A    That was the initial payment I made
3   to Construction Services of $55,848.33, the
4   second payment for $19,151.67.
5       Q    And you told us earlier that
6   Jarrett Palmer Construction Services endorsed
7   those, and that's true on the back of those
8   checks, isn't it?
9       A    It is.
10      Q    All right.  Nothing on there about
11  IPI Skyscraper?
12      A    No, sir.
13      Q    All right.
14      MR. IRBY:  We offer that as --
15      Q    All right.  Now, one of the -- one
16  of the problems and complaints you've got is
17  about this lien that's been filed against
18  your property, isn't it?
19      A    That's right, sir.
20      (WHEREUPON, Defendant's Exhibit 21
21      was marked for identification.
22      A copy is attached.)
23      Q    And Mr. Tom Leonard filed that, did

Page 91

1   he not?
2       A    That's correct.
3       Q    And that's filed in Houston County?
4       A    It is.
5       Q    I'll show you what's been marked as
6   Defendant's Exhibit 21 and ask you if that's
7   a copy of the lien that was so filed.
8       A    That's --
9       Q    Does it appear to be?
10      A    Yes, sir.
11      Q    All right.  And that's says Houston
12  County, does it not?
13      A    It does.
14      Q    And shows it's recorded in Houston
15  County?
16      A    It does.
17      Q    And that's one of the things you
18  want to clear up in this lawsuit, isn't it --
19  get that lien removed?
20      A    That's part of it.  Yes, sir.
21      Q    All right.  Do you remember
22  previously in this case I filed
23  interrogatories which are questions you

Page 92

1   answered under oath?
2       A    Yes, sir.
3       (WHEREUPON, Defendant's Exhibit 22
4       was marked for identification.
5       A copy is attached.)
6       Q    Okay.  I'll show you Defendant's
7   Exhibit 22.  See if that's a copy.  Look on
8   there and see if that's signed by you and
9   your wife, signed --
10      A    It is.
11      Q    -- and notarized.  Where was it
12  notarized?  Was it in Dothan?
13      A    It is.  Yes, sir.
14      Q    All right.  Let me see that again
15  if I may.  What difference would it make
16  whether IPI was a bank or not?
17      A    It would -- it wouldn't make any
18  difference.
19      Q    Okay.  They could have been --
20      A    I guess the -- I thought IPI had
21  the money.
22      Q    All right.
23      A    A bank would have the money.

Page 93

1       Q    All right.  And that's one of the
2   complaints you had -- they didn't tell you it
3   wasn't a bank; is that right?
4       A    I made that statement.  Yes, sir.
5       Q    And the other one was that they
6   didn't deliver on the 1.95 percent interest
7   rate you had been quoted?
8       A    That's correct, sir.
9       Q    All right.  But you didn't go
10  anywhere else and seek any other financing
11  once -- once it became apparent that you
12  weren't going to get that?  You didn't go
13  anywhere else and get any financing at a
14  higher rate of interest?
15      A    No, sir.
16      Q    All right.
17      MR. IRBY:  We'll offer that.
18      Q    Have you had a chance to look at
19  the complaint your lawyers have filed in this
20  case?
21      A    I have.
22      (WHEREUPON, Defendant's Exhibit 23
23      was marked for identification.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 94

1    A copy is attached.)
2    Q    I'll show you what I marked as
3  Defendant's Exhibit 23 which purports to be a
4  copy of the original complaint that was filed
5  on December 16th, '04. And I want you to
6  just flip through there and see if anywhere
7  in there there is any mention of IPI
8  Skyscraper.
9    A    No, sir.
10   Q    All right.
11   A    Not as IPI Skyscraper.
12   Q    All right, sir. And December 16th
13  of '04, you knew then all the complaints you
14  had against them just like you know here
15  today, didn't you -- don't you?
16   A    I do.
17   Q    All right. Yet knowing all that,
18  you elected -- or your lawyers elected not to
19  put that in the initial complaint. In fact,
20  wasn't the initial complaint all about the
21  shotty workmanship and all the Palmers had
22  done? Wasn't that the thrust of the case
23  then?

Page 95

1    A    It was. And we didn't know how
2  deep this went.
3    Q    All right. Well, do we know now?
4    A    Not for sure.
5    (WHEREUPON, Defendant's Exhibit 24
6    was marked for identification.
7    A copy is attached.)
8    Q    All right. I show you what's
9  marked as Defendant's Exhibit 24, I believe
10  it is, which appears to be a first amended
11  complaint filed on February the 7th of '05
12  for the first time mentioning IPI Skyscraper
13  in this lawsuit.
14   A    Uh-huh (nodding head). It's there.
15  Yes, sir.
16   Q    All right. And what's the basis of
17  the complaint then?
18   A    That IPI Skyscraper conspired with
19  other folks to deprive me of my money.
20   Q    All right. Now, you've accused
21  them of a conspiracy, IPI Skyscraper. And I
22  want you to tell me each and every way IPI
23  Skyscraper conspired with anyone to deprive

Page 96

1  you of your money.
2    A    Okay. You asked me earlier if I
3  had any documents that showed where IPI and
4  Global was connected, were they partners so
5  to speak. Sir, you have in your possession
6  three or four documents there --
7    Q    Well, what are they?
8    A    A letter from IPI that welcomes me
9  to IPI Skyscraper, thank you for choosing our
10  partner, Global Development, to build our
11  house. Here is also an application that says
12  IPI Skyscraper, a division of MortgageIT,
13  Incorporated for Global Development, an
14  approved premier builder.
15   Q    All right.
16   A    Here is another document that came
17  out of Global Development's office. It says
18  Adam DiSpirito, managing director, group
19  mortgage benefit plans for Global
20  Development, 24 hours a day, seven days a
21  week. Call him at that 1-800 number.
22   Q    All right. You say these documents
23  prove a conspiracy between IPI and these

Page 97

1  other defendants?
2    A    Probably not totally, but it proves
3  they're in business with them.
4    Q    All right. This first document you
5  refer to, which I'll mark as Defendant's
6  Exhibit 25, you say is -- they were talking
7  about a partnership between IPI and Mortgage
8  -- I mean, IPI and Global. Where is that
9  mentioned in that letter?
10   A    Thank you for choosing IPI
11  Skyscraper and Global Development for your
12  home purchase.
13   (WHEREUPON, Defendant's Exhibit 25
14   was marked for identification.
15   A copy is attached.)
16   Q    Now, Global Development was going
17  to build the house; is that correct?
18   A    That's correct, sir.
19   Q    And you went to them first before
20  IPI Skyscraper ever got involved?
21   A    That's correct, sir.
22   Q    You of your own choosing chose a
23  contractor to build your house?

**American Court Reporting**
**toll-free (877) 320-1050**

25 (Pages 98 to 101)

Page 98

1       A   I did.
2           MR. IRBY:  That was twenty --
3       COURT REPORTER:  You're on 26 now.
4       (WHEREUPON, Defendant's Exhibit 26
5       was marked for identification.
6       A copy is attached.)
7       Q   All right.  I'll show you what's
8   been marked as Defendant's Exhibit 26.  Where
9   did that document come from?
10      A   It came out of Global Development's
11  office.
12      Q   How -- how do you know that?
13      A   Because my wife and I picked it up.
14      Q   From Global Development?
15      A   Right.
16      Q   All right.  Do you know if Global
17  Development had that printed up or IPI
18  Skyscraper had it printed up?
19      A   I have no way of knowing that, sir.
20      Q   And that document is not filled
21  out, is it?
22      A   It is not.
23      Q   It's just a blank copy?

Page 99

1       A   It's a blank.
2       Q   And you don't know if that's a
3   forgery or counterfeit yourself, do you?
4       A   I don't.
5           (WHEREUPON, a break was taken to
6           allow the court reporter to change
7           out supplies.)
8           (WHEREUPON, Defendant's Exhibit 27
9           was marked for identification.
10          A copy is attached.)
11      Q   All right.  I'll show you
12  Defendant's Exhibit 27 which appears to be
13  the third piece of paper you gave me.  And
14  what is that?
15      A   It's another flyer -- handout if
16  you want to call it that -- talking about
17  their mortgage program highlights; IPI; and
18  then Adam DiSpirito, managing director, group
19  mortgage benefit plans for Global
20  Development.
21      Q   Where does it say that?
22      A   (Indicating.)
23      Q   All right.  Did you generate this

Page 100

1   off the Internet, or did your lawyers do it?
2       A   No, sir.  That came out of the -- a
3   copy -- the original came out of Global
4   Development's office.
5       Q   Oh, okay.  All right.  And that's
6   Defendant's Exhibit 27.  All right.  And I
7   believe you told us earlier that you got on
8   their web page, and it looked like a pretty
9   good web page?
10      A   Briefly.  One time.  In February,
11  March of '04.
12      Q   Uh-huh (nodding head).  And so you
13  say those three documents and the statements
14  of the Palmers or Drell or whoever you were
15  dealing with are the evidence that you've got
16  that there was a conspiracy --
17      A   Yes, sir.
18      Q   -- involving IPI?
19      A   Yes, sir.
20      Q   And that's all the evidence you've
21  got?
22      A   It is.
23      Q   All right.

Page 101

1       A   At this point in time, that's all.
2       Q   All right.  Tell me how IPI
3   benefitted from this conspiracy?
4       A   I can't tell you how they shared in
5   the money, but the -- my lawyer said that
6   initially they got a --
7           MS. CROW:  You don't have to tell
8   him anything that we discussed.
9           THE WITNESS:  Okay.
10      A   They got an application fee.
11      Q   All right.  Well, if you went to
12  Compass Bank or anywhere else to finance a
13  house, you would pay an application fee,
14  wouldn't you?
15      A   I guess you would, sir.
16      Q   So there's nothing unusual about
17  that, is there?  If other lenders charge you
18  an application fee, there wouldn't be
19  anything unusual about them charging you one,
20  would there?
21      A   No.
22      Q   And I believe you told me earlier
23  you didn't pay it anyway; isn't that right?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 102

1      A   I didn't think I did.  I didn't --
2  I didn't pay it outright.
3      Q   All right.  So what benefit, if
4  any, did they get besides the application
5  fee -- talking about IPI Skyscraper -- out of
6  this alleged conspiracy?
7      A   I do not know, sir.
8      Q   All right.  You don't have any
9  written documents, cancelled checks, or any
10  evidence that they got any money other than
11  this application fee?
12     A   I don't, sir.
13     Q   All right.  And they didn't get
14  your home.  You're still in your home, aren't
15  you?
16     A   I am.
17     Q   Now, I might as well, since I've
18  got them all here -- hold on.  How much did
19  you pay all total to the Palmers?
20     A   $140,000.
21     Q   Okay.  And you got cancelled checks
22  or evidence to back that up, because I've
23  only seen two here today?  I mean, I'm not

Page 103

1  doubting you did.  I'm just saying that's all
2  I've got.
3      A   Yes, sir.  There's another
4  -- another $65,000 cashier's check.
5         MR. SEABORN:  I handed it over
6  today in that stack somewhere.
7         MR. IRBY:  Yeah.  Okay.  Let me go
8  ahead and introduce that too.
9         MR. ADAMS:  What's the date on this
10  first one, June?
11        MR. IRBY:  I've already introduced
12  that one.
13        MS. CROW:  No.  That's not --
14        MR. IRBY:  Oh, that's not it?
15        MS. CROW:  No.  He can explain
16  this.  There was -- they gave him a cashier's
17  check, and --
18        MR. IRBY:  This is where he got the
19  money from.
20        MS. CROW:  -- then he had to
21  substitute it for a --
22        MR. ADAMS:  Personal check?
23        MS. CROW:  -- personal check for

Page 104

1  some reason.  He can explain that better.
2      Q   (MR. IRBY)  Well, tell us -- yeah.
3  Your lawyer said you got a cashier's check,
4  and then had to exchange it for --
5         MR. SEABORN:  This is the front and
6  back, just so y'all know.
7      Q   Had to exchange it for a personal
8  check.  What was the reason for that, sir?
9      A   Okay.  The -- when I called Mr.
10  Jarrett Palmer from Louisville, Alabama and
11  told him I would let him build me a house,
12  they told me at that time that they would
13  need a cashier's check for fifty-five
14  thousand and X dollars and that when I came
15  down to sign the contract that that's what
16  they needed.
17        Okay.  I went and got a cashier's
18  check for the amount that they said.  I had
19  it made to Construction Services and myself.
20     Q   Okay.
21     A   They refused that check.
22     Q   Who did?
23     A   The Palmers.

Page 105

1      Q   Why was that?
2      A   Because it was a two-party check.
3  Even though it was a cashier's check.  And
4  the -- he said he would fax it to -- or
5  overnight it to Birmingham and see if they
6  would take it.
7         He called me back on Saturday and
8  told me they wouldn't take it.  And this was
9  after the bank had closed.  And I told him
10  the only other solution I had was to give him
11  a personal check and basically, in so many
12  words, take it or leave it, you know.
13     Q   Okay.
14     A   We met in Ozark at McDonald's, and
15  I gave him the personal check -- the one he
16  negotiated there for $55,000.
17     Q   Okay.  I think we already --
18     A   And he gave me the cashier's check.
19     Q   I think we already introduced
20  the --
21        MR. ADAMS:  (Inaudible.)
22        MR. IRBY:  No.  He said it was a
23  $55,000 check.  It was a two-party check.

Page 106

1      A    No. That was -- the cashier's
2  check that I bought for $55,000 was a
3  cashier's check. That's a two-party. And
4  they wouldn't accept that one. So I
5  exchanged the two-party cashier's check and
6  gave them a personal check, and it's already
7  over here.
8      Q    In the stack we introduced earlier.
9  Okay. All right. So it's your testimony
10 you're out $140,000 on the house, but you're
11 still in the house?
12     A    I am in the house. Yes, sir.
13     Q    And the question of the lien with
14 Mr. Leonard hadn't been resolved?
15     A    Has not. Nor -- and neither
16 Jordan's Building Supply.
17     Q    How much is Jordan's? I forgot to
18 ask you.
19     A    And neither E. E. Bentley.
20     Q    How much is that? Do you know?
21     A    Six thousand and some odd dollars.
22     Q    What is the grand total of all the
23 liens?

Page 107

1      A    Slightly less than $127,000.
2      Q    Okay. What's the property worth?
3      A    I don't know. I have no idea.
4      Q    You looked at that appraisal a
5  while ago, didn't you, when I showed it to
6  you?
7      A    I did not. I didn't look.
8      Q    If you could sell it today, what
9  would you sell it for if it didn't have any
10 liens on it?
11     A    I'd take $250,000 for it, but it's
12 not for sale.
13     Q    I understand. I said if it was.
14 You'd take two fifty, and you've got a
15 hundred and forty in it?
16     A    Plus the lot.
17     Q    Plus the lot. How much did you pay
18 for the lot?
19     A    Some $20,000.
20     Q    So roughly 160,000 plus in it?
21     A    That's right.
22     Q    What about the -- you know, the
23 shotty workmanship that you were claiming a

Page 108

1  while ago, have you gone back and had that
2  redone by anybody else?
3      A    I have not.
4      Q    It's still the same?
5      A    It is.
6      Q    But you're able to live in the
7  house even with that there?
8      A    I am.
9      Q    All right. Now, I believe you gave
10 an affidavit earlier when you filed for
11 judgment against maybe the Palmers that you
12 and your wife claim mental anguish of
13 $100,000; is that right?
14     A    I don't know the amount, but we did
15 claim some mental anguish.
16     Q    Whatever is in that affidavit that
17 you swore to under oath before is what you
18 claim?
19     A    Yes, sir.
20         MS. CROW:  Against those
21 defendants.
22     Q    All right. What other damages, if
23 any, do you have?

Page 109

1      A    Expenses for my wife running around
2  trying to find a place to stay.
3      Q    Well, did she stay in any -- do you
4  have any receipts for any of that?
5      A    I don't have any receipts. No,
6  sir.
7      Q    All right. How much is that?
8      A    I don't know right now. I would
9  have to --
10     Q    Can you get that up?
11     A    She and I would have to talk.
12     Q    I mean --
13     A    I can't get it up within the next
14 ten minutes.
15     Q    I don't mean now, today. I mean in
16 the next few weeks.
17     A    I could. Yes, sir.
18     Q    But you don't have any receipts to
19 back it up?
20     A    I don't. No, sir.
21     Q    Okay. What other damages, if any,
22 other than your wife staying somewhere and
23 your mental anguish and what you're out on

**American Court Reporting**
**toll-free (877) 320-1050**

28  (Pages 110 to 113)

Page 110

1  the house are you claiming?
2      A    I guess that's basically it.
3      Q    All right.  You hadn't been to any
4  doctor or psychiatrist or anything about any
5  of this mental anguish, have you?
6      A    I haven't.
7      Q    Has your wife?
8      A    No, sir.
9      Q    Did your wife -- she went down to
10  Tom Leonard's when she found out about the
11  lien; is that right?
12      A    She went to see Tom Leonard on a
13  Thursday or a Friday when she picked up the
14  -- when she went and signed for the lien; did
15  not seen Tom Leonard that day; had to make an
16  appointment to go back on Monday to see him.
17      I didn't know anything about this
18  until I got to Dothan on Friday afternoon
19  late.  But, anyway, we -- we went to see Tom
20  Leonard on Monday.  And we discussed it, and
21  no resolution came.
22      Q    Okay.  Was your wife privy to any
23  of these conversations you had with Jarrett

Page 111

1  Palmer or Warren Palmer?
2      A    Yes, sir.  Especially the phone
3  conversations.
4      Q    Okay.  And what about any with Adam
5  DiSpirito?
6      A    She was.
7      Q    What was that conversation?
8      A    Well, it was the same thing that I
9  had heard several times before.
10      Q    About he was going to get it
11  straightened out?
12      A    That's right.  That's what he got
13  paid to do was straighten messes like that
14  out.
15      Q    I believe your lawyers have a tape
16  recording.  Is there a tape recording of some
17  of these conversations?
18      A    There are.  It came off the
19  answering machine.  This is what he left on
20  my answering machine.
21      Q    What did he say?
22      A    He said that he was working on
23  those municipals and that it was going to

Page 112

1  take a little while longer.  And that seemed
2  to be his theme all the way through this
3  thing -- just a little while longer and I'll
4  get it all straightened out.
5      Q    Do you know anybody by the name of
6  Jim Corley?
7      A    I know of Jim Corley.  Yes, sir.
8      Q    Has he ever contacted you about
9  this?
10      A    No, sir.
11      Q    Okay.  How do you know him?
12      A    I've been to several Barbour
13  Baptist men's breakfast.  Jim Corley was a
14  pastor somewhere over in eastern Barbour
15  County -- somewhere over around Bakerhill,
16  Texasville.  And I've been to some Baptist
17  men's breakfast where Jim Corley was present.
18      Q    Do you know if he has any
19  relationship with the Palmers?
20      A    I don't know.
21      Q    You don't know?
22      A    He's on the web site.
23      Q    The Palmers' web site?

Page 113

1      A    That's right.  Global Development's
2  web site.
3      Q    Well, what does it say?  I haven't
4  seen it.
5      A    I forgot what his title is now.  I
6  think it's maybe a salesman.  I'm not sure.
7      Q    Is Robert Drell on that web site?
8      A    He is.
9      Q    All right.  And Warren Palmer?
10      A    He is.
11      Q    And Jarrett Palmer?
12      A    He is.
13      Q    Is Adam DiSpirito on that web site?
14      A    No, sir.
15      Q    That's -- Adam is not on Global
16  Development's web site?
17      A    No, sir.  Not that I saw.
18      Q    Do you know where Jarrett Palmer is
19  now?
20      A    No, sir.  Other than hearsay.
21      Q    What's the hearsay?
22      A    Panama City, Florida.
23      Q    Do you know what he's doing?

Page 114

1    A   I don't know what he's doing.
2    Q   Did there ever come a time where
3  some company called Emerald Coast was
4  mentioned? Ever hear that name anywhere?
5    A   I did see that name. It was
6  something to the effect that I had been
7  switched from IPI to Emerald Coast or
8  something.
9    Q   Where did you see that?
10   A   In some documents that I saw that
11 came from Mr. Leonard.
12   Q   From Mr. Tom Leonard?
13   A   That's right.
14   Q   Do you know round about when those
15 documents came?
16   A   I don't -- oh, when they came?
17   Q   Yes, sir. Or when you saw them,
18 rather.
19   A   I don't know, sir. It was probably
20 two months ago.
21   Q   Okay. Two months ago after this --
22 I mean, while this lawsuit's been going on?
23 You didn't see it before then -- I mean, hear

Page 115

1  about Emerald Coast before then?
2    A   No, sir.
3    Q   All right. Did it say why you were
4  being switched from IPI Skyscraper to Emerald
5  Coast?
6    A   I don't recall.
7    Q   Do you know who Emerald Coast is?
8    A   I believe it said Emerald Coast
9  Mortgage Company, Destin, Florida. I think.
10 I'm not sure.
11   Q   Do you know who the principals of
12 that company are?
13   A   I have no idea.
14   Q   Do you know if Robert Drell is in
15 that?
16   A   I have no idea.
17   Q   You don't have any evidence that
18 IPI Skyscraper has got anything to do with
19 the company, do you?
20   A   I don't.
21   Q   Okay. I'm going to let you answer
22 Mr. Leonard's lawyer's questions for a while
23 and give him an opportunity to ask you some

Page 116

1  stuff and maybe come back.
2
3  EXAMINATION BY MR. BOYD:
4    Q   Mr. Hughes, my name is Bo Boyd, and
5  we met a few weeks ago at a --
6    A   We did.
7    Q   At a parole revocation or probation
8  revocation hearing. And I represent Tom
9  Leonard in this lawsuit. I'll be as brief as
10 I can, but I do have some questions for you.
11       The lot you purchased that your
12 house is on today, did you finance the lot?
13   A   I did not.
14   Q   Okay. You paid cash for it?
15   A   I did.
16   Q   And I think the purchase price was
17 $20,000?
18   A   Thereabout. It was --
19   Q   And that was bought in 2001?
20   A   I think that's correct, sir.
21   Q   Okay. Where exactly is your house
22 in Dothan? Can you give me just a general
23 idea of what part of town it's in?

Page 117

1    A   Okay. Do you know where the UPS
2  warehouse is?
3    Q   On 231 North?
4    A   Yes, sir. 231 North.
5    Q   Yes, sir.
6    A   My house is almost directly behind
7  it, on the street behind it.
8    Q   Okay. What's the name of the
9  neighborhood or subdivision? Does it have a
10 name?
11   A   It does. But I don't remember what
12 it is.
13   Q   Okay. I think we talked earlier.
14 You -- how did you -- you've explained how
15 you and your wife became a acquainted with
16 Jarrett Palmer and Warren Palmer and Global
17 Development. She found the number in the
18 Thrifty Nickle; is that right?
19   A   That's correct.
20   Q   Okay. And then y'all had a
21 conversation with Warren Palmer?
22   A   We did -- we did not have a
23 conversation with Warren Palmer until

**American Court Reporting**
**toll-free (877) 320-1050**

30 (Pages 118 to 121)

Page 118

1    1 November of '04, I think.
2        Q    Okay.  When your wife made the
3    phonecall, I think you said -- you testified
4    in February of '04?
5        A    To who?
6        Q    Made the phonecall to develop -- to
7    Global Development.
8        A    It was either the latter part of
9    January or first of February because we
10   negotiated there back and forth for about a
11   month.
12       Q    Okay.  Who was the first person
13   that either you or your wife spoke to at
14   Global Development?
15       A    Warren Palmer.
16       Q    Okay.  And how long after that was
17   it that you spoke with Jarrett Palmer?
18       A    Probably two weeks later.
19       Q    Who was the first person with
20   Global Development that y'all met face to
21   face?
22       A    Warren Palmer.
23       Q    And when was that?

Page 119

1        A    That would have been in February --
2    early February of '04.
3        Q    Okay.  And after speaking with
4    them, how long -- from the first time you
5    spoke with either Jarrett or Warren, how long
6    was it until y'all made a decision to use
7    them as your home builders?
8        A    It was a month to five weeks.
9        Q    Okay.  During that period of time,
10   did y'all do any investigation into their
11   reputation as builders?
12       A    No, sir.
13       Q    Did you go look at any houses they
14   had built previously?
15       A    No, sir.
16       Q    Did you talk to anyone who they had
17   built a house for?
18       A    No, sir.
19       Q    Okay.  What helped y'all in the
20   decision to use them as your builders?
21       A    Mr. Palmer's portrayal of his being
22   a very Christian fellow.
23       Q    Warren Palmer represented to you

Page 120

1    that he was a Christian?
2        A    That's correct.
3        Q    And that had a lot to do with your
4    decision in using them to build the house?
5        A    It did, sir.
6        Q    Okay.  Anything else -- did
7    anything else play a part in the decision to
8    use them?
9        A    Nothing other than the fact that
10   they could build the house that we decided on
11   and they could build it in our price range.
12       Q    Did y'all negotiate the price?
13       A    He gave me a price, and I accepted
14   it.
15       Q    Okay.  So there was no negotiating
16   then?  There was an offer, and there was an
17   acceptance; is that right?
18       A    That's correct, sir.
19       Q    Was Tom Leonard's name ever
20   mentioned during these negotiates or these
21   conversations?
22       A    No, sir.
23       Q    Was Wiregrass Properties ever

Page 121

1    mentioned during these communications?
2        A    No, sir.
3        Q    And eventually you entered into a
4    contract with Global Development?
5        A    I did.
6        Q    Okay.  And that contract was signed
7    sometime in March of two thousand --
8        A    Early March, yes, sir.
9        Q    And I think that --
10       A    I believe the 5th.  I think it's
11   the 5th of March of '04.
12       Q    And that contract has been
13   introduced into this deposition; is that
14   correct?
15       A    It has.
16       Q    Okay.  Did that contract mention
17   Tom Leonard at all?
18       A    It did not.
19       Q    Okay.  Did that contract mention
20   Wiregrass Properties?
21       A    Not to my knowledge.
22       Q    Prior to entering into that
23   contract, had you ever heard of Tom Leonard?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 122

1      A   Had not.
2      Q   Okay.  Had you ever heard of
3   Wiregrass Properties?
4      A   I had probably heard the name
5   Wiregrass Properties, Wiregrass Home
6   Builders.  Knew nothing about them.
7      Q   Okay.  Where had you heard that
8   about Wiregrass Properties?
9      A   I don't know.  In --
10      Q   In what context had you heard that
11   name?
12      A   Just in a general conversation.
13      Q   Was it good or bad?
14      A   I really don't remember.  No, sir.
15      Q   You don't remember who -- who made
16   those comments to you?
17      A   I don't.  No, sir.
18      Q   And the purchase price -- or the
19   contract price for you and your wife's home
20   was $148,000?
21      A   Eight hundred and seventy-five.
22   $148,875.
23      Q   And I think it's been your

Page 123

1   testimony today that you paid $140,000 of
2   that contract price?
3      A   That's correct, sir.
4      Q   And then one of your personal
5   checks has been introduced today, and it was
6   dated March the 7th of 2004 in the amount of
7   $55,848.33?
8      A   That's correct, sir.
9      Q   And that was the first payment that
10   you made to Global Development, Jarrett
11   Palmer, Warren Palmer, et cetera?
12      A   Yes.  That's correct, sir.
13      Q   And then the second payment you
14   made was March the 29th of 2004?
15      A   I believe that's right.
16      Q   That was about a $19,000 payment?
17      A   That's right, sir.
18      Q   About 20 days after you made the
19   initial down payment?
20      A   That's right, sir.
21      Q   What was that $19,000 payment for?
22   Was any explanation given as to why it was
23   needed?

Page 124

1      A   That came about because of a
2   conversation -- Robert Drell called me and
3   said we can't do $75,000.  We've got to do
4   $100,000.  And he said if you'll do this much
5   money -- give us this much money, well, then
6   we'll continue on with the loan.  I met --
7      Q   Let me stop you there.  It was
8   Robert Drell who asked for the $19,000
9   payment?
10      A   Yes.  He instructed me to give it
11   to Jarrett Palmer.
12      Q   Did he call you --
13      A   He did.
14      Q   -- to make the request?
15      A   He did.
16      Q   And the check was made payable to
17   Construction Services?
18      A   That's right.
19      Q   As was the first $55,000 --
20      A   That's right, sir.
21      Q   -- payment?  Okay.  I think I cut
22   you off earlier.
23      A   Okay.  I could not leave Maxwell

Page 125

1   Air Force Base, and I told them that they
2   would have to come to Montgomery to get that
3   money.  And we made arrangements to meet at
4   the McDonald's on Day Street, which I said
5   earlier was right near gate two on Maxwell
6   Air Force Base.
7      When we got there, Robert Drell
8   didn't show up.  A fellow named Jeff
9   Jernigan -- who introduced himself as Jeff
10   Jernigan showed up.  Then in the course of
11   the conversation concerning the money, well,
12   Jarrett Palmer called Robert Drell on the
13   phone.  And that's when he told me that his
14   child was sick at school and he wasn't going
15   to be able to make it, he had to go pick that
16   child up.
17      Q   Where was Robert Drell at that
18   time?
19      A   I have no idea, sir.
20      Q   Did you have an impression as to
21   whether he was somewhere in the state of
22   Alabama?
23      A   No, sir.  I had the impression that

Page 126

1    he was in Florida.
2        Q    Where in Florida?
3        A    I'm not sure. I think Destin
4    probably.
5        Q    So Jeff Jernigan showed up -- or a
6    gentleman who introduced himself as Jeff
7    Jernigan --
8        A    That's correct.
9        Q    -- showed up?
10        A    That's right.
11        Q    All right. Did he indicate to you
12    who he was or what capacity he had in this --
13        A    He was supposedly with Construction
14    Services.
15        Q    Did he say what he did for
16    Construction Services?
17        A    Nothing other than I just took it
18    he was their field man, you know.
19        Q    And was Jarrett Palmer with him?
20        A    He was. Yes, sir.
21        Q    Did they come together?
22        A    They did. As far as I know, yes,
23    sir.

Page 127

1        Q    Was anybody else there?
2        A    No.
3        Q    So just the three of you?
4        A    That's all that was in on that
5    conversation, yes, sir. That was all that
6    was --
7        Q    And you tendered the check to
8    Warren Palmer or --
9        A    Jarrett.
10        Q    Jarrett Palmer was there. I'm
11    sorry.
12        A    Yes.
13        Q    Okay. And what was the
14    conversation during that meeting?
15        A    It was, again, concerning the loan.
16    And he had some paperwork that he -- when I
17    questioned what was on the paperwork, he said
18    that was the paperwork backing out the loan,
19    I guess, application. And, you know, why
20    would you need paperwork backing out a loan
21    application?
22        So that's when he called Robert
23    Drell. And to my knowledge, I didn't sign

Page 128

1    any paperwork, to the best of my remembrance.
2    And -- but I did give him nineteen more
3    thousand dollars. Nineteen thousand dollars
4    and change.
5        Q    And had the construction of your
6    home already started by then?
7        A    It had. Yes, sir.
8        Q    Okay. How far along were they?
9        A    I don't know. As far as I
10    remember, they had pushed up some dirt and
11    maybe dug some on foundations.
12        Q    So there wasn't a slab laid or
13    anything like that?
14        A    Not that I remember. No, sir.
15        Q    Okay. But some foundation work was
16    beginning?
17        A    It was. Yes, sir.
18        Q    And in that meeting did you show
19    any concern or advise Jarrett Palmer or Jeff
20    Jernigan that you were concerned about
21    turning over another $19,000?
22        A    No, sir. I wasn't concerned. They
23    were working on my house -- I mean, working

Page 129

1    on, you know -- getting the house started.
2    And that was going to amount to, you know,
3    over half the payment on it. And that was
4    -- we were, what, less than 20 days or just a
5    little bit over 20 days after the contract
6    had been signed, so --
7        Q    But the house was still in its
8    early stages?
9        A    It was. Yes, sir.
10        Q    How many -- did y'all ever discuss
11    how the withdrawals were going to be made or
12    what the scheduled payments were supposed to
13    be?
14        A    We discussed, if I paid for it,
15    then there was to be four draws. And then if
16    the -- if it was financed, if they came
17    through with the loan, well, then it would be
18    up to IPI.
19        Q    So at this point, were you still
20    under the impression that there was a
21    possibility you were going to have some of
22    the house financed?
23        A    That's correct.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 130

1    Q    And like you said, you had already
2    -- this last payment -- or the second
3    payment, $19,000, that equalled about half of
4    the total construction cost?
5    A    Slightly over half.  Yes, sir.
6    Q    So you would, at that point, have
7    hoped to financed about 75,000?
8    A    That's what I had asked for
9    initially.
10   Q    Was there any discussion as to when
11   you were supposed to make the next payment?
12   A    There was not.  No, sir.
13   Q    How big is your house?  How many
14   square feet?
15   A    It's approximately 2200 square feet
16   of heated and cooled.
17   Q    Is it a brick house?
18   A    It is.
19   Q    Is it completely bricked?
20   A    Yes, sir.
21   Q    Are there any upgrades in the house
22   like hardwood floors, granite countertops --
23   things like that?

Page 131

1    A    No, sir.
2    Q    Crown molding?
3    A    There's some crown molding.
4    Q    Okay.  How much of the house has
5    crown molding?
6    A    Two rooms -- three rooms, I think.
7    Q    Okay.  Is it a one story home?
8    A    It is.
9    Q    What are -- what's the neighborhood
10   you were in?  Are houses moving pretty
11   quickly in that neighborhood?
12   A    There's one other lot on my street
13   that I'm aware of that's vacant that a house
14   is not on, so --
15   Q    Are there a lot of houses on the
16   market in your neighborhood?
17   A    There's only one to my knowledge,
18   and that's across the street from me.
19   Q    Okay.  And you mentioned some liens
20   that are on your house right now.  You said
21   that they total about $127,000?
22   A    Approximately that.  Slightly less
23   than that.

Page 132

1    Q    I think you mentioned Jordan's?
2    A    Yes, sir.
3    Q    And Jordan's lien is about $6,000?
4    A    Something over 6,000.
5    Q    Do you know what materials that
6    lien is for?
7    A    I don't, sir.
8    Q    Okay.  Do you know when that lien
9    was filed?
10   A    I don't remember the date.
11   Q    Okay.  Was it before or after the
12   lien that Tom Leonard filed?
13   A    I don't remember, sir.
14   Q    Okay.  You said E. E. Bentley
15   Insulation has also filed a lien?
16   A    Right.
17   Q    How much is that lien?
18   A    $1800.
19   Q    And I assume that's for insulation
20   of the home?
21   A    Yes, sir.
22   Q    Do you know when that lien was
23   filed?

Page 133

1    A    I -- to the best of my remembrance,
2    I think that was January of '05.
3    Q    So about the time this lawsuit was
4    filed?
5    A    Yes, sir.
6    Q    Okay.  Have you sued Jordan's as a
7    result of their lien?
8    A    I have not.
9    Q    Okay.  Have you sued E. E. Bentley
10   as a result of their lien?
11   A    I have not.
12   Q    And you talked a little bit about
13   the $112,000 lien Tom Leonard has.
14   A    A hundred and nineteen thousand --
15   Q    A hundred and nineteen thousand --
16   A    -- one hundred --
17   Q    -- dollar lien that Tom Leonard has
18   on your home.  Your attorney took Mr.
19   Leonard's deposition a few months back.  Did
20   you know that?
21   A    I did.
22   Q    Have you read the transcript of his
23   deposition?

**American Court Reporting**
**toll-free (877) 320-1050**

34 (Pages 134 to 137)

Page 134

1        A    I've seen the transcript of it.
2    Yes, sir.
3        Q    Is there anything that you can
4    recall or in particular that you disagree
5    with about as far as the testimony Mr.
6    Leonard gave in his deposition?
7        MS. CROW:  Object to the form.
8        A    I don't think so.  I don't recall
9    anything.
10       Q    That you disagree with?
11       A    No.  I don't recall anything now.
12       Q    The construction proposal, I think,
13   that was marked Defendant's Exhibit 3 that
14   you received from Jarrett Palmer, you
15   remember that -- receiving that proposal; is
16   that right?
17       A    I do.  Yes, sir.
18       Q    Okay.  Was Wiregrass Properties
19   mentioned in that proposal?
20       A    Not to my recollection.
21       Q    Okay.  Was Tom Leonard mentioned in
22   that proposal?
23       A    Not to my recollection.

Page 135

1        Q    Okay.  Tom Leonard testified in his
2    deposition that he had provided about
3    $112,000 worth of materials and labor for the
4    construction of your home.  Do you remember
5    reading that -- that testimony?
6        A    Not -- the figure of a hundred and
7    twelve I don't remember.
8        Q    Okay.
9        A    I remember him mentioning something
10   about I think it's up to about 125,000 now.
11       Q    Okay.  But the actual lien that's
12   filed now is for the amount of 119,000?
13       A    And one hundred.  Yes, sir.
14       Q    Okay.  And I think Tom has
15   indicated that it may go higher than a
16   hundred and nineteen, in his deposition.  Is
17   that what you understood?
18       A    Yes, sir.
19       Q    Okay.  But Tom has provided some
20   -- a tally sheet of the expenses that he has
21   paid for materials and labor for the
22   construction of your home.  Have you seen
23   that tally sheet?

Page 136

1        A    I have.  Yes, sir.
2        Q    Okay.  And I think that number was
3    about $112,000?
4        A    I do not remember on that.
5        Q    This was the tally sheet that was
6    marked as Plaintiff's Exhibit 18 to his
7    deposition.  Would you take a look at that
8    for me?
9        A    Yes, sir.
10       Q    Okay.  I think there's a total at
11   the end around a hundred and twelve?
12       A    A hundred and twelve two thirty-one
13   seventy-eight.
14       Q    And I think Mr. Leonard said there
15   might have been some more bills that had come
16   in since that sheet was printed out, but let
17   me ask you this.  Mr. Leonard testified that
18   he borrowed the money to pay those bills from
19   the bank.
20       Do you remember that -- reading
21   that testimony?
22       A    I do.
23       Q    Okay.  And he is charged interest

Page 137

1    on the money he borrowed.
2        A    I do.
3        Q    Do you remember reading that?
4        A    I do.
5        Q    And that's what banks do -- when
6    they lend someone money, charge interest; is
7    that right?
8        A    That's right.
9        Q    Can you see, now, where if the
10   expenses were $112,000 that interest on the
11   money lent would be somewhere in the
12   neighborhood of $120,000 today?
13       MS. CROW:  Objection.  Calls for
14   speculation.
15       A    I guess.
16       Q    All right.  Do you have any reason
17   to disagree with these figures that Tom has
18   given and with the testimony he gave in his
19   deposition -- that he has actually paid
20   $112,000 in materials and construction for
21   you and your wife's home?
22       MS. CROW:  Objection.  Calls for
23   speculation.

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

35 (Pages 138 to 141)

Page 138

1        MR. BOYD:  I'm asking if he
2    disagrees -- if he has any reason to disagree
3    with that.
4        A    I did not authorize it.
5        Q    Okay.  But you wouldn't disagree
6    he's paid that amount of money in materials
7    and labor?
8        MS. CROW:  Objection.
9        A    I have no way of knowing that.
10       Q    Okay.  But you have no evidence
11   that would be contrary to his testimony; is
12   that right?
13       A    None that I'm aware of.
14       Q    Okay.  These defects that you say
15   that are present in your home, can you tell
16   me a little bit about those?  I think you
17   mentioned a few of them.  I think that the
18   windows were not sealed; is that right?
19       A    That's right.
20       Q    Tell me about that.
21       A    Well, the brick courses has got a
22   scratched joint.  And where that scratched
23   joint meets the window, 90 percent of them is

Page 139

1    still open to the rain, to the wind, and
2    whatever else can get in there.
3        Q    So you have water coming in your
4    windows?
5        A    It can come in the windows.  Yes,
6    sir.
7        Q    Have you tried to fix that?
8        A    Jarrett Palmer gave me one tube of
9    caulking, and it's still unused.
10       Q    Okay.  So you didn't try to fix it?
11       A    That was his job.
12       Q    That he asked you to do?
13       A    That's correct.
14       Q    And you said that the plumbing was
15   out of code or did not meet code?
16       A    It don't meet code.
17       Q    Okay.  How does it not -- how is it
18   out of code?
19       A    The vent system is in wrong in the
20   number two bathroom.  When you let the water
21   out of the tub, it siphons the water out of
22   the commode.  And when that seal is gone,
23   sewer gas floods the house.

Page 140

1        Q    Okay.  Have you had anyone to look
2    at that problem?
3        A    I have.
4        Q    Okay.  Who did you have look at it?
5        A    I don't remember his name.
6        Q    Was he a plumber?
7        A    He was.  He was a licensed plumber.
8        Q    Out of Dothan?
9        A    He was.
10       Q    Was he with a company or
11   independent or --
12       A    He owned the company.  And I
13   don't -- I don't remember his name.
14       Q    Okay.  Did he charge you for coming
15   out and looking at your problem?
16       A    He did not.  That was part of
17   Jarrett Palmer's way to fix that.
18       Q    Okay.  Did you contact the plumber
19   or did Jarrett?
20       A    Jarrett.
21       Q    Okay.  Did he give you an estimate
22   as to what it would cost to fix the problem?
23       A    No, sir.

Page 141

1        Q    Is that the only plumbing problem
2    that you have?
3        A    No, sir.
4        Q    Okay.  What --
5        A    The master bathtub is -- as I said
6    earlier, it's supported by bricks stacked up
7    on top of each other and wooden wedges drove
8    under there.
9        Q    Okay.  Have you -- how do you know
10   that?
11       A    Well, you can take a panel off of
12   the side and see it.
13       Q    Okay.  So you've removed the panel?
14       A    Yes, sir.
15       Q    Okay.  Were you having a problem to
16   cause you to remove the panel, or why did you
17   remove it?
18       A    The -- the tub broke, busted.  It's
19   a fiberglass tub.  It busted.  And in the
20   course of them -- Jarrett getting somebody
21   out there to fix it, that panel was removed.
22   And I saw it.  And then thereafter it's held
23   on with Velcro.  I can take it off whenever I

**American Court Reporting**
**toll-free (877) 320-1050**

Page 142

1    so desire.
2        Q    Okay.  Did the fact it was on
3    bricks and had pieces of wooden -- wood
4    wedged there, did that cause a problem with
5    the tub?
6        A    It caused it to bust, break.
7        Q    Did it break in the middle of the
8    tub?
9        A    Broke on the side.
10       Q    Okay.  But the tub's been replaced?
11       A    No, sir.
12       Q    Did you ask Jarrett to replace the
13   tub?
14       A    I haven't talked to Jarrett Palmer
15   since.
16       Q    Okay.  When did the tub break?
17       A    A couple days prior to him turning
18   the house over to us.  And one of his
19   workers, I think, stepped on the tub.
20       Q    Okay.  So you and your wife didn't
21   break the tub?
22       A    No, sir.
23       Q    Okay.  Any other plumbing problems?

Page 143

1        A    Nothing other than the sewer gas
2    coming back up through that area of the house
3    too.  One bathroom is on one end, and one is
4    on the other one.  So the vent system was
5    installed wrong.
6        Q    Okay.  You mentioned something
7    about the brick, the way it was laid.  What
8    problem do you have with the brick?
9        A    I've got a two car garage.  And
10   over the garage, the soldier brick -- the
11   exposure on one side is seven inches.  The
12   exposure on the other side is less than
13   five inches.  And every time you drive up, it
14   is very obvious.
15       Q    Okay.  Any other problem with the
16   brick?
17       A    Nothing other than around the
18   windows.  And the window ledges are not laid
19   properly.  They're laid uneven, causing water
20   to be able to go back inside of the wall.
21       Q    When you say "back inside the
22   wall," you mean between the exterior wall and
23   the sheetrock?

Page 144

1        A    No, sir.  Between the brick wall
2    and the fiberboard -- whatever they put as
3    the outer skin of the house.
4        Q    Okay.  Has that caused a problem in
5    any way?
6        A    It hasn't yet, but it certainly has
7    the potential to.
8        Q    You haven't seen any wet spots on
9    the inside of your home?
10       A    No, sir.
11       Q    Haven't seen any mold on the inside
12   of your home?
13       A    Have not.
14           MR. SEABORN:  What do y'all want to
15   do about lunch?  I can do without it, but I'm
16   not so certain Christy's baby can do without
17   it.
18           (Off-the-record discussion.)
19       Q    Mr. Hughes, tell me about the
20   conversation or the meeting that you and your
21   wife had with Tom Leonard after the lien was
22   filed.
23       A    The lien was definitely discussed.

Page 145

1    And Tom Leonard suggested that I hold off a
2    while, too, before I get the lawyers
3    involved; that he had been in touch with
4    Adam DiSpirito; and that -- I believe his
5    word was, we going to get our money.  And,
6    you know, basically that's it.  He said that
7    he had done -- was going to do or wanted to
8    do some financing work with DiSpirito and --
9        Q    Did y'all discuss his agreement
10   with Jarrett Palmer on your house?
11       A    He said that he had an agreement
12   with Jarrett to finance my house.  And I told
13   him that I paid cash for my house and, you
14   know, where was my money.  And he said
15   Construction Services must have it.
16       Q    So did he tell you that he paid for
17   the materials and labor on your house?
18       A    He said he had money invested.
19   Yes, sir.
20       Q    And have you seen the receipts that
21   we produced on behalf of Mr. Leonard showing
22   what he's paid?
23       A    I have.  Yes, sir.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 146

1    Q    And do you have any reason to
2  disagree or dispute what Mr. Leonard told you
3  on that day as far as what he's put into the
4  house?
5    A    No, sir.  I don't have any reason
6  to dispute that.
7    Q    Did Mr. Leonard tell you that --
8  was there any discussion about his knowledge
9  of what you've paid or put down on the house
10 during that meeting?
11   A    I had the cancelled checks.
12   Q    Okay.  Did you show the checks to
13 him?
14   A    And a copy of the cashier's checks.
15 I held them up and showed them to him at a
16 range that he could read, and I have no
17 reason that he disbelieved me.
18   Q    Okay.
19   A    He told me that I had enough
20 evidence to put the boy in jail.  And he said
21 if you'll just hold off and not get lawyers
22 involved, said, we'll get our money.
23   Q    Did Mr. Leonard tell you that he

Page 147

1  did not know that you and your wife had paid
2  money down on the home?
3    A    He did.
4    Q    Told you he did not know?
5    A    That's right.
6    Q    Okay.  Did you believe him?
7    A    No, sir.
8    Q    Why did you not believe him?
9    A    All he had to do was take a look at
10 the contract -- mine and the other contract
11 that was going on at the same time, my
12 son-in-law.  And, you know, there was so many
13 red flags that should have flown up for him
14 that he should have had questions for Jarrett
15 Palmer.
16   Q    Well, tell me about the contract.
17 Let's just talk about your contract.  What
18 red flags do you say he should have seen from
19 your contract?
20   A    Okay.  The -- I believe that the
21 contract between Jarrett and him was
22 initiated on -- sometime in late May.  In my
23 mind, what would be the need for the house

Page 148

1  that's 40 percent done -- you know, why would
2  you need to go initiate a whole new contract
3  and moneys and all that stuff?
4    Q    Okay.  Have you ever been in the
5  construction business?
6    A    I have not.
7    Q    Have you ever built houses?
8    A    I have not.
9    Q    Okay.  Have you ever been in the
10 business of lending money?
11   A    I have not.
12   Q    Okay.  So, first of all, you say
13 the fact that -- if Mr. Leonard looked at
14 this contract between you and Global
15 Development that that should have raised a
16 red flag because of the date when the
17 contract was entered into?
18   A    Yes, sir.
19   Q    Are you aware of the explanation
20 that Jarrett Palmer gave him as to why he
21 needed the financing at that time on your
22 house?
23   A    I think it was something to the

Page 149

1  effect that I wouldn't send my paperwork
2  back.
3    Q    Now, who told you that?
4    A    It was somewhere in the deposition,
5  I think, that -- that Jarrett told Mr.
6  Leonard.
7    Q    Okay.  Other than the time
8  difference between the time that the contract
9  -- you entered into the contract with Jarrett
10 Palmer and the time the agreement was entered
11 into between Jarrett and Tom, besides that
12 red flag that you say, what else should have
13 given Mr. Leonard suspicion that this wasn't
14 exactly right?
15   A    I don't know.
16   Q    Okay.  So the only thing you can
17 think of today is that -- the time difference
18 between the two agreements?
19   A    Uh-huh (nodding head).
20   Q    Okay.  At Mr. Leonard's deposition,
21 the question was asked by your lawyer, but
22 who is Construction Services to your
23 knowledge.

**American Court Reporting**
**toll-free (877) 320-1050**

38 (Pages 150 to 153)

Page 150

1      Mr. Leonard answered: You know,
2   this morning I was sitting there, and I told
3   Bo I did not -- would not reveal. He told me
4   who Construction Services was, is the bank.
5   See, when he come to me, he told me, he said,
6   I've got construction money set up on these,
7   and I've got everything to go. But, he said,
8   I can't get my money in fast enough. He
9   said, if I buy something and put it on the
10  job, then later it takes two weeks for me to
11  get an inspection and get them to process my
12  loan -- I mean, to process that amount of
13  money.
14      And so he says, you know, I would
15  like to do it with you because I pay my bills
16  every week. If it hits the ground before
17  Friday, I pay it -- I mean, if it hits the
18  ground before Wednesday and I've got a bill
19  on it, I pay it and have for many years.
20      So he could not get his money up
21  and down the line, so that's why he come to
22  me and asked me to do the construction on
23  these.

Page 151

1      And that was his -- that was Mr.
2   Leonard's explanation as to why he offered
3   the money to Jarrett or the agreement was
4   entered into. Now, do you have any reason to
5   suspect that that's not what Jarrett Palmer
6   told Mr. Leonard?
7      MR. SEABORN: Object to the form.
8      A   No, sir.
9      Q   Okay. Tell me what else y'all
10  discussed during that meeting with Tom
11  Leonard.
12     A   That's basically it other than the
13  fact that I saw a Shrine emblem on his desk.
14  And I asked him was he a Shriner, and he said
15  yes. And I said Alcázar, and he said yes.
16  And then we went back to discussing the lien
17  and how we was going to get our money.
18     Q   Okay. So you are a Shriner?
19     A   I am.
20     Q   And Mr. Leonard is a Shriner?
21     A   Yes, he is.
22     Q   And as I understand, there's some
23  bond between Shriners about telling each

Page 152

1   other the truth unconditionally; is that
2   right?
3      A   There definitely should be.
4      Q   Okay. Do you suspect that Mr.
5   Leonard was less than truthful with you on
6   that day?
7      A   I do.
8      Q   Okay. And in what way was he
9   untruthful with you?
10     A   I -- I would be purely speculating.
11  And I don't know if this is the time or the
12  place to do that.
13     Q   Well --
14         MS. CROW: You don't need to
15  speculate.
16     Q   I've asked the question. And if
17  you have any reason to suspect that he wasn't
18  truthful with you on that date, then I need
19  to know it.
20     A   I won't speculate. No, sir.
21     Q   Okay. So as far as you're
22  concerned, he was truthful with you that day?
23         MS. CROW: Objection. Asked and

Page 153

1   answered.
2      Q   I mean, do you have any evidence
3   that he was not truthful with you on that
4   day?
5      A   I -- no, sir. I don't have any
6   tangible evidence. No, sir.
7      Q   So basically he told you that he
8   did not know that you had put any money down
9   for the construction of your home?
10     A   He did.
11     Q   But you do not believe that?
12     A   I believe he should have known.
13     Q   Okay. So the answer to the
14  question is no, you don't have any reason to
15  suspect that he would have known?
16         MS. CROW: Objection. Asked and
17  answered.
18         You've answered it.
19         THE WITNESS: Okay.
20     Q   When you say he should have
21  known -- will you tell me why you say he
22  should have known?
23     A   Again, that calls for speculation

**www.AmericanCourtReporting.com**
**October 26, 2005**

Page 154

1   on my part. And I -- you know, you -- I've
2   been advised not to speculate.
3       Q    Well, you've given an answer to one
4   of my questions, and you say he should have
5   known. And that's not a speculative
6   response. And I want to know why you say he
7   should have known?
8       A    I gave you the red flags earlier,
9   the red flag that I thought should have, you
10  know, alerted him to something is not right
11  here.
12      Q    Okay. That being the time
13  difference between the two contracts?
14      A    That's right.
15      Q    Okay. Do you know for certain that
16  he had seen your contract with Jarrett
17  Palmer?
18      A    Pardon me? Ask --
19      Q    Do you know for certain he had seen
20  the contract between you and Jarrett Palmer,
21  or Global?
22      A    He gave a copy in his documents.
23      Q    Okay. Now, was -- could -- do you

Page 155

1   know that he had that document in his
2   possession at the time of your meeting? Or
3   did he even have that document in his
4   possession at the time he entered into the
5   agreement with Global Development?
6       A    I have no way of knowing that. No,
7   sir.
8       Q    Okay. So he did not show you that
9   contract on the day of y'all's meeting?
10      A    No, sir.
11      Q    And you did not show him that
12  contract on the day of y'all's meeting?
13      A    No, sir.
14      Q    And I think that the contract
15  states that -- under article four, the
16  progress payments, it says payments to the
17  contract price shall be made in the manner
18  following: Per IPI Skyscraper Mortgage.
19      A    That's correct. Yes, it does.
20      Q    So this contract mentions nothing
21  about you making payments?
22      A    It doesn't. Sure doesn't.
23      Q    Do you have any evidence that Tom

Page 156

1   Leonard or Wiregrass Properties has made any
2   money off the construction of your home?
3       A    I don't have any evidence. No,
4   sir.
5       Q    Okay. Do you have any evidence
6   that Jarrett Palmer, Warren Palmer or Global
7   Development have paid Tom Leonard anything
8   from the construction of your home?
9       A    No, sir. But they were partners.
10  I don't know what transpired between them.
11      Q    Okay. Why do you say they were
12  partners?
13      A    Well, Mr. Leonard said it.
14      Q    Okay. When did he say that?
15      A    In his deposition.
16      Q    Mr. Leonard said I was a partner
17  with --
18      A    Not in -- not in so many words, but
19  he entered into a contract, an agreement,
20  with Global Development.
21      Q    But have you seen that agreement?
22      A    I have.
23      Q    Okay. And what is your

Page 157

1   understanding as to the terms of that
2   agreement?
3       A    I believe that Leonard was going to
4   furnish the money and Palmer was going to
5   build the house and they were going to split
6   the profit.
7       Q    Okay. So Tom Leonard was loaning
8   the money to Jarrett to build your house?
9       A    That's what the agreement says. Yes,
10  sir.
11      Q    And the division of profits is the
12  ends to -- for the repayment of the loan?
13      MS. CROW: Objection. The
14  agreement speaks for itself. There's a copy
15  of it. It's been marked Plaintiff's Exhibit
16  15 to the deposition of Tom Leonard.
17      A    Yes, sir. It says that -- to pay
18  the loan and interest on the cost incurred on
19  the house. After expense, profit will be
20  divided 50/50 between the parties. Jarrett
21  Palmer, Global Group, Inc. are responsible
22  for building said house.
23      Q    Prior to your meeting with Mr.

**American Court Reporting**
**toll-free (877) 320-1050**

---

Page 158

1    Leonard -- was it sometime in November of
2    2004? Is that right?
3        A    I believe it was 1 November of
4    2004.
5        Q    Had you ever had any conversation
6    with Tom Leonard?
7        A    No, sir. Did not know him.
8        Q    Okay. Ever had any conversation
9    with anybody from Wiregrass Properties?
10       A    Not to my knowledge.
11       Q    Well, let me ask you this: Why
12   would Tom Leonard pay for the materials and
13   labor for the construction of your house
14   knowing that you have already made
15   down payments or payments toward the purchase
16   and construction of the home?
17       A    I'm not sure I have any way of
18   knowing that -- what his motive was. There
19   was a profit, maybe, according to that
20   agreement.
21       Q    But my question is, why would Tom
22   Leonard pay for the materials and labor for
23   the construction of your house knowing that

---

Page 159

1    you have already made payments on the home?
2        MS. CROW: Objection. Calls for
3    speculation.
4        A    I could not know that.
5        Q    Well, you've alleged a claim of
6    conspiracy -- you understand that -- against
7    Tom Leonard?
8        A    I have. Yes, sir.
9        Q    And you say that Tom Leonard and
10   Wiregrass Properties conspired with other
11   folks to deprive you of your property and
12   money?
13       A    Yes, sir.
14       Q    Okay. Well, if you will, describe
15   this conspiracy for me.
16       A    The -- Jarrett Palmer took my money
17   and then took my contract over to Mr.
18   Leonard who was a partner. And then Mr.
19   Leonard entered into an agreement there with
20   him to furnish money to build that house so
21   that -- and the rest is speculation on my
22   part. But then --
23       Q    How has Tom Leonard benefitted from

---

Page 160

1    this conspiracy that you just described?
2        A    I don't know. I couldn't know
3    that. No, sir.
4        Q    Okay. So Tom Leonard has paid a
5    hundred and twelve plus thousand dollars
6    toward labor and materials for your home.
7    Would you agree with that?
8        A    So his paperwork says.
9        Q    But you have no reason to disagree
10   with that though?
11       A    I don't. No, sir.
12       Q    No evidence to dispute that?
13       A    I don't.
14       Q    Okay. And as of today, Tom Leonard
15   hasn't been paid for the materials for those
16   expenses that he's paid in connection with
17   your home?
18       MS. CROW: Not according to his
19   deposition testimony. In fact, he testified
20   that he did get some of that money back from
21   the sale of the --
22       MR. BOYD: Object to the form will
23   be fine.

---

Page 161

1        MS. CROW: Well, you're asking him
2    to testify about things Mr. Leonard did, and
3    he has no personal knowledge about that. And
4    you know that he doesn't have personal
5    knowledge about that. And I've let it go on
6    for about an hour now, and it's really
7    getting to the point of being ridiculous.
8        MR. BOYD: Well, I'm asking the
9    question.
10       MS. CROW: Well, you're asking him
11   things that he has no personal knowledge of.
12       MR. BOYD: Well, he's alleged a
13   claim of -- well, I'm not going to argue with
14   you, Christy, but I'm asking him to describe
15   this conspiracy and how --
16       MS. CROW: And he's described it.
17       MR. BOYD: And how he benefitted --
18   how Tom Leonard benefitted from this
19   conspiracy.
20       MS. CROW: And he said he doesn't
21   know how Tom Leonard benefitted. I mean,
22   he's answered your questions on the things he
23   has knowledge about, and now you're asking

---

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

41 (Pages 162 to 165)

Page 162

1  him to testify about things he has no
2  personal knowledge about.
3  Q  (BY MR. BOYD) Mr. Hughes, sitting
4  here today, under oath, in your heart of
5  hearts, do you actually believe that Tom
6  Leonard was involved in the conspiracy to
7  deprive you of your money and your property?
8  A  I do.
9  Q  Okay. And I think we've gone
10  through the various reasons for how you say
11  the conspiracy took place -- his involvement;
12  right? But you can't tell me how he
13  benefitted from this conspiracy; right?
14  A  I have no way of knowing that. No,
15  sir.
16  Q  Well, please tell me what your
17  belief today is, what it's actually based on
18  -- that Mr. Leonard was involved in the
19  conspiracy.
20  A  I believe that Mr. Leonard was --
21  conspired with all the other people that are
22  involved in this case --
23  Q  Okay. But that's not my question.

Page 163

1  A  -- to --
2  Q  I'm asking you --
3  A  They're all part of the conspiracy,
4  sir.
5  Q  Well, that's just a general
6  concession.
7  A  Uh-huh (nodding head).
8  Q  And I'm telling (sic) you what your
9  specific knowledge of how Mr. Leonard
10  conspired in this whole deal.
11  A  By loaning money to build my house
12  that I had already given to Jarrett Palmer.
13  Q  Money Mr. Leonard has not yet been
14  paid back for?
15  A  I have no way of knowing that. I
16  know he's got a lien against my house for
17  $119,100.
18  Q  And I think you just testified that
19  you can't -- I won't go there.
20  Is there any other evidence or any
21  other reason that you would suspect that Tom
22  Leonard -- besides the contract we've talked
23  about, that Tom Leonard would have known that

Page 164

1  you and your wife put money down on your
2  home?
3  A  No, sir. Nothing I can think of at
4  this time.
5  Q  Thank you. I pass you along.
6  MR. IRBY: I would like to hear the
7  tape if we could.
8  (WHEREUPON, be agreement of
9  counsel, the recorded tape was
10  played off the record.)
11
12  RE-EXAMINATION BY MR. IRBY:
13  Q  We heard, off the record, a tape a
14  moment ago. Where is the original tape?
15  A  It was erased off the answering
16  machine -- the telephone answering machine.
17  Q  All right. So the tape we heard is
18  a copy of something that came off the
19  answering machine?
20  A  That's correct, sir.
21  Q  All right. And who all has heard
22  the tape?
23  A  Myself, my wife, my son-in-law, my

Page 165

1  daughter, and that's it as far as I --
2  Q  In other words, all the parties
3  that are in these two lawsuits are the only
4  people that have heard the tape, to your
5  knowledge -- besides your lawyers of course?
6  A  Well -- and they didn't hear it
7  until yesterday.
8  Q  Yeah. They hadn't heard the
9  original because, I guess, that was erased
10  you said?
11  A  It was.
12  Q  What was the date that that was
13  left on the machine?
14  A  It was late November of '04.
15  Q  All right. And who do you claim is
16  on that tape?
17  A  The person identified himself in
18  the tape -- in the message early on and said
19  this is Adam DiSpirito.
20  Q  All right. That's in the original
21  tape that we don't have any more that's been
22  erased?
23  A  That's right. Yes, sir.

**American Court Reporting**
**toll-free (877) 320-1050**

42 (Pages 166 to 169)

---

Page 166

1    Q    But it's not on the copy where he
2    identifies himself --
3    A    No, sir.
4    Q    -- as Adam DiSpirito?
5    A    It is not.
6    Q    Okay.
7    A    I had two, three, four
8    conversations with Adam DiSpirito over the
9    phone. And without a doubt -- there's no
10   doubt in my mind that that's Adam DiSpirito.
11   Q    Okay. But you can't produce an
12   original tape --
13   A    I can't. No, sir.
14   Q    -- to back you up on that?
15   A    No, sir. I made a copy off the
16   answering machine, and inadvertently the
17   original was erased.
18   Q    And one other question. I noticed
19   earlier you said you met with somebody named
20   Jeff Jernigan?
21   A    That's right.
22   Q    And who does he represent?
23   A    Construction Services, supposedly.

---

Page 167

1    Q    Where does he live?
2    A    At that point in time, it was my
3    understanding he lived in Dothan.
4    Q    All right. Do you know anything
5    about him being affiliated with Chevy Chase
6    or anything like that?
7    A    I know nothing about him. It was
8    represented to me he was Construction
9    Services.
10   Q    That's what he told you when he met
11   with you?
12   A    That's right.
13   Q    Okay. Did -- okay. That's all.
14
15   RE-EXAMINATION BY MR. BOYD:
16   Q    Mr. Hughes, just one follow-up
17   question. I haven't had the opportunity to
18   see your house.
19   A    Yes, sir.
20   Q    Would it be okay if I arrange a
21   time with your attorneys to take a look at
22   your house?
23   A    It certainly would with us.

---

Page 168

1    Q    Okay. I believe that's all I have.
2    (FURTHER DEPONENT SAITH NOT.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

1         C E R T I F I C A T E
2    STATE OF ALABAMA)
3    JEFFERSON COUNTY)
4         I hereby certify that the
5    above and foregoing deposition was
6    taken down by me in stenotype and the
7    questions and answers thereto were
8    transcribed by means of computer-aided
9    transcription, and that the foregoing
10   represents a true and correct
11   transcript of the testimony given by
12   said witness upon said hearing.
13        I further certify that I am
14   neither of counsel, nor of kin to the
15   parties to the action, nor am I in
16   anywise interested in the result of
17   said cause.
18
19
20   _____
21   Melissa S. Lee, CSR
22   Notary Public
23   My Commission Expires 9/16/2006

---

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

**A**

**able** 108:6
125:15
143:20
**about** 3:12
10:23
12:12
19:20 23:6
24:5 25:13
25:16
26:22
28:13 29:4
32:18 34:8
35:12
37:12,17
41:1,6
47:13,20
48:12
50:21 53:6
53:11,22
56:5 59:16
61:18,21
63:7,17,18
64:6,13,19
66:19 67:9
68:11
74:10
76:15
85:10,13
87:18
89:17
90:10,17
94:20 97:7
99:16
101:16,19
102:5
107:22
110:4,10
110:17
111:4,10
112:8
114:14

115:1
118:10
122:6,8
123:16,18
124:1
128:20
130:3,7
131:21
132:3
133:3,12
134:5
135:2,10
135:10
136:3
138:16,20
143:7
144:15,19
146:8
147:16,17
151:23
155:21
161:2,3,5,6
161:23
162:1,2
163:23
167:5,7
**above** 10:12
22:17
169:5
**abundance**
11:20
**accept** 49:23
106:4
**acceptance**
120:17
**accepted**
120:13
**accordance**
5:1
**according**
158:19
160:18

**accused**
95:20
**acquainted**
117:15
**acquired**
48:18
**across**
131:18
**Act** 7:3,4
83:11,22
84:12
**acting** 10:3
**action** 2:5,12
169:15
**activated**
17:21
24:11
**active** 49:18
87:21
**acts** 44:16
**actual**
135:11
**actually**
42:20
137:19
162:5,17
**ad** 22:17,17
**Adam** 40:16
41:4,9,12
47:1,8,16
48:3,23
51:21 61:1
61:2,5,9
62:14
63:17 64:4
64:5,23
65:12
66:11
96:18
99:18
111:4
113:13,15

145:4
165:19
166:4,8,10
**Adams** 8:18
32:5,17
70:15 74:7
77:17
103:9,22
105:21
**Adam's** 41:9
**address**
19:22
**add-on**
34:11 39:3
**add-ons**
35:11
**adjustable**
75:11
**admit** 78:11
87:5
**ads** 21:18
22:13,15
**advise**
128:19
**advised** 5:9
154:2
**affidavit**
34:1 84:10
108:10,16
**affiliated**
167:5
**after** 15:14
15:18 23:5
24:5 26:9
27:21
28:10 30:2
30:16
33:16
34:17,19
43:20
44:19
54:12,19

61:17
63:16
80:19
105:9
114:21
118:16
119:3
123:18
129:5
132:11
144:21
157:19
**afternoon**
110:18
**again** 37:14
69:9 88:14
92:14
127:15
153:23
**against**
90:17
94:14
108:11,20
159:6
163:16
**ago** 14:17
46:22
47:11
107:5
108:1
114:20,21
116:5
164:14
**agree** 88:15
160:7
**agreed** 3:3
3:14,22
29:9
**agreement**
85:9 86:6
145:9,11
149:10

151:3
155:5
156:19,21
157:2,9,14
158:20
159:19
164:8
**agreements**
149:18
**ahead** 32:2
32:15 44:5
103:8
**Air** 18:1,1
66:4 125:1
125:6
**al** 2:9,16
**Alabama** 2:2
3:8,10 5:2
8:8,13,21
9:9 10:3,6
10:10 14:7
14:14 15:6
16:9 17:11
17:22 18:2
20:1 26:1
27:3
104:10
125:22
169:2
**Albert** 8:18
**Alcázar**
151:15
**alerted**
154:10
**alleged**
57:21
102:6
159:5
161:12
**allow** 99:6
**allowed** 12:4
**almost** 117:6

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| **along** 5:7 | 71:14 92:1 | 60:13 | 85:2,6 86:6 | **appropriate** | 150:22 |
| 19:20 | 150:1 | 87:22 88:1 | 95:10 | 18:10 | 151:14 |
| 55:11 | 153:1,17 | 101:8,19 | 99:12 | **approved** | 152:16,23 |
| 128:8 | 153:18 | 110:4,17 | **applicant** | 96:14 | 153:16 |
| 164:5 | 161:22 | 115:18 | 81:23 | **approxim...** | **asking** 138:1 |
| **already** | **answering** | 120:6,7 | **application** | 14:10,17 | 161:1,8,10 |
| 61:18 | 65:4 | 128:13 | 7:16 29:19 | 22:12 | 161:14,23 |
| 75:16 | 111:19,20 | 134:3,9,11 | 30:3 31:9 | 130:15 | 163:2 |
| 103:11 | 164:15,16 | 156:7 | 31:14 33:4 | 131:22 | **aspect** 80:15 |
| 105:17,19 | 164:19 | 167:4,6 | 33:17 | **April** 20:13 | **aspects** |
| 106:6 | 166:16 | **anyway** | 34:15 35:3 | 45:11 49:4 | 72:15 |
| 128:6 | **answers** | 24:15 30:6 | 36:13 | 51:4 53:5 | **assign** 4:4 |
| 130:1 | 169:7 | 68:5 | 49:18 50:7 | **area** 143:2 | **assume** |
| 158:14 | **anti-coerci...** | 101:23 | 50:12,23 | **argue** | 26:10 |
| 159:1 | 84:11 | 110:19 | 52:21 | 161:13 | 132:19 |
| 163:12 | **anybody** | **anywhere** | 55:10 57:6 | **Armories** | **assuming** |
| **amended** 5:3 | 12:15 26:6 | 21:3,6 59:8 | 57:8,10 | 15:10 | 30:4 37:22 |
| 95:10 | 35:19,22 | 80:22 81:5 | 70:3 80:9 | **Army** 15:20 | 61:10 |
| **amount** | 39:13 42:9 | 93:10,13 | 85:14 | 16:9 17:23 | **assumption** |
| 53:21 | 50:16 | 94:6 | 96:11 | **around** 18:2 | 30:5 |
| 104:18 | 59:10 | 101:12 | 101:10,13 | 20:3 25:16 | **attached** |
| 108:14 | 62:12 | 114:4 | 101:18 | 38:23 53:5 | 33:2 67:3 |
| 123:6 | 85:17,20 | **anywise** | 102:4,11 | 60:21 62:9 | 68:8 69:2 |
| 129:2 | 108:2 | 169:16 | 127:19,21 | 64:10 | 70:22 72:9 |
| 135:12 | 112:5 | **Ap** 6:12 | **applications** | 109:1 | 75:3 77:20 |
| 138:6 | 127:1 | **apartment** | 29:8,13 | 112:15 | 78:20 |
| 150:12 | 158:9 | 18:3 | 43:23 | 136:11 | 79:16 |
| **anguish** | **anyone** 44:1 | **apparent** | **applied** 49:3 | 143:17 | 81:18 |
| 108:12,15 | 45:7 72:19 | 93:11 | **applies** | **arrange** | 82:10 83:3 |
| 109:23 | 95:23 | **apparently** | 12:19 | 167:20 | 83:14 84:3 |
| 110:5 | 119:16 | 56:18 | **appointme...** | **arrangem...** | 84:20 86:2 |
| **another** 12:9 | 140:1 | **appear** | 110:16 | 125:3 | 86:12 |
| 24:1 96:16 | **anything** | 75:17 | **appointme...** | **article** | 88:19 |
| 99:15 | 12:2 33:18 | 83:18 85:4 | 24:14 | 155:15 | 89:16 |
| 103:3,4 | 35:23 39:2 | 86:17 87:7 | **appraisal** | **asked** 12:23 | 90:22 92:5 |
| 128:21 | 40:23 41:2 | 87:9 91:9 | 6:22,23 | 28:14 | 94:1 95:7 |
| **answer** | 44:6 47:12 | **appears** | 82:1,6,14 | 42:23 | 97:15 98:6 |
| 77:11 | 47:19 | 41:8 67:13 | 82:18,21 | 43:19 96:2 | 99:10 |
| 115:21 | 50:18 | 71:1 75:13 | 85:14 | 124:8 | **attitude** |
| 153:13 | 52:12,22 | 76:11 | 107:4 | 130:8 | 64:13 |
| 154:3 | 58:12 | 77:23 | **appreciate** | 139:12 | **attorney** |
| **answered** | 59:11 | 79:18 84:7 | 67:6 | 149:21 | 133:18 |

American Court Reporting
toll-free (877) 320-1050

Page 3

attorneys
167:21
authorizat...
86:16
authorize
138:4
aware 11:16
53:12
131:13
138:13
148:19
away 22:4
a.m 2:22
3:12 66:21
66:23

**B**
baby 144:16
back 10:22
16:3 25:14
30:6 33:11
34:3,5,20
34:21 37:9
39:9,16
55:22 62:7
65:3 67:4
73:5,6
84:16
88:16 90:7
102:22
104:6
105:7
108:1
109:19
110:16
116:1
118:10
133:19
143:2,20
143:21
149:2
151:16

160:20
163:14
166:14
backing
127:18,20
bad 122:13
Bakerhill
112:15
balance
30:22
bank 37:2
37:20
42:18 72:6
75:7 92:16
92:23 93:3
101:12
105:9
136:19
150:4
banking
56:20,21
banks 137:5
Baptist
112:13,16
Barbour 2:2
17:3 33:8
66:9,14
112:12,14
base 40:4
41:20 42:1
66:4 125:1
125:6
based 50:10
50:13 56:9
61:13
162:17
basic 15:17
16:3
basically
18:11
23:22
33:21

34:11
105:11
110:2
145:6
151:12
153:7
basis 95:16
bath 59:20
bathroom
139:20
143:3
bathtub
141:5
bear 76:11
became
53:12
93:11
117:15
before 3:7
10:8,16
14:11
16:12 17:7
19:4 21:3,6
23:13
40:15
45:19
60:23,23
61:2 63:18
72:4 75:5
80:14
97:19
108:17
111:9
114:23
115:1
132:11
145:2
150:16,18
beginning
28:9 42:17
128:16
behalf

145:21
behind
117:6,7
being 30:13
30:14 41:1
47:13,20
48:8,10
115:4
119:21
154:12
161:7
167:5
belief 162:17
believe 49:4
51:19
56:19 63:4
81:12 95:9
100:7
101:22
108:9
111:15
115:8
121:10
123:15
145:4
147:6,8,20
153:11,12
157:3
158:3
162:5,20
168:1
below 22:16
74:14
benefit
96:19
99:19
102:3
benefitted
101:3
159:23
161:17,18
161:21

162:13
Bentley 59:2
106:19
132:14
133:9
besides 35:3
102:4
149:11
163:22
165:5
best 66:2
69:22 70:7
82:15
128:1
133:1
better 104:1
between 3:4
59:4 67:14
96:23 97:7
143:22
144:1
147:21
148:14
149:8,11
149:18
151:23
154:13,20
156:10
157:20
big 34:12
130:13
bill 150:18
bills 136:15
136:18
150:15
Birmingh...
105:5
bit 26:22
129:5
133:12
138:16
blame 32:12

blank 98:23
99:1
Bo 116:4
150:3
bond 151:23
borrow
28:18
29:10
borrowed
136:18
137:1
Borrowers
86:15
Borrower's
7:8
bought 19:7
106:2
116:19
Box 8:7 9:8
boy 146:20
Boyd 6:6 9:6
13:3,7
116:3,4
138:1
160:22
161:8,12
161:17
162:3
167:15
break 66:18
66:22 99:5
142:6,7,16
142:21
breakfast
112:13,17
breeze 67:10
brick 59:20
59:22
130:17
138:21
143:7,8,10
143:16

**American Court Reporting**
**toll-free (877) 320-1050**

Page 4

144:1
**bricked**
130:19
**bricks** 141:6
142:3
**brief** 116:9
**briefly** 23:9
100:10
**Broad** 8:20
**broke**
141:18
142:9
**broker**
37:23 38:3
38:4 42:14
42:16
**brokers** 46:2
**Brothers**
16:6
**brought**
25:12
31:14
34:18
**Brundidge**
15:5,10
16:5,22,23
**build** 20:15
21:5 23:7
26:17 28:1
56:18
96:10
97:17,23
104:11
120:4,10
120:11
157:5,8
159:20
163:11
**builder** 21:5
21:8 96:14
**builders**
119:7,11

119:20
122:6
**building**
23:6 59:1
60:2,6,13
67:15
106:16
157:22
**built** 21:2
119:14,17
148:7
**bunch** 43:5
58:20
**business**
43:3 54:17
54:18
62:21 97:3
148:5,10
**bust** 142:6
**busted**
141:18,19
**buy** 150:9

——————
**C**
**C** 8:1 9:1
169:1,1
**call** 30:6,9
31:3,3
37:21 48:5
51:12,20
61:1,2,5,16
62:16,19
64:4 65:1
78:16
96:21
99:16
124:12
**called** 21:14
22:16
23:14
25:14
45:10,11

50:16 51:4
51:12 66:3
70:23
104:9
105:7
114:3
124:2
125:12
127:22
**calling** 22:14
53:3
**calls** 24:22
40:13 65:2
65:23 66:1
66:5 77:10
137:13,22
153:23
159:2
**came** 10:8
12:15 16:3
34:16 37:1
42:16
44:19
53:11 73:1
88:13
96:16
98:10
100:2,3
104:14
110:21
111:18
114:11,15
114:16
124:1
129:16
164:18
**cancelled**
7:10 102:9
102:21
146:11
**capacity**
126:12

**car** 143:9
**case** 10:23
11:8,17,21
12:8,9,15
12:18 19:5
91:22
93:20
94:22
162:22
**cases** 10:18
11:6
**cash** 54:2,4
80:16 81:1
116:14
145:13
**cashed** 56:1
**cashier's**
103:4,16
104:3,13
104:17
105:3,18
106:1,3,5
146:14
**caulking**
139:9
**cause** 10:12
141:16
142:4
169:17
**caused**
142:6
144:4
**causing**
143:19
**Cert** 7:8
**certain**
144:16
154:15,19
**certainly**
144:6
167:23
**certificate**

61:23 62:2
**certification**
86:15
**certify** 10:4
169:4,13
**cetera**
123:11
**chance** 67:6
93:18
**change** 55:6
55:9 74:15
88:22 99:6
128:4
**charge**
101:17
137:6
140:14
**charged**
136:23
**charges** 39:3
**charging**
101:19
**Chase** 6:17
37:1,20,20
38:17
39:18,20
42:19
43:13
44:19 45:2
69:21 72:6
73:2,7 75:7
78:12
80:21
88:11,14
167:5
**Chase's**
43:21
**check** 10:21
103:4,17
103:22,23
104:3,8,13
104:18,21

105:2,3,11
105:15,18
105:23,23
106:2,3,5,6
124:16
127:7
**checking**
48:1
**checks** 7:10
55:19,23
89:23 90:8
102:9,21
123:5
146:11,12
146:14
**Chevy** 6:17
37:10,20
38:16
39:18,20
42:19
43:12,21
44:19 45:2
69:21 72:6
73:1,7 75:7
78:12
80:21
88:11,14
167:5
**child** 125:14
125:16
**choosing**
96:9 97:10
97:22
**chose** 20:23
97:22
**Christian**
119:22
120:1
**Christine**
8:5
**Christy**
161:14

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

Christy's
144:16
Circle 23:10
23:20
CIRCUIT
2:1
City 113:22
Civil 2:5,12
5:2 10:6
claim 41:17
79:22
108:12,15
108:18
159:5
161:13
165:15
claiming
45:8
107:23
110:1
Clardy 14:6
19:23 61:6
Clayton 2:3
3:10 8:13
10:10
clear 11:13
53:4 62:22
63:3 91:18
cleared
62:23
63:17
closed 105:9
closing
34:12
Coast 114:3
114:7
115:1,5,7,8
COBB 9:7
code 59:19
139:15,15
139:16,18
collateral

19:12
college 15:2
15:8
come 18:16
21:12 46:9
46:9 61:18
72:22 98:9
114:2
116:1
125:2
126:21
136:15
139:5
150:5,21
coming
20:23 58:4
139:3
140:14
143:2
commenci...
3:12
comments
122:16
Commission
169:23
Commissi...
3:7 10:4
committed
39:21 77:7
commode
139:22
communic...
121:1
companies
55:3 57:14
57:15
company
16:4,6,7,8
17:1 22:20
23:3 29:1
42:20 43:2
43:8 59:2

114:3
115:9,12
115:19
140:10,12
Compass
101:12
complaint
7:13 60:1
93:19 94:4
94:19,20
95:11,17
complaints
90:16 93:2
94:13
completely
130:19
compliance
3:18
composite
89:20
computer-...
169:8
concern
128:19
concerned
128:20,22
152:22
concerning
51:15
125:11
127:15
concession
163:6
conditions
76:8
connected
96:4
connection
160:16
consisted
33:21
consolidated

10:18
conspiracy
95:21
96:23
100:16
101:3
102:6
159:6,15
160:1
161:15,19
162:6,11
162:13,19
163:3
conspired
95:18,23
159:10
162:21
163:10
construction
9:4 22:15
54:5,7,18
76:7 89:18
90:3,6
104:19
124:17
126:13,16
128:5
130:4
134:12
135:4,22
137:20
145:15
148:5
149:22
150:4,6,22
153:9
156:2,8
158:13,16
158:23
166:23
167:8
consulted

63:18
contact
21:13
29:16 31:5
35:19
39:13
41:12 42:8
45:7 49:13
62:11 63:6
140:18
contacted
20:5 112:8
context
122:10
continue
44:3 124:6
continued
7:1 9:1
36:15
contract
6:13 26:15
26:23 27:2
27:17,22
34:19
38:10
67:13 71:9
71:22
104:15
121:4,6,12
121:16,19
121:23
122:19
123:2
129:5
147:10,10
147:16,17
147:19,21
148:2,14
148:17
149:8,9
154:16,20
155:9,12

155:14,17
155:20
156:19
159:17
163:22
contractor
97:23
contracts
154:13
contrary
138:11
convenient
21:21
conversati...
64:23
111:7
117:21,23
122:12
124:2
125:11
127:5,14
144:20
158:5,8
conversati...
48:22
110:23
111:3,17
120:21
166:8
converted
58:13
cooled
130:16
copy 7:10
26:20
31:23 32:4
32:11 33:2
33:3 53:13
60:1 67:3
68:8 69:2
69:10
70:22 72:9

**American Court Reporting**
**toll-free (877) 320-1050**

Page 6

75:3 77:20
78:20
79:16
81:18 82:1
82:5,10,13
82:16,21
83:3,14
84:3,20
86:2,12
88:19,23
89:1,7,8,16
89:21
90:22 91:7
92:5,7 94:1
94:4 95:7
97:15 98:6
98:23
99:10
100:3
146:14
154:22
157:14
164:18
166:1,15
**Corley** 112:6
112:7,13
112:17
**corner** 81:9
**correct**
14:21
17:17,18
20:11
26:12 28:2
40:18,22
42:22
43:15 45:5
49:10
54:15
56:14
64:21
67:15,16
68:20 69:5

69:10,15
69:16,18
70:9 71:18
71:19
80:18
82:19 91:2
93:8 97:17
97:18,21
116:20
117:19
120:2,18
121:14
123:3,8,12
126:8
129:23
139:13
155:19
164:20
169:10
**cost** 34:12
130:4
140:22
157:18
**counsel** 3:5
4:1,3 10:7
164:9
169:14
**count** 70:14
**counterfeit**
99:3
**countertops**
130:22
**country**
87:21
**County** 2:2
15:5 17:3
29:23 33:8
33:9 61:16
62:18 66:9
66:15
67:22 68:1
69:17 91:3

91:12,15
112:15
169:3
**couple** 18:17
24:15,22
33:14 52:2
57:5 66:3
142:17
**course** 12:4
12:6,20
27:14
38:16
125:10
141:20
165:5
**courses**
138:21
**court** 2:1
3:10,19
5:10,11
8:12 10:2,9
11:18
12:21
13:13,19
82:23 98:3
99:6
**credit** 7:3
83:10
84:12
85:15
88:22
**criminal**
11:18
**Crow** 8:5,6
11:11 12:1
12:11
13:10,22
32:3,6,10
32:19 41:3
47:3 49:20
66:20
70:12,17

71:8,13
74:21
75:15 77:9
78:9 84:15
101:7
103:13,15
103:20,23
108:20
134:7
137:13,22
138:8
152:14,23
153:16
157:13
159:2
160:18
161:1,10
161:16,20
**crown** 131:2
131:3,5
**CRUM** 9:7
**CSR** 2:23
3:7 5:4
10:1
169:21
**cut** 124:21
**CV-04-106**
2:5
**CV-04-107**
2:12
**C-L-A-R-...**
19:23

———
**D**
**D** 6:1 7:1
**damages**
108:22
109:21
**DANIEL**
8:6
**date** 10:5
36:7 79:7

89:3 103:9
132:10
148:16
152:18
165:12
**dated** 71:2
123:6
**dates** 87:3
87:16,18
**date's** 71:6
**daughter**
165:1
**day** 3:11 5:7
10:10 37:4
60:18
61:22
96:20
110:15
125:4
146:3
152:6,22
153:4
155:9,12
**days** 63:22
64:2 96:20
123:18
129:4,5
142:17
**deal** 53:22
58:5 80:13
163:10
**dealing**
26:11
100:15
**dealings**
51:8 53:5
**dealt** 27:13
**December**
63:5,8,13
94:5,12
**decide** 19:17
**decided**

24:16
25:21
120:10
**decision**
119:6,20
120:4,7
**deed** 69:11
**deeded**
20:10
**deep** 95:2
**defects**
138:14
**defendant**
2:10,17
8:15 9:3
11:1,18,21
32:16,16
70:16
**defendants**
11:3 97:1
108:21
**Defendant's**
6:12,13,14
6:15,16,17
6:18,19,20
6:21,22,23
7:3,4,5,6,7
7:8,9,10,11
7:12,13,14
7:15,16,17
32:22,23
42:3 67:1
67:12 68:6
68:18,23
69:9 70:5
70:20 72:3
72:7 73:13
75:1 76:4
77:18,22
78:18,22
79:14,18
81:16 82:8

**American Court Reporting**
**toll-free (877) 320-1050**

Page 7

| | | | | | |
|---|---|---|---|---|---|
| 82:12 83:1 | 135:2,16 | 22:18 27:5 | **director** | 41:5,9,12 | 35:3,10,18 |
| 83:5,12,15 | 136:7 | 27:23 46:7 | 96:18 | 47:1,8,16 | 36:11 |
| 84:1,4,18 | 137:19 | 46:11 | 99:18 | 48:3,23 | 43:21 |
| 84:21 | 149:4,20 | 54:13,17 | **dirt** 128:10 | 51:3,21 | 66:18 67:7 |
| 85:23 86:3 | 156:15 | 60:10 | **disagree** | 53:15 61:1 | 69:20 |
| 86:10,13 | 157:16 | 67:14 | 12:21 | 61:3,5,9 | 72:22 73:1 |
| 88:17,21 | 160:19 | 96:10,13 | 134:4,10 | 62:14 | 79:23 88:7 |
| 89:14 | 169:5 | 96:20 | 137:17 | 63:21 64:4 | 88:10,13 |
| 90:20 91:6 | **depositions** | 97:11,16 | 138:2,5 | 65:12 | 96:3,6,22 |
| 92:3,6 | 3:20 11:12 | 98:14,17 | 146:2 | 66:11 | 100:13 |
| 93:22 94:3 | 11:15 | 99:20 | 160:9 | 96:18 | 102:9 |
| 95:5,9 97:5 | 12:13,19 | 117:17 | **disagrees** | 99:18 | 114:10,15 |
| 97:13 98:4 | 13:9 | 118:7,14 | 138:2 | 111:5 | 154:22 |
| 98:8 99:8 | **deprive** | 118:20 | **disbelieved** | 113:13 | **doing** 48:16 |
| 99:12 | 57:22 | 121:4 | 146:17 | 145:4,8 | 54:17 64:6 |
| 100:6 | 95:19,23 | 123:10 | **disclosure** | 165:19 | 113:23 |
| 134:13 | 159:11 | 148:15 | 7:5,6 71:1 | 166:4,8,10 | 114:1 |
| **definitely** | 162:7 | 155:5 | 75:10 | **DiSpirito's** | **dollar** |
| 144:23 | **DERRICK** | 156:7,20 | 79:10 | 40:16 | 133:17 |
| 152:3 | 9:7 | **Developm...** | 84:10 85:8 | 51:12 | **dollars** |
| **delay** 20:19 | **describe** | 96:17 | **discovery** | **dispute** 17:6 | 30:14 55:5 |
| **deliver** 93:6 | 159:14 | 98:10 | 10:18 | 71:21,23 | 55:8 |
| **delivered** | 161:14 | 100:4 | **Discrimin...** | 86:23 | 104:14 |
| 25:10 33:9 | **described** | 113:1,16 | 7:4 83:22 | 146:2,6 | 106:21 |
| 33:15,16 | 160:1 | **Diane** 8:5 | **discuss** 24:2 | 160:12 | 128:3,3 |
| **delivering** | 161:16 | **difference** | 129:10 | **divided** | 160:5 |
| 5:4 | **description** | 43:8,11,16 | 145:9 | 157:20 | **done** 24:4,22 |
| **denial** 7:9 | 6:14,18 | 43:18 | **discussed** | **division** 2:3 | 25:4 29:23 |
| 88:22 | 76:8 | 92:15,18 | 25:13 34:2 | 75:8 96:12 | 38:15 43:3 |
| **deny** 89:6 | **desire** 142:1 | 149:8,17 | 34:9 80:5 | 157:11 | 43:4 52:22 |
| **deployed** | **desk** 151:13 | 154:13 | 101:8 | **doctor** 110:4 | 60:9 88:4 |
| 17:22 18:1 | **Destin** 115:9 | **different** | 110:20 | **document** | 94:22 |
| 24:11 | 126:3 | 34:8 58:9 | 129:14 | 6:17 41:20 | 145:7 |
| **DEPONE...** | **detail** 25:23 | 72:13,14 | 144:23 | 42:2 74:5 | 148:1 |
| 168:2 | **determined** | 76:15 | 151:10 | 77:8 79:1 | **Dothan** 9:9 |
| **deposition** | 48:2 74:11 | 87:16 | **discussing** | 81:21 82:2 | 14:6,16 |
| 2:19 3:6,15 | 74:12 | **direct** 35:19 | 151:16 | 85:7 86:4 | 17:16 |
| 3:16 4:6 | **Dev** 6:13 | 39:13 | **discussion** | 88:21 | 18:22 |
| 12:3,16,17 | **develop** | **directly** 31:6 | 130:10 | 96:16 97:4 | 19:18 20:1 |
| 121:13 | 118:6 | 49:13 | 144:18 | 98:9,20 | 20:23 22:2 |
| 133:19,23 | **Developm...** | 62:11 | 146:8 | 155:1,3 | 22:6 23:11 |
| 134:6 | 21:10 | 117:6 | **DiSpirito** | **documents** | 23:12,15 |

| | | | | | |
|---|---|---|---|---|---|
| 23:18 | 124:2,8 | 106:8 | 47:20 | 6:20 78:16 | **evidence** 4:6 |
| 24:16 25:3 | 125:7,12 | 108:10 | **employee** | 78:23 | 47:4 54:23 |
| 25:6 27:3 | 125:17 | 117:13 | 20:21 23:2 | 140:21 | 58:11,15 |
| 27:19 61:7 | 127:23 | 124:22 | 48:3 62:13 | **et** 2:9,16 | 58:16 |
| 66:1,6,10 | **drew** 24:17 | 125:5 | 62:13 | 123:11 | 100:15,20 |
| 92:12 | **drilling** | 141:6 | **employees** | **Eufaula** | 102:10,22 |
| 110:18 | 20:22 | 154:8 | 48:10 | 8:21 | 115:17 |
| 116:22 | **drive** 143:13 | 166:19 | **end** 136:11 | .**even** 12:16 | 138:10 |
| 140:8 | **drove** 59:21 | **early** 15:18 | 143:3 | 12:16 22:3 | 146:20 |
| 167:3 | 141:7 | 24:8 49:1 | **endorsed** | 50:8 79:22 | 153:2,6 |
| **doubt** 166:9 | **dug** 128:11 | 119:2 | 55:23 90:6 | 105:3 | 155:23 |
| 166:10 | **duly** 13:16 | 121:8 | **ends** 157:12 | 108:7 | 156:3,5 |
| **doubting** | **during** 11:4 | 129:8 | **enough** | 155:3 | 160:12 |
| 103:1 | 18:12 25:1 | 165:18 | 76:10 | **eventually** | 163:20 |
| **down** 22:13 | 27:14 | **eastern** | 146:19 | 121:3 | **exactly** 43:1 |
| 44:19 74:6 | 119:9 | 112:14 | 150:8 | **ever** 17:2,5,7 | 55:6 |
| 74:14 89:4 | 120:20 | **education** | **enter** 26:15 | 19:3 21:2 | 116:21 |
| 104:15 | 121:1 | 14:22 | **entered** | 22:20 35:2 | 149:14 |
| 110:9 | 127:14 | **effect** 3:17 | 121:3 | 36:2 44:10 | **examination** |
| 123:19 | ·146:10 | 64:5 65:4 | 148:17 | 45:6 48:7 | 6:4 10:12 |
| 146:9 | 151:10 | 114:6 | 149:9,10 | 48:22,22 | 14:2 116:3 |
| 147:2 | **duty** 87:21 | 149:1 | 151:4 | 55:15 | **examined** |
| 150:21 | | **effective** 5:3 | 155:4 | 60:16 64:3 | 13:16 |
| 153:8 | **E** | **effort** 20:15 | 156:19 | 64:3 82:18 | **except** 4:1 |
| 158:15 | **E** 6:1 7:1 8:1 | **Eight** 122:21 | 159:19 | 89:6 97:20 | **exchange** |
| 164:1 | 8:1 9:1,1 | **either** 37:5 | **entering** | 112:8 | 104:4,7 |
| 169:6 | 59:1,1 | 45:2 63:12 | 121:22 | 114:2,4 | **exchanged** |
| **draft** 25:4 | 106:19,19 | 66:6 70:16 | **Equal** 7:3 | 120:19,23 | 106:5 |
| 25:10 | 132:14,14 | 73:17 | 83:10 | 121:23 | **excuse** 25:5 |
| **drain** 59:19 | 133:9,9 | 118:8,13 | **equalled** | 122:2 | 27:9 31:2 |
| **draws** | 169:1,1 | 119:5 | 130:3 | 129:10 | 68:19 76:4 |
| 129:15 | **each** 65:23 | **elected** | **equivalency** | 148:4,7,9 | ·77:1 |
| **Drell** 40:11 | 95:22 | 94:18,18 | 15:1 | 158:5,8 | **executed** |
| 40:14 | 141:7 | **emblem** | **erased** | **every** 95:22 | 67:21 |
| 45:10,11 | 151:23 | 151:13 | 164:15 | 143:13 | **Exhibit** |
| 46:19 | **earlier** 67:22 | **Emerald** | 165:9,22 | 150:16 | 32:22,23 |
| 47:13 48:9 | 69:19 80:5 | 114:3,7 | 166:17 | **everybody** | 42:3 67:1 |
| 50:11 52:8 | 81:13 | 115:1,4,7,8 | **escrow** 54:6 | 11:1 | 67:13 68:6 |
| 52:11 | 87:18 | **employed** | **Especially** | **everything** | 68:17,22 |
| 100:14 | 89:18 90:5 | 46:4,6,10 | 111:2 | 55:10 | 68:23 69:9 |
| 113:7 | 96:2 100:7 | 46:15 | **essence** 54:9 | 150:7 | 70:5,20 |
| 115:14 | 101:22 | 47:13,16 | **estimate** | **evict** 59:10 | 72:7 73:13 |

**American Court Reporting**
**toll-free (877) 320-1050**

75:1 76:3,4
77:18,22
78:18,22
79:14,18
81:16,21
82:8,12
83:1,5,12
83:16 84:1
84:5,18,21
85:23
86:10,13
88:17,21
89:14
90:20 91:6
92:3,7
93:22 94:3
95:5,9 97:6
97:13 98:4
98:8 99:8
99:12
100:6
134:13
136:6
157:15
**exhibits** 5:8
  6:11 26:21
**expect** 39:17
**expectation**
  27:22
**expected**
  37:15
**expecting**
  36:20
  43:23
**expense**
  157:19
**expenses**
  109:1
  135:20
  137:10
  160:16
**expert** 72:12

**Expires**
  169:23
**explain**
  103:15
  104:1
**explained**
  117:14
**explanation**
  123:22
  148:19
  151:2
**exposure**
  143:11,12
**expressed**
  81:9
**extension**
  12:21
**exterior**
  143:22
**E-8** 16:20

_____
**F**
**F** 14:4 71:16
  169:1
**face** 118:20
  118:21
**fact** 12:14
  54:12,19
  58:18 82:5
  94:19
  120:9
  142:2
  148:13
  151:13
  160:19
**fair** 42:5
  49:11
  83:22
  84:11 87:1
**fairness**
  11:20
**faith** 6:20

78:16,23
**fall** 62:9
**far** 44:7
  62:18
  66:13
  76:10
  126:22
  128:8,9
  134:5
  146:3
  152:21
  165:1
**fast** 150:8
**Faulkner**
  15:9
**fax** 105:4
**faxed** 30:4
  33:11
**Faye** 2:6
  9:13
**February**
  24:8 25:18
  28:8 95:11
  100:10
  118:4,9
  119:1,2
**fee** 55:10
  57:8,10
  85:8,11,14
  85:14,15
  101:10,13
  101:18
  102:5,11
**feel** 50:6
**fees** 57:6
**feet** 130:14
  130:15
**fellow**
  119:22
  125:8
**few** 109:16
  116:5

133:19
138:17
**FHA** 84:12
**fiberboard**
  144:2
**fiberglass**
  141:19
**field** 126:18
**fifty** 55:7
  107:14
**fifty-five**
  55:5
  104:13
**fifty-nine**
  30:13
**figure** 135:6
**figures**
  137:17
**filed** 5:11
  53:13,23
  60:1 63:5
  90:17,23
  91:3,7,22
  93:19 94:4
  95:11
  108:10
  132:9,12
  132:15,23
  133:4
  135:12
  144:22
**fill** 29:18
  33:18
**filled** 31:8
  31:22 32:1
  33:4,7
  98:20
**filling** 36:9
**final** 25:4
**Finally** 25:2
**finance**
  28:15

101:12
116:12
145:12
**financed**
  129:16,22
  130:7
**financial**
  31:17
  83:21
**financing**
  80:15,22
  93:10,13
  145:8
  148:21
**find** 50:21
  53:2 109:2
**fine** 13:21,22
  66:20
  71:13
  160:23
**finish** 15:12
**finished**
  18:10
**FIRM** 8:19
**first** 11:11
  16:19
  22:19 24:6
  26:22
  27:10 45:7
  45:12 50:9
  51:14
  62:11,15
  63:6,9,12
  67:12 76:5
  82:17
  95:10,12
  97:4,19
  103:10
  118:9,12
  118:19
  119:4
  123:9

124:19
148:12
**five** 30:17
  51:6 55:7
  66:19
  76:12 78:3
  119:8
  143:13
**five-year**
  30:12
**fix** 139:7,10
  140:17,22
  141:21
**fixing** 62:8
**flag** 148:16
  149:12
  154:9
**flags** 147:13
  147:18
  154:8
**flip** 73:13
  76:5,10
  84:22 94:6
**floods**
  139:23
**floors**
  130:22
**Florida**
  113:22
  115:9
  126:1,2
**flown**
  147:13
**flyer** 99:15
**folks** 95:19
  159:11
**following**
  10:13
  51:20
  155:18
**follows**
  13:17

**American Court Reporting**
**toll-free (877) 320-1050**

Page 10

| | | | | | |
|---|---|---|---|---|---|
| follow-up | 155:15 | 98:9,14 | 12:3,8 13:8 | 141:20 | 113:1,15 |
| 167:16 | 166:7 | 101:3 | gate 125:5 | 161:7 | 117:16 |
| force 3:17 | free 21:20 | 103:19 | gave 29:22 | Gibson 16:4 | 118:7,14 |
| 18:1 66:4 | Friday | 104:10 | 30:3 31:9 | give 15:15 | 118:20 |
| 125:1,6 | 110:13,18 | 114:7,11 | 33:4 34:2,5 | 22:3 32:9 | 121:4 |
| foregoing | 150:17 | 114:12 | 34:17,20 | 39:23 52:1 | 123:10 |
| 10:7 169:5 | from 12:3 | 115:4 | 34:21 37:8 | 64:14 73:6 | 148:14 |
| 169:9 | 14:15 16:3 | 119:4 | 39:9,16 | 105:10 | 154:21 |
| forgery 77:7 | 16:6,8 | 131:18 | 40:5 54:12 | 115:23 | 155:5 |
| 99:3 | 17:20 20:6 | 134:14 | 55:19 62:1 | 116:22 | 156:6,20 |
| forgot 36:7 | 20:7,8,15 | 136:18 | 63:19 64:1 | 124:5,10 | 157:21 |
| 106:17 | 20:20 22:1 | 147:18 | 73:5 76:21 | 128:2 | Global/Drell |
| 113:5 | 26:5 29:15 | 156:8 | 88:16 | 140:21 | 40:7,21 |
| form 4:2 | 30:9 31:3,4 | 158:9 | 89:21 | given 27:7 | 41:1,7 |
| 7:16 41:3 | 31:10 | 159:23 | 99:13 | 32:3 88:23 | go 13:3 15:3 |
| 47:3 49:20 | 33:13 34:3 | 160:20 | 103:16 | 123:22 | 15:7 23:13 |
| 74:21 | 34:16 | 161:18 | 105:15,18 | 137:18 | 25:22 |
| 75:15 77:9 | 35:19,23 | 162:13 | 106:6 | 149:13 | 26:13 30:8 |
| 78:9 134:7 | 36:2 37:1 | front 104:5 | 108:9 | 154:3 | 32:2,15 |
| 151:7 | 37:10 | full 3:18 | 120:13 | 163:12 | 44:5 49:8 |
| 160:22 | 38:19 | 30:22 | 134:6 | 169:11 | 67:7 69:9 |
| forms 33:17 | 39:13,18 | full-time | 137:18 | giving 67:6 | 72:4 74:7 |
| forth 26:14 | 40:13 44:1 | 20:21 | 139:8 | Global 2:9 | 75:5 80:11 |
| 45:19 65:3 | 47:23 | furnish | 148:20 | 2:16 6:13 | 80:19 81:3 |
| 118:10 | 49:11 51:4 | 157:4 | 154:8,22 | 21:10 | 93:9,12 |
| forty 107:15 | 51:16,21 | 159:20 | general | 22:18 | 103:7 |
| forward | 52:9 53:5 | further 3:13 | 116:22 | 23:15 27:5 | 110:16 |
| 49:8 80:12 | 55:14 | 3:21 23:14 | 122:12 | 27:22 | 119:13 |
| found 38:2 | 56:12 61:1 | 24:2 44:11 | 163:5 | 41:17 46:7 | 125:15 |
| 45:21 | 61:2,5 | 76:9 168:2 | generally | 46:10,15 | 135:15 |
| 46:23 | 62:12,16 | 169:13 | 11:19 | 46:17 | 143:20 |
| 54:11 80:4 | 64:2 66:3,6 | furtherance | generate | 54:13,17 | 148:2 |
| 110:10 | 66:14 69:4 | 52:22 | 99:23 | 60:10 | 150:7 |
| 117:17 | 69:11 | ——— | gentleman | 67:14 | 161:5 |
| foundation | 72:23 73:1 | G | 126:6 | 85:19 96:4 | 163:19 |
| 128:15 | 75:7 76:15 | garage 143:9 | getting 35:7 | 96:10,13 | going 10:19 |
| foundations | 78:12 | 143:10 | 36:12 56:6 | 96:17,19 | 25:22 |
| 128:11 | 81:13 | gas 16:4,6 | 56:13 | 97:8,11,16 | 26:13,19 |
| four 25:1,6 | 87:20 | 139:23 | 63:17 | 98:10,14 | 27:23 |
| 51:6 70:11 | 88:10,10 | 143:1 | 78:15 79:9 | 98:16 | 28:14 |
| 78:3 96:6 | 88:14 | Gassett 2:13 | 80:3 88:20 | 99:19 | 29:10 |
| 129:15 | 89:22 96:8 | 2:13 9:14 | 89:8 129:1 | 100:3 | 30:18,21 |

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 11

| | | | | | |
|---|---|---|---|---|---|
| 34:13 | 150:16,18 | 39:8 | 146:15 | 146:13,15 | 133:18 |
| 49:23 52:4 | **grounds** 4:4 | **hard** 32:17 | **hell** 69:8 | 147:6,8,13 | 135:4,22 |
| 52:6 62:23 | **group** 2:9,16 | **Hardee's** | **helped** | 147:21 | 137:21 |
| 63:2 65:6 | 96:18 | 23:10,17 | 119:19 | 148:20 | 138:15 |
| 68:4,11 | 99:18 | **hardwood** | **her** 12:7 | 151:14 | 144:9,12 |
| 80:16 | 157:21 | 130:22 | 18:14,18 | 154:10 | 147:2 |
| 89:19 | **Grubbs** | **having** | **hey** 50:17 | 155:11 | 153:9 |
| 93:12 | 18:20 | 13:16 | 64:4 | 158:7 | 156:2,8 |
| 97:16 | **Guard** 15:23 | 141:15 | **high** 15:1,3 | 159:20 | 158:16 |
| 111:10,23 | 16:9,11,13 | **head** 18:18 | 15:5,12,15 | 161:1,10 | 159:1 |
| 114:22 | 16:15,21 | 39:1 41:23 | **higher** 81:4 | 161:14 | 160:6,17 |
| 115:21 | 17:3,23 | 48:14 | 93:14 | 162:1 | 164:2 |
| 125:14 | 18:1 20:21 | 51:17 | 135:15 | 167:5,7 | **homeless** |
| 129:2,11 | **guardsman** | 67:20 | **highlights** | **himself** 65:7 | 18:11 |
| 129:21 | 20:22 | 73:10 | 99:17 | 65:12,12 | **hoped** 130:7 |
| 145:5,7 | **guess** 33:23 | 95:14 | **Highway** | 125:9 | **hour** 161:6 |
| 147:11 | 36:8 65:18 | 100:12 | 14:13,13 | 126:6 | **hours** 96:20 |
| 151:17 | 74:5 82:20 | 149:19 | 17:10 | 165:17 | **house** 17:12 |
| 157:3,4,5 | 92:20 | 163:7 | **him** 20:7 | 166:2 | 18:9,9 19:7 |
| 161:13 | 101:15 | **hear** 114:4 | 23:22 | **history** | 19:8,10,11 |
| **gone** 108:1 | 110:2 | 114:23 | 25:14 | 15:16 | 19:18 |
| 139:22 | 127:19 | 164:6 | 27:13,15 | **hits** 150:16 | 20:15 23:6 |
| 162:9 | 137:15 | 165:6 | 34:3,11,18 | 150:17 | 25:15 |
| **good** 6:20 | 165:9 | **heard** 22:20 | 34:20 44:4 | **hold** 102:18 | 26:17 28:1 |
| 30:8 78:16 | **guy** 40:16 | 46:13 | 44:4 52:2 | 145:1 | 28:15 |
| 78:23 | **guys** 50:17 | 111:9 | 53:15,20 | 146:21 | 53:23 54:2 |
| 100:9 | | 121:23 | 63:19 64:2 | **home** 17:6,7 | 56:18 59:5 |
| 122:13 | **H** | 122:2,4,7 | 65:14 66:3 | 19:1,4,22 | 59:11,14 |
| **gotten** 22:6 | **H** 8:18 | 122:10 | 96:21 | 21:3,5,9 | 60:7,13 |
| 22:7 36:2 | **half** 129:3 | 164:13,17 | 101:8 | 25:12 | 61:6,21 |
| **grade** 16:19 | 130:3,5 | 164:21 | 103:16 | 34:18 | 68:11 |
| **grand** | **handed** | 165:4,8 | 104:11,11 | 57:23 | 80:16 |
| 106:22 | 103:5 | **hearing** | 105:9,10 | 58:18,19 | 96:11 |
| **granite** | **handled** | 116:8 | 105:15 | 66:1 67:15 | 97:17,23 |
| 130:22 | 43:9 | 169:12 | 110:16 | 69:14 | 101:13 |
| **granted** 88:5 | **handout** | **hearsay** | 112:11 | 97:12 | 104:11 |
| **granting** | 99:15 | 113:20,21 | 115:23 | 102:14,14 | 106:10,11 |
| 58:2 | **handwriting** | **heart** 162:4 | 126:19 | 119:7 | 106:12 |
| **great** 51:1 | 72:12 | **hearts** 162:5 | 128:2 | 122:5,19 | 108:7 |
| **grocery** | **happened** | **heated** | 135:9 | 128:6 | 110:1 |
| 21:21 | 17:12 23:5 | 130:16 | 142:17 | 131:7 | 116:12,21 |
| **ground** | 23:21 30:2 | **held** 141:22 | 145:13 | 132:20 | 117:6 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 12

| | | | | | |
|---|---|---|---|---|---|
| 119:17 | 86:21 | 97:14 98:5 | 123:19 | **Internatio...** | **IPI** 7:17 |
| 120:4,10 | 116:4 | 99:9 | **initially** 88:4 | 16:7,8 | 8:15 26:5 |
| 128:23 | 144:19 | **identified** | 101:6 | **Internet** | 28:4,13 |
| 129:1,7,22 | 162:3 | 165:17 | 130:9 | 50:21 | 29:2,4,15 |
| 130:13,17 | 167:16 | **identifies** | **initials** 85:4 | 100:1 | 31:6 35:20 |
| 130:21 | **Hugheses** | 166:2 | **initiate** | **interrogat...** | 36:14 |
| 131:4,13 | 13:8 | **identify** 86:4 | 148:2 | 7:12 91:23 | 37:23 |
| 131:20 | **hundred** | **impression** | **initiated** | **introduce** | 39:13,18 |
| 139:23 | 45:14,17 | 125:20,23 | 147:22 | 89:19 | 39:21 40:9 |
| 142:18 | 45:17 57:8 | 129:20 | **inside** | 103:8 | 41:1,16,18 |
| 143:2 | 107:15 | **inadverte...** | 143:20,21 | **introduced** | 42:11,15 |
| 144:3 | 122:21 | 166:16 | 144:9,11 | 103:11 | 43:12 44:3 |
| 145:10,12 | 133:14,15 | **Inaudible** | **inspection** | 105:19 | 45:2,8,13 |
| 145:13,17 | 133:16 | 105:21 | 150:11 | 106:8 | 46:4 47:1,9 |
| 146:4,9 | 135:6,13 | **Inc** 2:9,16 | **installed** | 121:13 | 47:21 48:3 |
| 147:23 | 135:16 | 54:17 | 143:5 | 123:5 | 48:10,13 |
| 148:22 | 136:11,12 | 157:21 | **instructed** | 125:9 | 49:13,19 |
| 157:5,8,19 | 160:5 | **inches** | 124:10 | 126:6 | 50:16,23 |
| 157:22 | | 143:11,13 | **insulation** | **invested** | 51:8 54:21 |
| 158:13,23 | **I** | **Incorpora...** | 59:2 | 145:18 | 55:1,14 |
| 159:20 | **idea** 40:10 | 96:13 | 132:15,19 | **investigati...** | 56:5,12,22 |
| 163:11,16 | 56:17 | **incurred** | **intend** 44:23 | 47:23 | 57:22 58:1 |
| 167:18,22 | 61:10 | 157:18 | 44:23 | 119:10 | 60:12 |
| **houses** 23:7 | 107:3 | **independent** | 80:11 | **investigati...** | 62:12 |
| 119:13 | 115:13,16 | 140:11 | **intended** | 48:2 | 69:21 |
| 131:10,15 | 116:23 | **indicate** | 81:1 | **invoke** 12:23 | 80:20 |
| 148:7 | 125:19 | 126:11 | **intentions** | **invoked** | 88:10 |
| **Housing** | **identificat...** | **indicated** | 30:23 | 11:14,14 | 90:11 |
| 83:21 | 33:1 67:2 | 135:15 | **interest** | **involved** | 92:16,20 |
| **Houston** | 68:7 69:1 | **Indicating** | 34:10 35:6 | 19:4,5 52:1 | 94:7,11 |
| 29:23 33:9 | 70:21 72:8 | 99:22 | 37:7,18 | 53:17 | 95:12,18 |
| 61:15 | 75:2 77:19 | **individuals** | 38:20 40:1 | 64:16,18 | 95:21,22 |
| 62:18 | 78:19 | 21:19 | 45:3,18 | 80:15 | 96:3,8,9,12 |
| 67:21,23 | 79:15 | **information** | 55:9 58:17 | 97:20 | 96:23 97:7 |
| 69:17 91:3 | 81:17 82:9 | 31:17 | 74:10,15 | 145:3 | 97:8,10,20 |
| 91:11,14 | 83:2,13 | 48:19 | 81:4,9 93:6 | 146:22 | 98:17 |
| **Hughes** 2:6 | 84:2,19 | **informed** | 93:14 | 162:6,18 | 99:17 |
| 2:6,20 3:6 | 86:1,11 | 45:20 | 136:23 | 162:22 | 100:18 |
| 9:13 10:11 | 88:18 | **initial** 50:22 | 137:6,10 | **involvement** | 101:2 |
| 12:4 13:15 | 89:15 | 50:23 55:5 | 157:18 | 162:11 | 102:5 |
| 14:4,5,23 | 90:21 92:4 | 90:2 94:19 | **interested** | **involving** | 114:7 |
| 71:17 | 93:23 95:6 | 94:20 | 169:16 | 100:18 | 115:4,18 |

**American Court Reporting**
**toll-free (877) 320-1050**

129:18
155:18
**Irby** 5:5 6:5
8:17,19
10:16
11:23 12:6
12:20 13:6
13:11,21
14:2 32:8
32:12,21
33:3 57:4,7
66:17 67:4
68:2,19,21
70:13 72:2
75:18
77:16
82:22 86:8
86:20
89:12
90:14
93:17 98:2
103:7,11
103:14,18
104:2
105:22
164:6,12

**J**
**J** 41:4
**jail** 146:20
**January**
16:9,14
17:21
118:9
133:2
**Jarrett**
21:10 27:8
27:9,11
34:7 44:2
47:20 54:8
54:9,14
55:2 56:4

56:10,16
60:19
61:23
63:20,23
68:9 73:5
76:23 77:1
88:16 90:6
104:10
110:23
113:11,18
117:16
118:17
119:5
123:10
124:11
125:12
126:19
127:9,10
128:19
134:14
139:8
140:17,19
140:20
141:20
142:12,14
145:10,12
147:14,21
148:20
149:5,9,11
151:3,5
154:16,20
156:6
157:8,20
159:16
163:12
**Jeff** 125:8,9
126:5,6
128:19
166:20
**JEFFERS...**
169:3
**Jernigan**

125:9,10
126:5,7
128:20
166:20
**Jim** 112:6,7
112:13,17
**Jimmy** 20:9
69:6
**JINKS** 8:6
**job** 51:21
139:11
150:10
**Joe** 2:6,20
3:6 10:11
13:15 14:4
71:16
**joint** 138:22
138:23
**Jordan's**
59:1
106:16,17
132:1,3
133:6
**Jr** 8:18
**Judge** 11:18
**judgment**
108:11
**June** 17:15
17:20
103:10
**just** 12:21
21:17 32:2
32:10,14
37:23 38:3
40:19
45:20
52:13
59:23
64:14
72:11
73:22 74:9
74:22

76:10 77:2
77:3 78:6
80:11
87:23 88:2
89:19 94:6
94:14
98:23
103:1
104:6
112:3
116:22
122:12
126:17
127:3
129:4
146:21
147:17
160:1
163:5,18
167:16

**K**
**keep** 32:7
87:2
**kin** 169:14
**kind** 26:15
45:21,23
53:7
**knew** 20:22
48:16
62:13
94:13
122:6
**know** 11:18
21:23 22:3
22:22 24:1
28:17 30:7
32:19 34:4
34:16
35:16 37:4
40:8,11
44:6,8,8

45:16 46:3
46:5,6,8,12
47:6,8
48:18,20
56:15,20
56:23 57:1
57:11
58:22
62:18
65:10,17
65:21
66:13 71:6
72:16,20
76:18,20
77:12,15
85:19,21
87:2,11
88:4 89:21
94:14 95:1
95:3 98:12
98:16 99:2
102:7
104:6
105:12
106:20
107:3,22
108:14
109:8
110:17
112:5,7,11
112:18,20
112:21
113:18,23
114:1,14
114:19
115:7,11
115:14
117:1
122:9
126:18,22
127:19
128:9

129:1,2
132:5,8,22
133:20
141:9
145:6,14
147:1,4,12
148:1
149:15
150:1,14
152:11,19
153:8
154:1,6,10
154:15,19
155:1
156:10
158:7
159:4
160:2,2
161:4,21
163:16
167:4,7
**knowing**
94:17
98:19
138:9
155:6
158:14,18
158:23
162:14
163:15
**knowledge**
23:3,4
35:15
60:15
73:11
82:16
121:21
127:23
131:17
146:8
149:23
158:10

American Court Reporting
toll-free (877) 320-1050

Page 14

| | | | | | |
|---|---|---|---|---|---|
| 161:3,5,11 | 12:15 | **left** 65:3 | 157:3,7,16 | **letter** 7:15 | 59:11,15 |
| 161:23 | **laws** 3:19 | 111:19 | 158:1,6,12 | 36:6,7,8 | 62:22 64:5 |
| 162:2 | **lawsuit** 63:5 | 165:13 | 158:22 | 96:8 97:9 | 68:12 71:4 |
| 163:9 | 91:18 | **lend** 137:6 | 159:7,9,18 | **let's** 32:2 | 71:12,15 |
| 165:5 | 95:13 | **lender** 72:5 | 159:19,23 | 71:5 | 73:16 |
| **known** | 116:9 | **lenders** | 160:4,14 | 147:17 | 76:17 78:1 |
| 153:12,15 | 133:3 | 101:17 | 161:2,18 | **licensed** | 78:2,4 79:6 |
| 153:21,22 | **lawsuits** | **lending** 6:21 | 161:21 | 140:7 | 82:3 86:8 |
| 154:5,7 | 165:3 | 75:8 79:10 | 162:6,18 | **lien** 7:11 | 89:12 |
| 163:23 | **lawsuit's** | 79:19 81:8 | 162:20 | 58:23 | 94:14 |
| | 114:22 | 83:22 | 163:9,13 | 90:17 91:7 | 100:8 |
| _____ | **lawyer** | 148:10 | 163:22,23 | 91:19 | 111:13 |
| **L** | 46:21 47:5 | **lent** 137:11 | **Leonard's** | 106:13 | 128:13 |
| **L** 3:1 5:5 | 56:19 63:6 | **Leon** 9:6 | 110:10 | 110:11,14 | 130:1,22 |
| 8:10 | 63:18 | **Leonard** 9:3 | 115:22 | 132:3,6,8 | 130:23 |
| **labor** 135:3 | 89:20 | 51:16,18 | 120:19 | 132:12,15 | 150:15 |
| 135:21 | 101:5 | 53:14,18 | 133:19 | 132:17,22 | 164:6 |
| 138:7 | 104:3 | 53:23 | 149:20 | 133:7,10 | 167:6 |
| 145:17 | 149:21 | 58:22 | 151:2 | 133:13,17 | **limited** |
| 158:13,22 | **lawyers** 52:1 | 90:23 | **less** 30:13 | 135:11 | 24:13 |
| 160:6 | 53:17 | 106:14 | 107:1 | 144:21,23 | **line** 150:21 |
| **laid** 59:22 | 64:15,18 | 110:12,15 | 129:4 | 151:16 | **little** 21:17 |
| 128:12 | 93:19 | 110:20 | 131:22 | 163:16 | 21:20 |
| 143:7,18 | 94:18 | 114:11,12 | 143:12 | **liens** 51:16 | 26:22 |
| 143:19 | 100:1 | 116:9 | 152:5 | 53:11,12 | 64:15,17 |
| **Large** 3:9 | 111:15 | 121:17,23 | **let** 23:13 | 53:22 | 112:1,3 |
| 10:3 | 145:2 | 132:12 | 25:15 | 58:21 59:3 | 129:5 |
| **last** 60:18 | 146:21 | 133:13,17 | 26:21 32:7 | 106:23 | 133:12 |
| 130:2 | 165:5 | 134:6,21 | 55:19 | 107:10 | 138:16 |
| **late** 49:1 | **lawyer's** | 135:1 | 72:21 | 131:19 | **live** 14:5,6 |
| 110:19 | 115:22 | 136:14,17 | 73:12 77:1 | **like** 11:10 | 14:11 |
| 147:22 | **leading** 4:2 | 144:21 | 78:21 79:8 | 12:22 | 17:19 18:4 |
| 165:14 | **learn** 42:16 | 145:1,21 | 82:11 | 31:17 | 18:7,21 |
| **later** 24:10 | 46:10 | 146:2,7,23 | 92:14 | 33:13 | 69:15 |
| 29:3 38:2 | **leave** 105:12 | 148:13 | 103:7 | 36:10,19 | 108:6 |
| 51:6 53:3 | 124:23 | 149:6,13 | 104:11 | 38:21 39:3 | 167:1 |
| 118:18 | **ledges** | 150:1 | 115:21 | 39:3 48:15 | **lived** 14:8 |
| 150:10 | 143:18 | 151:6,11 | 124:7 | 50:18 | 18:2,8 |
| **latter** 63:10 | **Lee** 2:23 3:7 | 151:20 | 136:16 | 51:22 | 167:3 |
| 63:11 | 5:4 8:17 | 152:5 | 139:20 | 52:19 | **loan** 6:18 |
| 118:8 | 10:1 | 156:1,7,13 | 158:11 | 54:17 57:6 | 19:6,12 |
| **law** 3:9 8:19 | 169:21 | 156:16 | 161:5 | 58:13 | 29:1 30:12 |
| 10:8 11:21 | | | | | |

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 15

| | | **M** | 70:18 | 78:19 | maybe |
|---|---|---|---|---|---|
| 30:22 | 84:23 85:3 | machine | 76:17 | 79:15,17 | 108:11 |
| 36:16 | 89:23 92:7 | 65:4 | 92:15,17 | 81:17,20 | 113:6 |
| 38:11,14 | 93:18 | 111:19,20 | 110:15 | 82:9,12 | 116:1 |
| 39:18 43:9 | 107:7 | 164:16,16 | 124:14 | 83:2,4,13 | 128:11 |
| 43:22 44:1 | 119:13 | 164:19 | 125:15 | 84:2,19 | 158:19 |
| 44:3,23 | 136:7 | 165:13 | 130:11 | 86:1,11 | McDonald's |
| 45:13 | 140:1,4 | 166:16 | making 13:4 | 88:18 | 105:14 |
| 48:13 | 147:9 | made 3:23 | 57:15 58:6 | 89:15 | 125:4 |
| 49:18 50:7 | 167:21 | 43:7,11 | 59:7 89:17 | 90:21 91:5 | mean 19:19 |
| 50:9 52:9 | looked 25:12 | 50:22 | 155:21 | 92:4 93:23 | 48:9,11 |
| 53:6 58:7 | 25:20,23 | 62:19 66:6 | man 126:18 | 94:2 95:6,9 | 65:8 97:8 |
| 76:7 80:8 | 26:6 50:23 | 66:8 89:23 | managing | 97:14 98:5 | 102:23 |
| 80:20 81:3 | 55:22 | 90:2 93:4 | 96:18 | 98:8 99:9 | 109:12,15 |
| 85:12 86:5 | 100:8 | 104:19 | 99:18 | 134:13 | 109:15 |
| 88:3,5 | 107:4 | 118:2,6 | manifested | 136:6 | 114:22,23 |
| 124:6 | 148:13 | 119:6 | 61:20 | 157:15 | 128:23 |
| 127:15,18 | looking | 122:15 | manner | market | 143:22 |
| 127:20 | 20:20 | 123:10,14 | 155:17 | 131:16 | 150:12,17 |
| 129:17 | 23:23 74:4 | 123:18 | many 105:11 | master | 153:2 |
| 150:12 | 79:5 | 124:16 | 129:10 | 59:19 | 161:21 |
| 157:12,18 | 140:15 | 125:3 | 130:13 | 141:5 | meaning |
| loaning | looks 72:14 | 129:11 | 147:12 | materials | 65:12 |
| 157:7 | 78:2 79:6 | 155:17 | 150:19 | 6:14 132:5 | means 169:8 |
| 163:11 | lose 32:11 | 156:1 | 156:18 | 135:3,21 | meet 59:19 |
| loans 38:5 | lot 20:4,7 | 158:14 | March 25:19 | 137:20 | 125:3 |
| 49:5,9 | 21:18 | 159:1 | 45:11 49:4 | 138:6 | 139:15,16 |
| 84:12 | 107:16,17 | 166:15 | 86:23 | 145:17 | meeting 23:9 |
| long 14:8 | 107:18 | mail 36:2 | 100:11 | 158:12,22 | 24:1,6 |
| 24:5 43:13 | 116:11,12 | 72:23 | 121:7,8,11 | 160:6,15 | 28:11 |
| 47:11 | 120:3 | mailed 89:4 | 123:6,14 | matter 58:18 | 127:14 |
| 63:16 74:3 | 131:12,15 | 89:4 | Margaret | Maxwell | 128:18 |
| 118:16 | Louisville | Maintena... | 18:20 | 66:4 | 144:20 |
| 119:4,5 | 14:14 | 17:1 | mark 32:21 | 124:23 | 146:10 |
| longer 64:18 | 17:10 18:8 | majority | 97:5 | 125:5 | 151:10 |
| 112:1,3 | 19:1,8,10 | 59:18 | marked 33:1 | may 3:6 4:3 | 155:2,9,12 |
| look 50:20 | 22:4 26:1 | make 4:3 | 42:2 67:2 | 5:3 53:5 | 157:23 |
| 57:5 71:4,5 | 30:7 31:15 | 20:14 | 68:7 69:1,8 | 71:2 87:1 | meetings |
| 71:12,15 | 104:10 | 24:14 | 70:10,21 | 87:19 88:1 | 24:23 25:1 |
| 72:4,13 | love 23:8 | 43:16,18 | 72:8 73:13 | 92:15 | 25:3,6,7 |
| 73:16 74:8 | lunch | 57:14,15 | 75:2 76:3 | 135:15 | meets |
| 74:9 78:1,4 | 144:15 | 57:18,19 | 77:19,21 | 147:22 | 138:23 |
| 81:7,8 82:3 | | | | | |

**www.AmericanCourtReporting.com**
**October 26, 2005**

| | | | | | |
|---|---|---|---|---|---|
| **Melissa** 2:23 | 166:19 | 110:16,20 | 125:2 | **move** 14:15 | 122:4,11 |
| 3:7 5:4 | 167:10 | **money** 28:16 | **month** 14:18 | 17:16 | 140:5,13 |
| 10:1 | **middle** | 28:18,18 | 118:11 | **moved** 66:14 | **named** 40:16 |
| 169:21 | 63:10 | 54:21 55:2 | 119:8 | **moving** | 125:8 |
| **mental** | 64:11 | 56:6,13,16 | **months** | 131:10 | 166:19 |
| 108:12,15 | 142:7 | 56:22 | 15:18 51:5 | **much** 14:22 | **National** |
| 109:23 | **might** 22:6,7 | 57:11,15 | 52:23 53:3 | 29:9,11 | 15:23 16:9 |
| 110:5 | 45:22 | 57:19,23 | 114:20,21 | 59:3 76:8 | 17:23 |
| **mention** | 63:11 | 58:12,13 | 133:19 | 77:5 | **near** 34:1 |
| 28:4 94:7 | 102:17 | 65:18 | **more** 24:15 | 102:18 | 125:5 |
| 121:16,19 | 136:15 | 92:21,23 | 33:17 35:2 | 106:17,20 | **nearly** 45:3 |
| **mentioned** | **Mikie** 22:15 | 95:19 96:1 | 35:10 | 107:17 | 51:5,6 |
| 32:14 97:9 | **mind** 10:22 | 101:5 | 36:22,23 | 109:7 | 52:23 |
| 114:4 | 41:21,22 | 102:10 | 44:18 | 124:4,5 | 81:14 |
| 120:20 | 52:20 | 103:19 | 64:15 88:7 | 131:4 | **necessary** |
| 121:1 | 66:17 | 124:5,5 | 128:2 | 132:17 | 3:22 |
| 131:19 | 87:18 | 125:3,11 | 136:15 | **multiple** | **need** 24:1 |
| 132:1 | 147:23 | 136:18 | 165:21 | 11:4 | 104:13 |
| 134:19,21 | 166:10 | 137:1,6,11 | **morning** | **municipals** | 127:20 |
| 138:17 | **mine** 71:7 | 138:6 | 150:2 | 65:6,9 | 147:23 |
| 143:6 | 79:6 87:7 | 145:5,14 | **mortgage** | 111:23 | 148:2 |
| **mentioning** | 147:10 | 145:18 | 6:19 7:7 | **must** 145:15 | 152:14,18 |
| 95:12 | **minute** | 146:22 | 18:23 19:3 | **myself** | **needed** |
| 135:9 | 26:20 77:2 | 147:2 | 19:15,16 | 104:19 | 63:22 |
| **mentions** | **minutes** | 148:10 | 29:1 33:23 | 164:23 | 104:16 |
| 155:20 | 66:19 | 150:6,8,13 | 42:14,16 | | 123:23 |
| **men's** | 109:14 | 150:20 | 42:20 43:2 | **———— N ————** | 148:21 |
| 112:13,17 | **mistake** | 151:3,17 | 43:8,12 | **N** 3:1 6:1 7:1 | **negotiate** |
| **message** | 70:18 | 153:8 | 46:2 57:13 | 8:1 9:1 | 120:12 |
| 165:18 | **mistaken** | 156:2 | 57:14,19 | **name** 14:3 | **negotiated** |
| **messages** | 73:21 | 157:4,8 | 75:10 86:5 | 40:17,20 | 105:16 |
| 65:3 | 74:22 | 159:12,16 | 96:19 97:7 | 41:9 43:21 | 118:10 |
| **messes** 51:22 | **misunders...** | 159:20 | 99:17,19 | 72:17 | **negotiates** |
| 62:22 | 51:23 | 160:20 | 115:9 | 75:19,21 | 120:20 |
| 111:13 | **mobilized** | 162:7 | 155:18 | 75:23 | **negotiating** |
| **met** 23:9,17 | 17:22 | 163:11,13 | **MortgageIT** | 76:13,19 | 120:15 |
| 24:15 | **mold** 144:11 | 164:1 | 96:12 | 76:22 77:8 | **neighborh...** |
| 34:18 | **molding** | **moneys** 55:8 | **mortgages** | 112:5 | 117:9 |
| 105:14 | 131:2,3,5 | 148:3 | 57:15 | 114:4,5 | 131:9,11 |
| 116:5 | **moment** | **Montgome...** | **most** 86:21 | 116:4 | 131:16 |
| 118:20 | 164:14 | 18:3,16 | **motive** | 117:8,10 | 137:12 |
| 124:6 | **Monday** | 66:7,8 | 158:18 | 120:19 | **neither** |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

| | | | | | |
|---|---|---|---|---|---|
| 106:15,19 | 149:19 | **number** 2:5 | 12:10,17 | **offices** 3:9 | 84:15 85:3 |
| 169:14 | 163:7 | 2:12 20:6 | **occasionally** | 10:9 | 85:16,19 |
| **never** 19:16 | **None** 66:8 | 21:14 | 18:15 | **Off-the-re...** | 86:20 |
| 21:5 32:19 | 138:13 | 22:10,16 | **occupancy** | 144:18 | 87:15 |
| 35:22 | **non-conve...** | 23:14,15 | 61:23 62:3 | **oh** 27:12 | 88:20 |
| 36:21,22 | 75:9 | 81:19 82:4 | 84:11 | 32:8 100:5 | 89:10 92:6 |
| 36:23 | **non-party** | 96:21 | **October** | 103:14 | 92:19 96:2 |
| 50:16 | 12:16 | 117:17 | 2:21 3:11 | 114:16 | 100:5 |
| 70:13 | **north** 23:10 | 136:2 | 5:7 10:11 | **okay** 14:11 | 101:9 |
| 82:16 | 117:3,4 | 139:20 | 14:19,20 | 14:15 | 102:21 |
| **new** 6:12 | **notarized** | **numerous** | 17:17,20 | 15:14,17 | 103:7 |
| 30:5 61:11 | 92:11,12 | 59:23 | 49:1,12 | 15:22 17:2 | 104:9,17 |
| 61:12 | **Notary** 3:8 | | 51:4,5,13 | 17:5,16 | 104:20 |
| 62:16,19 | 10:2 | **O** | 60:22 | 18:4 21:2,8 | 105:13,17 |
| 66:12 | 169:22 | **O** 3:1 8:7 | 61:17 62:9 | 22:19,22 | 106:9 |
| 148:2 | **noted** 13:10 | **oath** 92:1 | **odd** 106:21 | 23:5,17 | 107:2 |
| **newspaper** | **nothing** 56:5 | 108:17 | **off** 38:13,16 | 24:3,9,20 | 109:21 |
| 21:18 | 90:10 | 162:4 | 100:1 | 25:9,16 | 110:22 |
| **next** 109:13 | 101:16 | **object** 12:7 | 111:18 | 26:5 27:4 | 111:4 |
| 109:16 | 120:9 | 41:3 47:3 | 124:22 | 27:13,21 | 112:11 |
| 130:11 | 122:6 | 49:20 | 141:11,23 | 28:12,23 | 114:21 |
| **Nickle** 21:15 | 126:17 | 74:21 | 145:1 | 29:7 30:21 | 115:21 |
| 21:16 22:1 | 143:1,17 | 75:15 77:9 | 146:21 | 31:2,5,21 | 116:14,21 |
| 22:10 | 155:20 | 78:9 134:7 | 156:2 | 32:8 34:14 | 117:1,8,13 |
| 117:18 | 164:3 | 151:7 | 164:10,13 | 35:5 36:18 | 117:20 |
| **nights** 18:17 | 167:7 | 160:22 | 164:15,18 | 37:6 38:8 | 118:2,12 |
| **nineteen** | **notice** 46:21 | **objected** | 166:15 | 38:15,20 | 118:16 |
| 128:2,3 | 81:23 | 13:1 | **offer** 32:15 | 39:1 43:7 | 119:3,9,19 |
| 133:14,15 | 83:23 | **objection** | 68:2,21 | 47:23 | 120:6,15 |
| 135:16 | **noticed** | 13:6,7 | 72:2 86:8 | 50:20 | 121:6,16 |
| **Nobody** 26:5 | 86:21 | 137:13,22 | 86:20 | 55:12 | 121:19 |
| 29:14 | 166:18 | 138:8 | 89:12 | 56:19 58:6 | 122:2,7 |
| 55:14 | **notices** 7:5 | 152:23 | 90:14 | 59:3 60:3 | 124:21,23 |
| 56:12 | 84:10 | 153:16 | 93:17 | 60:16,23 | 127:13 |
| **nodding** | **November** | 157:13 | 120:16 | 62:5 63:14 | 128:8,15 |
| 18:18 39:1 | 49:2 51:19 | 159:2 | **offered** 4:6 | 64:3,17 | 131:4,7,19 |
| 41:23 | 62:10 | **objections** | 151:2 | 69:19 73:6 | 132:8,11 |
| 48:14 | 63:12 64:2 | 3:23 4:4 | **office** 9:8 | 73:9,12 | 132:14 |
| 51:17 | 64:11 | **obvious** | 27:4 96:17 | 77:6 78:15 | 133:6,9 |
| 67:20 | 118:1 | 143:14 | 98:11 | 79:3,9,22 | 134:18,21 |
| 95:14 | 158:1,3 | **obviously** | 100:4 | 82:17 | 135:1,8,11 |
| 100:12 | 165:14 | 10:19 11:6 | **officer** 60:4 | 83:15 84:4 | 135:14,19 |

American Court Reporting
toll-free (877) 320-1050

Page 18

| | | | | | |
|---|---|---|---|---|---|
| 136:2,10 | 22:17 32:5 | 17:3 | 147:10 | 111:11,14 | **owner** 46:16 |
| 136:23 | 32:9,15 | **opportunity** | 149:7 | 112:4 | **Ozark** 34:19 |
| 138:5,10 | 35:9 43:2 | 83:10 | 151:12 | 127:18,20 | 105:14 |
| 138:14 | 74:8 75:10 | 115:23 | 152:1 | 136:16 | |
| 139:10,17 | 77:16 79:4 | 167:17 | 159:10 | 139:15,18 | **P** |
| 140:1,4,14 | 85:3 88:7 | **oral** 5:6 | 162:21 | 139:21,21 | **P** 3:1 8:1,1,7 |
| 140:18,21 | 90:15,15 | 10:12 | 163:20,21 | 140:8,15 | 9:1,1 |
| 141:4,9,13 | 91:17 93:1 | **order** 26:21 | 165:2 | 141:21 | **package** |
| 141:15 | 93:5 | 67:8 84:13 | 166:18 | **outer** 144:3 | 78:12 |
| 142:2,10 | 100:10 | 84:16 | **others** 87:12 | **outright** | 79:11 80:3 |
| 142:16,20 | 101:19 | **original** 5:5 | **out** 11:2,19 | 102:2 | 88:13 |
| 142:23 | 103:10,12 | 94:4 100:3 | 12:15 | **outstanding** | **page** 6:4 |
| 143:6,15 | 105:15 | 164:14 | 15:15 | 43:22 | 7:17 22:14 |
| 144:4 | 106:4 | 165:9,20 | 16:21 17:3 | **over** 13:1 | 46:14,23 |
| 146:12,18 | 123:4 | 166:12,17 | 20:6 29:18 | 42:9 53:14 | 47:7,10 |
| 147:6,20 | 131:7,12 | **origination** | 31:8,22 | 62:6 63:21 | 51:1 73:14 |
| 148:4,9,12 | 131:17 | 6:19 7:7 | 32:1 33:4,7 | 73:14 76:5 | 75:10 |
| 149:7,16 | 133:16 | 86:5 | 33:18 36:9 | 76:10 | 76:12 |
| 149:20 | 135:13 | **originator** | 38:2 45:21 | 84:22,23 | 84:22,23 |
| 151:9,18 | 139:8 | 38:8 40:6 | 46:23 | 103:5 | 100:8,9 |
| 152:4,8,21 | 142:18 | **other** 11:9 | 48:12 | 106:7 | **pages** 85:3 |
| 153:13,19 | 143:3,3,3,4 | 17:5 24:23 | 50:21 | 112:14,15 | **paid** 52:18 |
| 154:12,15 | 143:11 | 25:6 34:13 | 51:22 52:3 | 128:21 | 54:2,5,9 |
| 154:23 | 154:3 | 35:11,13 | 52:5,7,14 | 129:3,5 | 55:2 56:22 |
| 155:8 | 166:18 | 48:6,9 | 52:17 | 130:5 | 85:11,20 |
| 156:5,11 | 167:16 | 57:10 70:1 | 53:20 | 132:4 | 111:13 |
| 156:14,23 | **ones** 86:23 | 70:2 93:5 | 54:11 55:1 | 142:18 | 116:14 |
| 157:7 | **one-inch** | 93:10 | 56:6,13 | 143:10 | 123:1 |
| 158:8 | 22:13 | 95:19 97:1 | 57:22 | 159:17 | 129:14 |
| 159:14 | **only** 10:23 | 101:17 | 59:11 | 166:8 | 135:21 |
| 160:4,14 | 11:14,14 | 102:10 | 60:17 | **overnight** | 137:19 |
| 162:9,23 | 11:17 48:1 | 105:10 | 63:21 64:7 | 18:16 | 138:6 |
| 166:6,11 | 71:8 84:12 | 108:22 | 80:4 84:13 | 105:5 | 145:13,16 |
| 167:13,13 | 102:23 | 109:21,22 | 87:21 | **owed** 30:15 | 145:22 |
| 167:20 | 105:10 | 113:20 | 96:17 | 30:17,20 | 146:9 |
| 168:1 | 131:17 | 120:9 | 98:10,21 | **own** 28:16 | 147:1 |
| **once** 93:11 | 141:1 | 126:17 | 99:7 100:2 | 28:18 | 156:7 |
| 93:11 | 149:16 | 131:12 | 100:3 | 58:18 | 160:4,15 |
| **one** 10:23 | 165:3 | 141:7 | 102:5 | 65:17 | 160:16 |
| 11:8,17 | **Op** 7:3 | 142:23 | 106:10 | 97:22 | 163:14 |
| 14:10,17 | **open** 139:1 | 143:1,4,12 | 109:23 | **owned** 17:7 | **Palmer** |
| 19:4 22:5 | **operating** | 143:15,17 | 110:10 | 140:12 | 21:11 23:1 |

**www.AmericanCourtReporting.com**
**October 26, 2005**

| | | | | | |
|---|---|---|---|---|---|
| 23:6 24:19 | 151:5 | 39:2,9,16 | 156:12 | 49:19 50:7 | 35:23 42:9 |
| 24:20 | 154:17,20 | 40:6 44:18 | **partnership** | 52:21 | 111:2 |
| 25:22 | 156:6,6 | 44:20 50:8 | 97:7 | **PENN** 3:9 | 125:13 |
| 26:10 27:7 | 157:4,21 | 127:16,17 | **pass** 164:5 | 8:11 10:9 | 166:9 |
| 27:8,9 34:6 | 159:16 | 127:18,20 | **pastor** | **penny** 55:1 | **phonecall** |
| 34:7,7,21 | 163:12 | 128:1 | 112:14 | **people** 21:19 | 118:3,6 |
| 37:9 39:10 | **Palmers** | 149:1 | **pay** 16:19 | 48:7,9 | **PHYLLIS** |
| 44:2 47:20 | 26:2 27:23 | 160:8 | 30:18,21 | 162:21 | 2:13 |
| 50:11 54:8 | 28:21,22 | **paragraph** | 34:13 54:4 | 165:4 | **pick** 20:2 |
| 54:10,14 | 29:8,14,22 | 74:4 | 54:20 | **per** 10:23,23 | 125:15 |
| 55:2 56:4 | 30:3 31:4,9 | **Pardon** | 80:16 81:1 | 11:17 | **picked** 25:11 |
| 56:10,16 | 33:5,9 | 154:18 | 81:4 85:16 | 155:18 | 98:13 |
| 60:19 | 39:17,23 | **parole** 116:7 | 85:17,18 | **percent** | 110:13 |
| 61:23 | 40:3 41:17 | **part** 23:10 | 101:13,23 | 28:19 35:6 | **piece** 99:13 |
| 63:20 | 48:9 55:13 | 63:10,10 | 102:2,19 | 38:23 | **pieces** 142:3 |
| 68:10 | 55:20 60:9 | 63:10,11 | 107:17 | 39:23 45:3 | **Pike** 15:5 |
| 72:23 73:5 | 60:16 | 63:12 | 136:18 | 81:14 93:6 | **place** 22:2 |
| 76:22,23 | 94:21 | 91:20 | 150:15,17 | 138:23 | 24:16 25:1 |
| 77:1 88:16 | 100:14 | 116:23 | 150:19 | 148:1 | 50:9 64:23 |
| 90:6 | 102:19 | 118:8 | 157:17 | **period** 51:7 | 65:1 109:2 |
| 104:10 | 104:23 | 120:7 | 158:12,22 | 119:9 | 152:12 |
| 111:1,1 | 108:11 | 140:16 | **payable** | **permanent** | 162:11 |
| 113:9,11 | 112:19,23 | 154:1 | 124:16 | 76:7 | **plaintiff** 2:7 |
| 113:18 | **Palmer's** | 159:22 | **payment** | **person** | 2:14 8:3 |
| 117:16,16 | 119:21 | 163:3 | 30:14,19 | 42:10 48:1 | 11:9 12:7,8 |
| 117:21,23 | 140:17 | **partially** | 90:2,4 | 77:7 | **plaintiffs** |
| 118:15,17 | **Panama** | 33:8 | 123:9,13 | 118:12,19 | 13:1 |
| 118:22 | 113:22 | **participate** | 123:16,19 | 165:17 | **Plaintiff's** |
| 119:23 | **panel** 141:11 | 80:7 | 123:21 | **personal** | 68:17,22 |
| 123:11,11 | 141:13,16 | **particular** | 124:9,21 | 19:6,12 | 69:8 76:3 |
| 124:11 | 141:21 | 11:20 22:5 | 129:3 | 103:22,23 | 81:20 |
| 125:12 | **paper** 16:7,8 | 134:4 | 130:2,3,11 | 104:7 | 136:6 |
| 126:19 | 21:20 27:2 | **parties** 3:4 | **payments** | 105:11,15 | 157:15 |
| 127:8,10 | 99:13 | 4:3 157:20 | 30:13 54:3 | 106:6 | **plan** 24:16 |
| 128:19 | **papers** | 165:2 | 59:7 74:11 | 123:4 | 24:17,21 |
| 134:14 | 36:22,23 | 169:15 | 89:18,22 | 161:3,4,11 | 25:10 |
| 139:8 | 50:1 76:21 | **partner** | 129:12 | 162:2 | **planned** |
| 142:14 | 78:12 | 96:10 | 155:16,16 | **perspective** | 28:16 |
| 145:10 | 79:11 80:4 | 156:16 | 155:21 | 32:18 | **plans** 25:21 |
| 147:15 | **paperwork** | 159:18 | 158:15,15 | **Pertaining** | 26:7,14 |
| 148:20 | 36:19 37:1 | **partners** | 159:1 | 88:3 | 96:19 |
| 149:10 | 38:18,21 | 96:4 156:9 | **pending** | **phone** 20:6 | 99:19 |

**American Court Reporting**
**toll-free (877) 320-1050**

play 120:7
played
  164:10
please 5:9
  14:3
  162:16
plumber
  140:6,7,18
plumbing
  59:18
  139:14
  141:1
  142:23
plus 35:11
  55:8
  107:16,17
  107:20
  160:5
point 28:3
  29:15
  35:17 36:6
  39:12
  41:13 42:8
  77:6 101:1
  129:19
  130:6
  161:7
  167:2
pointing
  70:3
poor 59:17
poorly 59:22
portrayal
  119:21
possession
  96:5 155:2
  155:4
possibility
  129:21
Post 9:8
potential
  144:7

potentially
  11:3
prejudice
  11:3
premier
  96:14
prepared
  40:9
present 9:11
  48:7
  112:17
  138:15
presented
  27:1,2
  28:12,17
  29:14
  43:13 45:1
  50:2 68:10
presently
  69:14
pretty 11:13
  77:5 100:8
  131:10
previous
  78:3
previously
  91:22
  119:14
Pre-Ap 7:6
Pre-applic...
  85:8
price 16:6
  116:16
  120:11,12
  120:13
  122:18,19
  123:2
  155:17
principal
  23:3
principals
  115:11

printed
  98:17,18
  136:16
prior 4:7
  17:16
  25:18
  121:22
  142:17
  157:23
privy 110:22
probably
  19:19
  24:10,23
  28:10
  64:10 97:2
  114:19
  118:18
  122:4
  126:4
probation
  116:7
problem
  39:20,21
  41:16 54:1
  140:2,15
  140:22
  141:1,15
  142:4
  143:8,15
  144:4
problems
  60:5 61:20
  90:16
  142:23
Procedure
  5:2 10:6
proceedings
  10:13
process
  45:10
  150:11,12
processing

85:11
produce
  166:11
produced
  145:21
profit 157:6
  157:19
  158:19
profits
  157:11
program
  6:18 76:8
  99:17
progress
  155:16
prohibit
  12:2,2
  87:20
promise
  60:16
promised
  58:3
Propane
  16:4
properly
  143:19
Properties
  120:23
  121:20
  122:3,5,8
  134:18
  156:1
  158:9
  159:10
property
  69:4,13
  85:14
  90:18
  107:2
  159:11
  162:7
proposal

68:9
  134:12,15
  134:19,22
propped
  59:20
prove 96:23
proves 97:2
provided
  10:5 135:2
  135:19
provides
  11:22
provisions
  30:10
  45:19
psychiatrist
  110:4
Public 3:8
  10:2
  169:22
pulled 12:18
purchase
  6:12 97:12
  116:16
  122:18
  158:15
purchased
  20:7
  116:11
purely 51:23
  152:10
purports
  78:22 94:3
purpose
  51:11
purposes
  11:15
pursue 44:3
  44:12
pursuing
  44:7,11
  50:12

push 38:13
pushed
  38:16
  128:10
put 12:22
  19:11
  26:14
  94:19
  144:2
  146:3,9,20
  150:9
  153:8
  164:1

———————
**Q**
question
  12:12
  43:20
  71:14
  106:13
  149:21
  152:16
  153:14
  158:21
  161:9
  162:23
  166:18
  167:17
questioned
  127:17
questions
  4:1,2 91:23
  115:22
  116:10
  147:14
  154:4
  161:22
  169:7
quick 67:10
quickly
  131:11
quite 37:13

American Court Reporting
toll-free (877) 320-1050

| | | | | | |
|---|---|---|---|---|---|
| **quoted** | 161:6 | **recorded** | 122:14,15 | 40:3 41:18 | **revocation** |
| 36:17 37:8 | **reason** 35:14 | 91:14 | 128:10,14 | **represented** | 116:7,8 |
| 50:5 58:3 | 80:20 | 164:9 | 132:10,13 | 55:4,12,15 | **RE-EXA...** |
| 93:7 | 104:1,8 | **recording** | 134:15 | 119:23 | 164:12 |
| | 137:16 | 111:16,16 | 135:4,7,9 | 167:8 | 167:15 |
| **R** | 138:2 | **records** | 136:4,20 | **represents** | **ridiculous** |
| **R** 8:1 9:1 | 146:1,5,17 | 56:20,21 | 137:3 | 169:10 | 161:7 |
| 169:1 | 151:4 | **red** 147:13 | 140:5,13 | **reputation** | **right** 6:22 |
| **rain** 139:1 | 152:17 | 147:18 | **remembra...** | 119:11 | 12:11 14:8 |
| **raised** | 153:14 | 148:16 | 66:3 69:23 | **request** 13:1 | 14:22 15:7 |
| 148:15 | 160:9 | 149:12 | 128:1 | 124:14 | 15:21 16:1 |
| **range** | 163:21 | 154:8,9 | 133:1 | **required** | 16:15 |
| 120:11 | **reasonable** | **redone** | **remove** | 31:15 | 17:19 |
| 146:16 | 53:21 | 108:2 | 141:16,17 | 33:14 | 18:23 |
| **rank** 16:18 | **reasons** 35:9 | **refer** 97:5 | **removed** | **resolution** | 19:14,17 |
| **rate** 29:1 | 162:10 | **referred** | 91:19 | 110:21 | 19:21 |
| 34:10 35:6 | **recall** 14:18 | 40:12 | 141:13,21 | **resolved** | 20:14,16 |
| 37:7,18 | 73:18,22 | **refused** 34:2 | **repayment** | 52:10 | 20:17,18 |
| .38:21 | 115:6 | 35:18 39:6 | 157:12 | 106:14 | 21:12 22:9 |
| 45:18 | 134:4,8,11 | 39:7 43:20 | **replace** | **RESPA** 6:16 | 23:2,19,20 |
| 74:11,15 | **receipts** | 50:1 | 142:12 | 70:23 | 24:5 26:9 |
| 75:9,11 | 109:4,5,18 | 104:21 | **replaced** | **respective** | 26:19 |
| 81:4,9 93:7 | 145:20 | **related** 60:5 | 142:10 | 3:5 | 27:10,16 |
| 93:14 | **receive** 82:1 | **relating** 3:19 | **report** 82:1 | **response** | 28:3 29:3 |
| **rather** 22:17 | 82:5 88:6,9 | **relationship** | 85:15 | 64:13 | 29:13,18 |
| 114:18 | **received** | 112:19 | **REPORT...** | 154:6 | 30:2,23 |
| **read** 34:18 | 51:16 61:5 | **remember** | 2:23 | **responsible** | 31:1,8,11 |
| 36:11 | 134:14 | 24:11 | **reporter** | 157:21 | 31:12,13 |
| 67:18 74:4 | **receiving** | 38:22 43:1 | 5:11 10:2 | **rest** 30:15,17 | 31:18,20 |
| 74:19,23 | 134:15 | 47:15 | 13:13,19 | 30:19 | 32:1,6,15 |
| 77:3 78:7 | **reckon** | 49:16 55:6 | 82:23 98:3 | 159:21 | 32:20 33:7 |
| 133:22 | 25:17 | 63:9 70:15 | 99:6 | **result** 11:2 | 33:10,16 |
| 146:16 | **recollect** | 72:12 | **Reporting** | 133:7,10 | 33:20 |
| **reading** 3:15 | 78:6 | 73:11 77:3 | 84:12 | 169:16 | 34:22 35:7 |
| 34:17 | **recollection** | 78:15 79:9 | **represent** | **retained** | 35:8,13 |
| 135:5 | 70:7 | 79:12 80:2 | 48:7 116:8 | 5:10 | 36:10 37:3 |
| 136:20 | 134:20,23 | 82:7 87:23 | 166:22 | **retire** 21:1 | 37:5,14,16 |
| 137:3 | **recommen...** | 88:2,8,12 | **representa...** | **retiring** | 38:1,9,12 |
| **real** 63:15 | 13:4 | 88:20 89:8 | 29:4 39:22 | 20:20 | 39:8,11 |
| **realize** 10:17 | **record** 12:22 | 89:10 | 42:11 45:8 | **reveal** 56:21 | 40:2,6,11 |
| **really** 88:12 | 13:4 67:5 | 91:21 | 50:11 58:4 | 150:3 | 40:15,17 |
| 122:14 | 164:10,13 | 117:11 | **representa...** | **revise** 36:18 | 40:19,23 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 41:8,11,15 | 74:3,4,16 | 120:17 | **row** 22:13 | 44:17 | **seal** 139:22 |
| 42:1,7,13 | 74:18 75:4 | 123:15,17 | **rule** 5:1 10:5 | 47:16 | **sealed** 59:22 |
| 42:19,23 | 75:12,13 | 123:20 | 10:17,22 | 60:18 | 138:18 |
| 43:19 | 76:2 77:14 | 124:18,20 | 11:10,12 | 113:17 | **second** |
| 44:22 45:6 | 78:5,11,21 | 125:5 | 11:13,16 | 114:10,17 | 28:10 |
| 46:3,16,20 | 79:8 80:14 | 126:10,11 | 11:22 | 141:22 | 73:14 90:4 |
| 46:21 47:9 | 81:12,15 | 131:20 | 12:13,19 | 151:13 | 123:13 |
| 47:12,15 | 81:19,23 | 132:16 | 12:23 | **saying** 36:15 | 130:2 |
| 47:19 48:6 | 82:4,11 | 134:16 | **rules** 3:19 | 76:21 | **see** 40:16 |
| 48:21 49:3 | 83:8,19 | 137:7,8,16 | 5:2 10:6 | 103:1 | 47:12,19 |
| 49:7,8,15 | 84:8 85:10 | 138:12,18 | **running** | **says** 11:17 | 55:23 68:5 |
| 49:17 50:3 | 85:22 86:7 | 138:19 | 109:1 | 40:19,20 | 72:5 74:6 |
| 50:4,14,15 | 87:4,11,17 | 147:5 | **Russell** 5:5 | 41:4 46:18 | 74:12,14 |
| 51:3 52:15 | 88:6,9 89:6 | 149:14 | 8:17 11:11 | 46:18 62:7 | 74:16 |
| 52:20 | 89:11 | 152:2 | 32:7 | 72:5 74:10 | 76:11 77:2 |
| 53:19 | 90:10,13 | 154:10,14 | | 74:14 | 79:8 84:23 |
| 54:11,20 | 90:15,19 | 158:2 | ——— | 75:11 76:7 | 92:7,8,14 |
| 55:11,14 | 91:11,21 | 162:12,13 | **S** | 89:4 91:11 | 94:6 105:5 |
| 55:18 | 92:14,22 | 164:17,21 | **s** 2:7,10,14 | 96:11,17 | 110:12,16 |
| 56:11,15 | 93:1,3,9,16 | 165:15,20 | 2:17,23 3:1 | 150:14 | 110:19 |
| 57:18,20 | 94:10,12 | 165:23 | 3:1,7 5:4 | 155:16 | 114:5,9,23 |
| 57:21 58:8 | 94:17 95:3 | 166:21 | 8:1,3,15 | 157:9,17 | 137:9 |
| 58:10 59:5 | 95:8,16,20 | 167:4,12 | 9:1,3 10:1 | 160:8 | 141:12 |
| 59:8 60:7 | 96:15,22 | 169:21 | 169:21 | **scheduled** | 150:5 |
| 60:12 61:8 | 97:4 98:7 | **Road** 14:6 | **SAITH** | 129:12 | 167:18 |
| 61:14,15 | 98:15,16 | 19:23 61:6 | 168:2 | **school** 15:1 | **seek** 80:21 |
| 62:17,20 | 99:11,23 | **Robert** | **sale** 20:4 | 15:4,5,12 | 93:10 |
| 63:1,4 64:1 | 100:5,6,23 | 46:19 | 21:17,19 | 15:15 | **seemed** |
| 64:12,20 | 101:2,11 | 47:13 52:8 | 107:12 | 45:21,23 | 112:1 |
| 65:19 66:5 | 101:23 | 52:11 | 160:21 | 46:2 | **seen** 27:10 |
| 66:11 67:4 | 102:3,8,13 | 113:7 | **salesman** | 125:14 | 47:2,7,9 |
| 67:18 68:2 | 106:9 | 115:14 | 113:6 | **scratched** | 82:13,16 |
| 68:14,16 | 107:21 | 124:2,8 | **same** 3:17 | 138:22,22 | 82:18,20 |
| 68:21 69:3 | 108:9,13 | 125:7,12 | 5:10 11:2,4 | **Seaborn** | 102:23 |
| 69:7,13,21 | 108:22 | 125:17 | 12:8 13:4,7 | 3:10 8:10 | 110:15 |
| 70:1,2,4,8 | 109:7,8 | 127:22 | 39:5 108:4 | 8:11 10:9 | 113:4 |
| 70:13,17 | 110:3,11 | **rode** 20:3 | 111:8 | 12:14 57:3 | 134:1 |
| 71:6,10,15 | 111:12 | **rooms** 131:6 | 147:11 | 57:5 68:18 | 135:22 |
| 71:20 72:1 | 113:1,9 | 131:6 | **Saturday** | 103:5 | 144:8,11 |
| 72:10,16 | 114:13 | **roughly** | 105:7 | 104:5 | 145:20 |
| 72:21 73:3 | 115:3 | 107:20 | **saw** 20:3 | 144:14 | 147:18 |
| 73:18 74:1 | 117:18 | **round** | 36:21,22 | 151:7 | 154:16,19 |
| | | 114:14 | 36:23 | | |

**www.AmericanCourtReporting.com**
**October 26, 2005**

| | | | | | |
|---|---|---|---|---|---|
| 156:21 | 139:23 | 126:5,9 | 75:14,17 | **sir** 14:22 | 84:7,14 |
| **sell** 107:8,9 | 143:1 | 146:15 | 76:11,14 | 19:10 21:7 | 85:7 87:8 |
| **semi-adju...** | **shaking** | **showing** | 76:16 | 24:12 25:5 | 87:10,23 |
| 75:9 | 73:10 | 145:21 | 77:23 78:2 | 28:6 29:17 | 88:12 89:1 |
| **send** 149:1 | **Shane** 8:10 | **shows** 91:14 | 78:4 79:5 | 35:15 | 90:12,19 |
| **sergeant** | **shared** | **Shrine** | 79:21 82:3 | 37:19 | 91:10,20 |
| 16:19 | 101:4 | 151:13 | 83:6,17,18 | 38:19 39:5 | 92:2,13 |
| **series** 65:22 | **SHEALY** | **Shriner** | 84:6 85:1 | 41:14,19 | 93:4,8,15 |
| **services** 54:6 | 9:7 | 151:14,18 | 86:6,18 | 41:21 42:6 | 94:9,12 |
| 54:7,18 | **sheet** 135:20 | 151:20 | 87:5 | 42:12,17 | 95:15 96:5 |
| 89:18 90:3 | 135:23 | **Shriners** | **signatures** | 43:6,10 | 97:18,21 |
| 90:6 | 136:5,16 | 86:22 | 86:22 | 44:21 45:5 | 98:19 |
| 104:19 | **sheetrock** | 151:23 | **signed** 27:21 | 46:5,8 | 100:2,17 |
| 124:17 | 143:23 | **sic** 68:22 | 34:20 50:8 | 47:22 48:5 | 100:19 |
| 126:14,16 | **She'll** 84:15 | 81:21 | 67:23 | 48:11,20 | 101:15 |
| 145:15 | 84:17 | 163:8 | 69:20 | 49:10,16 | 102:7,12 |
| 149:22 | **shotty** 60:6 | **sick** 125:14 | 71:16 | 51:10 56:2 | 103:3 |
| 150:4 | 61:17 | **side** 22:13 | 72:11,17 | 56:8 57:12 | 104:8 |
| 166:23 | 94:21 | 70:19 | 74:18 | 58:14,20 | 106:12 |
| 167:9 | 107:23 | 141:12 | 75:19 | 59:9,13 | 108:19 |
| **servicing** | **show** 68:4 | 142:9 | 76:19 | 60:8 61:19 | 109:6,17 |
| 6:16 70:23 | 69:7 70:10 | 143:11,12 | 77:13 78:6 | 62:15,16 | 109:20 |
| **set** 23:9 24:1 | 72:10,21 | **sign** 19:14 | 78:8,8 79:4 | 63:2 66:2 | 110:8 |
| 45:19 | 73:12 76:2 | 20:4 27:16 | 87:12,13 | 66:10,13 | 111:2 |
| 57:22 | 77:21 | 34:2 35:2 | 87:19 92:8 | 67:16 | 112:7,10 |
| 150:6 | 78:21 | 35:10,14 | 92:9 | 68:12,20 | 113:14,17 |
| **settled** 24:21 | 79:17 | 35:18 | 110:14 | 69:12,16 | 113:20 |
| **seven** 77:17 | 81:20 | 37:10 39:6 | 121:6 | 69:18,22 | 114:17,19 |
| 96:20 | 82:11 83:4 | 39:7 43:20 | 129:6 | 70:6,9 | 115:2 |
| 143:11 | 83:15 84:4 | 50:1 71:17 | **signing** | 71:19,23 | 116:20 |
| **seventy-ei...** | 84:21 86:3 | 74:20 77:2 | 73:19,21 | 72:18,20 | 117:4,5 |
| 136:13 | 91:5 92:6 | 77:13 78:5 | 87:20 88:1 | 73:16 | 119:12,15 |
| **seventy-five** | 94:2 95:8 | 78:23 | **similar** | 74:16,23 | 119:18 |
| 122:21 | 98:7 99:11 | 79:20,23 | 68:13 | 76:1,20 | 120:5,18 |
| **several** 65:2 | 125:8 | 82:2 | **since** 16:11 | 77:5 78:1 | 120:22 |
| 66:18 | 128:18 | 104:15 | 16:13 | 78:14,17 | 121:2,8 |
| 111:9 | 146:12 | 127:23 | 32:14 | 79:2,12 | 122:14,17 |
| 112:12 | 155:8,11 | **signature** | 102:17 | 80:10,13 | 123:3,8,12 |
| **severed** | **showed** | 3:14 67:17 | 136:16 | 80:18,23 | 123:17,20 |
| 10:20 11:7 | 46:22 78:3 | 71:1,2,4,9 | 142:15 | 81:2 82:7 | 124:20 |
| 12:10 | 96:3 107:5 | 71:12,16 | **siphons** | 82:15,19 | 125:19,23 |
| **sewer** 59:18 | 125:10 | 71:21,22 | 139:21 | 82:20 83:7 | 126:20,23 |
| | | 73:15,17 | | | |

American Court Reporting
toll-free (877) 320-1050

Page 24

| | | | | | |
|---|---|---|---|---|---|
| 127:5 | **site** 112:22 | 62:12 | 52:10 65:5 | 150:9 | 25:11 |
| 128:7,14 | 112:23 | 80:21 | 65:7,9 67:7 | 154:10 | 68:15 |
| 128:17,22 | 113:2,7,13 | 88:10 | 67:8,9 | 164:18 | **speculate** |
| 129:9 | 113:16 | 90:11 94:8 | 72:14 87:4 | **sometime** | 152:15,20 |
| 130:5,12 | **sites** 18:1 | 94:11 | 87:5,7,12 | 20:16 63:8 | 154:2 |
| 130:20 | **sitting** 11:8 | 95:12,18 | 88:9,10 | 121:7 | **speculating** |
| 131:1 | 12:3 13:8 | 95:21,23 | 89:17 | 147:22 | 152:10 |
| 132:2,7,13 | 150:2 | 96:9,12 | 104:1 | 158:1 | **speculation** |
| 132:21 | 162:3 | 97:11,20 | 106:21 | **sometimes** | 77:10 |
| 133:5 | **situated** | 98:18 | 107:19 | 18:15 | 137:14,23 |
| 134:2,17 | 62:17 | 102:5 | 108:15 | **somewhere** | 153:23 |
| 135:13,18 | **six** 15:18 | 115:4,18 | 111:16 | 10:21 | 159:3,21 |
| 136:1,9 | 51:5 52:23 | 155:18 | 112:16 | 19:20 81:4 | **speculative** |
| 139:6 | 53:3 | **Skyscrapers** | 114:3,10 | 103:6 | 154:5 |
| 140:23 | 106:21 | 31:6 | 115:23 | 109:22 | **split** 157:5 |
| 141:3,14 | **sixtieth** | **Skyscrape...** | 116:10 | 112:14,15 | **spoke** |
| 142:11,22 | 30:14,18 | 47:10 | 127:16 | 125:21 | 118:13,17 |
| 144:1,10 | 30:19 | **slab** 128:12 | 128:10,11 | 137:11 | 119:5 |
| 145:19,23 | **six-month** | **Slightly** | 128:15 | 149:4 | **spot** 20:2 |
| 146:5 | 51:7 | 107:1 | 129:21 | **somewheres** | **spots** 144:8 |
| 147:7 | **skin** 144:3 | 130:5 | 131:3,19 | 38:23 | **Springs** 8:8 |
| 148:18 | **Skyscraper** | 131:22 | 135:19 | 60:21 | 16:2,5 |
| 151:8 | 8:15 26:5 | **smallest** | 136:15 | **son-in-law** | **square** 3:10 |
| 152:20 | 28:5,13 | 45:14 | 145:8 | 147:12 | 8:12 10:9 |
| 153:5,6 | 29:2,4,15 | **Smithart** | 151:22 | 164:23 | 130:14,15 |
| 155:7,10 | 35:20 | 11:19 | 160:20 | **sorry** 68:19 | **stack** 103:6 |
| 155:13 | 36:13,14 | **sold** 17:13 | **somebody** | 127:11 | 106:8 |
| 156:4,9 | 39:14,18 | 18:9 | 89:20 | **sort** 53:2 | **stacked** |
| 157:10,17 | 40:9 41:2 | **soldier** | 141:20 | 67:8 | 22:16 |
| 158:7 | 41:16,18 | 143:10 | 166:19 | **source** 40:7 | 141:6 |
| 159:8,13 | 42:11,15 | **solution** | **someone** | 40:20 41:7 | **stages** 129:8 |
| 160:3,11 | 45:2,9 46:4 | 105:10 | 137:6 | **speak** 96:5 | **stands** 21:20 |
| 162:15 | 47:1,21 | **some** 10:22 | **something** | **speaking** | **start** 62:7 |
| 163:4 | 48:10,13 | 12:14 19:9 | 22:11 64:5 | 119:3 | **started** |
| 164:3,20 | 49:13,19 | 21:18 22:2 | 68:12 | **speaks** | 10:16 |
| 165:23 | 50:17 51:1 | 27:13 | 74:10 75:6 | 157:14 | 128:6 |
| 166:3,13 | 51:8 52:9 | 31:15 | 87:17 | **specific** | 129:1 |
| 166:15 | 54:21 55:1 | 33:12,13 | 114:6,8 | 163:9 | **state** 3:8 |
| 167:19 | 55:15 56:6 | 33:13 36:6 | 132:4 | **specifically** | 10:3 14:3 |
| **sister** 18:14 | 56:12,22 | 37:1 40:13 | 135:9 | 22:3 79:13 | 18:2 81:22 |
| 18:19 | 57:22 58:1 | 45:20 | 143:6 | 80:3 | 125:21 |
| **sit** 12:4,15 | 60:12 | 46:22 | 148:23 | **specificati...** | 169:2 |

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| statement | 51:22 52:5 | supported | 143:4 | 102:5 | 163:8 |
| 7:9 42:5 | 52:7,13,17 | 141:6 | ───── | talks 85:13 | ten 63:22 |
| 79:10,19 | 64:6 | supposed | T | tally 135:20 | 64:2 |
| 81:8 84:11 | 111:13 | 19:5 68:16 | T 3:1,1 | 135:23 | 109:14 |
| 87:1 88:21 | straightened | 129:12 | 169:1,1 | 136:5 | tendered |
| 93:4 | 52:3 53:20 | 130:11 | take 36:16 | tangible | 127:7 |
| statements | 60:17 | supposedly | 38:14 | 153:6 | term 10:23 |
| 100:13 | 63:21 | 54:6 | 45:17,17 | tape 111:15 | 11:5 |
| states 155:15 | 111:11 | 126:13 | 66:17 | 111:16 | termination |
| stay 18:12 | 112:4 | 166:23 | 105:6,8,12 | 164:7,9,13 | 88:22 |
| 18:16 | strange 53:2 | sure 33:11 | 107:11,14 | 164:14,17 | terms 37:15 |
| 109:2,3 | 53:7 | 37:12,13 | 112:1 | 164:22 | 45:1 49:8 |
| stayed 18:14 | street 8:20 | 46:12 48:4 | 136:7 | 165:4,16 | 58:9 157:1 |
| staying | 117:7 | 48:4,16 | 141:11,23 | 165:18,21 | testified |
| 109:22 | 125:4 | 56:17 | 147:9 | 166:12 | 13:17 |
| stenotype | 131:12,18 | 57:17 | 167:21 | telephone | 75:16 |
| 169:6 | struck 11:1 | 63:15,19 | taken 3:6 | 21:14 | 118:3 |
| stepped | stuff 21:19 | 68:4 72:20 | 5:6 66:22 | 22:10 | 135:1 |
| 142:19 | 31:15 | 79:3 95:4 | 99:5 169:6 | 24:22 30:6 | 136:17 |
| Steve 56:4 | 33:12 | 113:6 | takes 150:10 | 40:13 48:5 | 160:19 |
| still 12:22 | 46:22 67:9 | 115:10 | taking 3:20 | 51:20 | 163:18 |
| 24:11 31:5 | 116:1 | 126:3 | talk 23:8 | 64:22 | testify 161:2 |
| 37:7 50:12 | 148:3 | 155:22 | 29:3 85:10 | 65:23 | 162:1 |
| 58:19 | subdivision | 158:17 | 109:11 | 164:16 | testimony |
| 71:11 81:1 | 117:9 | Survivors... | 119:16 | tell 33:20 | 2:19 5:6 |
| 102:14 | submitted | 6:15 | 147:17 | 44:10 52:8 | 11:8 106:9 |
| 106:11 | 50:8 | suspect | talked 22:23 | 52:11 | 123:1 |
| 108:4 | subpoenaed | 151:5 | 23:6 25:13 | 73:14 74:9 | 134:5 |
| 129:7,19 | 56:20 | 152:4,17 | 27:15 | 76:5 93:2 | 135:5 |
| 139:1,9 | substitute | 153:15 | 35:22 | 95:22 | 136:21 |
| STIPULA... | 103:21 | 163:21 | 51:14,18 | 101:2,4,7 | 137:18 |
| 3:3,13,21 | sued 133:6,9 | suspicion | 53:14,15 | 104:2 | 138:11 |
| stipulations | suggested | 149:13 | 89:17 | 138:15,20 | 160:19 |
| 10:7 13:20 | 145:1 | switched | 117:13 | 144:19 | 169:11 |
| stole 58:12 | Summons | 114:7 | 133:12 | 145:16 | Texasville |
| stop 124:7 | 7:14 | 115:4 | 142:14 | 146:7,23 | 112:16 |
| stores 21:21 | Sunday | swore | 163:22 | 147:16 | thank 96:9 |
| 21:21 | 34:19 | 108:17 | talking | 151:9 | 97:10 |
| story 131:7 | supplies | sworn 33:12 | 35:12 41:6 | 153:21 | 164:5 |
| straight | 99:7 | 13:16 | 48:12,15 | 162:12,16 | thanking |
| 48:12 | Supply 59:1 | system 59:19 | 63:17 97:6 | telling 50:14 | 36:3,8 |
| straighten | 106:16 | 139:19 | 99:16 | 151:23 | their 3:5 |

**www.AmericanCourtReporting.com**
**October 26, 2005**

| | | | | | |
|---|---|---|---|---|---|
| 24:15 | 43:19 47:4 | 36:12 | **tied** 41:1 | 111:9 | 149:3,5 |
| 39:22 40:3 | 53:7 57:9 | 42:18 | **time** 4:5,5 | **title** 113:5 | 150:2,3,5 |
| 50:10 58:3 | 70:12 71:8 | 49:21,22 | 18:10,13 | **titled** 75:4 | 151:6 |
| 99:17 | 73:23 | 50:10,11 | 20:19 22:4 | **today** 64:19 | 153:7 |
| 100:8 | 75:19 | 50:13 | 22:19 | 82:17 | 167:10 |
| 119:10 | 76:12,13 | 52:21 | 24:13 25:2 | 94:15 | **Tom** 2:13 |
| 126:18 | 78:17 83:7 | 92:20 | 27:10 28:4 | 102:23 | 9:3,14 |
| 133:7,10 | 89:20 | 154:9 | 28:21 | 103:6 | 51:16,18 |
| **theme** 112:2 | 102:1 | **thousand** | 29:15 31:6 | 107:8 | 53:14,18 |
| **themselves** | 105:17,19 | 30:14 | 35:17 36:7 | 109:15 | 53:23 |
| 48:7,8 | 113:6 | 45:15 55:5 | 39:12 | 116:12 | 58:22 |
| 61:21 | 115:9 | 55:7 | 41:13 42:9 | 123:1,5 | 90:23 |
| **Thereabout** | 116:16,20 | 104:14 | 47:11 | 137:12 | 110:10,12 |
| 116:18 | 117:13 | 106:21 | 49:12 | 149:17 | 110:15,19 |
| **thereabouts** | 118:1,3 | 121:7 | 51:15 53:6 | 160:14 | 114:12 |
| 49:4 | 121:9,10 | 128:3,3 | 53:21 | 162:4,17 | 116:8 |
| **thereto** 4:7 | 122:23 | 133:14,15 | 61:13 | **together** | 120:19 |
| 169:7 | 124:21 | 160:5 | 62:11,15 | 126:21 | 121:17,23 |
| **thing** 39:5 | 126:3 | **three** 24:23 | 64:15 | **told** 23:22 | 132:12 |
| 45:14 | 131:6 | 25:6 45:12 | 65:23 | 26:9 28:15 | 133:13,17 |
| 65:20 71:8 | 132:1 | 54:2 84:23 | 70:18 | 28:20 | 134:21 |
| 111:8 | 133:2 | 96:6 | 82:17 88:7 | 34:11 | 135:1,14 |
| 112:3 | 134:8,12 | 100:13 | 95:12 | 42:10 44:2 | 135:19 |
| 149:16 | 135:10,14 | 100:10 | 100:10 | 44:4,12 | 137:17 |
| **things** 34:12 | 136:2,10 | 131:6 | 101:1 | 45:12 | 144:21 |
| 52:18 | 136:14 | 166:7 | 104:12 | 53:20 | 145:1 |
| 59:23 | 138:16,17 | **Thrifty** | 114:2 | 56:10,12 | 149:11 |
| 60:17 | 142:19 | 21:15,16 | 119:4,9 | 62:21 | 151:10 |
| 91:17 | 148:23 | 22:1,10 | 125:18 | 63:20,23 | 155:23 |
| 130:23 | 149:5,17 | 117:18 | 133:3 | 67:9,22 | 156:7 |
| 161:2,11 | 155:14 | **through** 3:4 | 143:13 | 68:14 69:3 | 157:7,16 |
| 161:22 | 162:9 | 39:22 44:3 | 147:11 | 69:19 | 158:6,12 |
| 162:1 | 163:18 | 48:2 58:4 | 148:21 | 77:12 | 158:21 |
| **think** 10:20 | 164:3 | 67:7,10 | 149:7,8,10 | 81:12 90:5 | 159:7,9,23 |
| 11:12,13 | **third** 99:13 | 80:19 94:6 | 149:17 | 100:7 | 160:4,14 |
| 12:1,12,14 | **thirty-one** | 112:2 | 152:11 | 101:22 | 161:18,21 |
| 12:18 | 136:12 | 129:17 | 154:12 | 104:11,12 | 162:5 |
| 20:13 22:5 | **though** | 143:2 | 155:2,4 | 105:8,9 | 163:21,23 |
| 22:8 24:7 | 105:3 | 162:10 | 164:4 | 125:1,13 | **tomorrow** |
| 32:3,17 | 160:10 | **thrust** 94:22 | 167:2,21 | 145:12 | 62:7 |
| 33:13,15 | **thought** | **Thursday** | **times** 24:15 | 146:2,19 | **top** 72:5 |
| 42:23 43:3 | 22:14 35:6 | 110:13 | 45:12 66:3 | 147:4 | 75:5 141:7 |

American Court Reporting
toll-free (877) 320-1050

Page 27

**total** 102:19
106:22
130:4
131:21
136:10
**totally** 97:2
**touch** 145:3
**toward**
158:15
160:6
**town** 116:23
**training**
15:17 16:3
**transcribed**
169:8
**transcript**
5:6 133:22
134:1
169:11
**transcripti...**
169:9
**transpired**
156:10
**trial** 4:5
11:14
12:10
**trials** 11:4
**tried** 10:19
59:10
139:7
**Troy** 15:11
**true** 22:21
47:6 69:10
90:7
169:10
**truth** 6:21
79:10,19
81:7 152:1
**truthful**
152:5,18
152:22
153:3

**try** 10:23
11:17
62:23 67:7
67:10
139:10
**trying** 52:9
52:12 53:4
64:6 109:2
**tub** 59:20
139:21
141:18,19
142:5,8,13
142:16,19
142:21
**tube** 139:8
**tub's** 142:10
**turned** 20:6
**turning**
63:20
128:21
142:17
**twelve** 135:7
136:11,12
160:5
**twenty** 98:2
**two** 15:2
22:12
45:11 57:7
70:12
75:10 85:4
89:23
102:23
107:14
114:20,21
118:18
121:7
125:5
131:6
136:12
139:20
143:9
149:18

150:10
154:13
165:3
166:7
**two-party**
105:2,23
106:3,5
**typed** 34:16

**U**

**U** 3:1
**Uh-huh**
18:18 39:1
41:23
48:14
51:17
67:20
95:14
100:12
149:19
163:7
**Uh-uh** 73:10
**unconditio...**
152:1
**under** 40:20
41:8 59:21
80:13 92:1
108:17
129:20
141:8
155:15
162:4
**understand**
24:12 38:4
54:16
57:13
61:12
67:19
74:19 78:7
107:13
151:22
159:6

**understan...**
38:7 56:9
157:1
167:3
**understood**
42:14,15
77:4
135:17
**underwrite**
65:7,11,13
65:16
**uneven**
143:19
**Union** 8:8
16:2,4
**unit** 16:21
17:23
**University**
15:9
**Unless** 87:16
**Unsigned**
34:23 35:1
**until** 18:8
20:15 37:1
41:11
49:12 51:5
53:5 54:19
110:18
117:23
119:6
165:7
**untruthful**
152:9
**unused**
139:9
**unusual**
101:16,19
**upgrades**
130:21
**UPS** 117:1
**upset** 81:13
**upside** 74:6

**use** 28:16,17
119:6,20
120:8
**using** 65:17
120:4
**Usual** 13:19

**V**

**vacant** 20:3
131:13
**various**
162:10
**Velcro**
141:23
**venire** 11:2
**vent** 139:19
143:4
**very** 28:9
59:17,22
68:13
119:22
143:14
**vs** 2:8,15

**W**

**wait** 53:21
**waited** 63:16
64:17
**waiting** 88:4
**waived** 3:16
**Walding**
22:15
**wall** 143:20
143:22,22
144:1
**want** 10:17
11:7 13:3
32:10 74:7
76:9 80:6,6
91:18 94:5
95:22
99:16
144:14

154:6
**wanted**
19:18
30:12 44:4
45:4 145:7
**warehouse**
117:2
**Warrant**
6:15
**Warren**
21:11 23:1
24:19,20
26:10 27:7
47:20
76:22
111:1
113:9
117:16,21
117:23
118:15,22
119:5,23
123:11
127:8
156:6
**wasn't** 18:9
34:13 35:5
36:11 37:5
37:7 44:18
49:23
56:17
66:12 80:4
93:3 94:20
94:22
125:14
128:12,22
149:13
152:17
**water** 139:3
139:20,21
143:19
**Watford**
20:5,8,9

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 69:6 | 118:18 | 162:16 | 88:22 96:4 | 108:1 | 121:20 |
| **Watfords** | 119:8 | 163:5 | 97:6 | 112:1,3 | 122:3,5,5,8 |
| 69:4,11 | 150:10 | 165:6 | 100:14 | 114:22 | 134:18 |
| **way** 34:1 | **welcomes** | **went** 15:9,17 | 107:23 | 115:22 | 156:1 |
| 36:11 79:7 | 96:8 | 16:5 31:10 | 115:3 | 145:2 | 158:9 |
| 83:9,20 | **well** 11:23 | 31:10 34:3 | 128:8,20 | **whole** 22:13 | 159:10 |
| 84:9,13 | 12:20 | 53:14 | 128:23 | 148:2 | **withdraw** |
| 95:22 | 18:12 38:8 | 55:10 62:6 | 129:4,11 | 163:10 | 36:13 |
| 98:19 | 40:5,8 41:6 | 65:2 81:13 | 129:12,19 | **wholesale** | 80:10 |
| 112:2 | 48:18,21 | 95:2 97:19 | 129:21 | 75:8 | **withdrawals** |
| 138:9 | 49:22 52:4 | 101:11 | 130:11 | **wife** 18:4 | 129:11 |
| 140:17 | 53:11 58:6 | 104:17 | 131:10 | 20:10 | **withdrew** |
| 143:7 | 63:9 71:5 | 110:9,12 | 137:10 | 21:14 | 80:8 |
| 144:5 | 72:21 74:5 | 110:14,19 | 138:18 | 25:12,21 | **witness** 3:16 |
| 152:8 | 75:18 76:5 | 151:16 | 141:15 | 31:19 | 10:11 11:7 |
| 155:6 | 76:18 | **were** 10:14 | 156:9,11 | 51:14,20 | 11:9 12:17 |
| 158:17 | 77:12 79:5 | 17:23 | 157:5 | 59:15 61:4 | 13:11 |
| 162:14 | 80:14 | 22:15 25:3 | 169:7 | 69:14 92:9 | 101:9 |
| 163:15 | 82:11 | 25:5,8,22 | **weren't** 26:2 | 98:13 | 153:19 |
| **web** 7:17 | 84:22 | 26:2,4,6,7 | 43:23 | 108:12 | 169:12 |
| 46:14,23 | 87:11 88:6 | 26:8,11,13 | 80:17 | 109:1,22 | **wood** 142:3 |
| 47:7,10 | 89:3 95:3 | 26:23 | 87:21 | 110:7,9,22 | **wooden** |
| 51:1 100:8 | 96:7 | 27:23 | 93:12 | 117:15 | 59:20 |
| 100:9 | 101:11 | 29:14 | **West** 8:20 | 118:2,13 | 141:7 |
| 112:22,23 | 102:17 | 30:11,21 | **wet** 144:8 | 142:20 | 142:3 |
| 113:2,7,13 | 104:2 | 33:21 | **we'll** 24:2 | 144:21 | **word** 145:5 |
| 113:16 | 109:3 | 34:15 35:7 | 25:14,15 | 147:1 | **words** |
| **wedged** | 111:8 | 36:12,19 | 93:17 | 164:1,23 | 105:12 |
| 142:4 | 113:3 | 40:3 41:17 | 124:6 | **wife's** | 156:18 |
| **wedges** | 124:5 | 41:19 | 146:22 | 122:19 | 165:2 |
| 59:21 | 125:11 | 42:10 44:1 | **we're** 64:19 | 137:21 | **work** 15:16 |
| 141:7 | 129:17 | 48:12,15 | **we've** 32:3 | **wind** 139:1 | 50:17 62:8 |
| **Wednesday** | 138:21 | 48:16 | 124:3 | **window** | 128:15 |
| 150:18 | 141:11 | 50:12,14 | 162:9 | 138:23 | 145:8 |
| **week** 24:10 | 147:16 | 53:12 | 163:22 | 143:18 | **worked** 16:2 |
| 25:18 | 152:13 | 56:13 61:4 | **whatnot** | **windows** | 16:3 47:1 |
| 51:20 | 154:3 | 61:15 | 21:22 | 59:21 | **workers** |
| 96:21 | 156:13 | 62:17 65:2 | 24:14 | 138:18 | 142:19 |
| 150:16 | 158:11 | 65:23 66:5 | **whatsoever** | 139:4,5 | **working** |
| **weeks** 52:2 | 159:5,14 | 66:8,9,10 | 42:8 54:23 | 143:18 | 64:14 65:5 |
| 109:16 | 161:1,8,10 | 80:16 | **while** 46:22 | **Wiregrass** | 65:5,8 |
| 116:5 | 161:12,13 | 87:22 | 107:5 | 9:4 120:23 | 111:22 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 128:23,23 | **years** 15:2 | **$120,000** | 124:3 | **10:31** 66:23 | 16:12 |
| **workmans...** | 30:17 | 137:12 | ――――― | **11** 6:22 | **1988** 5:3 |
| 59:16,17 | 33:14 | **$127,000** | **0** | 81:16,21 | **1989** 19:19 |
| 60:6 61:18 | 150:19 | 59:4 107:1 | **03** 17:21 | 82:4 | **1990** 19:19 |
| 94:21 | **yesterday** | 131:21 | **04** 14:20 | **115-163** 6:6 | ――――― |
| 107:23 | 165:7 | **$140,000** | 17:15,17 | **119,000** | **2** |
| **worth** 107:2 | **York** 30:5 | 102:20 | 17:20 | 135:12 | **2** 6:13 67:1 |
| 135:3 | 61:11,12 | 106:10 | 20:16 24:8 | **12** 6:23 82:8 | 67:13 |
| **wouldn't** | 62:16,19 | 123:1 | 24:9 25:19 | 82:12,23 | **20** 7:10 |
| 11:7 43:16 | 66:12 | **$148,000** | 25:19 28:8 | **125,000** | 89:14 |
| 43:18 | **y'all** 22:19 | 122:20 | 49:2,5,12 | 135:10 | 123:18 |
| 45:13 | 23:17 | **$148,875** | 51:13 | **126** 59:4 | 129:4,5 |
| 87:12 | 25:20 | 122:22 | 60:22 | **13** 7:3 16:13 | **2000** 19:20 |
| 92:17 | 26:14,23 | **$1800** | 61:17 | 83:1,5 | **2001** 20:13 |
| 101:14,18 | 27:16 | 132:18 | 62:10 63:6 | **13-115** 6:5 | 20:15 |
| 105:8 | 50:18 51:7 | **$19,000** | 63:8 64:2 | **130** 14:13,14 | 116:19 |
| 106:4 | 53:4 65:22 | 123:16,21 | 71:2 86:23 | 17:10 | **2004** 123:6 |
| 138:5 | 66:17 | 124:8 | 87:1 94:5 | **14** 7:4 83:12 | 123:14 |
| 149:1 | 104:6 | 128:21 | 94:13 | 83:16 | 158:2,4 |
| **written** | 117:20 | 130:3 | 100:11 | **15** 5:3 7:5 | **2005** 2:21 |
| 102:9 | 118:20 | **$19,151.67** | 118:1,4 | 84:1,5,17 | 3:12 5:7 |
| **wrong** 37:6 | 119:6,10 | 90:4 | 119:2 | 157:16 | 10:11 |
| 59:14 62:6 | 119:19 | **$20,000** | 121:11 | **15th** 60:21 | **2006** 20:23 |
| 70:19 | 120:12 | 107:19 | 165:14 | **16** 7:6 84:18 | **21** 7:11 |
| 139:19 | 129:10 | 116:17 | **05** 95:11 | 84:21 | 90:20 91:6 |
| 143:5 | 144:14 | **$250,000** | 133:2 | 85:22 | 92:7 |
| **W-2s** 33:13 | 145:9 | 107:11 | ――――― | **16th** 94:5,12 | **2200** 130:15 |
| ――――― | 151:9 | **$365** 57:8 | **1** | **160,000** | **23** 7:13 |
| **X** | **y'all's** 155:9 | **$5,000** 55:9 | **1** 6:12 32:22 | 107:20 | 93:22 94:3 |
| **X** 6:1 7:1 | 155:12 | **$55,000** | 32:23 42:3 | **163-166** 6:5 | **231** 117:3,4 |
| 104:14 | ――――― | 105:16,23 | 70:5 118:1 | **166-167** 6:6 | **24** 7:14 95:5 |
| ――――― | **$** | 106:2 | 158:3 | **177** 7:7 85:23 | 95:9 96:20 |
| **Y** | **$100,000** | 124:19 | **1st** 51:19 | 86:3,9 | **25** 7:15 97:6 |
| **yeah** 19:13 | 108:13 | **$55,848.33** | 64:2 | **18** 7:8 86:10 | 97:13 |
| 29:2 32:8,8 | 124:4 | 90:3 123:7 | **1-800** 96:21 | 86:13 | **257** 8:20 |
| 32:12,19 | **$112,000** | **$6,000** 132:3 | **1.95** 28:18 | 136:6 | **26** 2:21 7:16 |
| 43:4 57:7 | 133:13 | **$65,000** | 28:20 35:6 | **19** 7:9 88:17 | 98:3,4,8 |
| 84:17 | 135:3 | 54:12 | 39:23 45:4 | 88:21 | **26th** 3:11 |
| 103:7 | 136:3 | 103:4 | 81:14 93:6 | **1964** 15:13 | 5:7 10:10 |
| 104:2 | 137:10,20 | **$75,000** | **10** 6:21 | 16:14 | **27** 7:17 99:8 |
| 165:8 | **$119,100** | 29:12 | 79:14,18 | **1977** 83:22 | 99:12 |
| **year** 14:10 | 163:17 | 45:13 54:5 | 81:19 | **1980** 16:10 | |
| 14:17 | | | **10:14** 66:21 | | |

**www.AmericanCourtReporting.com**
**October 26, 2005**

| | | |
|---|---|---|
| 100:6 | **66** 6:13 | **90** 138:23 |
| **29th** 123:14 | **67** 6:14,15 | **900** 17:1 |
| | **69** 6:16 | **91** 7:12 |
| **3** | | **92** 7:13 |
| **3** 6:14 68:6 | **7** | **94** 7:14 |
| 68:17,22 | **7** 6:18 71:2 | **96** 7:15 |
| 134:13 | 75:1 76:3,4 | **97** 7:16 |
| **30** 10:5 | 77:16 | **98** 7:17 |
| **31** 6:12 | **7th** 95:11 | |
| **3200** 14:6 | 123:6 | |
| 19:23 61:6 | **71** 6:17 | |
| **350** 8:7 | **74** 6:18 | |
| **36027** 8:21 | **75** 14:13 | |
| **36089** 8:8 | 17:10 | |
| **36106** 3:11 | **75,000** 30:8 | |
| 8:13 10:10 | 45:22 | |
| **36302** 9:9 | 130:7 | |
| | **76** 6:19 | |
| **4** | **77** 6:20 | |
| **4** 6:15 68:23 | **78** 6:21 | |
| 69:9 | | |
| **4s** 70:12 | **8** | |
| **4.375** 81:11 | **8** 6:19 77:18 | |
| **40** 148:1 | 77:22 | |
| | **8/9/2004** | |
| **5** | 89:5 | |
| **5** 3:10 6:16 | **80** 6:22 | |
| 8:12 10:9 | **81** 6:23 | |
| 25:18,19 | **82** 7:3,4 | |
| 38:23 45:3 | **83** 7:5,6 | |
| 70:20 72:3 | **84** 7:7 | |
| 81:14 | **85** 7:8 | |
| **5th** 121:10 | **87** 7:9 | |
| 121:11 | **88** 7:10 | |
| **5(d)** 5:1 | **89** 7:11 | |
| **50/50** 157:20 | | |
| | **9** | |
| **6** | **9** 6:20 78:18 | |
| **6** 6:17 72:7 | 78:22 | |
| 73:13 | **9/16/2006** | |
| **6,000** 132:4 | 169:23 | |
| **6346** 9:8 | **9:00** 2:22 | |
| **65** 15:19 | 3:12 | |