# EXHIBIT "13"

**American Court Reporting**
**toll-free (877) 320-1050**

1 (Pages 2 to 5)

Page 2

IN THE CIRCUIT COURT OF

BARBOUR COUNTY, ALABAMA

CLAYTON DIVISION

CIVIL ACTION NUMBER: CV-04-106

JOE HUGHES and FAYE HUGHES,

    Plaintiff (s),

vs.

GLOBAL GROUP, INC., et al.,

    Defendant (s).

*********************************************

CIVIL ACTION NUMBER: CV-04-107

TOM GASSETT and PHYLLIS GASSETT

    Plaintiff (s),

vs

GLOBAL GROUP, INC., et al.,

    Defendant (s).

DEPOSITION TESTIMONY OF:

TOM GASSETT

OCTOBER 26, 2005

1:15 p.m.

REPORTED BY: MELISSA S. LEE, CSR

Page 3

S T I P U L A T I O N S

    IT IS STIPULATED AND AGREED,
by and between the parties through
their respective counsel, that the
deposition of TOM GASSETT may be taken
before Melissa S. Lee, CSR, Commissioner and
Notary Public for the State of Alabama
At Large, at the law offices of PENN &
SEABORN, 5 Court Square, Clayton, Alabama,
36106, on the 26th day of October,
2005, commencing at or about 1:15 p.m.
    IT IS FURTHER STIPULATED AND
AGREED that the signature to and the
reading of the deposition by the
witness is waived, the deposition to
have the same force and effect as if
full compliance had been had with all
laws and rules of court relating to
the taking of depositions.
    IT IS FURTHER STIPULATED AND
AGREED that it shall not be necessary
for any objections to be made by

Page 4

Counsel as to any questions except as
to form or leading questions, and that
counsel for the parties may make
objections and assign grounds at the
time of trial, or at the time said
deposition is offered in evidence, or
prior thereto.

Page 5

    In accordance with Rule 5(d) of
The Alabama Rules of Civil Procedure, as
Amended, effective May 15, 1988, I,
MELISSA S. LEE, CSR, am hereby delivering
to RUSSELL L. IRBY, the original
transcript of the oral testimony taken on
the 26th day of October, 2005, along with
exhibits.
    Please be advised that this is
the same and not retained by the Court
Reporter, nor filed with the Court.

**American Court Reporting**
**toll-free (877) 320-1050**

2 (Pages 6 to 9)

---

Page 6

1                I N D E X
2
3
4   EXAMINATION BY:                PAGE NO:
5   Mr. Irby                  10-57; 91
6   Mr. Boyd                   58-91
7
8
9
10
11   EXHIBITS:
12   Defendant's 1 (Contractor Agreement)   14
13   Defendant's 2 (Statement of Denial)   20
14   Defendant's 3 (Interrogatories)       43
15   Defendant's 4 (Washington Mutual Doc)  57
16   Defendant's 5 (Interrogatories)       76
17   Defendant's 6 (Contractor Agreement)  77
18
19
20
21
22
23

---

Page 7

1                A P P E A R A N C E S
2
3   FOR THE PLAINTIFF (S):
4
5      Ms. Christine Diane Crow
6      JINKS, DANIEL & CROW
7      P. O. Box 350
8      Union Springs, Alabama,  36089
9
10      Mr. L. Shane Seaborn
11      PENN & SEABORN
12      5 Court Square
13      Clayton, Alabama,  36106
14
15   FOR THE DEFENDANT (S), IPI SKYSCRAPER:
16
17      Mr. Russell Lee Irby
18      Mr. Albert H. Adams, Jr.
19      IRBY LAW FIRM
20      257 West Broad Street
21      Eufaula, Alabama,  36027
22
23

---

Page 8

1         A P P E A R A N C E S (Continued)
2
3   FOR THE DEFENDANT (S), TOM LEONARD and
4   WIREGRASS CONSTRUCTION:
5
6      Mr. Leon A. Boyd
7      COBB, SHEALY, CRUM & DERRICK
8      Post Office Box 6346
9      Dothan, Alabama,  36302
10
11   ALSO PRESENT:
12
13      Joe Hughes
14      Faye Hughes
15
16
17
18
19
20
21
22
23

---

Page 9

1      I, MELISSA S. LEE, CSR,
2   Court Reporter and Notary Public for
3   the State of Alabama at Large, acting
4   as Commissioner, certify that on this
5   date as provided by Rule 30 of the
6   Alabama Rules of Civil Procedure, and
7   the foregoing stipulations of counsel,
8   there came before me at the law
9   offices of PENN & SEABORN, 5 Court Square,
10   Clayton, Alabama, 36106, on the 26th day
11   of October, 2005, JOE GASSETT, witness in
12   the above cause, for oral examination,
13   whereupon, the following proceedings
14   were had:
15
16         JOE GASSETT,
17   Being first duly sworn, was examined
18   and testified as follows:
19
20      COURT REPORTER:  Usual
21   stipulations?
22      MS. CROW:  That's fine
23      MR. IRBY:  Before we get started, I

---

**www.AmericanCourtReporting.com**
**October 26, 2005**

## Page 10

1  would like to interpose the same objection as
2  I did this morning when Mr. Hughes was
3  testifying; that is, to the effect that Mr.
4  And Mrs. Hughes are plaintiffs in a case
5  that's been consolidated for discovery. And
6  they are now sitting -- or will be sitting in
7  the testimony of Mr. Gassett. And I objected
8  to him sitting in this morning because we
9  asked that the rule be invoked for the
10  purpose of this deposition.
11      If we were in trial -- a trial
12  setting, the rule would preclude these
13  witnesses from being -- sitting in together
14  listening to each other's testimony. And
15  whose to say that something couldn't happen
16  to one of these witnesses between now and the
17  time of trial where this would be trial
18  testimony. So I object to Mr. and
19  Mrs. Hughes sitting in here, and I renew my
20  objection about Mr. Gassett sitting in on
21  theirs.
22      MS. CROW: And we have the same
23  response. I don't think there's any case law

## Page 11

1  that indicates that the rule would be
2  applicable to a deposition setting. In fact,
3  I think the case law is exactly the opposite
4  of that, and therefore we're going to
5  continue to let the Hugheses sit in on Mr.
6  Gassett's deposition.
7      MR. BOYD: I'm going to adopt the
8  same objection as Mr. Irby.
9
10  EXAMINATION BY MR. IRBY:
11   Q   Would you state your name, please.
12   A   Judge Thomas Gassett.
13   Q   All right. Mr. Gassett, where do
14  you live?
15   A   Dothan at 120 Bradberry Drive.
16   Q   How long have you lived there?
17   A   Approximately six months.
18   Q   Where did you live before you lived
19  in Dothan at Bradberry Drive?
20   A   We were living in Dothan at
21  Fieldcrest Lane Apartments. We were living
22  there when our house was being built.
23   Q   When did you --

## Page 12

1      MS. CROW: Can I interrupt real
2  quick. Did y'all talk about Phyllis, whether
3  you wanted her coming here? I was just
4  thinking we might need to call her to come.
5      This is going to be off the record.
6      (Off-the-record discussion.)
7   A   You had asked where we were at
8  before?
9   Q   Right.
10   A   120 Bradberry Drive.
11   Q   When did you first move to Dothan?
12   A   We moved to Dothan about the middle
13  of May of 2004.
14   Q   Okay. And before that, where were
15  you living?
16   A   We were living in Eufaula, Alabama.
17   Q   Did you work in Eufaula?
18   A   Yes, sir.
19   Q   Whereabouts?
20   A   Worked for the Alabama Technology
21  Network which was on the campus there with
22  Sparks College.
23   Q   Okay. Dealing with computers

## Page 13

1  and --
2   A   Yes, sir.
3   Q   With that said, tell us your
4  educational background.
5   A   I graduated high school at Carroll
6  High in Ozark in 1985. I have a B.S. in
7  computer science from Troy State, 1994.
8   Q   Okay. And what were you doing at
9  the Technology Center there in Eufaula? Were
10  you teaching or what?
11   A   Well, we did some instruction, but
12  we did a lot of off-site technical support
13  for medium- and small-sized businesses who
14  couldn't afford a full-time IT person on
15  staff.
16   Q   And are you doing that now?
17   A   No, sir. I work for an engineering
18  company here in Dothan -- or in Dothan.
19   Q   What's the name of that?
20   A   Polyengineering.
21   Q   Okay. Is that -- what do they do?
22   A   They do mainly civil engineering.
23   Q   Okay. Are you still working with

Page 14

1  computers and --
2      A   Yes, sir.  I take care of their
3  network and their computers there.
4      Q   In-house --
5      A   In house.
6      Q   -- computer technician?
7      A   Yes, sir.
8      Q   So you moved from Eufaula to Dothan
9  about May of 2004?
10     A   Yes, sir.
11     Q   All right.  You were going to build
12 a house?  Is that --
13     A   The house had already been started.
14 The building of the house had already been
15 started.
16     Q   When did the house work start?
17     A   Approximately the first week of
18 April, 2004.
19     Q   Okay.  Who was going to build the
20 house?
21     A   Global Development.
22     Q   Did you enter into a contract with
23 Global to build the house?

Page 15

1      A   Yes, sir.
2          (WHEREUPON, Defendant's Exhibit 1
3          was marked for identification.
4          A copy is attached.)
5      Q   Let me show you what I marked as
6  Defendant's Exhibit 1 for the purposes of
7  your deposition.  Is that a copy of the
8  contract you entered into with Global?
9      A   Yes, sir, it is.
10     Q   And what's the date of that?
11     A   It is 19, March of 2004.
12     Q   All right.  And how did you select
13 Global in the first place?
14     A   My mother- and father-in-law had
15 already talked with Global about building
16 them a house, and so we had talked to them
17 about it.  And so we contacted Global
18 ourselves and began talking to them about
19 building us a house as well.
20     Q   How long before signing this
21 contract did y'all start talking --
22     A   We were talking to them probably
23 February of 2004.

Page 16

1      Q   So a month or so --
2      A   Yes, sir.
3      Q   -- before --
4      A   Six weeks or so --
5      Q   -- you actually entered -- all
6  right.  And what was the contract price?
7      A   $153,000.
8      Q   And how was it to be paid?
9      A   It was to be paid to Construction
10 Services.  And the contract here says four
11 equal payments, but actually myself and Jeff
12 Jernigan who had contacted me --
13     Q   Who is Jeff Jernigan?  I keep
14 hearing his name.
15     A   All that I know is he was
16 associated with Construction Services, and he
17 contacted me by phone about setting up these
18 payments to Construction Services for the
19 house.
20     Q   Okay.  It doesn't say anything in
21 there about IPI Skyscraper in that contract,
22 does it?
23     A   No, sir.  We had already spoken

Page 17

1  with IPI.
2      Q   Before you entered into this
3  contract --
4      A   Yes, sir.
5      Q   -- with Global?  When did you first
6  speak to IPI?
7      A   We -- the few times that we went to
8  Global's office, they had IPI paperwork
9  there:  The loan pre-application and that
10 sort of thing.
11     Q   Right.
12     A   And so we considered using IPI to
13 build our -- to get the money to build our
14 house.  We contacted IPI.  We even filled out
15 the little pre-application form.  I spoke
16 with Adam DiSpirito several times on the
17 phone in the February/March, 2004 time frame.
18 But we owned our house in Eufaula, so we
19 decided to use the equity that we had in our
20 home in Eufaula to build the house in Dothan.
21     Q   All right.  So you didn't enter
22 into any loan agreement with IPI?
23     A   No, sir.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 18

```
 1        Q   And you knew they were not going to
 2   finance your home?
 3        A   That's exactly right.
 4        Q   You were going to use the equity
 5   out of your home in Eufaula to do that --
 6        A   Yes, sir.
 7        Q   -- is that right?  Did you ever go
 8   to any other bank or lending institution to
 9   see if they would finance it, other than IPI?
10        A   No, sir.
11        Q   Okay.  Did you have a mortgage on
12   your home in Eufaula?
13        A   No, sir.  We did not.
14        Q   Where was it located in Eufaula?
15        A   It was located on Red Oak Lane
16   behind Sparks College.
17        Q   I was going to ask you where that
18   was because I didn't know where Red Oak was,
19   and I thought I knew where most places were
20   in Eufaula.  Okay.  Did -- how did you
21   express yourself, that you weren't going to
22   use IPI Skyscraper?
23        A   Well, Global was, I'll say, pushing
```

Page 19

```
 1   the use of IPI.  They recommended it to my
 2   mother- and father-in-law, and then they
 3   strongly recommended using IPI to us.  So
 4   then, when I spoke to IPI and I was talking
 5   to Adam DiSpirito, you know, he said that
 6   we'll beat anybody else's deal, we've got a
 7   thousand different options on how you can
 8   borrow money, we'll beat anybody else's rate.
 9   But me and my wife discussed it, and we
10   decided just to use the equity in our home
11   and not go through the process of the
12   mortgage and everything.
13        Q   When you say use the equity on your
14   home, did you have like an equity line of
15   credit or something on it that you could use?
16        A   We did.  And since we had 100
17   percent equity there, we could draw off it to
18   get the house started.  And then, when our
19   house sold in Eufaula, we could pay the
20   equity line off, and we would have the rest
21   of the money to continue paying --
22        Q   Who did you have the equity line
23   with?
```

Page 20

```
 1        A   Compass Bank in Eufaula.
 2        Q   Had you ever entered into any other
 3   mortgages prior to the one with Compass Bank
 4   on the equity line?
 5        A   No, sir.  Not that I can remember.
 6        Q   Okay.  Did you just tell Global or
 7   IPI thank you, but no thanks?  I mean, I
 8   just -- I appreciate it, but I'm not going to
 9   use y'all?  I mean, that's what I'm trying to
10   find out is how it was communicated that you
11   weren't going to use their lender.
12        A   Yes, sir.  I told -- I'm pretty
13   sure the last time that DiSpirito and I spoke
14   that I told him that we decided to go a
15   different route, that we were not going to --
16   weren't interested in a loan --
17        Q   And that would have been --
18        A   -- with IPI.
19        Q   -- in the February, first of
20   March --
21        A   That would have been in --
22        Q   -- time frame?
23        A   In probably the March time frame,
```

Page 21

```
 1   yes, sir.
 2        Q   All right.  Did they ever send you
 3   a document stating that you had withdrawn
 4   your loan application?
 5        A   No, sir.  Because I really never
 6   applied for a loan.
 7        Q   You never made application?
 8        A   No, sir.  I filled out the little,
 9   I guess you'd call it maybe a,
10   pre-application there which doesn't even
11   have -- I don't think it has an amount on it
12   that we would even be asking for.
13            (WHEREUPON, Defendant's Exhibit 2
14            was marked for identification.
15            A copy is attached.)
16        Q   All right.  Let me just ask you if
17   you ever received this document which I
18   marked as Defendant's Exhibit 2.
19        A   No, sir.  I don't think I've ever
20   seen this document before.
21        Q   Okay.  It really wouldn't have
22   mattered anyway because you made, of your own
23   volition, the choice not to use IPI?
```

American Court Reporting
toll-free (877) 320-1050

6 (Pages 22 to 25)

Page 22

1    A   That's right.
2    Q   Rather than them telling you we've
3 turned you down or whatever?
4    A   Yes, sir.
5    Q   So it wouldn't have made any
6 difference whether they sent that to you or
7 not, would it?
8    A   Right.
9    Q   All right. So from the time you
10 and your wife made the decision not to use
11 IPI Skyscraper, tell me sort of in
12 chronological order the chain of events that
13 happened before you were next dealing with
14 IPI Skyscraper.
15    A   Can you say that one more time?
16    Q   I probably didn't phrase it
17 correctly, but all I'm trying to get at is,
18 from the time you told IPI Skyscraper you
19 weren't going to use them as a lender -- just
20 sort of walk me through what happened in the
21 process of building your home and dealing
22 with the Palmers and on up to November,
23 whenever it was, that Adam DiSpirito appeared

Page 23

1 back in the picture.
2    A   Okay. We originally wanted a lot
3 in RimRock subdivision in Dothan, and Jarrett
4 told us he could get us a particular lot in
5 RimRock. So the original agreement was for a
6 lot in RimRock. About a week to ten days
7 passed, and he called and said that they
8 couldn't get the lot in RimRock, but he could
9 get a bigger, better, more expensive lot in
10 Westbrook subdivision if we were interested
11 in it. And so we went and looked at the lot.
12 And we talked about it, and we decided to go
13 with the lot in Westbrook.
14        We had actually already paid the
15 first payment that we made out to
16 Construction Services toward the end of
17 March. I can't remember the -- March 20th?
18 March 21st? Because we had agreed on the lot
19 in RimRock. So basically Jarrett said you
20 can get your $30,000 back or we can go ahead
21 and just move everything to this secondary
22 lot. So we agreed to do that.
23        They broke ground and started

Page 24

1 working on the footer and foundation, I'd
2 say, first week or two of April. And Jeff
3 Jernigan had already contacted me about how
4 to pay and how many payments we were going to
5 make. We were going to pay Construction
6 Services.
7    Q   Who was Construction Services to
8 your way of understanding?
9    A   We didn't know at the time, but
10 later we found out it was Jarrett Palmer.
11    Q   And best you know, this Jeff
12 Jernigan was affiliated with Construction
13 Services?
14    A   Yes, sir. That's how he
15 represented himself.
16    Q   Okay. Go ahead.
17    A   So we had -- we had agreed to wire
18 the money to Construction Service's account.
19 And that's -- so that's how we wound up
20 paying our other payments. You know, the
21 house was being built. It was a slow go.
22 Sometimes there would be several days that
23 there would be no work, but eventually it

Page 25

1 would start back.
2    Q   Did y'all complain to --
3    A   Oh, yeah. Yes, sir.
4    Q   -- Jarrett Palmer or whoever it --
5    A   We did.
6    Q   Was he accommodating, or how would
7 he act when you complained?
8    A   He always had an excuse to give you
9 as to why there was a delay in the work.
10    Q   Before we go any further, did you
11 do any investigation or did your in-laws do
12 any investigation on the Palmers before y'all
13 agreed to let them build y'all's homes?
14    A   I don't think my in-laws did, but
15 actually I did. I called a gentleman that
16 works with Chapman's Building Systems in
17 Dothan.
18    Q   Who would that have been?
19    A   I can't remember his name.
20    Q   Okay.
21    A   The Palmers had told me they would
22 be using Chapman's Building Systems for the
23 major supplies: The walls and everything,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 26

1  tresses, and that sort of stuff.
2      So I called Chapman. And I'm not
3  sure whether they had given me the name of
4  the individual I spoke with or whether I just
5  asked for someone that would be selling this
6  type of material. I can't remember the
7  individual's name, but, anyway, I asked him
8  specifically about the Palmers -- about
9  Warren Palmer. We were getting ready to let
10  him build a house for us, you know, what did
11  he think of him and all that. And he said
12  that he was a fine fellow so far as he knew,
13  and he would be good to do business with.
14      Q   And that's the extent of the
15  investigation?
16      A   Yes, sir.
17      Q   Had you heard anything derogatory
18  or bad about him from anybody?
19      A   No. Not really. We had had
20  another contractor that we had spoken with
21  about building us a house. And he had said
22  something negative about the Palmers, about
23  maybe you might not want to deal with them,

Page 27

1  but nothing really concrete to go off of.
2      Q   Who was that guy?
3      A   I can't remember his name either.
4  That was January of '04, nearly two years
5  ago.
6      Q   Before you entered into the
7  contract?
8      A   Yes, sir.
9      Q   And even though he told you that,
10  you made a decision to go ahead and use the
11  Palmers anyway?
12      A   Yes, sir.
13      Q   All right. Before I interrupted
14  you, you were telling us, you know, you --
15  building was a slow go and you had complaints
16  which you expressed to Palmer. And so bring
17  us on up to speed from there.
18      A   Well, that pretty much went on
19  throughout the summer. And we had problems
20  with our house like the Hugheses do, but of
21  course now we don't have a house, so we don't
22  have any structural complaints because we're
23  not living there.

Page 28

1      Q   Right. What were the complaints or
2  the problems with the house when you observed
3  them and when you saw them?
4      A   The house in Westbrook was a -- had
5  a bonus room above the garage. I work at an
6  engineering company, and so I began to
7  question some of the engineers there about a
8  particular way they were doing something with
9  the footer with the bonus room above the
10  garage.
11      And a couple of the engineers told
12  me there that they needed to do it a certain
13  way or else the foundation would not support
14  that extra weight that the bonus room would
15  be putting on. And from what I had seen I
16  couldn't tell that work had been done
17  properly. And so that was one of the main
18  things I was complaining about back in
19  probably July -- July of '04.
20      Q   And did the Palmers tell you they
21  would straighten that out or anything?
22      A   I spoke with Warren Palmer about it
23  and Jarrett as well. They called in, I

Page 29

1  think, a subcontractor that handles
2  foundations and that sort of thing. First of
3  all, they tried to tell me that the concrete
4  was under there; that it was covered up; that
5  I just couldn't see, you know, the footer.
6  You can't see the footer from above. But
7  they dug down and supposedly fixed it, but I
8  don't think they ever fixed it right.
9      Q   Okay. And this would have been
10  July of '04. Did any other problems crop up?
11      A   The foundation was unlevel in
12  several spots that caused the trim work
13  inside the house to be -- there to be
14  disformed and not look right, and it would
15  have been hard to have fixed. We also had
16  plumbing problems. We had plumbing hardware
17  that was not assembled properly.
18      Q   Now, the title to this land never
19  was in your and your wife's name, was it?
20      A   No, sir, it was not.
21      Q   Was it in Wiregrass Builders or
22  somebody like that?
23      A   It was in Tom Leonard's.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 30

1    Q    Tom Leonard's?
2    A    Wiregrass Properties' name.
3    Q    Did you enter into an agreement
4 with them to do it that way?
5    A    No, sir.
6    Q    Well, how did it come to pass that
7 you and your wife were going to buy this
8 property, yet the title was taken in somebody
9 else's name?
10    A    We don't know exactly.  We found
11 out later that Tom Leonard was paying for,
12 you know, bills.  He was paying some
13 subcontractors and materials, but we had no
14 idea what kind of agreement that he and
15 Global Development had.
16    Q    So Tom Leonard was paying the
17 material and stuff like that, and at the same
18 time was Palmer getting money from you for
19 the same thing?
20    A    We had -- by the end of April, we
21 had already paid $145,000 on our contract
22 price.
23    Q    How far along was the house when

Page 31

1 you paid that money?
2    A    The house was not very far along.
3 But the reason we paid it is after we had
4 paid the initial $30,000, Jeff Jernigan with
5 Construction Services had contacted me about
6 the second payment, because I knew that the
7 lot would eat up the 30,000.
8    Q    Right.
9    A    So the second payment from -- he
10 had told me that the materials for the
11 building package could be prepaid.  And if it
12 was prepaid, then the contract would save
13 2 percent that he would turn and pass on to
14 me so that we could use it maybe for some
15 other upgrades in the house -- maybe some
16 crown molding or a sprinkler system or
17 something like that.  So my wife and I talked
18 about it, and we agreed to go ahead and make
19 another payment to Construction Services even
20 though they were not that far along with the
21 house.
22    Q    Okay.  You had no -- you had no
23 option or land sell contract or anything to

Page 32

1 obligate anybody to sell this lot to you?
2    A    No, sir.  I went in -- made an
3 agreement with Global --
4    Q    To build your house?
5    A    -- for the house and lot together,
6 a lot and key job, on that property in
7 Westbrook.
8    Q    And then when -- I guess the way it
9 would work, when that job was done, you were
10 satisfied with it, if you owed any more
11 money, you would pay them and they would give
12 you a deed?  Is that --
13    A    Yes, sir.
14    Q    Is that the scenario that was
15 supposed to work?
16    A    Yes, sir.
17    Q    But you're saying you paid all the
18 $145,000 before they completed it?
19    A    The contract was for a hundred and
20 fifty-three.  We had paid a hundred and
21 forty-eight.  And I can tell you about the
22 third installment as well.
23    Q    Yes, sir.  Please.

Page 33

1    A    After the phonecall from Jeff
2 Jernigan about the second installment and
3 repaying the Chapman System's package,
4 several days passed.  And they were working
5 on the house, and Jeff Jernigan called me
6 again.  And he said, well, you know, you
7 prepaid the Chapman System's package, and it
8 saved you "x" number of dollars.  Are you
9 interested in prepaying for anything else
10 because, if you're willing to prepay some
11 other materials, then you could save another
12 2 percent that you could apply in some other
13 areas.  So my wife and I talked about it
14 again?  And it cost a wire fee to wire money.
15    Q    Yes, sir.
16    A    I don't know how much it is.  My
17 wife was wiring the money from Compass Bank
18 in Eufaula to this Construction Service's
19 account.  So we knew the money was not going
20 directly to the contractor because it was
21 going to Construction Services.  So we had no
22 reason to not do that.  We couldn't see a
23 reason why not to go ahead and prepay as much

9 (Pages 34 to 37)

Page 34

1  as we possibly could to save as much money as
2  we possibly could.
3      Q   Well, did you talk to any lawyer or
4  seek any legal advise before you ever got
5  started out on this adventure of getting this
6  house?
7      A   No, sir.
8      Q   When you bought the house in
9  Eufaula, did you have a lawyer helping you on
10  that?
11      A   No, sir.  Because we paid cash for
12  that as well.  You know, we bought the lot
13  and then got the deed for the lot and then
14  had the house built on the lot.
15      Q   All right.  Well, did you not know,
16  if you don't have anything in writing
17  obligating somebody to give you a deed, you
18  might not get one?  Was that ever a concern
19  for you?
20      A   Well, again, we entered a contract
21  to have the house built.  And it was a lot
22  and key job.  The house and the lot are all
23  together.

Page 35

1      Q   Okay.  Well, when did it become
2  apparent to you that the deal wasn't going to
3  close and you were going to lose out?
4      A   We didn't know anything until the
5  very end of October when the lien was filed
6  against my mother- and father's-in-law house.
7      Q   All right.  That's the one they
8  testified to here earlier today you heard
9  them talk about?
10      A   Yes, sir.
11      Q   Was any lien filed on the house
12  that you were to get?
13      A   I don't believe there was ever a
14  lien filed.  There was a talk of liens by
15  like Jordan's Building Supply and that sort
16  of thing.
17      Q   Well, did Tom Leonard end up with
18  the property?
19      A   Yes, sir.
20      Q   How did he end up with it?
21      A   He bought the lot and paid for a
22  good part of the material and labor, so there
23  was --

Page 36

1      Q   And he bought the lot in his name?
2      A   He bought the lot in his name.
3      Q   Okay.  And so when the deal went
4  sour and y'all lost out on the house, he sold
5  it; is that right?
6      A   He did.
7      Q   Okay.  Did you get any of the
8  money?
9      A   Not one penny.
10      Q   All right.  Now, all this time
11  leading up from February or the first of
12  March, that was the last time you had any
13  conversations with Adam DiSpirito?
14      A   No, sir.
15      Q   Oh, you had other conversations
16  with him?
17      A   At the end.
18      Q   Yes, sir.  I'm talking about before
19  we get up to October or November, whenever --
20      A   That's the last I spoke with Adam
21  DiSpirito until the very end, yes, sir.
22      Q   And you didn't have any outstanding
23  loan applications with Adam's employer,

Page 37

1  IPI --
2      A   No, sir.
3      Q   -- Skyscraper; is that right?
4      A   No, sir.
5      Q   So you knew you weren't getting a
6  loan through IPI Skyscraper?
7      A   That's correct.
8      Q   All right.  And then all of a
9  sudden here's Adam DiSpirito showing up in
10  October or November -- was it November or
11  October?
12      A   Approximately the first week of
13  November.
14      Q   All right.  How did he get back
15  involved?
16      A   After all this happened with the
17  meeting with Tom Leonard --
18      Q   Oh, you were at the meeting too.
19      A   Yes, sir.
20      Q   Was this after your in-laws had the
21  lien placed on their property?
22      A   Yes, sir.
23      Q   When the meeting came about, were

**American Court Reporting**
**toll-free (877) 320-1050**

Page 38

1   you and your wife present at that meeting?
2       A   Just me.
3       Q   Tell us, if you will, what went
4   down at that meeting -- what was said and
5   done.
6       A   We went the week before, as my
7   mother-in-law had said, to see him. And he
8   was not there, so we set up a meeting for the
9   following week. I think it was on a Monday.
10  We went in. And he would not take all of us
11  in there at one time, just like my
12  mother-in-law said. He took the Hugheses in
13  first. And I don't know what they talked
14  about.
15          And then after they left, he took
16  me in and talked to me about -- that he had
17  money invested in the house. And, you know,
18  he had -- we talked about the lien or the --
19  you know, he didn't have a lien on mine
20  because he already owned the property.
21      Q   He owned it. I understand.
22      A   But, you know, he was not going to
23  give us any money or give us the property

Page 39

1   that we had bought.
2       Q   Did he say what happened to your
3   money that you had given to the Palmers or
4   Global?
5       A   He didn't say. I don't think he
6   knew.
7       Q   Do you, sitting here today, know
8   what happened to it?
9       A   No, sir, I don't.
10      Q   Do you have any evidence that IPI
11  Skyscraper got any of that money?
12      A   I don't know whether they did or
13  not.
14      Q   You don't know, do you?
15      A   No, sir.
16      Q   All right. So you had this meeting
17  with Mr. Leonard, and he said he wasn't going
18  to give you any money. Would this have been
19  in October?
20      A   This would have been in November.
21      Q   November. Had you had any contact
22  with Adam DiSpirito up until that point since
23  you last talked to him in March?

Page 40

1       A   No, sir. That was a few days
2   later.
3       Q   So a few days later you had a
4   contact with Adam DiSpirito?
5       A   Yes, sir. He called me.
6       Q   All right. And how did he present
7   himself then?
8       A   He said that it was all a big
9   misunderstanding down there where the houses
10  were being built; and that something to the
11  effect that the only thing the Palmers were
12  guilty of was building houses too cheap; and
13  that he got paid to clean up messes like
14  this; that there was money that was being
15  borrowed against some properties; and that it
16  would be straightened out in a few days -- to
17  give him ten days, and it should be taken
18  care of.
19      Q   Was he talking about borrowing some
20  money on Robert Drell's property in New York
21  or somewhere? Because I saw that mentioned
22  in --
23      A   He didn't say.

Page 41

1       Q   He didn't say, but it's your
2   understanding that's where it was? Or did
3   you have an understanding?
4       A   We didn't have an understanding.
5   All we wanted was it straightened out.
6       Q   Okay. Didn't you find it sort of
7   odd that Adam DiSpirito, who had been out of
8   the picture for some eight or nine months,
9   all of sudden here you are dealing with him
10  again and you don't even have an outstanding
11  loan application with his company?
12      A   We found it kind of odd, but we
13  thought they were in business together.
14      Q   All right. Do you have anything
15  other than the documents that your in-laws
16  presented today and any word of mouth from
17  Palmer or Drell that they were in business
18  together?
19      A   No, sir.
20      Q   So you rely on the same documents
21  that your in-laws relied on to make that
22  assertion that they were all in business
23  together?

Page 42

1    A  I do.
2    Q  All right.  Well, how did -- if IPI
3 Skyscraper wasn't going to make a loan to
4 you, how did they -- how would they be
5 benefitted by clearing this up?
6    A  I have no idea.
7    Q  Okay.  At that particular point in
8 time, IPI Skyscraper had no contractual
9 obligation to you, did it?
10    A  No, sir.
11    Q  All right.  If -- if IPI Skyscraper
12 -- if Adam DiSpirito hadn't called for them,
13 you would have lost your home anyway wouldn't
14 you?
15    A  I don't know.  But he -- as my
16 mother- and father-in-law said, he
17 recommended, you know, no lawyers as well.
18 In other words, if --
19    Q  I understand that.
20    A  If you get lawyers involved, it's
21 going to take a lot longer for you to get
22 your money back is what he said.
23    Q  I can identify with that, but I

Page 43

1 think my question was, they had no
2 contractual obligation to you and you didn't
3 have a loan pending with them?
4    A  No, sir.
5    Q  Okay.  Well, so what's in it for
6 IPI?
7    A  I don't know.
8    Q  And you don't have any evidence
9 that you can cite me to where IPI benefitted
10 from this or got any money out of it?
11    A  Nothing but what we've already
12 talked about.
13    Q  In fact, you didn't even pay a
14 processing fee to IPI Skyscraper, did you?
15    A  Not that I know of.
16    Q  Now, when you had other mortgages
17 like at Compass Bank -- I mean, you know,
18 when you apply for credit sometimes, you have
19 to pay an application fee and stuff like
20 that.  Did you do that with Compass?
21    A  I'm sure we did.
22    Q  But you don't recollect doing that
23 with IPI?

Page 44

1    A  No, sir.
2    Q  When Adam DiSpirito talked to you
3 in November of '04, was there any talk about
4 you coming back as a customer to get a loan?
5    A  I can't remember for sure.
6    Q  All right.
7    A  I believe there was for my mother-
8 and father-in-law, but -- but not -- not for
9 us.
10    Q  I know for them.  I'm asking about
11 you right now.  Let me show you what I'll
12 mark as Defendant's Exhibit 3.
13        MR. IRBY:  Is it 3?
14        COURT REPORTER:  (Nods head.)
15        (WHEREUPON, Defendant's Exhibit 3
16        was marked for identification.
17        A copy is attached.)
18    Q  Do you remember when you answered
19 some -- I'll show you Defendant's Exhibit 3.
20 Do you remember answering those questions
21 before?
22    A  Yes, I do.
23    Q  And did you give true and correct

Page 45

1 answers, at the time, on those?
2    A  Yes, sir.
3    Q  Okay.  And you stated, I spoke with
4 Adam on more than one occasion about the
5 different options that could be provided by
6 IPI.  He told me IPI could beat anyone's
7 rates -- else's rates and he could offer many
8 different options.  After a few days my wife
9 and I decided to use the equity we had in our
10 existing home to finance construction of our
11 new home, and I did not speak with Adam or
12 anyone else at IPI again until approximately
13 November of 2004.
14        That's what you told us earlier
15 correct, right, and that's what you said in
16 your interrogatories?
17    A  That's correct.
18    Q  Now, you also went on to say, Adam
19 told me he was handling this himself and that
20 he got paid to straighten out messes like
21 this.
22        Did he say he was handling it for
23 IPI Skyscraper on their behalf or on behalf

**American Court Reporting**
**toll-free (877) 320-1050**

Page 46

1   of himself individually?
2       A   He didn't say.  But what he said
3   was he was handling it -- in other words, he
4   was not passing this duty off to another
5   individual there.  He was doing the actual
6   paperwork himself is what it sounded like to
7   us when he was telling us.
8       Q   That's what you understood him to
9   mean; is that correct?
10      A   Yes, sir.  Yes, sir.
11      Q   And he also said one of the
12  properties was in East Hampton, New York and
13  the loan would go through any day.
14          Would that have been Robert Drell's
15  property?
16      A   I don't know.
17      Q   Do you know if, in fact, a loan was
18  made to Robert Drell?
19      A   I have no idea.
20      Q   All right.
21      A   All I know is I spoke with him
22  several times -- me calling him and him
23  calling me.  And then probably about the

Page 47

1   middle of December the contact was completely
2   cut off, and we never heard from him again.
3       Q   Who cut off the contact?
4       A   We never -- he never called us
5   again.
6       Q   Did you try to call him back?
7       A   Yes, sir.
8       Q   Did he not return your call, or
9   what happened?
10      A   He didn't return the call.
11      Q   Did you leave him a message?
12      A   I can't remember for sure if we
13  left voicemails or whether we just called and
14  asked to speak with him.  We probably left at
15  least one voicemail.
16      Q   All during this time were you
17  getting up with the Palmers saying, man, what
18  have y'all done with my money?  Did you get
19  up with him about anything?
20      A   We had asked that after the lien
21  was filed against the Hugheses' home.
22      Q   Did you ever meet with Robert
23  Drell?

Page 48

1       A   No, sir.
2       Q   You met the -- I believe his name
3   was Jeff --
4           MR. IRBY:  What was his name?
5           MR. ADAMS:  Jernigan.
6       Q   Jernigan.  You did meet Jeff
7   Jernigan, though; right?
8       A   No, sir.  I spoke with Jeff
9   Jernigan on the phone.  My father-in-law met
10  with Jeff Jernigan.
11      Q   Oh, I'm sorry.  And where was he
12  calling you from?  Do you know?
13      A   No, sir.  I don't know.
14      Q   All those telephone calls you had
15  with Adam DiSpirito when you started out
16  trying to get the loan, you were in Dothan;
17  right?
18      A   Some were in Eufaula, and some were
19  in Dothan.
20      Q   Whereabouts in Eufaula?
21      A   At home.
22      Q   You were living in Eufaula at the
23  time?

Page 49

1       A   Yes, sir.
2       Q   All right.  All the telephone calls
3   you had in November of '04 about trying to
4   get the mess straightened out, you were in
5   Dothan at the time, were you not?
6       A   Yes, sir.
7       Q   Okay.  And about how many
8   phonecalls was it in '04, November?
9       A   At the end, or at the beginning?
10      Q   At the end.
11      A   At the end?  Probably a half dozen
12  calls.
13      Q   And how about at the beginning?
14      A   Probably two to three.
15      Q   All right.  And you would be in
16  Eufaula, and Adam would be in New York?
17      A   That's correct.
18      Q   Now, there was no problem about
19  those first two or three phonecalls because
20  you -- you weren't getting a loan with them,
21  were you?  You were just exploring options.
22  Y'all just, you know, were plodding along to
23  see if you wanted to do a deal with IPI,

**American Court Reporting**
**toll-free (877) 320-1050**

Page 50

1  weren't you?
2      A   That's correct.
3      Q   Of which you made the decision not
4  to -- you and your wife?
5      A   That's correct.
6      Q   All right. So there was nothing
7  misrepresented to you and no fraud
8  perpetrated to you in those first phonecalls,
9  was there?
10     A   In the first phonecalls, no, sir.
11     Q   And these latter phonecalls in
12  November of '04, all those were in Houston
13  County?
14     A   Yes, sir.
15     Q   Okay. And Adam didn't come through
16  -- whatever happened, you didn't get your
17  house back?
18     A   That's correct.
19     Q   Did you ever file any criminal
20  charges against the Palmers or anyone who got
21  your money?
22     A   I went to the police station and
23  spoke with an officer there. It was a lady.

Page 51

1  I can't remember her name.
2      Q   In Dothan or in Eufaula?
3      A   In Dothan. And she called someone
4  that actually she probably would have been
5  sending me to had -- had they taken me in,
6  and basically they turned me away and said
7  this is a civil matter that needs to be
8  handled through court; that it's not a
9  criminal matter because he's still in the
10  process of -- you're not in your house yet.
11  And of course I told them that our house had
12  been stolen from us, but that's pretty much
13  as far as it went.
14     Q   All right. You don't have any
15  evidence that IPI stole your house, do you?
16     A   Don't have any evidence other than
17  they were in business with the Palmers.
18     Q   So you say.
19     A   Yes, sir.
20     Q   All right. And you don't have any
21  evidence that IPI got any money from the
22  Palmers?
23     A   No, sir.

Page 52

1      Q   Okay. Did you ever file any
2  complaint with like the Better Business
3  Bureau or any state regulatory agency?
4      A   The Home Licensure Board.
5      Q   All right. And what did they do?
6      A   They came and did an investigation
7  and wrote a report. And last week we came to
8  Montgomery -- went to Montgomery to a hearing
9  about revoking the contractor's license that
10  the Palmers -- that Mr. Palmer had for Global
11  Development.
12     Q   Did they revoke it?
13     A   I'm not sure.
14     Q   Were the Palmers there?
15     A   No, sir.
16     Q   They didn't show up?
17     A   That's correct.
18     Q   Are you aware of any criminal
19  charges against the Palmers in Dothan or
20  anywhere?
21     A   Yes, sir.
22     Q   What's that?
23     A   Jarrett's being charged with

Page 53

1  forging documents, and I don't really know
2  what else.
3      Q   Okay. And tell me exactly how much
4  you were out that you expended for this home?
5      A   $145,000 that was paid directly.
6  $1500 in a sprinkler system that was not
7  completed, and then another 6- to $800 on
8  blinds that were installed in the house. So
9  probably 147- to 148,000.
10     Q   You put out that much money
11  yourself?
12     A   Yes, sir.
13     Q   Okay.
14     A   Then the apartment that we wound up
15  staying in longer than we should have -- kept
16  paying apartment rent, and we had a storage
17  building that we were paying rent to as well.
18  My wife --
19     Q   How much was that approximately?
20     A   I would have to figure it up. I
21  don't have it.
22     Q   Would it be less than 10,000?
23     A   I'm not sure.

Case 1:05-cv-01082-MHT-VPM   Document 27   Filed 01/06/2006   Page 15 of 41
**American Court Reporting**
**toll-free (877) 320-1050**

14 (Pages 54 to 57)

Page 54

1    Q    All right.
2    A    And my wife wound up going to the
3  doctor, had to take my son to the doctor
4  because all of this was almost -- drove us to
5  a nervous breakdown losing -- losing
6  basically everything.
7    Q    Well, who was your wife's doctor?
8    A    Dr. Bendinger and Meadows in
9  Abbeville.
10    Q    All right.  And what does she go to
11  them for?
12    A    She went to them for nerves after
13  all this happened.  You know, a lot of
14  stress.
15    Q    Had they been her family physicians
16  before that?
17    A    They had been our physicians for
18  several years.  Yes.
19    Q    Okay.  How many times did she see
20  Dr. Bendinger and his group for this?
21    A    I'm not sure how many times.  More
22  than one.  But like I said, she had to take
23  my son to the doctor as well.  He had a

Page 55

1  nervous problem.
2    Q    What -- related to this or
3  something else?
4    A    Yes, sir.
5    Q    What?  Something else?
6    A    Related to this.
7    Q    How -- how did he have a nervous
8  problem?
9    A    Well, we were taking the kids over
10  to the house in Westbrook as it was being
11  built.  So they were knowing that this is
12  where they were going to live, this is going
13  to be my bedroom, this is going to be your
14  bedroom.  This was not a daily thing, but
15  this was something that happened several
16  times during the week.
17    If you keep taking a child over to
18  a house and telling them that it's going to
19  be theirs, this is going to be their bedroom,
20  and then all of a sudden we're not going to
21  be our house anymore, we're going to stay in
22  the apartment longer, we're going to have to
23  find somewhere else to live -- it was why

Page 56

1  daddy, why mommy, why aren't we moving into
2  the house, you promised us this is where we
3  were going to be living.  And then all of a
4  sudden, it's was like you pulled the rug out
5  from under us.
6    Q    Well, did Dr. Bendinger and his
7  group treat your son too?
8    A    They did.  I don't believe they
9  ever gave him any medication because --
10    Q    How many times did he go to them?
11    A    At least once.  I'm not sure how
12  many times.
13    Q    What's your son's name?
14    A    Seth.
15    Q    Seth.  Did -- how old is he?
16    A    He's seven years old.
17    Q    Did your wife or your son ever go
18  to a psychiatrist about any of this?  I mean,
19  Bendinger is not a psychiatrist, is he?
20    A    My wife took my son to a child
21  psychiatrist or psychologist.  I'm not sure.
22  A psychiatrist, I think.
23    Q    Who was that?

Page 57

1    A    I can't remember his name.
2    Q    When was that?
3    A    Approximately spring of '05.
4    Q    Of course your son's not -- he's
5  not a party in this lawsuit, is he?
6    A    No, sir.  He's a part of it, but
7  not a party.
8    Q    All right.  And you told us you
9  went to Montgomery or wherever on the
10  administrative thing.  Do you have any kind
11  of loan with Washington Mutual?
12    A    Washington Mutual?  I can't think
13  of one.  We have -- no.  They -- they hold
14  our mortgage on our home now.  I believe it's
15  Washington Mutual.
16    Q    Okay.  Your lawyer had given me
17  some document.  I just wanted -- just
18  wondered what the relevance was.
19    A    We just pay the payment on it.
20    Q    Did you have to pay Washington
21  Mutual an application fee to get a loan with
22  them?
23    A    We took the loan through Southland

Page 58

1 Bank in Dothan, so I'm not sure who got the
2 fee.
3     Q    So you went through Southland to
4 get the loan, yet Washington Mutual actually
5 made the loan?
6     A    I think so.
7         (WHEREUPON, Defendant's Exhibit 4
8         was marked for identification.
9         A copy is attached.)
10    Q    Let's -- let me see. This is a
11 statement that your lawyer gave me.
12    A    Yeah. This is a copy of a mortgage
13 note that we're paying on our home now that
14 we've got --
15    Q    With Washington Mutual; right?
16    A    We got several months after all
17 this had ended.
18    Q    With Washington Mutual?
19    A    Yes, sir. We got the loan through
20 Southland, but they turned it over to
21 Washington Mutual.
22    Q    Okay. I want to let Mr. Boyd ask
23 you a few questions if he wants to.

Page 59

1
2 EXAMINATION BY MR. BOYD:
3     Q    Mr. Gassett, I represent Tom
4 Leonard in this lawsuit. Just a few
5 questions. Tell me about how you began the
6 process of picking out your lot in Dothan.
7     A    We had looked all over Dothan, but
8 we liked the west side because of the
9 elementary schools. And so we really wanted
10 a lot in that part of town. We liked the
11 RimRock subdivision, and we -- Jarrett had
12 told us he could get a particular lot there.
13 And then, as I told earlier, as it turned out
14 we were steered toward the Westbrook lot.
15    Q    Where is RimRock?
16    A    RimRock is off of Fortner Street on
17 the west side of Dothan.
18    Q    Okay. Across Honey Suckle?
19    A    It's right before you get to
20 Brannon Stand Road. If you're coming from
21 the circle toward Brannon Stand, RimRock will
22 be on the left right before you get to
23 Brannon Stand.

Page 60

1     Q    How much was the lot in RimRock?
2     A    We don't know.
3     Q    Do you know who owned the lot?
4     A    No, sir, we don't.
5     Q    And something happened to the
6 purchase of that lot? Is that what you're
7 telling us?
8     A    That's correct.
9     Q    What did -- what did Jarrett or
10 Warren, whoever, tell you about the lot? Or
11 what was the problem with you and your wife
12 purchasing the lot?
13    A    The way they expressed it to us,
14 someone had told them they could buy the lot.
15 And so they told us that they could get the
16 lot for us to build a house on. And like I
17 said, a week or two later, he contacted us
18 and told us that something had happened, the
19 deal had fell through, and he couldn't get
20 the lot, but he had another lot --
21    Q    Y'all never discussed the price of
22 that lot?
23    A    No.

Page 61

1     Q    Never gave you a price range?
2     A    Yeah. I mean, I think maybe he
3 said the lots in there are approximately
4 $30,000. The lots in there are approximately
5 25- to $30,000. Maybe something like that.
6     Q    And when did -- what time period
7 are we talking about?
8     A    We're talking about mid-March of
9 '04.
10    Q    And how did -- how were you steered
11 toward the Westbrook lot?
12    A    Well, after the lot in RimRock fell
13 through, we had already given them $30,000.
14 And so he told us that he had money tied up
15 in our home materials and he really wanted to
16 build us a house, but if we didn't want to do
17 that, then he would give us our money back.
18 But if we would, to go look at this other lot
19 and see if we were interested. The lot was
20 in Westbrook, and Tom Leonard wound up buying
21 the lot.
22        So we went and looked at the lot
23 and -- you know, initially we were

**American Court Reporting**
**toll-free (877) 320-1050**

16 (Pages 62 to 65)

Page 62

1    apprehensive about doing it because we had
2    already decided on the RimRock lot, but we
3    decided to go ahead with it.  As it turned
4    out, it looked like it was going to be a good
5    thing.
6        Q    Okay.  Did you talk about the price
7    of the Westbrook lot?
8        A    No, sir.  He said it was a more
9    expensive lot, but since he already had money
10   tied up, he would -- we would go ahead and
11   get the house and lot for the same price that
12   we were going to get it in RimRock.
13       Q    Had you entered into a contract
14   with Global Development at that time?
15       A    Yes, sir.
16       Q    And when was that contract entered
17   into?
18       A    I think March 21 of 2004.
19       Q    And that was about the same time
20   y'all were looking at lots?
21       A    Yes, sir.
22       Q    Both at the RimRock and the
23   Westbrook lot?

Page 63

1        A    No, sir.  We were not considering
2    the lot in Westbrook, but we were considering
3    a lot in RimRock.
4        Q    So at the time the contract was
5    entered into, you were focussed on the
6    RimRock lot?
7        A    Yes.
8        Q    Okay.  How long was it after the
9    contract was signed that that lot fell
10   through?
11       A    A week to ten days.
12       Q    Okay.  And did the Palmers -- did
13   they immediately put you on the Westbrook
14   lot?
15       A    That's when -- that's when he
16   contacted me about going to look at it to see
17   if I was interested in -- in just building
18   the house in Westbrook.
19       Q    Okay.  Do you know who owned the
20   lot at the time you looked at it?
21       A    In Westbrook?
22       Q    Yeah.
23       A    No, sir.

Page 64

1        Q    Was Tom Leonard's name ever
2    mentioned to you --
3        A    Not at that time.
4        Q    -- during this time?  Was Wiregrass
5    Properties' name ever mentioned to you before
6    this time?
7        A    No.
8        Q    When you were negotiating with
9    Global Development about building your house,
10   did y'all ever talk about a price?
11       A    Yes, we did.
12       Q    Okay.  And tell me about those
13   -- that conversation or that communication?
14       A    The price on the house started out
15   a little lower than what it wound up being
16   because it seems like you always add stuff to
17   rather than take away, but I think it
18   initially started in the one forties and then
19   wound up being in 153,000 range.
20       Q    Okay.  And that's what you signed
21   the contract for?
22       A    Right.
23       Q    Who provided the plans for the

Page 65

1    house?
2        A    Global did.
3        Q    Did you give them a general idea of
4    what you wanted your house to look like and
5    what the floor plan was to be when they drew
6    it?
7        A    Yes, sir.  We had a set of plans
8    from a house that we had seen some time back
9    that we liked, and so we took those plans.
10   And they modified them slightly, and that's
11   what we were going to build.
12       Q    Did you look at any other houses in
13   Westbrook before you started building?
14       A    No, sir.
15       Q    Were there houses for sale in
16   Westbrook before you started building?
17       A    I can't remember.
18       Q    So you didn't look at the
19   neighborhood as far as the price that houses
20   were selling for?
21       A    I knew that most likely they were
22   probably a little bit more than what ours was
23   selling for, and I knew ours was going to be

**American Court Reporting**
**toll-free (877) 320-1050**

Page 66

1   one of the less expensive houses in the
2   neighborhood, but, you know, they keep going
3   up every day so --
4       Q    How big was -- what was the square
5   footage of your house?
6       A    Between 22- and 2300 heated.
7       Q    Was it an all brick house?
8       A    All brick.
9       Q    Was -- did it have a lot of
10  upgrades in the house, meaning hardwood
11  flooring?
12      A    The wood laminate hardwood
13  flooring, but not -- not anything real
14  elaborate.
15      Q    Have any granite countertops?
16      A    No.
17      Q    And the total contract for the
18  house was 153,000; is that right?
19      A    That's correct.
20      Q    And that included the lot?
21      A    That's correct.
22      Q    And I think you talked a little bit
23  about the problems you had along the way with

Page 67

1   construction of the home before the meeting
2   with Mr. Leonard; is that right?
3       A    That's correct.
4       Q    Okay.  Is there anything else, any
5   other problems you had during construction
6   that you remember?
7       A    Not anything that really sticks
8   out.
9       Q    Okay.  Just a slow go I guess is
10  the best way to put it?
11      A    Slow go and the plumbing problems I
12  spoke about.  The foundation and the footer
13  that was going to be supporting the upstairs
14  room was the big thing.
15      Q    Okay.  And you communicated these
16  problems to Tom Leonard -- I mean, to Jarrett
17  Palmer; is that right?
18      A    That's correct.  Jarrett and Warren
19  Palmer.
20      Q    Did you ever see Tom Leonard on the
21  construction site?
22      A    No, sir.
23      Q    Did you ever see anyone from

Page 68

1   Wiregrass Properties on the construction
2   site?
3       A    No, sir.
4       Q    Okay.  And your mother-in-law just
5   testified that on the day she received the
6   notice of the lien on their home that she
7   contacted you; is that right?
8       A    That's correct.
9       Q    Can you tell us what the substance
10  of that conversation was?
11      A    Well, they had already received the
12  lien from Jordan's Building Supply.  So when
13  they received the lien from Tom Leonard, I
14  mean, it was very upsetting.  You can
15  understand why.  So like she said, she called
16  me instead of my father-in-law.  So she and I
17  just followed each other to Wiregrass
18  Properties.
19           We didn't know exactly where it was
20  at.  We had a general idea.  We found it.
21  Went to Wiregrass Properties, spoke with Bill
22  Mitchum -- Tom Leonard was not there -- and
23  we made an appointment for the following -- I

Page 69

1   think Monday it was.
2       Q    Then tell me about the meeting you
3   had with Tom Leonard.
4       A    It was like first thing that Monday
5   morning.  It was like an eight or
6   nine o'clock meeting if I remember right.  He
7   met with the Hugheses first and wouldn't let
8   me in to hear what was going on.  And then
9   after he met with them, he met with me.
10           We talked about the lien -- or we
11  talked about the fact that he had -- he owned
12  the lot and had paid for materials and
13  labor -- I don't know how much material and
14  labor -- and that we needed to see if we
15  couldn't work this thing out, give Jarrett
16  and Global time to come up with the money
17  -- come up with a solution, and that he had
18  spoken with Adam DiSpirito, and that he
19  thought it would all be resolved in a few
20  days.
21      Q    Okay.  Was that the first time
22  -- you believe that was the first time Mr.
23  Leonard had any knowledge that you had put

Page 70

1  any money down on the house?
2      A   I don't know.
3      Q   Okay.  Is that what he indicated to
4  you?
5      A   That's what he indicated to me.
6      Q   Okay.  Did you believe him?
7      A   I wasn't sure whether I believed
8  him or not.
9      Q   Okay.  Did you take any documents
10  with you to that meeting?
11      A   I can't remember.
12      Q   Okay.
13      A   My little packet of information
14  that y'all have, I may have had that with me,
15  but I can't -- I don't think I took it in the
16  office with me anyway.
17      Q   Did Mr. Leonard ever show you any
18  documents during the meeting?
19      A   He showed me a printout of where he
20  had invoices, supposedly, for where he had
21  paid for materials and work on the house in
22  Westbrook.
23      Q   Showed a tally sheet of all the

Page 71

1  materials and labor that had gone into your
2  house?
3      A   Something like that.  Yeah.
4      Q   And that document has also been
5  produced at Mr. Leonard's deposition.  Have
6  you looked at that -- that tally sheet?
7      A   I don't know whether I looked at it
8  or not.  I can't remember.
9      Q   Have you read Mr. Leonard's
10  deposition?
11      A   Yes, I have.  I probably did look
12  at the tally sheet, but didn't study it --
13  just thumbed through it.
14      Q   It indicates about $168,000 were
15  paid by him for the labor and materials on
16  your house.  Do you have any evidence that
17  would suggest that that's incorrect, that he
18  has not paid that amount of money toward the
19  construction of your house?
20      A   Any evidence?
21      Q   Yeah.
22      A   No.
23      Q   If he says that he has paid that

Page 72

1  amount of money toward the construction of
2  your home, do you dispute that?
3      A   I don't know whether he did or not
4  other than what he showed me on the
5  paperwork.
6      Q   After you left the meeting with Tom
7  Leonard, did you and your in-laws communicate
8  about what all had gone on?
9      A   We were still pretty upset.  Well,
10  not pretty upset.  Very upset.  So we didn't
11  really know what to think.
12      Q   Did Mr. Leonard ask y'all to
13  provide him with anything?
14      A   He wanted to see where we had paid
15  the money.  And, of course, we had already
16  shown him that.
17      Q   At the meeting that day?
18      A   Yeah.  I believe it was -- that was
19  the only time we met with him, so it had to
20  have been that date.
21      Q   What did you show him to prove that
22  you paid the money?
23      A   Showed him the copies of where we

Page 73

1  had paid money to Construction Services for
2  the house.
3      Q   Were these bank statements or
4  transaction statements?
5      A   One of them was a cashier's -- a
6  copy of a cashier's check, and the other two
7  were copies of where money had been wired to
8  a SouthTrust Bank account.
9      Q   Did you leave that with Mr.
10  Leonard, or did you take those documents with
11  you?
12      A   I can't remember.
13      Q   Did you ever supply Mr. Leonard
14  with any -- any of these documents?
15      A   I'm not sure.  I can't -- I can't
16  remember really giving him anything,
17  paperwork-wise.  I'm not sure he ever asked
18  for anything, but he did want to know about
19  us paying the --
20      Q   Did he seem surprised that y'all
21  had paid money down on the house?
22      A   I couldn't tell whether he was
23  surprised or not.

**American Court Reporting**
**toll-free (877) 320-1050**

19 (Pages 74 to 77)

Page 74

1    Q    Well, you met with him after your
2  in-laws; is that right?
3    A    That's right.
4    Q    Well, tell me what -- generally
5  what you say that Tom Leonard did wrong in
6  this whole ordeal?
7    A    Well, I don't have a house. I know
8  that. And I don't have the money that I paid
9  for the house. And he and Global, Jarrett,
10  were in business together. And we're the
11  ones losing out on the deal.
12    Q    And how do you say him and Jarrett
13  were in business together?
14    A    Well, we had an agreement: Jarrett
15  to build the house and him to pay for
16  materials and labor.
17    Q    And that's what you base your
18  statement that -- or your position that they
19  were in business together?
20    A    Well, if me and you made an
21  agreement for me to build a house and you to
22  pay for the material and labor, we would
23  have -- we would have a little partnership

Page 75

1  going there it sounds like to me.
2    Q    Well, is that your only basis for
3  saying they were in business together?
4    A    Right now, yeah.
5    Q    Okay. And back to my question.
6  Specifically what did Tom Leonard or
7  Wiregrass Properties do wrong?
8    A    Stole my house.
9    Q    Tom Leonard did?
10    A    I don't have it.
11    Q    But you say Tom Leonard stole your
12  house?
13    A    Well, he had the deed -- he had the
14  deed to it. He sold it.
15    Q    And Tom Leonard -- have you seen
16  the check from Wiregrass Properties to the
17  owner of the lot, that he paid for the lot
18  and the home? Have you seen that?
19    A    The payment where Wiregrass
20  Properties paid for the lot at Westbrook?
21    Q    Right.
22    A    I think it's in the paperwork.
23    Q    So you're aware that he did pay for

Page 76

1  the lot?
2    A    That's right.
3    Q    And are you aware that Tom has
4  presented documentation that he paid about
5  $168,000 toward the construction of the home?
6    A    I'm aware of that, yes.
7    Q    Okay. Anything else that you say
8  that Tom Leonard has done wrong in connection
9  with your home?
10    A    Not anything that I can really --
11  really think of.
12    Q    Do you think that Tom knew that you
13  had paid money down on the home?
14    A    I don't know. I don't know whether
15  he knew or not.
16    Q    Okay.
17    A    I don't know how their deal was
18  worked out.
19    Q    Okay. In your interrogatory
20  responses you say that Tom Leonard has a copy
21  of the contract between you and Global
22  Development. Have you -- do you remember
23  answering the interrogatories?

Page 77

1    A    I do.
2    Q    Is this a copy of your responses?
3       MS. COOK: Do you want to mark it --
4       MR. BOYD: I'm going to mark it as
5  whatever the next --
6       COURT REPORTER: It would be Number
7  5.
8       (WHEREUPON, Defendant's Exhibit 5
9       was marked for identification.
10       A copy is attached.)
11    A    Yeah. That looks like a copy of
12  the interrogatories that we answered.
13    Q    And that's your signature on the
14  second to last page?
15    A    That's correct.
16    Q    Okay. Let me see that. In
17  response to Number 12 you say that Tom
18  Leonard has a copy of our contract. Now, do
19  you mean that he had a copy of the contract
20  before y'all met on that day in November of
21  '04?
22    A    I don't know exactly when he got
23  the contract, but he -- I'm pretty sure he

**American Court Reporting**
**toll-free (877) 320-1050**

Page 78

1  told me he had a copy of the contract is the
2  way that I know he had a copy -- is he told
3  me.
4      Q    During that meeting?
5      A    Even though we didn't have anymore
6  face-to-face meetings after the November 1,
7  he and I spoke on the phone several times
8  after that.
9      Q    We have -- we have produced
10  documents in response to your request in this
11  case.  And we produced a copy of the contract
12  between you and Global Development.  Have you
13  seen that contract?
14      A    Yes.
15      Q    Okay.  And this was marked as
16  Exhibit 3 to Mr. Leonard's deposition.
17          MR. BODY:  Can you mark that as
18  Exhibit 5 -- or 6.
19          (WHEREUPON, Defendant's Exhibit 6
20          was marked for identification.
21          A copy is attached.)
22      A    Yeah.  That's a copy of the
23  contract.

Page 79

1      Q    Okay.  Will you look up at the top
2  of the contract?  Is there a business name at
3  the top on the fax ID bar, I guess is what it
4  would be?
5      A    You're referring to the -- like
6  where you faxed it to somebody?
7      Q    Sure.
8      A    Yes, there is.
9      Q    What is the name of the business?
10      A    Polyengineering, Incorporated.
11      Q    Okay.  Is that Polyengineering's
12  fax number?
13      A    It looks like it is.  Yes.
14      Q    Okay.  That is a copy of the
15  contract that we produced in response to your
16  request.  And what's the date of that fax?
17      A    November 17, 2004.
18      Q    Would that have been about the time
19  you met with Mr. Leonard?
20      A    We met with him on November 1, I
21  believe.
22      Q    Okay.  So if Mr. Leonard didn't get
23  a copy of the contract until November the

Page 80

1  17th of 2004, he would not have known the
2  details of your agreement with Global
3  Development.  Would that be fair to say?
4          MS. COOK:  Objection.  Calls for
5  speculation.
6      A    No.  He -- he told me he got a copy
7  of our contract back when he made his
8  agreement with Global Development.
9      Q    Okay.  You specifically remember
10  him saying that?
11      A    I'm 99 percent sure.
12      Q    But it's possible he didn't say
13  that?
14      A    I guess it's possible.
15          MR. SEABORN:  1 percent.
16      A    Because I remember him saying he
17  had a copy of our contract and a copy of the
18  Hugheses' contract before he made his
19  agreement with Global Development.
20      Q    And you're sure it was that
21  contract?
22      A    This is the only contract I've ever
23  seen.

Page 81

1      Q    And how did y'all -- you end the
2  meeting with Mr. Leonard in November?
3      A    We left the meeting hoping that
4  whatever IPI or Adam DiSpirito was supposed
5  to be doing along with the Palmers and Tom
6  Leonard himself -- whatever they were going
7  to finally resolve would leave us with the
8  house that we had bought instead of empty
9  handed.
10      Q    Did you contract with Tom Leonard?
11      A    No.
12      Q    Did you contract with Wiregrass
13  Properties?
14      A    No.
15      Q    And you never spoke with Tom
16  Leonard until November the 1st, 2004?
17      A    That's correct.
18      Q    You never knew who he was until
19  November 1st, 2004?
20      A    I heard some of the subcontractors
21  talking about Wiregrass Properties or maybe
22  other jobs that may have been going on, and I
23  had heard the name before.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 82

1   Q   While you were on the job site?
2   A   While I was out there at the house.
3   Q   But you never --
4   A   But I didn't know --
5   Q   -- followed up on that?
6   A   -- who he was.  No.
7       Earlier, when you asked about
8   Wiregrass Properties and Tom Leonard, he also
9   told me that he had ridden out to our house
10  with Jarrett before.  I don't know how many
11  times, but at least once.  I'm not sure what
12  it was concerning, but that completely
13  answers the question you had asked.
14  Q   Do you remember your in-laws ever
15  providing Mr. Leonard with any documents
16  relevant to this house?
17  A   I don't know.
18  Q   Did you ever ask for a deed to the
19  lot?
20  A   Yes.
21  Q   When was that?
22  A   Early on.  Probably May or June I
23  started asking about the deed.  And first he

Page 83

1   would tell me that it was being recorded and
2   that I would get it after it had been
3   recorded.
4   Q   Who is "he"?
5   A   Jarrett.  I'm sorry.  And then a
6   little bit later it was, when we finish the
7   house and we settle up, that's when you'll
8   get your deed.
9       So even though we weren't going to
10  go to a formal closing because we weren't --
11  there was not going to be a mortgage on the
12  house, we would have still owed him moneys
13  based on what we hadn't paid yet, and we
14  would need to figure out that.  And then once
15  everything was settled up, we would get the
16  deed.
17  Q   Did you talk to anyone else about
18  building your house?
19  A   Talked with one other contractor.
20  Probably -- it was probably January of 2004.
21  One other contractor about building the
22  house.
23  Q   Okay.  Who was that?

Page 84

1   A   I can't remember his name because
2   that's been nearly two years ago.
3   Q   Was it the same lot in RimRock that
4   you were talking to him about?
5   A   We hadn't decided on a lot at the
6   time.
7   Q   What price range had you talked to
8   Jarrett or Warren about keeping the house
9   within?
10  A   In the $150,000 range.
11  Q   Do you have any idea as to how Tom
12  Leonard benefitted from this transaction?
13  A   I don't have any idea.
14  Q   Do you know how he -- you say that
15  he's conspired to deprive you of your
16  property and your money.  Can you tell me how
17  he did that?
18  A   I don't know how he did it.  As I
19  said earlier, I don't have my house and we're
20  left with nothing.
21  Q   So you have no theories as to how
22  this all worked out?
23  A   We don't.  I don't.  All I know is

Page 85

1   he and Jarrett were partners building our
2   house, and now we don't have a house.  And
3   Adam DiSpirito and IPI were supposed to help
4   straighten the mess out.  That didn't happen
5   either.
6   Q   But as far as the specifics of the
7   conspiracy, you don't have any knowledge as
8   to how it worked?
9   A   I don't.
10  Q   Okay.  You don't have any evidence
11  of how it worked?
12  A   No, I don't.  I have minus $145,000
13  though.
14  Q   Okay.  And you don't have any
15  specific evidence that Tom Leonard knew you
16  had made payments on the house?
17  A   Not specific evidence.  If he did
18  have a copy of the contract, like he told me
19  he did, if he had read it, it would show that
20  the payments were going to be made to
21  Construction Services.
22  Q   Did you grow up in Barbour County?
23  A   Dale County.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 86

1      Q    And how long have you been working
2  for Polyengineering?
3      A    Since January of 2004. January
4  will be two years.
5      Q    Have you ever had any conversations
6  with Jim Corley?
7      A    One time, yes.
8      Q    Okay. When was that?
9      A    I think it was April of '05. I was
10  in the north side K-Mart in Dothan and ran
11  into he and Jarrett.
12      Q    Okay. What -- what was the
13  substance of that conversation?
14      A    He basically told me that he was
15  trying to help straighten the situation out
16  and that they thought it would be taken care
17  of and straightened out within a few days. I
18  can't remember. I was so angry at seeing
19  him, so I can't remember what all was said,
20  but he did say that things were being worked
21  out and that it should be taken care of in a
22  few days. This was in April of 2005.
23      Q    Was Jim making these statements, or

Page 87

1  was it Jarrett?
2      A    Jim.
3      Q    Did you talk to Jarrett at all?
4      A    There was maybe a word or two in
5  there that I won't repeat.
6      Q    But Jim was sort of the peacemaker
7  of the conversation?
8      A    That's correct.
9      Q    Do you think Jim is in business
10  with Jarrett Palmer?
11      A    I think somehow he is.
12      Q    Okay. And what do you base that
13  on?
14      A    I think his name is on the web site
15  with everyone else's.
16      Q    The Global Development --
17      A    The Global Development web site.
18      Q    Is Tom Leonard's name on the web
19  site?
20      A    I haven't spent a lot of time on
21  the site. It's not on the front page there
22  with Global's employees.
23      Q    Is Wiregrass Properties mentioned

Page 88

1  on that web site?
2      A    I don't know about that either.
3      Q    What does the web site say about
4  Jim Corley?
5      A    I'm not sure it says a lot of
6  anything other than whatever his title is.
7      Q    What is his title?
8      A    I can't remember what it said.
9  Like salesman, foreman. I'm not sure.
10      Q    Is that the first time you had ever
11  seen him, in K-Mart?
12      A    Yes.
13      Q    Did Jarrett introduce him to you?
14      A    I think so. Or he may have
15  introduced himself.
16      Q    Okay. Have you heard anyone else,
17  throughout the whole ordeal, mention Jim
18  Corley?
19      A    I think one of y'all had asked the
20  Hugheses.
21      Q    Besides what we've heard today.
22      A    Oh, besides what we've heard today?
23      Q    Yes.

Page 89

1      A    No, no. Not that I can remember.
2      Q    So let me just clarify this to get
3  it straight for myself. The equity you had
4  in your home in Eufaula was used to make the
5  payments to Construction Services and Jarrett
6  Palmer; is that right?
7      A    Yes.
8      Q    And that used up all the equity you
9  had in your house, those payments that you
10  made?
11      A    Yes.
12      Q    What did you sell your house for?
13      A    I can't remember exactly. It was
14  the low one forties. One forty-one, one
15  forty-two, something like that. That was in
16  May of 2004.
17      Q    How long did you have your house in
18  Eufaula?
19      A    Almost nine years.
20      Q    Did you inherit the house?
21      A    No, we didn't.
22      Q    And what did you pay for it?
23      A    How much?

Page 90

1    Q    Yeah.
2    A    I can't remember.  It was 1995.  We
3    bought the lot.  I think it was around
4    10,000 --
5    Q    Was it a new construction?
6    A    Yes.  It was around 10,000, and
7    then I think the house back then was 75,000
8    or so.
9    Q    And you're still paying on -- well,
10   I'm sorry.  You took -- the house you live on
11   Bradberry now, it has a mortgage --
12   A    It does.
13   Q    -- of about 145,000?
14   A    It does.
15   Q    And how long have you been in that
16   house?
17   A    Since March of 2005.
18   Q    So not very long.  Just give me a
19   second.  I think I'm through.  I'll pass you
20   along in a moment.
21           (3:15 p.m., off the record.)
22           (3:21 p.m., back on the record.)
23   Q    Just one question or two.

Page 91

1    A    Or three.
2    MR. IRBY:  Or two.
3    Q    Have you ever lived anywhere
4    besides -- well, let me strike that.  At the
5    time this contract was entered into, were you
6    living in Eufaula?
7    A    I was.
8    Q    Okay.  And how long had you been
9    living in Eufaula at the time this contract
10   was signed?
11   A    Almost nine years.
12   Q    And then shortly thereafter you
13   moved to Dothan?
14   A    Signed the contract in March, moved
15   to Dothan in May.
16   Q    Okay.  Have you ever lived anywhere
17   in Barbour County besides Eufaula?
18   A    No.
19   Q    That's all I have.  Thank you.
20   A    Well, I take that back.  We lived
21   with my in-laws temporarily while the house
22   was being built in Eufaula.  So we lived in
23   Louisville three or four months before we

Page 92

1    moved to Eufaula in 1995.
2    Q    Before your house in Eufaula was
3    built?
4    A    That's correct.
5    Q    Okay.  For a few months?
6    A    That's correct.
7    Q    Thank you.
8
9    RE-EXAMINATION BY MR. IRBY:
10   Q    Just one question too.  Earlier you
11   testified, when Bo was asking you about you
12   went on the Global Development web site and
13   it had Jim Corley listed and -- who else did
14   it have listed that you recollect?
15   A    Well, I remember it had Warren
16   Palmer, Jarrett Palmer, Robert Drell, Jim
17   Corley, and there was maybe one or two more
18   names that I can't remember.
19   Q    It didn't have Adam DiSpirito, did
20   it?
21   A    I don't remember seeing Adam's.
22   Q    That's all.  Thank you.
23          (FURTHER DEPONENT SAITH NOT.)

1          C E R T I F I C A T E
2    STATE OF ALABAMA)
3    JEFFERSON COUNTY)
4          I hereby certify that the
5    above and foregoing deposition was
6    taken down by me in stenotype and the
7    questions and answers thereto were
8    transcribed by means of computer-aided
9    transcription, and that the foregoing
10   represents a true and correct
11   transcript of the testimony given by
12   said witness upon said hearing.
13          I further certify that I am
14   neither of counsel, nor of kin to the
15   parties to the action, nor am I in
16   anywise interested in the result of
17   said cause.
18
19
20   _____
21   Melissa S. Lee, CSR
22   Notary Public
23   My Commission Expires 9/16/2006

**American Court Reporting**
**toll-free (877) 320-1050**

| A | | | | | |
|---|---|---|---|---|---|
| **Abbeville** 54:9 | 84:4,8 88:2 88:3 90:13 92:11 | **administr...** 57:10 | 6:12,17 17:22 23:5 30:3,14 | **Amended** 5:3 | 67:7 72:13 73:16,18 76:7,10 |
| **about** 3:12 10:20 12:2 12:12 14:9 15:15,17 15:18 16:17,21 23:6,12 24:3 26:8,8 26:18,21 26:22,22 28:7,18,22 31:5,18 32:21 33:2 33:13 35:9 36:18 37:23 38:14,16 38:18 40:19 43:12 44:3 44:10 45:4 46:23 47:19 49:3 49:7,13,18 52:9 56:18 59:5 60:10 61:7,8 62:1 62:6,19 63:16 64:9 64:10,12 66:23 67:12 69:2 69:10,11 71:14 72:8 73:18 76:4 79:18 81:21 82:7 82:23 83:17,21 | **above** 9:12 28:5,9 29:6 93:5 **accommod...** 25:6 **accordance** 5:1 **account** 24:18 33:19 73:8 **Across** 59:18 **act** 25:7 **acting** 9:3 **action** 2:5,12 93:15 **actual** 46:5 **actually** 16:5,11 23:14 25:15 51:4 58:4 **Adam** 17:16 19:5 22:23 36:13,20 37:9 39:22 40:4 41:7 42:12 44:2 45:4,11,18 48:15 49:16 50:15 69:18 81:4 85:3 92:19 **Adams** 7:18 48:5 **Adam's** 36:23 92:21 **add** 64:16 | **adopt** 11:7 **adventure** 34:5 **advise** 34:4 **advised** 5:9 **affiliated** 24:12 **afford** 13:14 **after** 31:3 33:1 37:16 37:20 38:15 45:8 47:20 54:12 58:16 61:12 63:8 69:9 72:6 74:1 78:6,8 83:2 **again** 33:6 33:14 34:20 41:10 45:12 47:2 47:5 **against** 35:6 40:15 47:21 50:20 52:19 **agency** 52:3 **ago** 27:5 84:2 **agreed** 3:3 3:14,22 23:18,22 24:17 25:13 31:18 **agreement** | 32:3 74:14 74:21 80:2 80:8,19 **ahead** 23:20 24:16 27:10 31:18 33:23 62:3 62:10 **al** 2:9,16 **Alabama** 2:2 3:8,10 5:2 7:8,13,21 8:9 9:3,6 9:10 12:16 12:20 93:2 **Albert** 7:18 **almost** 54:4 89:19 91:11 **along** 5:7 30:23 31:2 31:20 49:22 66:23 81:5 90:20 **already** 14:13,14 15:15 16:23 23:14 24:3 30:21 38:20 43:11 61:13 62:2 62:9 68:11 72:15 **always** 25:8 64:16 | 21:11 71:18 72:1 **angry** 86:18 **another** 26:20 31:19 33:11 46:4 53:7 60:20 **answered** 44:18 77:12 **answering** 44:20 76:23 **answers** 45:1 82:13 93:7 **anybody** 19:6,8 26:18 32:1 **anymore** 55:21 78:5 **anyone** 45:12 50:20 67:23 83:17 88:16 **anyone's** 45:6 **anything** 16:20 26:17 28:21 31:23 33:9 34:16 35:4 41:14 47:19 66:13 67:4 | 88:6 **anyway** 21:22 26:7 27:11 42:13 70:16 **anywhere** 52:20 91:3 91:16 **anywise** 93:16 **apartment** 53:14,16 55:22 **Apartments** 11:21 **apparent** 35:2 **appeared** 22:23 **applicable** 11:2 **application** 21:4,7 41:11 43:19 57:21 **applications** 36:23 **applied** 21:6 **apply** 33:12 43:18 **appointme...** 68:23 **appreciate** 20:8 **apprehens...** 62:1 **approxim...** |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 2

11:17
14:17
37:12
45:12
53:19 57:3
61:3,4
**April** 14:18
24:2 30:20
86:9,22
**areas** 33:13
**around** 90:3
90:6
**asked** 10:9
12:7 26:5,7
47:14,20
73:17 82:7
82:13
88:19
**asking** 21:12
44:10
82:23
92:11
**assembled**
29:17
**assertion**
41:22
**assign** 4:4
**associated**
16:16
**attached**
15:4 21:15
44:17 58:9
77:10
78:21
**aware** 52:18
75:23 76:3
76:6
**away** 51:6
64:17

**B**
**back** 23:1,20

25:1 28:18
37:14
42:22 44:4
47:6 50:17
61:17 65:8
75:5 80:7
90:7,22
91:20
**background**
13:4
**bad** 26:18
**bank** 18:8
20:1,3
33:17
43:17 58:1
73:3,8
**bar** 79:3
**Barbour** 2:2
85:22
91:17
**base** 74:17
87:12
**based** 83:13
**basically**
23:19 51:6
54:6 86:14
**basis** 75:2
**beat** 19:6,8
45:6
**become** 35:1
**bedroom**
55:13,14
55:19
**before** 3:7
9:8,23
11:18 12:8
12:14
15:20 16:3
17:2 21:20
22:13
25:10,12
27:6,13

32:18 34:4
36:18 38:6
44:21
54:16
59:19,22
64:5 65:13
65:16 67:1
77:20
80:18
81:23
82:10
91:23 92:2
**began** 15:18
28:6 59:5
**beginning**
49:9,13
**behalf** 45:23
45:23
**behind**
18:16
**being** 9:17
10:13
11:22
24:21
40:10,14
52:23
55:10
64:15,19
83:1 86:20
91:22
**believe**
35:13 44:7
48:2 56:8
57:14
69:22 70:6
72:18
79:21
**believed**
70:7
**Bendinger**
54:8,20
56:6,19

**benefitted**
42:5 43:9
84:12
**besides**
88:21,22
91:4,17
**best** 24:11
67:10
**better** 23:9
52:2
**between** 3:4
10:16 66:6
76:21
78:12
**big** 40:8 66:4
67:14
**bigger** 23:9
**Bill** 68:21
**bills** 30:12
**bit** 65:22
66:22 83:6
**blinds** 53:8
**Bo** 92:11
**Board** 52:4
**BODY**
78:17
**bonus** 28:5,9
28:14
**borrow** 19:8
**borrowed**
40:15
**borrowing**
40:19
**Both** 62:22
**bought** 34:8
34:12
35:21 36:1
36:2 39:1
81:8 90:3
**Box** 7:7 8:8
**Boyd** 6:6 8:6
11:7 58:22

59:2 77:4
**Bradberry**
11:15,19
12:10
90:11
**Brannon**
59:20,21
59:23
**breakdown**
54:5
**brick** 66:7,8
**bring** 27:16
**Broad** 7:20
**broke** 23:23
**build** 14:11
14:19,23
17:13,13
17:20
25:13
26:10 32:4
60:16
61:16
65:11
74:15,21
**Builders**
29:21
**building**
14:14
15:15,19
22:21
25:16,22
26:21
27:15
31:11
35:15
40:12
53:17
63:17 64:9
65:13,16
68:12
83:18,21
85:1

**built** 11:22
24:21
34:14,21
40:10
55:11
91:22 92:3
**Bureau** 52:3
**business**
26:13
41:13,17
41:22
51:17 52:2
74:10,13
74:19 75:3
79:2,9 87:9
**businesses**
13:13
**buy** 30:7
60:14
**buying**
61:20
**B.S** 13:6

**C**
**C** 7:1 8:1
93:1,1
**call** 12:4
21:9 47:6,8
47:10
**called** 23:7
25:15 26:2
28:23 33:5
40:5 42:12
47:4,13
51:3 68:15
**calling** 46:22
46:23
48:12
**calls** 48:14
49:2,12
80:4
**came** 9:8

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 37:23 52:6 | **circle** 59:21 | **Compass** | **conspiracy** | 66:17 | 80:6,17,17 |
| 52:7 | **CIRCUIT** | 20:1,3 | 85:7 | 76:21 | 85:18 |
| **campus** | 2:1 | 33:17 | **conspired** | 77:18,19 | **Corley** 86:6 |
| 12:21 | **cite** 43:9 | 43:17,20 | 84:15 | 77:23 78:1 | 88:4,18 |
| **care** 14:2 | **civil** 2:5,12 | **complain** | **construction** | 78:11,13 | 92:13,17 |
| 40:18 | 5:2 9:6 | 25:2 | 8:4 16:9,16 | 78:23 79:2 | **correct** 37:7 |
| 86:16,21 | 13:22 51:7 | **complained** | 16:18 | 79:15,23 | 44:23 |
| **Carroll** 13:5 | **clarify** 89:2 | 25:7 | 23:16 24:5 | 80:7,17,18 | 45:15,17 |
| **case** 10:4,23 | **Clayton** 2:3 | **complaining** | 24:7,12,18 | 80:21,22 | 46:9 49:17 |
| 11:3 78:11 | 3:10 7:13 | 28:18 | 31:5,19 | 81:10,12 | 50:2,5,18 |
| **cash** 34:11 | 9:10 | **complaint** | 33:18,21 | 85:18 91:5 | 52:17 60:8 |
| **cashier's** | **clean** 40:13 | 52:2 | 45:10 67:1 | 91:9,14 | 66:19,21 |
| 73:5,6 | **clearing** | **complaints** | 67:5,21 | **contractor** | 67:3,18 |
| **cause** 9:12 | 42:5 | 27:15,22 | 68:1 71:19 | 6:12,17 | 68:8 77:15 |
| 93:17 | **close** 35:3 | 28:1 | 72:1 73:1 | 26:20 | 81:17 87:8 |
| **caused** | **closing** | **completed** | 76:5 85:21 | 33:20 | 92:4,6 |
| 29:12 | 83:10 | 32:18 53:7 | 89:5 90:5 | 83:19,21 | 93:10 |
| **Center** 13:9 | **COBB** 8:7 | **completely** | **contact** | **contractor's** | **correctly** |
| **certain** | **College** | 47:1 82:12 | 39:21 40:4 | 52:9 | 22:17 |
| 28:12 | 12:22 | **compliance** | 47:1,3 | **contractual** | **cost** 33:14 |
| **certify** 9:4 | 18:16 | 3:18 | **contacted** | 42:8 43:2 | **counsel** 3:5 |
| 93:4,13 | **come** 12:4 | **computer** | 15:17 | **conversati...** | 4:1,3 9:7 |
| **chain** 22:12 | 30:6 50:15 | 13:7 14:6 | 16:12,17 | 64:13 | 93:14 |
| **Chapman** | 69:16,17 | **computers** | 17:14 24:3 | 68:10 | **countertops** |
| 26:2 33:3,7 | **coming** 12:3 | 12:23 14:1 | 31:5 60:17 | 86:13 87:7 | 66:15 |
| **Chapman's** | 44:4 59:20 | 14:3 | 63:16 68:7 | **conversati...** | **County** 2:2 |
| 25:16,22 | **commenci...** | **computer-...** | **continue** | 36:13,15 | 50:13 |
| **charged** | 3:12 | 93:8 | 11:5 19:21 | 86:5 | 85:22,23 |
| 52:23 | **Commission** | **concern** | **Continued** | **COOK** 77:3 | 91:17 93:3 |
| **charges** | 93:23 | 34:18 | 8:1 | 80:4 | **couple** 28:11 |
| 50:20 | **Commissi...** | **concerning** | **contract** | **copies** 72:23 | **course** 27:21 |
| 52:19 | 3:7 9:4 | 82:12 | 14:22 15:8 | 73:7 | 51:11 57:4 |
| **cheap** 40:12 | **communic...** | **concrete** | 15:21 16:6 | **copy** 15:4,7 | 72:15 |
| **check** 73:6 | 72:7 | 27:1 29:3 | 16:10,21 | 21:15 | **court** 2:1 |
| 75:16 | **communic...** | **connection** | 17:3 27:7 | 44:17 58:9 | 3:10,19 |
| **child** 55:17 | 20:10 | 76:8 | 30:21 | 58:12 73:6 | 5:10,11 |
| 56:20 | 67:15 | **considered** | 31:12,23 | 76:20 77:2 | 7:12 9:2,9 |
| **choice** 21:23 | **communic...** | 17:12 | 32:19 | 77:10,11 | 9:20 44:14 |
| **Christine** | 64:13 | **considering** | 34:20 | 77:18,19 | 51:8 77:6 |
| 7:5 | **company** | 63:1,2 | 62:13,16 | 78:1,2,11 | **covered** 29:4 |
| **chronologi...** | 13:18 28:6 | **consolidated** | 63:4,9 | 78:21,22 | **credit** 19:15 |
| 22:12 | 41:11 | 10:5 | 64:21 | 79:14,23 | 43:18 |

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| criminal | 86:17,22 | DEPONE... | disformed | 12:11,12 | 93:1 |
| 50:19 51:9 | deal 19:6 | 92:23 | 29:14 | 13:18,18 | each 10:14 |
| 52:18 | 26:23 35:2 | deposition | DiSpirito | 14:8 17:20 | 68:17 |
| crop 29:10 | 36:3 49:23 | 2:19 3:6,15 | 17:16 19:5 | 23:3 25:17 | earlier 35:8 |
| Crow 7:5,6 | 60:19 | 3:16 4:6 | 20:13 | 48:16,19 | 45:14 |
| 9:22 10:22 | 74:11 | 10:10 11:2 | 22:23 | 49:5 51:2,3 | 59:13 82:7 |
| 12:1 | 76:17 | 11:6 15:7 | 36:13,21 | 52:19 58:1 | 84:19 |
| crown 31:16 | dealing | 71:5,10 | 37:9 39:22 | 59:6,7,17 | 92:10 |
| CRUM 8:7 | 12:23 | 78:16 93:5 | 40:4 41:7 | 86:10 | Early 82:22 |
| CSR 2:23 | 22:13,21 | depositions | 42:12 44:2 | 91:13,15 | East 46:12 |
| 3:7 5:4 9:1 | 41:9 | 3:20 | 48:15 | down 22:3 | eat 31:7 |
| 93:21 | December | deprive | 69:18 81:4 | 29:7 38:4 | educational |
| customer | 47:1 | 84:15 | 85:3 92:19 | 40:9 70:1 | 13:4 |
| 44:4 | decided | derogatory | dispute 72:2 | 73:21 | effect 3:17 |
| cut 47:2,3 | 17:19 | 26:17 | DIVISION | 76:13 93:6 | 10:3 40:11 |
| CV-04-106 | 19:10 | DERRICK | 2:3 | dozen 49:11 | effective 5:3 |
| 2:5 | 20:14 | 8:7 | Doc 6:15 | Dr 54:8,20 | eight 41:8 |
| CV-04-107 | 23:12 45:9 | details 80:2 | doctor 54:3 | 56:6 | 69:5 |
| 2:12 | 62:2,3 84:5 | Developm... | 54:3,7,23 | draw 19:17 | either 27:3 |
| | decision | 14:21 | document | Drell 41:17 | 85:5 88:2 |
| **D** | 22:10 | 30:15 | 21:3,17,20 | 46:18 | elaborate |
| D 6:1 | 27:10 50:3 | 52:11 | 57:17 71:4 | 47:23 | 66:14 |
| daddy 56:1 | deed 32:12 | 62:14 64:9 | document... | 92:16 | elementary |
| daily 55:14 | 34:13,17 | 76:22 | 76:4 | Drell's 40:20 | 59:9 |
| Dale 85:23 | 75:13,14 | 78:12 80:3 | documents | 46:14 | else's 19:6,8 |
| DANIEL | 82:18,23 | 80:8,19 | 41:15,20 | drew 65:5 | 30:9 45:7 |
| 7:6 | 83:8,16 | 87:16,17 | 53:1 70:9 | Drive 11:15 | 87:15 |
| date 9:5 | Defendant | 92:12 | 70:18 | 11:19 | employees |
| 15:10 | 2:10,17 | Diane 7:5 | 73:10,14 | 12:10 | 87:22 |
| 72:20 | 7:15 8:3 | difference | 78:10 | drove 54:4 | employer |
| 79:16 | Defendant's | 22:6 | 82:15 | dug 29:7 | 36:23 |
| day 3:11 5:7 | 6:12,13,14 | different | doing 13:8 | duly 9:17 | empty 81:8 |
| 9:10 46:13 | 6:15,16,17 | 19:7 20:15 | 13:16 28:8 | during | end 23:16 |
| 66:3 68:5 | 15:2,6 | 45:5,8 | 43:22 46:5 | 47:16 | 30:20 35:5 |
| 72:17 | 21:13,18 | directly | 62:1 81:5 | 55:16 64:4 | 35:17,20 |
| 77:20 | 44:12,15 | 33:20 53:5 | dollars 33:8 | 67:5 70:18 | 36:17,21 |
| days 23:6 | 44:19 58:7 | discovery | done 28:16 | 78:4 | 49:9,10,11 |
| 24:22 33:4 | 77:8 78:19 | 10:5 | 32:9 38:5 | duty 46:4 | 81:1 |
| 40:1,3,16 | delay 25:9 | discussed | 47:18 76:8 | | ended 58:17 |
| 40:17 45:8 | delivering | 19:9 60:21 | Dothan 8:9 | **E** | engineering |
| 63:11 | 5:4 | discussion | 11:15,19 | E 6:1 7:1,1 | 13:17,22 |
| 69:20 | Denial 6:13 | 12:6 | 11:20 | 8:1,1 93:1 | 28:6 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| engineers | 24:23 | 9:17 | 30:23 31:2 | 35:5,11,14 | 28:9 29:5,6 |
| 28:7,11 | ever 18:7 | except 4:1 | 31:20 | 47:21 | 67:12 |
| enter 14:22 | 20:2 21:2 | excuse 25:8 | 51:13 | filled 17:14 | force 3:17 |
| 17:21 30:3 | 21:17,19 | Exhibit 15:2 | 65:19 85:6 | 21:8 | foregoing |
| entered 15:8 | 29:8 34:4 | 15:6 21:13 | father's-in... | finally 81:7 | 9:7 93:5,9 |
| 16:5 17:2 | 34:18 | 21:18 | 35:6 | finance 18:2 | foreman |
| 20:2 27:6 | 35:13 | 44:12,15 | father-in-l... | 18:9 45:10 | 88:9 |
| 34:20 | 47:22 | 44:19 58:7 | 15:14 19:2 | find 20:10 | forging 53:1 |
| 62:13,16 | 50:19 52:1 | 77:8 78:16 | 42:16 44:8 | 41:6 55:23 | form 4:2 |
| 63:5 91:5 | 56:9,17 | 78:18,19 | 48:9 68:16 | fine 9:22 | 17:15 |
| equal 16:11 | 64:1,5,10 | exhibits 5:8 | fax 79:3,12 | 26:12 | formal 83:10 |
| equity 17:19 | 67:20,23 | 6:11 | 79:16 | finish 83:6 | forties 64:18 |
| 18:4 19:10 | 70:17 | existing | faxed 79:6 | FIRM 7:19 | 89:14 |
| 19:13,14 | 73:13,17 | 45:10 | Faye 2:6 | first 9:17 | Fortner |
| 19:17,20 | 80:22 | expended | 8:14 | 12:11 | 59:16 |
| 19:22 20:4 | 82:14,18 | 53:4 | February | 14:17 | forty-eight |
| 45:9 89:3,8 | 86:5 88:10 | expensive | 15:23 | 15:13 17:5 | 32:21 |
| et 2:9,16 | 91:3,16 | 23:9 62:9 | 20:19 | 20:19 | forty-one |
| Eufaula | every 66:3 | 66:1 | 36:11 | 23:15 24:2 | 89:14 |
| 7:21 12:16 | everyone | Expires | February/... | 29:2 36:11 | forty-two |
| 12:17 13:9 | 87:15 | 93:23 | 17:17 | 37:12 | 89:15 |
| 14:8 17:18 | everything | exploring | fee 33:14 | 38:13 | found 24:10 |
| 17:20 18:5 | 19:12 | 49:21 | 43:14,19 | 49:19 50:8 | 30:10 |
| 18:12,14 | 23:21 | express | 57:21 58:2 | 50:10 69:4 | 41:12 |
| 18:20 | 25:23 54:6 | 18:21 | fell 60:19 | 69:7,21,22 | 68:20 |
| 19:19 20:1 | 83:15 | expressed | 61:12 63:9 | 82:23 | foundation |
| 33:18 34:9 | evidence 4:6 | 27:16 | fellow 26:12 | 88:10 | 24:1 28:13 |
| 48:18,20 | 39:10 43:8 | 60:13 | few 17:7 | fixed 29:7,8 | 29:11 |
| 48:22 | 51:15,16 | extent 26:14 | 40:1,3,16 | 29:15 | 67:12 |
| 49:16 51:2 | 51:21 | extra 28:14 | 45:8 58:23 | floor 65:5 | foundations |
| 89:4,18 | 71:16,20 | ――――― | 59:4 69:19 | flooring | 29:2 |
| 91:6,9,17 | 85:10,15 | **F** | 86:17,22 | 66:11,13 | four 16:10 |
| 91:22 92:1 | 85:17 | F 93:1 | 92:5 | focussed | 91:23 |
| 92:2 | exactly 11:3 | face-to-face | Fieldcrest | 63:5 | frame 17:17 |
| even 17:14 | 18:3 30:10 | 78:6 | 11:21 | followed | 20:22,23 |
| 21:10,12 | 53:3 68:19 | fact 11:2 | fifty-three | 68:17 82:5 | fraud 50:7 |
| 27:9 31:19 | 77:22 | 43:13 | 32:20 | following | from 10:13 |
| 41:10 | 89:13 | 46:17 | figure 53:20 | 9:13 38:9 | 13:7 14:8 |
| 43:13 78:5 | examination | 69:11 | 83:14 | 68:23 | 22:9,18 |
| 83:9 | 6:4 9:12 | fair 80:3 | file 50:19 | follows 9:18 | 26:18 |
| events 22:12 | 11:10 59:2 | family 54:15 | 52:1 | footage 66:5 | 27:17 |
| eventually | examined | far 26:12 | filed 5:11 | footer 24:1 | 28:15 29:6 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 6

30:18 31:9
33:1,17
36:11
41:16
43:10 47:2
48:12
51:12,21
56:5 59:20
65:8 67:23
68:12,13
75:16
84:12
**front** 87:21
**full** 3:18
**full-time**
13:14
**further** 3:13
3:21 25:10
92:23
93:13

___ **G** ___
**garage** 28:5
28:10
**Gassett** 2:13
2:13,20 3:6
9:11,16
10:7,20
11:12,13
59:3
**Gassett's**
11:6
**gave** 56:9
58:11 61:1
**general** 65:3
68:20
**generally**
74:4
**gentleman**
25:15
**getting** 26:9
30:18 34:5

37:5 47:17
49:20
**give** 25:8
32:11
34:17
38:23,23
39:18
40:17
44:23
61:17 65:3
69:15
90:18
**given** 26:3
39:3 57:16
61:13
93:11
**giving** 73:16
**Global** 2:9
2:16 14:21
14:23 15:8
15:13,15
15:17 17:5
18:23 20:6
30:15 32:3
39:4 52:10
62:14 64:9
65:2 69:16
74:9 76:21
78:12 80:2
80:8,19
87:16,17
92:12
**Global's**
17:8 87:22
**go** 18:7
19:11
20:14
23:12,20
24:16,21
25:10 27:1
27:10,15
31:18

33:23
46:13
54:10
56:10,17
61:18 62:3
62:10 67:9
67:11
83:10
**going** 11:4,7
12:5 14:11
14:19 18:1
18:4,17,21
20:8,11,15
22:19 24:4
24:5 30:7
33:19,21
35:2,3
38:22
39:17 42:3
42:21 54:2
55:12,12
55:13,18
55:19,20
55:21,22
56:3 62:4
62:12
63:16
65:11,23
66:2 67:13
69:8 75:1
77:4 81:6
81:22 83:9
83:11
85:20
**gone** 71:1
72:8
**good** 26:13
35:22 62:4
**graduated**
13:5
**granite**
66:15

**ground**
23:23
**grounds** 4:4
**group** 2:9,16
54:20 56:7
**grow** 85:22
**guess** 21:9
32:8 67:9
79:3 80:14
**guilty** 40:12
**guy** 27:2

___ **H** ___
**H** 7:18
**half** 49:11
**Hampton**
46:12
**handed** 81:9
**handled**
51:8
**handles** 29:1
**handling**
45:19,22
46:3
**happen**
10:15 85:4
**happened**
22:13,20
37:16 39:2
39:8 47:9
50:16
54:13
55:15 60:5
60:18
**hard** 29:15
**hardware**
29:16
**hardwood**
66:10,12
**head** 44:14
**hear** 69:8
**heard** 26:17

35:8 47:2
81:20,23
88:16,21
88:22
**hearing**
16:14 52:8
93:12
**heated** 66:6
**help** 85:3
86:15
**helping** 34:9
**her** 12:3,4
51:1 54:15
**high** 13:5,6
**him** 10:8
20:14 26:7
26:10,11
26:18
36:16 38:7
39:23
40:17 41:9
46:8,21,22
46:22 47:2
47:6,11,14
47:19 56:9
70:6,8
71:15
72:13,16
72:19,21
72:23
73:16 74:1
74:12,15
79:20
80:10,16
83:12 84:4
86:19
88:11,13
**himself**
24:15 40:7
45:19 46:1
46:6 81:6
88:15

**hold** 57:13
**home** 17:20
18:2,5,12
19:10,14
22:21
42:13
45:10,11
47:21
48:21 52:4
53:4 57:14
58:13
61:15 67:1
68:6 72:2
75:18 76:5
76:9,13
89:4
**homes** 25:13
**Honey** 59:18
**hoping** 81:3
**house** 11:22
14:5,12,13
14:14,16
14:20,23
15:16,19
16:19
17:14,18
17:20
19:18,19
24:21
26:10,21
27:20,21
28:2,4
29:13
30:23 31:2
31:15,21
32:4,5 33:5
34:6,8,14
34:21,22
35:6,11
36:4 38:17
50:17
51:10,11

| | | | | | |
|---|---|---|---|---|---|
| 51:15 53:8 | **I** | **installment** | 42:20 | 28:23 | 29:10 |
| 55:10,18 | **ID** 79:3 | 32:22 33:2 | **In-house** | 59:11 60:9 | **June** 82:22 |
| 55:21 56:2 | **idea** 30:14 | **instead** | 14:4 | 67:16,18 | **just** 12:3 |
| 60:16 | 42:6 46:19 | 68:16 81:8 | **in-laws** | 69:15 74:9 | 19:10 20:6 |
| 61:16 | 65:3 68:20 | **institution** | 25:11,14 | 74:12,14 | 20:8 21:16 |
| 62:11 | 84:11,13 | 18:8 | 37:20 | 82:10 83:5 | 22:19 |
| 63:18 64:9 | **identificat...** | **instruction** | 41:15,21 | 84:8 85:1 | 23:21 26:4 |
| 64:14 65:1 | 15:3 21:14 | 13:11 | 72:7 74:2 | 86:11 87:1 | 29:5 38:2 |
| 65:4,8 66:5 | 44:16 58:8 | **interested** | 82:14 | 87:3,10 | 38:11 |
| 66:7,10,18 | 77:9 78:20 | 20:16 | 91:21 | 88:13 89:5 | 47:13 |
| 70:1,21 | **identify** | 23:10 33:9 | **IPI** 7:15 | 92:16 | 49:21,22 |
| 71:2,16,19 | 42:23 | 61:19 | 16:21 17:1 | **Jarrett's** | 57:17,17 |
| 73:2,21 | **immediately** | 63:17 | 17:6,8,12 | 52:23 | 57:19 59:4 |
| 74:7,9,15 | 63:13 | 93:16 | 17:14,22 | **Jeff** 16:11,13 | 63:17 67:9 |
| 74:21 75:8 | **INC** 2:9,16 | **interpose** | 18:9,22 | 24:2,11 | 68:4,17 |
| 75:12 81:8 | **included** | 10:1 | 19:1,3,4 | 31:4 33:1,5 | 71:13 89:2 |
| 82:2,9,16 | 66:20 | **interrogat...** | 20:7,18 | 48:3,6,8,10 | 90:18,23 |
| 83:7,12,18 | **Incorpora...** | 6:14,16 | 21:23 | **JEFFERS...** | 92:10 |
| 83:22 84:8 | 79:10 | 45:16 | 22:11,14 | 93:3 | |
| 84:19 85:2 | **incorrect** | 76:23 | 22:18 37:1 | **Jernigan** | **K** |
| 85:2,16 | 71:17 | 77:12 | 37:6 39:10 | 16:12,13 | **keep** 16:13 |
| 89:9,12,17 | **indicated** | **interrogat...** | 42:2,8,11 | 24:3,12 | 55:17 66:2 |
| 89:20 90:7 | 70:3,5 | 76:19 | 43:6,9,14 | 31:4 33:2,5 | **keeping** 84:8 |
| 90:10,16 | **indicates** | **interrupt** | 43:23 45:6 | 48:5,6,7,9 | **kept** 53:15 |
| 91:21 92:2 | 11:1 71:14 | 12:1 | 45:6,12,23 | 48:10 | **key** 32:6 |
| **houses** 40:9 | **individual** | **interrupted** | 49:23 | **Jim** 86:6,23 | 34:22 |
| 40:12 | 26:4 46:5 | 27:13 | 51:15,21 | 87:2,6,9 | **kids** 55:9 |
| 65:12,15 | **individually** | **introduce** | 81:4 85:3 | 88:4,17 | **kin** 93:14 |
| 65:19 66:1 | 46:1 | 88:13 | **Irby** 5:5 6:5 | 92:13,16 | **kind** 30:14 |
| **Houston** | **individual's** | **introduced** | 7:17,19 | **JINKS** 7:6 | 41:12 |
| 50:12 | 26:7 | 88:15 | 9:23 11:8 | **job** 32:6,9 | 57:10 |
| **Hughes** 2:6 | **information** | **invested** | 11:10 | 34:22 82:1 | **knew** 18:1 |
| 2:6 8:13,14 | 70:13 | 38:17 | 44:13 48:4 | **jobs** 81:22 | 18:19 |
| 10:2,4,19 | **inherit** | **investigati...** | 91:2 92:9 | **Joe** 2:6 8:13 | 26:12 31:6 |
| **Hugheses** | 89:20 | 25:11,12 | | 9:11,16 | 33:19 37:5 |
| 11:5 27:20 | **initial** 31:4 | 26:15 52:6 | **J** | **Jordan's** | 39:6 65:21 |
| 38:12 | **initially** | **invoices** | **January** | 35:15 | 65:23 |
| 47:21 69:7 | 61:23 | 70:20 | 27:4 83:20 | 68:12 | 76:12,15 |
| 80:18 | 64:18 | **invoked** | 86:3,3 | **Jr** 7:18 | 81:18 |
| 88:20 | **inside** 29:13 | 10:9 | **Jarrett** 23:3 | **Judge** 11:12 | 85:15 |
| **hundred** | **installed** | **involved** | 23:19 | **July** 28:19 | **know** 16:15 |
| 32:19,20 | 53:8 | 37:15 | 24:10 25:4 | 28:19 | 18:18 19:5 |

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 24:9,11,20 | 7:10 | 5:4 7:17 | 25:13 26:9 | 19:22 20:4 | 91:8 |
| 26:10 | **labor** 35:22 | 9:1 93:21 | 44:11 | **listed** 92:13 | **longer** 42:21 |
| 27:14 29:5 | 69:13,14 | **left** 38:15 | 58:10,22 | 92:14 | 53:15 |
| 30:10,12 | 71:1,15 | 47:13,14 | 69:7 77:16 | **listening** | 55:22 |
| 33:6,16 | 74:16,22 | 59:22 72:6 | 89:2 91:4 | 10:14 | **look** 29:14 |
| 34:12,15 | **lady** 50:23 | 81:3 84:20 | **Let's** 58:10 | **little** 17:15 | 61:18 |
| 35:4 38:13 | **laminate** | **legal** 34:4 | **license** 52:9 | 21:8 64:15 | 63:16 65:4 |
| 38:17,19 | 66:12 | **lender** 20:11 | **Licensure** | 65:22 | 65:12,18 |
| 38:22 39:7 | **land** 29:18 | 22:19 | 52:4 | 66:22 | 71:11 79:1 |
| 39:12,14 | 31:23 | **lending** 18:8 | **lien** 35:5,11 | 70:13 | **looked** 23:11 |
| 42:15,17 | **Lane** 11:21 | **Leon** 8:6 | 35:14 | 74:23 83:6 | 59:7 61:22 |
| 43:7,15,17 | 18:15 | **Leonard** 8:3 | 37:21 | **live** 11:14,18 | 62:4 63:20 |
| 44:10 | **Large** 3:9 | 30:11,16 | 38:18,19 | 55:12,23 | 71:6,7 |
| 46:16,17 | 9:3 | 35:17 | 47:20 68:6 | 90:10 | **looking** |
| 46:21 | **last** 20:13 | 37:17 | 68:12,13 | **lived** 11:16 | 62:20 |
| 48:12,13 | 36:12,20 | 39:17 59:4 | 69:10 | 11:18 91:3 | **looks** 77:11 |
| 49:22 53:1 | 39:23 52:7 | 61:20 67:2 | **liens** 35:14 | 91:16,20 | 79:13 |
| 54:13 60:2 | 77:14 | 67:16,20 | **like** 10:1 | 91:22 | **lose** 35:3 |
| 60:3 61:23 | **later** 24:10 | 68:13,22 | 19:14 | **living** 11:20 | **losing** 54:5,5 |
| 63:19 66:2 | 30:11 40:2 | 69:3,23 | 27:20 | 11:21 | 74:11 |
| 68:19 | 40:3 60:17 | 70:17 72:7 | 29:22 | 12:15,16 | **lost** 36:4 |
| 69:13 70:2 | 83:6 | 72:12 | 30:17 | 27:23 | 42:13 |
| 71:7 72:3 | **latter** 50:11 | 73:10,13 | 31:17 | 48:22 56:3 | **lot** 13:12 |
| 72:11 | **law** 3:9 7:19 | 74:5 75:6,9 | 35:15 | 91:6,9 | 23:2,4,6,8 |
| 73:18 74:7 | 9:8 10:23 | 75:11,15 | 38:11 | **loan** 17:9,22 | 23:9,11,13 |
| 76:14,14 | 11:3 | 76:8,20 | 40:13 | 20:16 21:4 | 23:18,22 |
| 76:17 | **laws** 3:19 | 77:18 | 43:17,19 | 21:6 36:23 | 31:7 32:1,5 |
| 77:22 78:2 | **lawsuit** 57:5 | 79:19,22 | 45:20 46:6 | 37:6 41:11 | 32:6 34:12 |
| 82:4,10,17 | 59:4 | 81:2,6,10 | 52:2 54:22 | 42:3 43:3 | 34:13,14 |
| 84:14,18 | **lawyer** 34:3 | 81:16 82:8 | 56:4 60:16 | 44:4 46:13 | 34:21,22 |
| 84:23 88:2 | 34:9 57:16 | 82:15 | 61:5 62:4 | 46:17 | 35:21 36:1 |
| **knowing** | 58:11 | 84:12 | 64:16 65:4 | 48:16 | 36:2 42:21 |
| 55:11 | **lawyers** | 85:15 | 68:15 69:4 | 49:20 | 54:13 59:6 |
| **knowledge** | 42:17,20 | **Leonard's** | 69:5 71:3 | 57:11,21 | 59:10,12 |
| 69:23 85:7 | **leading** 4:2 | 29:23 30:1 | 75:1 77:11 | 57:23 58:4 | 59:14 60:1 |
| **known** 80:1 | 36:11 | 64:1 71:5,9 | 79:5,13 | 58:5,19 | 60:3,6,10 |
| **K-Mart** | **least** 47:15 | 78:16 | 85:18 88:9 | **located** | 60:12,14 |
| 86:10 | 56:11 | 87:18 | 89:15 | 18:14,15 | 60:16,20 |
| 88:11 | 82:11 | **less** 53:22 | **liked** 59:8,10 | **long** 11:16 | 60:20,22 |
| | **leave** 47:11 | 66:1 | 65:9 | 15:20 63:8 | 61:11,12 |
| **L** | 73:9 81:7 | **let** 11:5 15:5 | **likely** 65:21 | 86:1 89:17 | 61:18,19 |
| **L** 3:1 5:5 | **Lee** 2:23 3:7 | 21:16 | **line** 19:14,20 | 90:15,18 | 61:21,22 |

**American Court Reporting**
**toll-free (877) 320-1050**

62:2,7,9,11
62:23 63:2
63:3,6,9,14
63:20 66:9
66:20
69:12
75:17,17
75:20 76:1
82:19 84:3
84:5 87:20
88:5 90:3
**lots** 61:3,4
62:20
**Louisville**
91:23
**low** 89:14
**lower** 64:15

**M**
**made** 3:23
21:7,22
22:5,10
23:15
27:10 32:2
46:18 50:3
58:5 68:23
74:20 80:7
80:18
85:16,20
89:10
**main** 28:17
**mainly**
13:22
**major** 25:23
**make** 4:3
24:5 31:18
41:21 42:3
89:4
**making**
86:23
**man** 47:17
**many** 24:4

45:7 49:7
54:19,21
56:10,12
82:10
**March** 15:11
20:20,23
23:17,17
23:18
36:12
39:23
62:18
90:17
91:14
**mark** 44:12
77:3,4
78:17
**marked** 15:3
15:5 21:14
21:18
44:16 58:8
77:9 78:15
78:20
**material**
26:6 30:17
35:22
69:13
74:22
**materials**
30:13
31:10
33:11
61:15
69:12
70:21 71:1
71:15
74:16
**matter** 51:7
51:9
**mattered**
21:22
**may** 3:6 4:3
5:3 12:13

14:9 70:14
81:22
82:22
88:14
89:16
91:15
**maybe** 21:9
26:23
31:14,15
61:2,5
81:21 87:4
92:17
**Meadows**
54:8
**mean** 20:7,9
43:17 46:9
56:18 61:2
67:16
68:14
77:19
**meaning**
66:10
**means** 93:8
**medication**
56:9
**medium**
13:13
**meet** 47:22
48:6
**meeting**
37:17,18
37:23 38:1
38:4,8
39:16 67:1
69:2,6
70:10,18
72:6,17
78:4 81:2,3
**meetings**
78:6
**Melissa** 2:23
3:7 5:4 9:1

93:21
**mention**
88:17
**mentioned**
40:21 64:2
64:5 87:23
**mess** 49:4
85:4
**message**
47:11
**messes** 40:13
45:20
**met** 48:2,9
69:7,9,9
72:19 74:1
77:20
79:19,20
**middle**
12:12 47:1
**mid-March**
61:8
**might** 12:4
26:23
34:18
**mine** 38:19
**minus** 85:12
**misrepres...**
50:7
**misunders...**
40:9
**Mitchum**
68:22
**modified**
65:10
**molding**
31:16
**moment**
90:20
**mommy**
56:1
**Monday**
38:9 69:1,4

**money** 17:13
19:8,21
24:18
30:18 31:1
32:11
33:14,17
33:19 34:1
36:8 38:17
38:23 39:3
39:11,18
40:14,20
42:22
43:10
47:18
50:21
51:21
53:10
61:14,17
62:9 69:16
70:1 71:18
72:1,15,22
73:1,7,21
74:8 76:13
84:16
**moneys**
83:12
**Montgome...**
52:8,8 57:9
**month** 16:1
**months**
11:17 41:8
58:16
91:23 92:5
**more** 22:15
23:9 32:10
45:4 54:21
62:8 65:22
92:17
**morning**
10:2,8 69:5
**mortgage**
18:11

19:12
57:14
58:12
83:11
90:11
**mortgages**
20:3 43:16
**most** 18:19
65:21
**mother**
15:14 19:2
35:6 42:16
44:7
**mother-in-...**
38:7,12
68:4
**mouth** 41:16
**move** 12:11
23:21
**moved** 12:12
14:8 91:13
91:14 92:1
**moving** 56:1
**much** 27:18
33:16,23
34:1 51:12
53:3,10,19
60:1 69:13
89:23
**Mutual** 6:15
57:11,12
57:15,21
58:4,15,18
58:21
**myself** 16:11
89:3

**N**
**N** 3:1 6:1 7:1
8:1
**name** 11:11
13:19

**American Court Reporting**
**toll-free (877) 320-1050**

Page 10

16:14
25:19 26:3
26:7 27:3
29:19 30:2
30:9 36:1,2
48:2,4 51:1
56:13 57:1
64:1,5 79:2
79:9 81:23
84:1 87:14
87:18
**names** 92:18
**nearly** 27:4
84:2
**necessary**
3:22
**need** 12:4
83:14
**needed**
28:12
69:14
**needs** 51:7
**negative**
26:22
**negotiating**
64:8
**neighborh...**
65:19 66:2
**neither**
93:14
**nerves** 54:12
**nervous**
54:5 55:1,7
**network**
12:21 14:3
**never** 21:5,7
29:18 47:2
47:4,4
60:21 61:1
81:15,18
82:3
**new** 40:20

45:11
46:12
49:16 90:5
**next** 22:13
77:5
**nine** 41:8
69:6 89:19
91:11
**Nods** 44:14
**north** 86:10
**Notary** 3:8
9:2 93:22
**note** 58:13
**nothing** 27:1
43:11 50:6
84:20
**notice** 68:6
**November**
22:22
36:19
37:10,10
37:13
39:20,21
44:3 45:13
49:3,8
50:12
77:20 78:6
79:17,20
79:23 81:2
81:16,19
**number** 2:5
2:12 33:8
77:6,17
79:12

---
**O**
---
**O** 3:1 7:7
**Oak** 18:15
18:18
**object** 10:18
**objected**
10:7

**objection**
10:1,20
11:8 80:4
**objections**
3:23 4:4
**obligate**
32:1
**obligating**
34:17
**obligation**
42:9 43:2
**observed**
28:2
**occasion**
45:4
**October**
2:21 3:11
5:7 9:11
35:5 36:19
37:10,11
39:19
**odd** 41:7,12
**off** 12:5
19:17,20
27:1 46:4
47:2,3
59:16
90:21
**offer** 45:7
**offered** 4:6
**office** 8:8
17:8 70:16
**officer** 50:23
**offices** 3:9
9:9
**off-site**
13:12
**Off-the-re...**
12:6
**Oh** 25:3
36:15
37:18

48:11
88:22
**Okay** 12:14
12:23 13:8
13:21,23
14:19
16:20
18:11,20
20:6 21:21
23:2 24:16
25:20 29:9
31:22 35:1
36:3,7 41:6
42:7 43:5
45:3 49:7
50:15 52:1
53:3,13
54:19
57:16
58:22
59:18 62:6
63:8,12,19
64:12,20
67:4,9,15
68:4 69:21
70:3,6,9,12
75:5 76:7
76:16,19
77:16
78:15 79:1
79:11,14
79:22 80:9
83:23
85:10,14
86:8,12
87:12
88:16 91:8
91:16 92:5
**old** 56:15,16
**once** 56:11
82:11
83:14

**one** 10:16
20:3 22:15
28:17
34:18 35:7
36:9 38:11
45:4 46:11
47:15
54:22
57:13
64:18 66:1
73:5 83:19
83:21 86:7
88:19
89:14,14
89:14
90:23
92:10,17
**ones** 74:11
**only** 40:11
72:19 75:2
80:22
**opposite**
11:3
**option** 31:23
**options** 19:7
45:5,8
49:21
**oral** 5:6 9:12
**ordeal** 74:6
88:17
**order** 22:12
**original** 5:5
23:5
**originally**
23:2
**other** 18:8,9
20:2 24:20
29:10
31:15
33:11,12
36:15
41:15

42:18
43:16 46:3
51:16
61:18
65:12 67:5
68:17 72:4
73:6 81:22
83:19,21
88:6
**other's**
10:14
**ourselves**
15:18
**out** 17:14
18:5 20:10
21:8 23:15
24:10
28:21
30:11 34:5
35:3 36:4
40:16 41:5
41:7 43:10
45:20
48:15 49:4
53:4,10
56:4 59:6
59:13 62:4
64:14 67:8
69:15
74:11
76:18 82:2
82:9 83:14
84:22 85:4
86:15,17
86:21
**outstanding**
36:22
41:10
**over** 55:9,17
58:20 59:7
**owed** 32:10
83:12

**American Court Reporting**
**toll-free (877) 320-1050**

**own** 21:22
**owned** 17:18
  38:20,21
  60:3 63:19
  69:11
**owner** 75:17
**Ozark** 13:6
**o'clock** 69:6

_____
**P**
**P** 3:1 7:1,1,7
  8:1,1
**package**
  31:11 33:3
  33:7
**packet** 70:13
**page** 6:4
  77:14
  87:21
**paid** 16:8,9
  23:14
  30:21 31:1
  31:3,4
  32:17,20
  34:11
  35:21
  40:13
  45:20 53:5
  69:12
  70:21
  71:15,18
  71:23
  72:14,22
  73:1,21
  74:8 75:17
  75:20 76:4
  76:13
  83:13
**Palmer**
  24:10 25:4
  26:9 27:16
  28:22

30:18
41:17
52:10
67:17,19
87:10 89:6
92:16,16
**Palmers**
  22:22
  25:12,21
  26:8,22
  27:11
  28:20 39:3
  40:11
  47:17
  50:20
  51:17,22
  52:10,14
  52:19
  63:12 81:5
**paperwork**
  17:8 46:6
  72:5 75:22
**paperwor...**
  73:17
**part** 35:22
  57:6 59:10
**particular**
  23:4 28:8
  42:7 59:12
**parties** 3:4
  4:3 93:15
**partners**
  85:1
**partnership**
  74:23
**party** 57:5,7
**pass** 30:6
  31:13
  90:19
**passed** 23:7
  33:4
**passing** 46:4

**pay** 19:19
  24:4,5
  32:11
  43:13,19
  57:19,20
  74:15,22
  75:23
  89:22
**paying**
  19:21
  24:20
  30:11,12
  30:16
  53:16,17
  58:13
  73:19 90:9
**payment**
  23:15 31:6
  31:9,19
  57:19
  75:19
**payments**
  16:11,18
  24:4,20
  85:16,20
  89:5,9
**peacemaker**
  87:6
**pending**
  43:3
**PENN** 3:9
  7:11 9:9
**penny** 36:9
**percent**
  19:17
  31:13
  33:12
  80:11,15
**period** 61:6
**perpetrated**
  50:8
**person**

13:14
**phone** 16:17
  17:17 48:9
  78:7
**phonecall**
  33:1
**phonecalls**
  49:8,19
  50:8,10,11
**phrase**
  22:16
**Phyllis** 2:13
  12:2
**physicians**
  54:15,17
**picking** 59:6
**picture** 23:1
  41:8
**place** 15:13
**placed** 37:21
**places** 18:19
**Plaintiff** 2:7
  2:14 7:3
**plaintiffs**
  10:4
**plan** 65:5
**plans** 64:23
  65:7,9
**please** 5:9
  11:11
  32:23
**plodding**
  49:22
**plumbing**
  29:16,16
  67:11
**point** 39:22
  42:7
**police** 50:22
**Polyengin...**
  13:20
  79:10 86:2

**Polyengin...**
  79:11
**position**
  74:18
**possible**
  80:12,14
**possibly**
  34:1,2
**Post** 8:8
**preclude**
  10:12
**prepaid**
  31:11,12
  33:7
**prepay**
  33:10,23
**prepaying**
  33:9
**present** 8:11
  38:1 40:6
**presented**
  41:16 76:4
**pretty** 20:12
  27:18
  51:12 72:9
  72:10
  77:23
**pre-applic...**
  17:9,15
  21:10
**price** 16:6
  30:22
  60:21 61:1
  62:6,11
  64:10,14
  65:19 84:7
**printout**
  70:19
**prior** 4:7
  20:3
**probably**
  15:22

20:23
22:16
28:19
46:23
47:14
49:11,14
51:4 53:9
65:22
71:11
82:22
83:20,20
**problem**
  49:18 55:1
  55:8 60:11
**problems**
  27:19 28:2
  29:10,16
  66:23 67:5
  67:11,16
**Procedure**
  5:2 9:6
**proceedings**
  9:13
**process**
  19:11
  22:21
  51:10 59:6
**processing**
  43:14
**produced**
  71:5 78:9
  78:11
  79:15
**promised**
  56:2
**properly**
  28:17
  29:17
**properties**
  30:2 40:15
  46:12 64:5
  68:1,18,21

**American Court Reporting**
**toll-free (877) 320-1050**

Page 12

75:7,16,20
81:13,21
82:8 87:23
**property**
30:8 32:6
35:18
37:21
38:20,23
40:20
46:15
84:16
**prove** 72:21
**provide**
72:13
**provided** 9:5
45:5 64:23
**providing**
82:15
**psychiatrist**
56:18,19
56:21,22
**psychologist**
56:21
**Public** 3:8
9:2 93:22
**pulled** 56:4
**purchase**
60:6
**purchasing**
60:12
**purpose**
10:10
**purposes**
15:6
**pushing**
18:23
**put** 53:10
63:13
67:10
69:23
**putting**
28:15

**p.m** 2:22
3:12 90:21
90:22

_____
**Q**
**question**
28:7 43:1
75:5 82:13
90:23
92:10
**questions**
4:1,2 44:20
58:23 59:5
93:7
**quick** 12:2

_____
**R**
**R** 7:1 8:1
93:1
**ran** 86:10
**range** 61:1
64:19 84:7
84:10
**rate** 19:8
**rates** 45:7,7
**rather** 22:2
64:17
**read** 71:9
85:19
**reading** 3:15
**ready** 26:9
**real** 12:1
66:13
**really** 21:5
21:21
26:19 27:1
53:1 59:9
61:15 67:7
72:11
73:16
76:10,11
**reason** 31:3
33:22,23

**received**
21:17 68:5
68:11,13
**recollect**
43:22
92:14
**recommen...**
19:1,3
42:17
**record** 12:5
90:21,22
**recorded**
83:1,3
**Red** 18:15
18:18
**referring**
79:5
**regulatory**
52:3
**related** 55:2
55:6
**relating** 3:19
**relevance**
57:18
**relevant**
82:16
**relied** 41:21
**rely** 41:20
**remember**
20:5 23:17
25:19 26:6
27:3 44:5
44:18,20
47:12 51:1
57:1 65:17
67:6 69:6
70:11 71:8
73:12,16
76:22 80:9
80:16
82:14 84:1
86:18,19

88:8 89:1
89:13 90:2
92:15,18
92:21
**renew** 10:19
**rent** 53:16
53:17
**repaying**
33:3
**repeat** 87:5
**report** 52:7
**REPORT...**
2:23
**Reporter**
5:11 9:2,20
44:14 77:6
**represent**
59:3
**represented**
24:15
**represents**
93:10
**request**
78:10
79:16
**resolve** 81:7
**resolved**
69:19
**respective**
3:5
**response**
10:23
77:17
78:10
79:15
**responses**
76:20 77:2
**rest** 19:20
**result** 93:16
**retained**
5:10
**return** 47:8

47:10
**revoke** 52:12
**revoking**
52:9
**RE-EXA...**
92:9
**ridden** 82:9
**right** 11:13
12:9 14:11
15:12 16:6
17:11,21
18:3,7 21:2
21:16 22:1
22:8,9
27:13 28:1
29:8,14
31:8 34:15
35:7 36:5
36:10 37:3
37:8,14
39:16 40:6
41:14 42:2
42:11 44:6
44:11
45:15
46:20 48:7
48:17 49:2
49:15 50:6
51:14,20
52:5 54:1
54:10 57:8
58:15
59:19,22
64:22
66:18 67:2
67:17 68:7
69:6 74:2,3
75:4,21
76:2 89:6
**RimRock**
23:3,5,6,8
23:19

59:11,15
59:16,21
60:1 61:12
62:2,12,22
63:3,6 84:3
**Road** 59:20
**Robert**
40:20
46:14,18
47:22
92:16
**room** 28:5,9
28:14
67:14
**route** 20:15
**rug** 56:4
**rule** 5:1 9:5
10:9,12
11:1
**rules** 3:19
5:2 9:6
**Russell** 5:5
7:17

_____
**S**
**s** 2:7,10,14
2:17,23 3:1
3:1,7 5:4
7:1,3,15
8:1,3 9:1
93:21
**SAITH**
92:23
**sale** 65:15
**salesman**
88:9
**same** 3:17
5:10 10:1
10:22 11:8
30:17,19
41:20
62:11,19

**www.AmericanCourtReporting.com**
**October 26, 2005**

**American Court Reporting**
**toll-free (877) 320-1050**

| | | | | | |
|---|---|---|---|---|---|
| 84:3 | seem 73:20 | 58:16 78:7 | 25:3 26:16 | 86:15 | 19:15 |
| satisfied | seems 64:16 | Shane 7:10 | 27:8,12 | six 11:17 | 26:22 28:8 |
| 32:10 | seen 21:20 | SHEALY | 29:20 30:5 | 16:4 | 31:17 |
| save 31:12 | 28:15 65:8 | 8:7 | 32:2,13,16 | Skyscraper | 40:10 55:3 |
| 33:11 34:1 | 75:15,18 | sheet 70:23 | 32:23 | 7:15 16:21 | 55:5,15 |
| saved 33:8 | 78:13 | 71:6,12 | 33:15 34:7 | 18:22 | 60:5,18 |
| saw 28:3 | 80:23 | shortly | 34:11 | 22:11,14 | 61:5 71:3 |
| 40:21 | 88:11 | 91:12 | 35:10,19 | 22:18 37:3 | 89:15 |
| saying 32:17 | select 15:12 | show 15:5 | 36:14,18 | 37:6 39:11 | sometimes |
| 47:17 75:3 | sell 31:23 | 44:11,19 | 36:21 37:2 | 42:3,8,11 | 24:22 |
| 80:10,16 | 32:1 89:12 | 52:16 | 37:4,19,22 | 43:14 | 43:18 |
| says 16:10 | selling 26:5 | 70:17 | 39:9,15 | 45:23 | somewhere |
| 71:23 88:5 | 65:20,23 | 72:21 | 40:1,5 | slightly | 40:21 |
| scenario | send 21:2 | 85:19 | 41:19 | 65:10 | 55:23 |
| 32:14 | sending 51:5 | showed | 42:10 43:4 | slow 24:21 | son 54:3,23 |
| school 13:5 | sent 22:6 | 70:19,23 | 44:1 45:2 | 27:15 67:9 | 56:7,17,20 |
| schools 59:9 | Services | 72:4,23 | 46:10,10 | 67:11 | son's 56:13 |
| science 13:7 | 16:10,16 | showing | 47:7 48:1,8 | small-sized | 57:4 |
| Seaborn | 16:18 | 37:9 | 48:13 49:1 | 13:13 | sorry 48:11 |
| 3:10 7:10 | 23:16 24:6 | shown 72:16 | 49:6 50:10 | sold 19:19 | 83:5 90:10 |
| 7:11 9:9 | 24:7,13 | side 59:8,17 | 50:14 | 36:4 75:14 | sort 17:10 |
| 80:15 | 31:5,19 | 86:10 | 51:19,23 | solution | 22:11,20 |
| second 31:6 | 33:21 73:1 | signature | 52:15,21 | 69:17 | 26:1 29:2 |
| 31:9 33:2 | 85:21 89:5 | 3:14 77:13 | 53:12 55:4 | some 13:11 | 35:15 41:6 |
| 77:14 | Service's | signed 63:9 | 57:6 58:19 | 28:7 30:12 | 87:6 |
| 90:19 | 24:18 | 64:20 | 60:4 62:8 | 31:14,15 | sounded |
| secondary | 33:18 | 91:10,14 | 62:15,21 | 33:10,12 | 46:6 |
| 23:21 | set 38:8 65:7 | signing | 63:1,23 | 40:15,19 | sounds 75:1 |
| see 18:9 29:5 | Seth 56:14 | 15:20 | 65:7,14 | 41:8 44:19 | sour 36:4 |
| 29:6 33:22 | 56:15 | since 19:16 | 67:22 68:3 | 48:18,18 | Southland |
| 38:7 49:23 | setting 10:12 | 39:22 62:9 | sit 11:5 | 57:17 65:8 | 57:23 58:3 |
| 54:19 | 11:2 16:17 | 86:3 90:17 | site 67:21 | 81:20 | 58:20 |
| 58:10 | settle 83:7 | sir 12:18 | 68:2 82:1 | somebody | SouthTrust |
| 61:19 | settled 83:15 | 13:2,17 | 87:14,17 | 29:22 30:8 | 73:8 |
| 63:16 | seven 56:16 | 14:2,7,10 | 87:19,21 | 34:17 79:6 | Sparks |
| 67:20,23 | several | 15:1,9 16:2 | 88:1,3 | somehow | 12:22 |
| 69:14 | 17:16 | 16:23 17:4 | 92:12 | 87:11 | 18:16 |
| 72:14 | 24:22 | 17:23 18:6 | sitting 10:6 | someone | speak 17:6 |
| 77:16 | 29:12 33:4 | 18:10,13 | 10:6,8,13 | 26:5 51:3 | 45:11 |
| seeing 86:18 | 46:22 | 20:5,12 | 10:19,20 | 60:14 | 47:14 |
| 92:21 | 54:18 | 21:1,5,8,19 | 39:7 | something | specific |
| seek 34:4 | 55:15 | 22:4 24:14 | situation | 10:15 | 85:15,17 |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 14

| | | | | | |
|---|---|---|---|---|---|
| **specifically** 26:8 75:6 80:9 | 82:23 **state** 3:8 9:3 11:11 13:7 | 49:4 86:17 **Street** 7:20 59:16 | **supposed** 32:15 81:4 85:3 | 93:6 **taking** 3:20 55:9,17 | 29:3 32:21 38:3 53:3 59:5 60:10 |
| **specifics** 85:6 | 52:3 93:2 **stated** 45:3 | **stress** 54:14 **strike** 91:4 | **supposedly** 29:7 70:20 | **talk** 12:2 34:3 35:9 | 64:12 68:9 69:2 73:22 |
| **speculation** 80:5 | **statement** 6:13 58:11 | **strongly** 19:3 | **sure** 20:13 26:3 43:21 | 35:14 44:3 62:6 64:10 | 74:4 83:1 84:16 |
| **speed** 27:17 | 74:18 | **structural** 27:22 | 44:5 47:12 | 83:17 87:3 | **telling** 22:2 |
| **spent** 87:20 | **statements** 73:3,4 | **study** 71:12 | 52:13 53:23 | **talked** 15:15 15:16 | 27:14 46:7 55:18 60:7 |
| **spoke** 17:15 19:4 20:13 | 86:23 **stating** 21:3 | **stuff** 26:1 30:17 | 54:21 56:11,21 | 23:12 31:17 | **temporarily** 91:21 |
| 26:4 28:22 36:20 45:3 | **station** 50:22 | 43:19 64:16 | 58:1 70:7 73:15,17 | 33:13 38:13,16 | **ten** 23:6 40:17 |
| 46:21 48:8 50:23 | **stay** 55:21 **staying** | **subcontra...** 29:1 | 77:23 79:7 80:11,20 | 38:18 39:23 | 63:11 **testified** |
| 67:12 68:21 78:7 | 53:15 **steered** | **subcontra...** 30:13 | 82:11 88:5 88:9 | 43:12 44:2 66:22 | 9:18 35:8 68:5 92:11 |
| 81:15 | 59:14 61:10 | 81:20 | **surprised** 73:20,23 | 69:10,11 83:19 84:7 | **testifying** 10:3 |
| **spoken** 16:23 | **stenotype** 93:6 | **subdivision** 23:3,10 | **sworn** 9:17 | **talking** 15:18,21 | **testimony** 2:19 5:6 |
| 26:20 69:18 | **sticks** 67:7 **still** 13:23 | 59:11 **substance** | **system** 31:16 53:6 | 15:22 19:4 36:18 | 10:7,14,18 93:11 |
| **spots** 29:12 | 51:9 72:9 83:12 90:9 | 68:9 86:13 **Suckle** 59:18 | **Systems** 25:16,22 | 40:19 61:7 61:8 81:21 | **thank** 20:7 91:19 92:7 |
| **spring** 57:3 **Springs** 7:8 | **STIPULA...** 3:3,13,21 | **sudden** 37:9 41:9 55:20 | **System's** 33:3,7 | 84:4 **tally** 70:23 | 92:22 **thanks** 20:7 |
| **sprinkler** 31:16 53:6 | **stipulations** 9:7,21 | 56:4 **suggest** | | 71:6,12 **teaching** | **their** 3:5 14:2,3 |
| **square** 3:10 7:12 9:9 | **stole** 51:15 | 71:17 **summer** | | T | 13:10 **technical** | 20:11 37:21 |
| 66:4 | 75:8,11 **stolen** 51:12 | 27:19 **supplies** | **T** 3:1,1 93:1 93:1 | 13:12 **technician** | 45:23 55:19 68:6 |
| **staff** 13:15 **Stand** 59:20 | **storage** 53:16 | 25:23 **supply** 35:15 | **take** 14:2 38:10 | 14:6 **Technology** | 76:17 **theirs** 10:21 |
| 59:21,23 **start** 14:16 | **straight** 89:3 **straighten** | 68:12 73:13 | 42:21 54:3 54:22 | 12:20 13:9 **telephone** | 55:19 **theories** |
| 15:21 25:1 **started** 9:23 | 28:21 45:20 85:4 | **support** 13:12 | 64:17 70:9 73:10 | 48:14 49:2 **tell** 13:3 20:6 | 84:21 **thereto** 4:7 |
| 14:13,15 19:18 | 86:15 **straightened** | 28:13 **supporting** | 91:20 **taken** 3:6 | 22:11 28:16,20 | 93:7 **thing** 17:10 |
| 23:23 34:5 48:15 | 40:16 41:5 | 67:13 | 5:6 30:8 40:17 51:5 | | |
| 64:14,18 65:13,16 | | | 86:16,21 | | |

**American Court Reporting**
**toll-free (877) 320-1050**

Page 15

29:2 30:19
35:16
40:11
55:14
57:10 62:5
67:14 69:4
69:15
**things** 28:18
86:20
**think** 10:23
11:3 21:11
21:19
25:14
26:11 29:1
29:8 38:9
39:5 43:1
56:22
57:12 58:6
61:2 62:18
64:17
66:22 69:1
70:15
72:11
75:22
76:11,12
86:9 87:9
87:11,14
88:14,19
90:3,7,19
**thinking**
12:4
**third** 32:22
**Thomas**
11:12
**though** 27:9
31:20 48:7
78:5 83:9
85:13
**thought**
18:19
41:13
69:19

86:16
**thousand**
19:7
**three** 49:14
49:19 91:1
91:23
**through** 3:4
19:11
22:20 37:6
46:13
50:15 51:8
57:23 58:3
58:19
60:19
61:13
63:10
71:13
90:19
**throughout**
27:19
88:17
**thumbed**
71:13
**tied** 61:14
62:10
**time** 4:5,5
10:17
17:17
20:13,22
20:23 22:9
22:15,18
24:9 30:18
36:10,12
38:11 42:8
45:1 47:16
48:23 49:5
61:6 62:14
62:19 63:4
63:20 64:3
64:4,6 65:8
69:16,21
69:22

72:19
79:18 84:6
86:7 87:20
88:10 91:5
91:9
**times** 17:7
17:16
46:22
54:19,21
55:16
56:10,12
78:7 82:11
**title** 29:18
30:8 88:6,7
**today** 35:8
39:7 41:16
88:21,22
**together**
10:13 32:5
34:23
41:13,18
41:23
74:10,13
74:19 75:3
**told** 20:12
20:14
22:18 23:4
25:21 27:9
28:11
31:10 45:6
45:14,19
51:11 57:8
59:12,13
60:14,15
60:18
61:14 78:1
78:2 80:6
82:9 85:18
86:14
**Tom** 2:13,20
3:6 8:3
29:23 30:1

30:11,16
35:17
37:17 59:3
61:20 64:1
67:16,20
68:13,22
69:3 72:6
74:5 75:6,9
75:11,15
76:3,8,12
76:20
77:17 81:5
81:10,15
82:8 84:11
85:15
87:18
**top** 79:1,3
**total** 66:17
**toward**
23:16
59:14,21
61:11
71:18 72:1
76:5
**town** 59:10
**transaction**
73:4 84:12
**transcribed**
93:8
**transcript**
5:6 93:11
**transcripti...**
93:9
**treat** 56:7
**tresses** 26:1
**trial** 4:5
10:11,11
10:17,17
**tried** 29:3
**trim** 29:12
**Troy** 13:7
**true** 44:23

93:10
**try** 47:6
**trying** 20:9
22:17
48:16 49:3
86:15
**turn** 31:13
**turned** 22:3
51:6 58:20
59:13 62:3
**two** 24:2
27:4 49:14
49:19
60:17 73:6
84:2 86:4
87:4 90:23
91:2 92:17
**type** 26:6

**U**

**U** 3:1
**under** 29:4
56:5
**understand**
38:21
42:19
68:15
**understan...**
24:8 41:2,3
41:4
**understood**
46:8
**Union** 7:8
**unlevel**
29:11
**until** 35:4
36:21
39:22
45:12
79:23
81:16,18
**upgrades**

31:15
66:10
**upset** 72:9
72:10,10
**upsetting**
68:14
**upstairs**
67:13
**use** 17:19
18:4,22
19:1,10,13
19:15 20:9
20:11
21:23
22:10,19
27:10
31:14 45:9
**used** 89:4,8
**using** 17:12
19:3 25:22
**Usual** 9:20

**V**

**very** 31:2
35:5 36:21
68:14
72:10
90:18
**voicemail**
47:15
**voicemails**
47:13
**volition**
21:23
**vs** 2:8,15

**W**

**waived** 3:16
**walk** 22:20
**walls** 25:23
**want** 26:23
58:22
61:16

**American Court Reporting**
**toll-free (877) 320-1050**

73:18 77:3
**wanted** 12:3
23:2 41:5
49:23
57:17 59:9
61:15 65:4
72:14
**wants** 58:23
**Warren** 26:9
28:22
60:10
67:18 84:8
92:15
**Washington**
6:15 57:11
57:12,15
57:20 58:4
58:15,18
58:21
**wasn't** 35:2
39:17 42:3
70:7
**way** 24:8
28:8,13
30:4 32:8
60:13
66:23
67:10 78:2
**web** 87:14
87:17,18
88:1,3
92:12
**week** 14:17
23:6 24:2
37:12 38:6
38:9 52:7
55:16
60:17
63:11
**weeks** 16:4
**weight** 28:14
**well** 13:11

15:19
18:23
27:18
28:23 30:6
32:22 33:6
34:3,12,15
34:20 35:1
35:17 42:2
42:17 43:5
53:17 54:7
54:23 55:9
56:6 61:12
68:11 72:9
74:1,4,7,14
74:20 75:2
75:13 90:9
91:4,20
92:15
**went** 17:7
23:11
27:18 32:2
36:3 38:3,6
38:10
45:18
50:22
51:13 52:8
54:12 57:9
58:3 61:22
68:21
92:12
**were** 9:14
10:11
11:20,21
12:7,14,16
13:8,9
14:11
15:22 18:1
18:4,19
20:15
22:13
23:10 24:4
24:5 26:9

27:14 28:1
28:8 30:7
31:20 32:9
33:4 35:3
35:12
37:18,23
40:10,11
41:13,17
41:22
47:16
48:16,18
48:18,22
49:4,5,21
49:21,22
50:12
51:17
52:14 53:4
53:8,17
55:9,11,12
56:3 59:14
61:10,19
61:23
62:12,20
63:1,2,5
64:8 65:11
65:15,20
65:21
71:14 72:9
73:3,7
74:10,13
74:19 75:3
81:6 82:1
84:4 85:1,3
85:20
86:20 91:5
93:7
**weren't**
18:21
20:11,16
22:19 37:5
49:20 50:1
83:9,10

**west** 7:20
59:8,17
**Westbrook**
23:10,13
28:4 32:7
55:10
59:14
61:11,20
62:7,23
63:2,13,18
63:21
65:13,16
70:22
75:20
**we'll** 19:6,8
**we're** 11:4
27:22
55:21,22
58:13 61:8
74:10
84:19
**we've** 19:6
22:2 43:11
58:14
88:21,22
**Whereabo...**
12:19
48:20
**while** 82:1,2
91:21
**whole** 74:6
88:17
**wife** 19:9
22:10 30:7
31:17
33:13,17
38:1 45:8
50:4 53:18
54:2 56:17
56:20
60:11
**wife's** 29:19

54:7
**willing**
33:10
**wire** 24:17
33:14,14
**wired** 73:7
**Wiregrass**
8:4 29:21
30:2 64:4
68:1,17,21
75:7,16,19
81:12,21
82:8 87:23
**wiring** 33:17
**withdrawn**
21:3
**witness** 3:16
9:11 93:12
**witnesses**
10:13,16
**wondered**
57:18
**wood** 66:12
**word** 41:16
87:4
**words** 42:18
46:3
**work** 12:17
13:17
14:16
24:23 25:9
28:5,16
29:12 32:9
32:15
69:15
70:21
**worked**
12:20
76:18
84:22 85:8
85:11
86:20

**working**
13:23 24:1
33:4 86:1
**works** 25:16
**wouldn't**
21:21 22:5
42:13 69:7
**wound**
24:19
53:14 54:2
61:20
64:15,19
**writing**
34:16
**wrong** 74:5
75:7 76:8
**wrote** 52:7

| X |
| --- |

**x** 6:1 33:8

| Y |
| --- |

**yeah** 25:3
58:12 61:2
63:22 71:3
71:21
72:18 75:4
77:11
78:22 90:1
**years** 27:4
54:18
56:16 84:2
86:4 89:19
91:11
**York** 40:20
46:12
49:16
**y'all** 12:2
15:21 20:9
25:2,12
36:4 47:18
49:22
60:21

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

| | | | |
|---|---|---|---|
| 62:20 | 90:4,6 | 3:12 5:7 | **6** 6:17 53:7 |
| 64:10 | **10-57** 6:5 | 9:11 86:22 | 78:18,19 |
| 70:14 | **100** 19:16 | 90:17 | **6346** 8:8 |
| 72:12 | **12** 77:17 | **21** 62:18 | |
| 73:20 | **120** 11:15 | **21st** 23:18 | **7** |
| 77:20 81:1 | 12:10 | **22** 66:6 | **75,000** 90:7 |
| 88:19 | **14** 6:12 | **2300** 66:6 | **76** 6:16 |
| **y'all's** 25:13 | **145,000** | **25** 61:5 | **77** 6:17 |
| | 90:13 | **257** 7:20 | |
| **$** | **147** 53:9 | **26** 2:21 | **9** |
| **$145,000** | **148,000** 53:9 | **26th** 3:11 | **9/16/2006** |
| 30:21 | **15** 5:3 | 5:7 9:10 | 93:23 |
| 32:18 53:5 | **153,000** | | **91** 6:5 |
| 85:12 | 64:19 | **3** | **99** 80:11 |
| **$150,000** | 66:18 | **3** 6:14 44:12 | |
| 84:10 | **17** 79:17 | 44:13,15 | |
| **$1500** 53:6 | **17th** 80:1 | 44:19 | |
| **$153,000** | **19** 15:11 | 78:16 | |
| 16:7 | **1985** 13:6 | **3:15** 90:21 | |
| **$168,000** | **1988** 5:3 | **3:21** 90:22 | |
| 71:14 76:5 | **1994** 13:7 | **30** 9:5 | |
| **$30,000** | **1995** 90:2 | **30,000** 31:7 | |
| 23:20 31:4 | 92:1 | **350** 7:7 | |
| 61:4,5,13 | | **36027** 7:21 | |
| **$800** 53:7 | **2** | **36089** 7:8 | |
| | **2** 6:13 21:13 | **36106** 3:11 | |
| **0** | 21:18 | 7:13 9:10 | |
| **04** 27:4 | 31:13 | **36302** 8:9 | |
| 28:19 | 33:12 | | |
| 29:10 44:3 | **20** 6:13 | **4** | |
| 49:3,8 | **20th** 23:17 | **4** 6:15 58:7 | |
| 50:12 61:9 | **2004** 12:13 | **43** 6:14 | |
| 77:21 | 14:9,18 | | |
| **05** 57:3 86:9 | 15:11,23 | **5** | |
| | 17:17 | **5** 3:10 6:16 | |
| **1** | 45:13 | 7:12 9:9 | |
| **1** 6:12 15:2,6 | 62:18 | 77:7,8 | |
| 78:6 79:20 | 79:17 80:1 | 78:18 | |
| 80:15 | 81:16,19 | **5(d)** 5:1 | |
| **1st** 81:16,19 | 83:20 86:3 | **57** 6:15 | |
| **1:15** 2:22 | 89:16 | **58-91** 6:6 | |
| 3:12 | **2005** 2:21 | | |
| **10,000** 53:22 | | **6** | |

**www.AmericanCourtReporting.com**
**October 26, 2005**